DAVID L. NEALE (SBN 141225)
JEFFREY S. KWONG (SBN 288239)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: dln@lnbyg.com; jsk@lnbyg.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>AFTERSHOCK COMICS, LLC, a California limited liability company,<br><br>   Debtor and Debtor in Possession.<br><br>In re:<br><br>RIVE GAUCHE TELEVISION, a California corporation,<br><br>   Debtor and Debtor in Possession.<br><br>☒ Affects both Debtors<br>☐ Affects AfterShock Comics, LLC only<br>☐ Affects Rive Gauche Television only | Lead Case No.: 1:22-bk-11456-MB<br><br>Jointly administered with:<br>1:22-bk-11457-MB<br>(Rive Gauche Television).<br>Chapter 11 Cases<br><br>**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; (II) GRANTING ADEQUATE PROTECTION REPLACEMENT LIENS; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Omnibus Declaration in Support Hereof Filed Concurrently Herewith]<br><br><u>Hearing</u><br>DATE: To Be Determined<br>TIME: To Be Determined<br>PLACE: Courtroom 303<br>    21041 Burbank Boulevard<br>    Woodland Hills, CA 91367 |

1

## SUMMARY AND MOTION

AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together with Aftershock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein (the "Debtors"), hereby move (the "Motion"), pursuant to Local Bankruptcy Rules ("LBR") 2081-1, 4001-2, and 9075-1, Federal Rules of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code"),[1] for the entry of an interim order, in substantially the form attached as **Exhibit "1"** to the concurrently filed omnibus declaration of Jonathan Kramer (the "Kramer Declaration") in support of this Motion and other first day motions (the "Interim Order") and a final order (the "Final Order" and, with the Interim Order, the "Orders"), among other things:

(1)    authorizing the Debtors to use Cash Collateral (as defined under Section 363), including funds in the Holding Account (defined in the Motion below), in accordance with the terms of the Aftershock budget and RGTV budget that are attached to the Kramer Declaration as **Exhibits "2" and "3"**, respectively, (the "Budgets"), provided that, with regards to their respective budgets, the Debtors shall be entitled to a monthly variance of up to 10% on a line item basis and up to 15% on a collective basis, or such other variance as may be requested by the Debtors and approved by Access Road Capital, LLC (the "Lender" or "Access Road"), the Debtors' secured lender, with any negative variance carrying over to future months;

(2)    in addition to the protection of the Lender's interest by way of a substantial equity cushion and continued operations, providing the Lender with further adequate protection by granting the Lender replacement liens on, and security interests in, the assets of the Debtors' estates, with the same extent, validity, and priority as the Lender's pre-petition liens on pre-petition collateral and all post-petition proceeds obtained by the Debtors from such pre-petition collateral

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

2

(the "Adequate Protection Liens"), to the extent of any diminution in the Lender's collateral after the petition date resulting from the Debtors' use of any Cash Collateral in which the Lender has a valid interest;

(3) vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the Orders to provide the Lender with the Adequate Protection Liens;

(4) scheduling, pursuant to FRBP 4001 and LBR-4001-2(b), a final hearing (the "Final Hearing") before this Court to consider entry of the Final Order approving the Debtors' use of Cash Collateral on a final basis;

(5) waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Interim Financing Order; and

(6) granting related relief.

As required by LBR 4001-2, concurrently herewith, the Debtors filed a *Statement Regarding Cash Collateral Or Debtor In Possession Financing [FRBP 4001; LBR 4001-2]*.

**WHEREFORE**, the Debtors respectfully request that the Court:

(1) grant the relief requested in the Motion on an interim basis;

(2) enter an Interim Order in substantially the form attached as **Exhibit "1"** to the Kramer Declaration;

(3) authorize the Debtors' usage of cash collateral, including the ability to use, among other funds, the funds in the Holding account (defined in the Motion below);

(4) schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

///

///

///

///

///

1     (5)    grant such further relief as the Court deems just and proper.

2 Dated: December 21, 2022     AFTERSHOCK COMICS, LLC &
RIVE GAUCHE TELEVISION

*/s/ Jeffrey S. Kwong*
David L. Neale
Jeffrey S. Kwong
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
Proposed Counsel for Debtors and Debtors in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES[2]

### I.

### STATEMENT OF FACTS

**A.    GENERAL BACKGROUND.**

1. Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on December 19, 2022 (the "Petition Date"). The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience. ASM has three principal lines of business:

- (1) "**Traditional TV Licensing and Advertising Video on Demand (AVOD) Distribution**" related to RGTV's distribution of rights to the RGTV Library (defined below, and which consists primarily of unscripted television programming);

- (2) "**Retail Comics**" related to Aftershock's sale of comic books and related products through retail channels; and

- (3) "**Comic Book IP Development and Exploitation**" related to Aftershock's creation, worldwide licensing, and/or sale of comic IP (defined below) for use in scripted television or film programming.

3. Aftershock is engaged in the business of developing, creating, and publishing comic books and graphic novels, which it sells through retail channels (*e.g.*, bookstores). Aftershock also creates and owns original intellectual property content related to its comic books ("IP"), which it controls for exploitation in all forms of media. Exploitation of the IP includes

---

[2] Capitalized terms not otherwise defined herein have the same meanings as in the preceding Notice of Motion and Motion.

not only Aftershock's ability to sell the IP, but also to license such IP to other companies for conversion to other forms of media such as scripted television and film. Aftershock currently has interests in more than 150 IP properties (which it expects to increase by approximately 36 IP properties per year).

4.  Aftershock's affiliate, RGTV, is a leading co-producer and distributor of television programing around the world. Since its founding in 1994, RGTV has acquired distribution rights ("Distribution Rights") to a library of over 166 titles, representing over 2,200 episodes and 1,700 hours of non-scripted television and documentary programming (the "RGTV Library"). Well known series in the RGTV Library include *Dog Whisperer with Cesar Milan*, *Homicide Hunter*, *My Strange Addiction*, *Ice Cold Killers*, and *Sins and Secrets*, and the genres in the RGTV Library include true crime, reality, animal/wildlife, and documentary.

5.  RGTV generates revenue by sublicensing or selling its Distribution Rights to broadcast networks and other licensees in territories around the world. When RGTV sublicenses or sells distribution rights in a territory, it earns a sales fee and recoups any advances paid to the producers/licensors of the series, as well as any marketing costs advanced.

**B.    THE LOAN, AND THE FILING OF THE BANKRUPTCY CASES.**

6.  The Debtors' senior secured lender is Access Road Capital LLC, a Delaware limited liability company (the "Lender" or "Access Road"). The Debtors originally[3] borrowed money from the Lender in March 2020 in the principal amount of $11,090,000[4] (the "Loan") pursuant to the "*Second Amended And Restated Credit And Security Agreement*" (the "Loan Agreement," and collectively with the other loan documents, the "Loan Documents"). The Loan Agreement was amended by the "*Amendment To Second Amended And Restated Credit And*

---

[3] RGTV and East West Bank ("EWB") previously entered into the "*Amended and Restated Credit and Security Agreement, dated as of November 23, 2012*" (as amended, supplemented, or otherwise modified, the "EWB Credit Agreement"), pursuant to which EWB extended a revolving credit facility to RGTV (the "EWB Loan"). A portion of the proceeds from the Loan (as defined above) were subsequently used for the Lender's purchase of the EWB Loan from EWB.

[4] The initial Loan amount, as set forth in the Loan Agreement, consists of: (1) $11,000,000 for the "Base Loan Amount"; (2) $35,000 for the Lender's legal fees; and (3) $55,000 for the "BondIt arrangement fee."

6

Case 1:22-bk-11456-MB    Doc 12    Filed 12/21/22    Entered 12/21/22 17:19:22    Desc
Main Document    Page 7 of 20

*Security Agreement*" dated October 15, 2021 (the "<u>Amendment</u>") whereby the Lender agreed to lend additional funds to RGTV, in an amount "equal to . . . 85% . . . of [certain] receivables . . . payable to RG[TV] . . . not to exceed . . . $2,392,000[.]"  The Debtors are jointly and severally liable to repay the Loan, and Lender asserts that the Loan is secured by all, or substantially all, of the Debtors' assets.

7. Pursuant to the Loan Documents, the Debtors were required to make: (1) "Required Interest Payments" on "(a) September 26, 2021; (b) March 26, 2022; (c) September 26, 2022; (d) March 26, 2023; (e) September 26, 2023; and (f) March 26, 2024"; and (2) "Principal Payments" on "(a) March 26, 2022; (b) March 26, 2023; and (c) March 26, 2024, but only if the Lender has . . . agreed to extend the Maturity Date by twelve (12) months." (Loan Agreement, pgs. 11 & 15).

8. Although the Debtors' businesses were highly successful prior to the COVID-19 pandemic (the "<u>Pandemic</u>"), the circumstances surrounding the Pandemic have detrimentally impacted the Debtors' operations and financial condition.  For example, after the Pandemic started: (1) RGTV's revenues and sales suffered because channel buyers were taking longer to decide on transactions with RGTV regarding Distribution Rights licenses and sales; and (2) Aftershock's revenues and sales suffered because many of the retail outlets for comic books and related material were closed during the Pandemic, and Aftershock's management was forced to hold back new comic IP releases during the height of the Pandemic.

9. In addition, the Debtors' financial problems were exacerbated by liquidity problems associated with insufficient junior capital to fund the high cash requirements of their new business ventures that have long investment lead times.  For example, regarding ASM's:

- (1) **""Traditional TV Licensing and Advertising Video on Demand (AVOD) Distribution" line of business**: RGTV experienced delayed decisions with clients and broadcasters during the COVID-19 pandemic that led to revenue shortfalls, high upfront AVOD costs, and a longer delivery process for content, and longer payment terms.

- (2) **"Retail Comics" line of business**: Aftershock faced higher printing costs as a result of supply chain issues. Moreover, Aftershock's liquidity problems can be attributed to substantial investments that are associated with the creation of new comic IP.

- (3) "**Development and Exploitation of Comic IP" line of business**: Aftershock experienced longer than expected negotiations for comic IP "option" deals, and a longer than expected developmental process to convert IP "options" to film and television production. However, with respect to the IP "options," many of these deals are on the cusp of reaching a steady-state to generate revenue to Aftershock.

10.    As a result of these liquidity and other financial issues, the Debtors were unable to make certain Loan payments to the Lender (and several of their other creditors and vendors). The Lender asserted that defaults occurred under the Loan, and: (1) provided the Debtors with a written Notice of Default; and (2) on October 10, 2022, initiated an action in the California Superior Court titled "*Access Road Capital, LLC v. Rive Gauche Television, et al.*," LASC Case No.22STCV33196 (the "State Court Action") against the Debtors and other parties. Although the Debtors attempted pre-petition to negotiate in good faith to reach an agreement with the Lender, those negotiations reached an impasse.

11.    In order to, among other reasons, continue operations and preserve the Debtors' going concern values for their creditors, the Debtors filed for bankruptcy protection on the Petition Date. In their respective Chapter 11 cases, the Debtors plan to restructure their financial affairs, obtain possible refinancing of the debt facility (with the current Lender or a new lender), seek investors, and/or propose a joint plan which will pay their creditors.

///
///
///
///
///

8

## C. THE DEBTORS' ASSETS, INCLUDING THE PRIMARY ASSETS SECURING THE LENDER'S LOAN.

12. Pursuant to this Motion, the Debtors request that the Court enter an order in substantially the same form as the proposed order attached as **Exhibit "1"** to the Kramer Declaration.

13. As of November 2022, the Lender contends that the Debtors are jointly and severally indebted to the Lender in an amount of approximately $16,785,928 (which includes asserted default interest) under the Loan.

14. The Debtors' primary assets (the "Primary Assets") are as follows:

**AFTERSHOCK PRIMARY ASSETS**

    a.    <u>Cash</u>. As of the Petition Date, Aftershock had cash in the total sum of approximately $16,000.

    b.    <u>Inventory</u>. As of the Petition Date, Aftershock had "inventory," which includes released books and expenses of unreleased books, conservatively valued at approximately $2.2 million.

    c.    <u>Prepayments</u>. As of the Petition Date, Aftershock had prepayments that were made to vendors and other parties totaling approximately $315,000.

    d.    <u>Accounts Receivable</u>. As of the Petition Date, Aftershock had customer accounts receivable totaling approximately $218,000.

    e.    <u>Intellectual Property</u>. As of the Petition Date, Aftershock had comic book related intellectual property, including copyrights and trademarks, that have been independently valued conservatively at approximately $17.2 million.

**RGTV PRIMARY ASSETS**

    a.    <u>Cash</u>. As of the Petition Date, RGTV had cash in the total sum of approximately $680,000.

    b.    <u>Accounts Receivable</u>. As of the Petition Date, RGTV had customer accounts receivable totaling approximately $1 million.

c. <u>Office Furniture</u>:  As of the Petition Date, RGTV had various items office furniture and equipment that are valued at approximately $15,000.

d. <u>Licenses and Royalties</u>.  As of the Petition Date, RGTV had distribution recouped minimum guarantees, distribution costs advanced, and other amounts that are due to be paid from certain distributors of the RGTV Library that total approximately $8 million.

e. <u>Distribution Rights to RGTV Library</u>.  As of the Petition Date, RGTV had Distribution Rights to the RGTV Library that are valued conservatively at approximately $41 million.[5]

f. <u>Unused Foreign Tax Credits</u>.  As of the Petition Date, RGTV had unused foreign tax credits that total at approximately $772,000.

**D.    THE DEBTOR'S IMMEDIATE AND ONGOING NEED FOR THE USE OF CASH COLLATERAL.**

15.    In connection with the operation of their businesses, the Debtors pay various expenses for, among other things, payroll, comic distributors, producers of content in the RGTV Library, shipping, taxes, printing, IP Development, and other costs associated with operating ASM's three business lines.  The Debtors need immediate and ongoing use of cash collateral to pay such expenses, which are detailed in the Aftershock Budget and RGTV Budget attached as **Exhibit "2" and "3"**, respectively, to the Kramer Declaration.[6]  *See also* the Debtors'

---

[5] As set forth in the Kramer Declaration, the Debtors' belief as to the value of the Lender's collateral is based upon an independent valuation prepared by Focus Advisory Services, LLC, a well-known firm that specializes in, among other things, the valuation of entertainment industry assets, dated February 4, 2022, a true and correct copy of which is attached to the Kramer Declaration as **Exhibit "5"**.  That valuation concluded that the value of just RGTV's library of TV episodes is $56 million.  The $41 million valuation referenced herein is discounted substantially in order to provide a conservative estimate of the value of the Lender's collateral and show that, even at this discounted value, the Lender enjoys a substantial equity cushion.  In the event of litigation with the Lender, the Debtors reserve the right to argue (and show) that the value of the Lender's collateral is higher than the estimate used in this Motion.

[6] Because the Debtors worked together as the "Aftershock Media" enterprise and Aftershock was a newer and developing company, prior to the Petition Date, RGTV funds would at times be used to support Aftershock's operations.  Although the Debtors are providing separate Budgets for purposes of the Cash Collateral Motion, historically, the Debtors' cash has been managed on a consolidated basis.

concurrently filed emergency motion to pay pre-petition wages and commissions, which payments are essential.

16. The Debtors' request to use cash collateral includes the ability to use, among other funds, the funds in one of RGTV's bank accounts (CNB Account No. 4772, the "<u>Holding Account</u>") that was created pursuant to the Loan Documents – whereby the Holding Account was required to have a minimum balance of $660,000, and the Lender is a signatory and has the authority to transfer, dispose, encumber, or control the funds in the Holding Account.

17. In the event that the Debtors are not able to timely pay such expenses, including honoring pre-petition checks and paying wages and commissions earned immediately prior to the bankruptcy filing, as well as post-petition wages and commissions, the Debtors will likely face business interruptions, and an operational shutdown, which would be detrimental to all creditors and negatively impact the going-concern value of the ASM enterprise.

**E.   Compliance with Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 4001-2.**

18. Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtors submit that the relief requested herein pertaining to the use of cash collateral does not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only | No |

11

| **Provision** | |
|---|---|
| during the period in which the Debtor is authorized to use cash collateral or borrow funds. | |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

19. Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtors are required to serve a copy of the Motion on any entity with an interest in the Debtors' cash collateral, the 20 largest unsecured creditors, and any other entity that the Court directs. The Debtors will serve a copy of the Motion on all known secured creditor(s), the 20 largest unsecured creditors, the United States Trustee, and parties requesting special notice.

///

///

# II.

# THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL ON AN INTERIM AND FINAL BASIS

## A. THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL TO PAY THEIR EXPENSES AND MAINTAIN AND PRESERVE THE VALUE OF THEIR BUSINESSES AND ASSETS.

The Debtors' use of property of the estate is governed by Section 363. 11 U.S.C. § 363(c). Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]" 11 U.S.C. § 363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)  each entity that has an interest in such cash collateral consents; or
> (B)  the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its business. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (B.A.P. 9th Cir. 1991). In addition, where the debtor is operating a business, it is extremely

13

important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

Here, the only source of funds available to the Debtors to use to maintain and operate their businesses are the Debtors' cash on hand and future payments to the Debtors, including the Debtors' accounts receivables, all of which are purportedly the cash collateral of the Lender ("Cash Collateral").[7] As a result, the Debtors cannot continue to maintain and operate their business operations or preserve the value of their assets unless the Debtors have the ability to use Cash Collateral to pay their projected expenses in accordance with the Budgets. The Debtors' inability to pay those expenses would cause immediate and irreparable harm to the Debtors' bankruptcy estates. Indeed, the Debtors' inability to pay their expenses, including payroll, and other "bare bones" and necessary operating expenses would very likely result in the immediate shutdown of the Debtors' businesses and the decimation of the value (going-concern or otherwise) of the Debtors' businesses and assets. The maintenance of the Debtors' businesses and preservation of the Debtors' assets are critical to maximizing value and providing the greatest likelihood for recoveries by creditors in these cases.

Accordingly, the Debtors respectfully request that the Court enter an order authorizing the Debtors to use Cash Collateral pursuant to the Budgets on an interim basis pending a final hearing, and providing that each of the Debtors shall be entitled to a monthly variance of up to 10% on line item basis and up to 15% on a collective basis, or such other variance as may be requested by the Debtors and approved by the Lender, with any negative variance carrying over to future months, to enable the Debtors to avoid having to rush back into Court if the Debtors' actual expenses exceed the Debtors' budgeted expenses by a small amount.

---

[7] The Debtors' request to use cash collateral includes, among other funds, the funds in the Holding Account that was created pursuant to the Loan Documents – whereby the Holding Account was required to have a minimum balance of $660,000, and the Lender is a signatory and has the authority to transfer, dispose, encumber, or control the funds in the Holding Account.

## B. **THE LENDER'S INTEREST IN CASH COLLATERAL WILL BE ADEQUATELY PROTECTED.**

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral only if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); s*ee also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

Here, the Debtors will seek to obtain the Lender's consent to their use of cash collateral. However, even in the absence of such consent, the Lender will be adequately protected in three ways, which provides a basis for the immediate and ongoing authorization for the Debtors to use Cash Collateral. **First,** the Debtors will be adequately protected by a large equity cushion well over 20%. The Ninth Circuit made clear in *Mellor* that, in the case of an oversecured creditor, an equity cushion of 20% is considered adequate protection of a secured creditor's interest in cash collateral as a matter of law. *Mellor*, 734 F.2d at 1401; *see also In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa.1980) (holding that a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va.1980) (holding that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor).

Specifically, the Lender is protected by equity cushions that are well in excess of 20%, calculated based on the values of Aftershock's and RGTV's Primary Assets.

| | |
|---|---|
| Primary Assets (Aftershock): | Approximately $19.9 million |
| Primary Assets (RGTV): | Approximately $51.4 million |
| Asserted Access Road Debt: | Approximately $16.7 million |
| Equity Cushion (Aftershock) | Approximately $3.2 million, or over 19% |
| Equity Cushion (RGTV) | Approximately $34.7 million, or over 200% |
| Total Equity Cushion: | Approximately $54.6 million, or over 326% |

Since the Lender has an equity cushion greatly exceeding 20%, the Lender is adequately protected as a matter of law by the equity cushion alone, but, as noted below, the Debtors are providing additional forms of adequate protection.

**Second,** as additional adequate protection, the Debtors propose that the Court authorize the Debtors to grant and provide the Lender with replacement Adequate Protection Liens on, and security interests in, the assets of the Debtors' estate, with the same extent, validity, and priority as the Lender's pre-petition liens on pre-petition collateral and all post-petition proceeds obtained by the Debtors from such pre-petition collateral, to secure any diminution in the Lender's collateral after the Petition Date resulting from the Debtors' use of Cash Collateral. This form of adequate protection is contemplated and allowed pursuant to Section 361(2) of the Bankruptcy Code.

**Third,** in addition to the foregoing two forms of adequate protection, the Lender will also be further adequately protected by the Debtors' use of Cash Collateral pursuant to the Budgets to maintain operations and preserve the value of the Lenders' collateral. For example, in *Stein*, *supra*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. *Stein*, 19 B.R. at 459. The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *Id.*; *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 341–42 (Bankr. D. Nev. 2010) (noting that "other courts have found that a debtor's use of cash collateral to maintain properties from which rents are being generated is a sufficient form of adequate protection") (*citing Federal Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship.* 153 B.R. 204, 214 (N.D. Ill. 1993) ("[T]he required adequate protection of Rents is satisfied to the extent the Debtor reinvests the rents in the operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased."); *In re 499 W. Warren Street Assocs., Ltd. P'ship,* 142 B.R. 53, 58

(Bankr.N.D.N.Y.1992) (allowing the use of cash collateral to maintain property); *McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.),* 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would increase rent flow even without equity cushion); *Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996) (continued business operations can constitute adequate protection of a secured creditor); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993) (same); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993) (same); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994) (same).

Based on the foregoing, the Debtors submit that the Lender is adequately protected based alone on its equity cushion of well over 20%, and that the Lender is certainly adequately protected by the equity cushion together with the replacement Adequate Protection Liens and continued operations that will maintain and enhance collateral values. Therefore, the Debtors have satisfied the requirements of Section 363(c)(2) to enable the Debtors to use Cash Collateral to pay the expenses set forth in the Budgets subject to the requested variance both on an interim and final basis.

### III.

### THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE

For the reasons noted herein, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth in the Budgets pending a final hearing on the Motion. The Debtors require the terms of the Interim Order to become immediately effective to ensure that the Debtors will be able to use Cash Collateral to pay their ordinary expenses to ensure the continued operation of the Debtors' businesses and the maintenance of the value thereof. Based on the foregoing, the Debtors request that any applicable stay, including any stay provided under FRBP 4001(b) be waived to allow the Interim Order to become immediately effective.

///

///

# IV.

## **CONCLUSION**

**WHEREFORE**, the Debtors respectfully requests that the Court:

(1)    grant the relief requested in the Motion on an interim basis;

(2)    enter an Interim Order in substantially the form attached to the Kramer Declaration as **Exhibit "1;"**

(3)    authorize the Debtor's usage of cash collateral, including the ability to use, among other funds, the funds in the Holding account;

(4)    schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(5)    grant such further relief as the Court deems just and proper.

Dated: December 21, 2022

AFTERSHOCK COMICS, LLC &
RIVE GAUCHE TELEVISION

*/s/ Jeffrey S. Kwong*
David L. Neale
Jeffrey S. Kwong
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
Proposed Counsel for Debtors and Debtors in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled (*specify*): DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; (II) GRANTING ADEQUATE PROTECTION REPLACEMENT LIENS; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 21, 2022** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **December 21, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 21, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Honorable Martin Barash**
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| **December 21, 2022** | **Jason Klassi** | /s/ Jason Klassi |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**

**1:22-bk-11456-MB Notice will be electronically mailed to:**

Russell Clementson on behalf of U.S. Trustee United States Trustee (SV)
russell.clementson@usdoj.gov

Jeffrey S Kwong on behalf of Debtor AfterShock Comics, LLC
jsk@lnbyg.com, jsk@ecf.inforuptcy.com

David L. Neale on behalf of Debtor AfterShock Comics, LLC
dln@lnbyg.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov