1  DAVID L. NEALE (SBN 141225)
   JEFFREY S. KWONG (SBN 288239)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
   2818 La Cienega Avenue
3  Los Angeles, California 90034
   Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
4  Email: dln@lnbyg.com; jsk@lnbyg.com

5

6  Proposed Attorneys for Chapter 11 Debtors
   and Debtors in Possession

7

8              **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
9              **SAN FERNANDO VALLEY DIVISION**

10 In re:                                    )  Lead Case No. 1:22-bk-11456-MB
                                             )
11 AFTERSHOCK COMICS, LLC, a California      )  Jointly administered with:
   limited liability company,                )  1:22-bk-11457-MB
12                                           )  (Rive Gauche Television).
           Debtor and Debtor in Possession. )
13 _____       )  Chapter 11 Cases
   In re:                                    )
14                                           )
   RIVE GAUCHE TELEVISION, a California      )  **DEBTORS' EMERGENCY MOTION**
15 corporation,                              )  **FOR AUTHORITY TO (1) PAY PRE-**
                                             )  **PETITION PRIORITY WAGES AND**
16         Debtor and Debtor in Possession.  )  **COMMISSIONS; AND (2) HONOR**
                                             )  **EMPLOYMENT AND BENEFIT**
17 _____       )  **POLICIES; MEMORANDUM OF**
   ☒ Affects both Debtors                    )  **POINTS AND AUTHORITIES IN**
18 ☐ Affects AfterShock Comics, LLC only     )  **SUPPORT THEREOF**
   ☐ Affects Rive Gauche Television only     )
19                                           )  [Omnibus Declaration in Support Hereof
                                             )  Filed Concurrently Herewith]
20                                           )
                                             )
21                                           )
                                             )
22                                           )
                                             )
23                                           )
                                             )
24                                           )  Hearing
                                             )  DATE:    To Be Determined
25                                           )  TIME:    To Be Determined
                                             )  PLACE:  Courtroom 303
26                                           )           21041 Burbank Boulevard
                                             )           Woodland Hills, CA 91367
27                                           )

28

1

## SUMMARY AND MOTION

Pursuant to Local Bankruptcy Rules 2081-1(a)(6) and 9075-1, 11 U.S.C. §§ 105(a) and 507(a)(4), and Rule 6003 of the Federal Rules of Bankruptcy Procedure, AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together with Aftershock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein (the "Debtors"), hereby bring this emergency motion (the "Motion") for the entry of an order authorizing the Debtors to (1) pay pre-petition priority wages, including paid vacation, sick and leave pay (collectively, "Wages")[1] to their non-insider Employees/Contractors (defined below), provided that no individual shall receive more than $15,150 for such Wages; (2) pay pre-petition commissions (the "Commissions") to the Aftershock Ambassadors, provided that no individual shall receive more than $15,150 for such Commissions; and (3) continue to honor the Debtors' employment and benefit policies in the ordinary course of the Debtors' businesses.  The Debtors are not seeking authority to pay the pre-petition priority Wages or Commissions of their "insiders" as defined in the Bankruptcy Code; approval to pay insider compensation will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the Office of the United States Trustee.

Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on December 19, 2022 (the "Petition Date").  The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience. ASM has three principal lines of business:

---

[1]  The Wages that the Debtors are seeking authority to pay to its Employees include all applicable federal and state withholding taxes and payroll taxes.

1    ▪    (1) "**Traditional TV Licensing and Advertising Video on Demand (AVOD)**

2    **Distribution**" related to RGTV's distribution of rights to the RGTV Library (defined

3    below, and which consists primarily of unscripted television programming);

4    ▪    (2) "**Retail Comics**" related to Aftershock's sale of comic books and related

5    products through retail channels (*e.g.*, bookstores); and

6    ▪    (3) "**Comic Book IP Development and Exploitation**" related to Aftershock's

7    creation, worldwide licensing, and/or sale of comic IP (defined below) for use in scripted

8    television or film programming.

9        Aftershock is engaged in the business of developing, creating, and publishing comic

10   books and graphic novels, which it sells through retail channels (*e.g.*, bookstores).  Aftershock

11   also creates and owns original intellectual property content related to its comic books ("IP"),

12   which it controls for exploitation in all forms of media.  Exploitation of the IP includes not only

13   Aftershock's ability to sell the IP, but also to license such IP to other companies for conversion

14   to other forms of media such as scripted television and film.  Aftershock currently has interests

15   in more than 150 IP properties (which it expects to increase by approximately 36 IP properties

16   per year).

17       Aftershock's affiliate, RGTV, is a leading co-producer and distributor of television

18   programing around the world.  Since its founding in 1994, RGTV has acquired distribution rights

19   ("Distribution Rights") to a library of over 166 titles, representing over 2,200 episodes and 1,700

20   hours of non-scripted television and documentary programming (the "RGTV Library").  Well

21   known series in the RGTV Library include *Dog Whisperer with Cesar Milan*, *Homicide Hunter*,

22   *My Strange Addiction*, *Ice Cold Killers*, and *Sins and Secrets*, and the genres in the RGTV

23   Library include true crime, reality, animal/wildlife, and documentary.

24       RGTV generates revenue by sublicensing or selling its Distribution Rights to broadcast

25   networks and other licensees in territories around the world.  When RGTV sublicenses or sells

26   distribution rights in a territory, it earns a sales fee and recoups any advances paid to the

27   producers/licensors of the series, as well as any marketing costs advanced.  Active titles in the

28

3

RGTV Library have generated approximately $102 million in revenue since inception, and $19.4 million in sales over the past five (5) years.

Aftershock has: (1) 14 non-insider employees that are paid either based on salary or hourly (the "Aftershock Employees"); and (2) 5 non-insider independent contractors[2] that are paid either based on salary or hourly (the "Aftershock Contractors," and together with the Aftershock Employees, the "Aftershock Employees/Contractors"). The Aftershock Employees/Contractors are either paid on a monthly basis (whereby they are paid on or around the 30th of each month, and approximately one month in arrears) or, alternatively, on a semi-monthly basis (whereby they are paid on or around the 15th and the last day, generally the 30th, of each month, and approximately two weeks in arrears). A list of the Aftershock Employees/Contractors currently employed by Aftershock (together with the RGTV Employees employed by RGTV) which reflects the amount of wages, including all payroll taxes and any insurance reimbursements (the "Wages") estimated to be payable to these individuals for each pay period is attached as **Exhibit "6"** to the Declaration of Jonathan Kramer (the "Kramer Declaration") and is incorporated herein by this reference.

In addition, Aftershock has 40 sales representatives that are part of Aftershock's "Ambassadors Program" (the "Aftershock Ambassadors") that are paid monthly commissions and bonuses (ranging ***on average*** from approximately $133.33 to $1,000 per month) based, in part, on the number of physical visits (*i.e.*, $50 per visit) and zoom/phone calls (*i.e.*, $20 per call) made to retail outlets and stores, and appearances at industry events (*i.e.*, $100 per event). The Aftershock Ambassadors are paid on the last day of the month. Aftershock is not aware of any Aftershock Ambassadors that intend to stop performing services to Aftershock provided they receive timely payment of amounts due to them. Attached as **Exhibit "7"** to the Kramer Declaration is a list of the Aftershock Ambassadors, reflecting the average monthly commission that is paid to each of the Aftershock Ambassadors (the "Ambassadors List").

---

[2] Prior to the Petition Date, Aftershock hired an independent contractor that will not start until January 1, 2023.

RGTV has 4 non-insider employees that are paid either based on salary or hourly (the "RGTV Employees, and together with the Aftershock Employees/Contractors, the "Employees/Contractors"). Each of the RGTV Employees are paid on a semi-monthly basis (whereby they are paid on or around the 15th and the last day, generally the 30th, of each month, and approximately two weeks in arrears).

On or around December 30, 2022 – the Debtors' next payroll date – the Debtors will owe wages to its Employees/Contractors ("Wages") for the pre-petition period (consisting of 3 days) from December 16, 2022 through and including December 18, 2022 (*i.e.*, one day before the Petition Date) – all of which will constitute pre-petition obligations. The December 30, 2022 payroll will also pay the Employees/Contractors for amounts for the post-petition period of December 19, 2022 through and including December 31, 2022 in the ordinary course of business.

In addition, on or around December 30, 2022, as set forth on the Ambassadors List, Aftershock will owe commissions (the "Commissions") to the Aftershock Ambassadors in the aggregate amount of approximately $15,056.67.

Because some of the Wages and Commissions owed on December 31, 2022 constitute pre-petition obligations of the Debtors, the Debtors are requesting that the Court authorize them to pay the pre-petition portion of the Wages and Commissions to the Employees/Contractors and Aftershock Ambassadors.

The Debtors also provide many of their Employees/Contractors employment and benefit programs that are comparable to the programs that are typically offered by other employers within the industry, as described in detail in the Memorandum of Points and Authorities annexed hereto. For clarity, these benefits are not available to the Aftershock Ambassadors.

By the Motion, the Debtors seek authority to (i) pay and/or honor all pre-petition Wages of their Employees/Contractors (including any outstanding checks for Wages that were issued prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts to debtor

in possession accounts, and to issue replacement checks to the extent necessary to pay such Wages), provided that no individual shall receive more than $15,150 for such Wages; (ii) pay pre-petition Commissions to the Aftershock Ambassadors (including any outstanding checks for Commissions that were issued prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts to debtor in possession accounts, and to issue replacement checks to the extent necessary to pay such Commissions), provided that no individual shall receive more than $15,150 for such Commissions; and (iii) continue to honor the Debtors' employment and benefit policies in the ordinary course of the Debtors' businesses.

The source of the funds to be used to pay and/or honor the pre-petition Wages and Commissions, and to continue honoring the Debtors' employment and benefit policies will be the Debtors' revenue.  Based on the operating Budgets submitted in connection with the Debtors' motion for, among other things, authority to use cash collateral (the "Cash Collateral Motion"), payment of pre-petition priority claims for the Wages, Commissions, and the honoring of employment and benefit policies will not render the Debtors' bankruptcy estates administratively insolvent.

The Debtors must retain their personnel (which includes the Employees/Contractors and Aftershock Ambassadors) to maintain their business operations, and to preserve and maximize the value of their assets.  The Debtors' personnel are familiar with the Debtors' operations, and are thus essential to the preservation of the Debtors' businesses.  The Debtors' failure to pay pre-petition Wages to the Employees/Contractors, to honor the Debtors' employment and benefit programs, or to pay the pre-petition Commissions to the Aftershock Ambassadors will likely result in those individuals quitting or ceasing services (without an ability to quickly or cost-effectively replace such individuals), and will likely result in a shutdown of the Debtors' businesses, to the detriment of creditors.  The Debtors' ability to preserve the full value of their businesses and assets depends upon the maintenance of the Debtors' business operations, which cannot occur without the efforts of the Employees/Contractors, and Aftershock Ambassadors.

Based on the foregoing, the Debtors respectfully submits that the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

## ADDITIONAL INFORMATION

This Motion is based upon Local Bankruptcy Rules 2081-1(a)(6) and 9075-1, 11 U.S.C. §§ 105(a) and 507(a)(4), and Rule 6003 of the Federal Rules of Bankruptcy Procedure, this Motion, the supporting Memorandum of Points and Authorities, the Kramer Declaration filed concurrently herewith, the arguments and statements of counsel made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

In order to provide maximum notice of this Motion, the Debtors will serve a copy of this Motion and all supportive papers (including notice of the hearing on the Motion) upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the 20 largest unsecured creditors of the Debtors and parties requesting special notice via overnight mail.

**WHEREFORE**, the Debtors respectfully requests that this Court hold an emergency hearing on the Motion and issue an order:

(1)    affirming the adequacy of the notice given;

(2)    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

(3)    authorizing the Debtors to pay and/or honor all pre-petition Wages of the Employees/Contractors (including any outstanding checks for Wages that were issued prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts to debtor in possession accounts, and to issue replacement checks to the extent necessary to pay such Wages), provided that no individual shall receive more than $15,150 for such Wages;

(4)    authorizing the Debtors to pay all pre-petition Commissions of the Aftershock Ambassadors (including any outstanding checks for Commissions that were issued prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts to debtor in

possession accounts, and to issue replacement checks to the extent necessary to pay such Commissions), provided that no individual shall receive more than $15,150 for such Commissions;

(5)    authorizing the Debtors to continue to honor the Debtors' employment and benefit policies in the ordinary course of the Debtors' businesses; and

(6)    granting such other and further relief as the Court deems just and proper.

Dated: December 21, 2022                        AFTERSHOCK COMICS, LLC &
                                                RIVE  GAUCHE TELEVISION

                                                /s/ Jeffrey S. Kwong
                                                    David L. Neale
                                                    Jeffrey S. Kwong
                                                    LEVENE, NEALE, BENDER, YOO
                                                    & GOLUBCHIK L.L.P.
                                                Proposed Counsel for Debtors and Debtors in Possession

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES[3]

## I.

## STATEMENT OF FACTS

**A.    Background.**

1.    Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on December 19, 2022 (the "Petition Date").  The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience.  ASM has three principal lines of business:

▪    (1) "**Traditional TV Licensing and Advertising Video on Demand (AVOD) Distribution**" related to RGTV's distribution of rights to the RGTV Library (defined below, and which consists primarily of unscripted television programming);

▪    (2) "**Retail Comics**" related to Aftershock's sale of comic books and related products through retail channels; and

▪    (3) "**Comic Book IP Development and Exploitation**" related to Aftershock's creation, worldwide licensing, and/or sale of comic IP (defined below) for use in scripted television or film programming.

3.    Aftershock is engaged in the business of developing, creating, and publishing comic books and graphic novels, which it sells through retail channels (*e.g.*, bookstores). Aftershock also creates and owns original intellectual property content related to its comic books ("IP"), which it controls for exploitation in all forms of media.  Exploitation of the IP includes

---

[3] Capitalized terms not otherwise defined herein have the same meanings as in the preceding Notice of Motion and Motion.

not only Aftershock's ability to sell the IP, but also to license such IP to other companies for conversion to other forms of media such as scripted television and film.  Aftershock currently has interests in more than 150 IP properties (which it expects to increase by approximately 36 IP properties per year).

4.    Aftershock's affiliate, RGTV, is a leading co-producer and distributor of television programing around the world.  Since its founding in 1994, RGTV has acquired distribution rights ("Distribution Rights") to a library of over 166 titles, representing over 2,200 episodes and 1,700 hours of non-scripted television and documentary programming (the "RGTV Library").  Well known series in the RGTV Library include *Dog Whisperer with Cesar Milan*, *Homicide Hunter*, *My Strange Addiction*, *Ice Cold Killers*, and *Sins and Secrets*, and the genres in the RGTV Library include true crime, reality, animal/wildlife, and documentary.

5.    RGTV generates revenue by sublicensing or selling its Distribution Rights to broadcast networks and other licensees in territories around the world.  When RGTV sublicenses or sells distribution rights in a territory, it earns a sales fee and recoups any advances paid to the producers/licensors of the series, as well as any marketing costs advanced.  Active titles in the RGTV Library have generated approximately $102 million in revenue since inception, and $19.4 million in sales over the past five (5) years.

6.    The Debtors' senior secured lender is Access Road Capital LLC, a Delaware limited liability company (the "Lender" or "Access Road").  The Debtors originally[4] borrowed money from the Lender in March 2020 in the principal amount of $11,090,000[5] (the "Loan") pursuant to the "*Second Amended And Restated Credit And Security Agreement*" (the "Loan Agreement," and collectively with the other loan documents, the "Loan Documents").  The Loan

---

[4] RGTV and East West Bank ("EWB") previously entered into the "*Amended and Restated Credit and Security Agreement, dated as of November 23, 2012*" (as amended, supplemented, or otherwise modified, the "EWB Credit Agreement"), pursuant to which EWB extended a revolving credit facility to RGTV (the "EWB Loan").  A portion of the proceeds from the Loan (as defined above) were subsequently used for Access Road's purchase of the EWB Loan from EWB.

[5] The initial Loan amount, as set forth in the Loan Agreement, consists of: (1) $11,000,000 for the "Base Loan Amount"; (2) $35,000 for the Lender's legal fees; and (3) $55,000 for the "BondIt arrangement fee."

Agreement was amended by the "*Amendment To Second Amended And Restated Credit And Security Agreement*" dated October 15, 2021 (the "<u>Amendment</u>") whereby the Lender agreed to lend additional funds to RGTV, in an amount "equal to . . . 85% . . . of [certain] receivables . . . payable to RG[TV] . . . not to exceed . . . $2,392,000[.]"  The Debtors are jointly and severally liable to repay the Loan, and Lender asserts that the Loan is secured by all, or substantially all, of the Debtors' assets.

7.    Pursuant to the Loan Documents, the Debtors were required to make: (1) "Required Interest Payments" on "(a) September 26, 2021; (b) March 26, 2022; (c) September 26, 2022; (d) March 26, 2023; (e) September 26, 2023; and (f) March 26, 2024"; and (2) "Principal Payments" on "(a) March 26, 2022; (b) March 26, 2023; and (c) March 26, 2024, but only if the Lender has . . . agreed to extend the Maturity Date by twelve (12) months." (Loan Agreement, pgs. 11 & 15).

8.    Although the Debtors' businesses were highly successful prior to the COVID-19 pandemic (the "<u>Pandemic</u>"), the circumstances surrounding the Pandemic have detrimentally impacted the Debtors' operations and financial condition.  For example, after the Pandemic started: (1) RGTV's revenues and sales suffered because channel buyers were taking longer to decide on transactions with RGTV regarding Distribution Rights licenses and sales; and (2) Aftershock's revenues and sales suffered because many of the retail outlets for comic books and related material were closed during the Pandemic, and Aftershock's management was forced to hold back new comic IP releases during the height of the Pandemic.

9.    In addition, the Debtors' financial problems were exacerbated by liquidity problems associated with insufficient junior capital to fund the high cash requirements of their new business ventures that have long investment lead times.  For example, regarding ASM's:

- (1) **"AVOD Distribution" line of business**: RGTV experienced delayed decisions with clients and broadcasters during the COVID-19 pandemic that led to revenue shortfalls, high upfront AVOD costs, and a longer delivery process for content, and longer payment terms.

- (2) **"Retail Comics" line of business**: Aftershock faced higher printing costs as a result of supply chain issues.  Moreover, Aftershock's liquidity problems can be attributed to substantial investments that are associated with the creation of new comic IP.

- (3) "**Development and Exploitation of Comic IP" line of business**: Aftershock experienced longer than expected negotiations for comic IP "option" deals, and a longer than expected developmental process to convert IP "options" to film and television production.  However, with respect to the IP "options," many of these deals are on the cusp of reaching a steady-state to generate revenue to Aftershock.

10.     As a result of these liquidity and other financial issues, the Debtors were unable to make certain Loan payments to the Lender (and several of their other creditors and vendors). The Lender asserted that defaults occurred under the Loan, and: (1) provided the Debtors with a written Notice of Default; and (2) on October 10, 2022, initiated an action in the California Superior Court titled "*Access Road Capital, LLC v. Rive Gauche Television, et al.*," LASC Case No.22STCV33196 (the "State Court Action") against the Debtors and other parties.  Although the Debtors attempted pre-petition to negotiate in good faith to reach an agreement with the Lender, those negotiations reached an impasse.

11.     In order to, among other reasons, continue operations and preserve the Debtors' going concern values for their creditors, the Debtors filed for bankruptcy protection on the Petition Date.  In their respective Chapter 11 cases, the Debtors plan to restructure their financial affairs, obtain possible refinancing of the debt facility (with the current Lender or a new lender), seek investors, and/or propose a joint plan which will pay their creditors.

**B.     Necessity To Pay Pre-Petition Priority Wages And Commissions, And Honor Employment And Benefit Policies.**

12.     Aftershock has: (1) 14 non-insider employees that are paid either based on salary or hourly (the "Aftershock Employees"); and (2) 5 non-insider independent contractors[6] that are

---

[6] Prior to the Petition Date, Aftershock hired an independent contractor that will not start until January 1, 2023.

paid either based on salary or hourly (the "<u>Aftershock Contractors,</u>" and together with the Aftershock Employees, the "<u>Aftershock Employees/Contractors</u>").  The Aftershock Employees/Contractors are either paid on a monthly basis (whereby they are paid on or around the 30th of each month, and approximately one month in arrears) or, alternatively, on a semi-monthly basis (whereby they are paid on or around the 15th and the last day, generally the 30th, of each month, and approximately two weeks in arrears).  A list of the Aftershock Employees currently employed by Aftershock (together with the RGTV Employees employed by RGTV) which reflects the amount of wages, including all payroll taxes and any insurance reimbursements (the "<u>Wages</u>") estimated to be payable to these individuals for each pay period is attached as **<u>Exhibit "6"</u>** to the Kramer Declaration.

13.    In addition, Aftershock has 40 sales representatives that are part of Aftershock's "Ambassadors Program" (the "<u>Aftershock Ambassadors</u>") that are paid monthly commissions and bonuses (ranging ***on average*** from approximately $133.33 to $1,000 per month) based, in part, on the number of physical visits (*i.e.*, $50 per visit) and zoom/phone calls (*i.e.*, $20 per call) made to retail outlets and stores, and appearances at industry events (*i.e.*, $100 per event).  The Aftershock Ambassadors are paid on or around the last day of the month.  Aftershock is not aware of any Aftershock Ambassadors that intend to stop performing services to Aftershock provided they receive timely payment of amounts due to them.  Attached as **<u>Exhibit "7"</u>** to the Kramer Declaration is a list of the Aftershock Ambassadors, reflecting the average monthly commission that is paid to each of the Aftershock Ambassadors (the "<u>Ambassadors List</u>").

14.    RGTV has 4 non-insider employees that are paid either based on salary or hourly (the "<u>RGTV Employees</u>, and together with the Aftershock Employees/Contractors, the "<u>Employees/Contractors</u>").  Each of the RGTV Employees are paid on a semi-monthly basis (whereby they are paid on or around the 15th and the last day, generally the 30th, of each month, and approximately two weeks in arrears).  A list of the RGTV Employees employed by RGTV (together with the Aftershock Employees/Contractors employed by Aftershock) which reflects

the amount of Wages estimated to be payable to these individuals for each pay period is attached as **Exhibit "6"** to the Kramer Declaration.

15.     On or around December 30, 2022 – the Debtors' next payroll date – the Debtors will owe wages to its Employees/Contractors ("Wages") for the pre-petition period (consisting of 3 days) from December 16, 2022 through and including December 18, 2022 (*i.e.*, one day before the Petition Date) – all of which will constitute pre-petition obligations.  The December 30, 2022 payroll will also pay the Employees/Contractors for amounts for the post-petition period of December 19, 2022 through and including December 31, 2022 in the ordinary course of business.

16.     In addition, on or around December 30, 2022, as set forth on the Ambassadors List, Aftershock will owe commissions (the "Commissions") to the Aftershock Ambassadors in the aggregate amount of approximately $15,056.67.

17.     Because some of the Wages and Commissions owed on December 31, 2022[7] constitute pre-petition obligations of the Debtors, the Debtors are requesting that the Court authorize them to pay the pre-petition portion of the Wages and Commissions to the Employees/Contractors and Aftershock Ambassadors.  The Debtors are ***not*** seeking authority to pay the pre-petition priority Wages or Commissions of any employees or contractors who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code. Approval to pay compensation to the Debtors' "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

18.     The Debtors also provide their eligible Employees/Contractors employment and benefit programs that are comparable to the programs which the Debtors believe are typically

---

[7]  It is estimated that the total payroll obligations due to the Employees/Contractors and Aftershock Ambassadors on the next payroll date of December 30, 2022, including all applicable payroll taxes and insurance reimbursements, will be approximately $103,058.31 (*i.e.*, approximately $88,001.64 owed to Employees/Contractors for Wages, and approximately $15,056.67 owed to the Aftershock Ambassadors for Commissions).

offered by other employers within the industry.  For clarity, these benefits are not available to the Aftershock Ambassadors.

19.    The following employment and benefit programs are proposed to be continued to be offered post-petition:

a.    ***Vacation Time, Paid Holidays, And Personal Leave Policies***.  The Debtors offer paid time off, vacation and sick leave policies for their eligible Employees/Contractors.

Eligible Employees/Contractors accrue vacation days on a yearly basis at a rate of: (1) ten (10) vacation days per year for their first three years of employment; (2) fifteen (15) vacation days per year for their next two years of employment; and (3) twenty (20) vacation days per year after five years of employment with the Debtors.  If an eligible Employee/Contractor does not use his/her accrued paid time off for a particular year, such time will be carried over from year to year.

The Debtors also offer eleven (11) paid holidays to eligible Employees/Contractors, effective upon hire.  If an eligible Employee/Contractor is required to work on a holiday, that employee will be paid holiday pay in accordance with applicable laws.

Eligible California Employee/Contractors are entitled to paid sick leave for three (3) days per year pursuant to the Healthy Workplaces, Healthy Families Act.  The Debtors also have emergency paid sick leave policies for COVID 19, whereby full-time eligible Employees may use up to eighty (80) hours of paid sick leave per year, and part-time eligible Employees may use paid sick leave in the amount not to exceed the average number of hours they work over a two-week period.  Further, Eligible Employee/Contractors are entitled to three (3) days of paid time off for a death in the immediate family, with additional paid time off being considered on a case-by-case, discretionary basis.

The Debtors desire to continue having their existing vacation, holiday, and sick leave policies in effect, and seek authority to honor such policies post-petition as set forth above.

b.    ***Health Insurance Policy***.   Eligible Employees/Contractors of the Debtors can either obtain company-subsidized medical insurance coverage or, alternatively, a health insurance stipend that generally[8] will not exceed $400 per month.    Eligible Contractors/Employees are entitled to begin health insurance benefits on the first day of the month after completing the introductory period.

c.    ***401(K) Plan Contribution Policy.***   The Debtors offer eligible Employees/Contractors (generally, those individuals that have their Wages paid through ADP Payroll Services) the opportunity to participate in their respective 401(k) plans.  Each of the Debtors' 401(k) plans allows eligible Employees/Contractors to contribute to the applicable 401(k) plan (up to the current IRS maximum) through payroll deductions.  The Debtors desire to continue having their existing 401(k) policies in effect and therefore, seek authority to continue to honor such policies post-petition.

20.    In summary, by this Motion, the Debtors seek authority to:

a.    pay pre-petition priority Wages to the Employees;

b.    pay pre-petition priority Commissions to the Aftershock Ambassadors; and

c.    continue to honor the Debtors' employment and benefit policies as described above.

The source of the funds to be used to pay and/or honor the pre-petition Wages and Commissions, and to continue honoring the Debtors' employment and benefit policies will be the Debtors' revenue.  The revenue generated by the Debtors constitute the Lender's cash collateral.  Accordingly, concurrently herewith, the Debtors has filed a motion for entry of an order authorizing the Debtors to use cash collateral (the "Cash Collateral Motion") to allow the Debtors

---

[8] For one of Aftershock's employees, an exception was made to the Debtors' health insurance policy to pay him a $800 stipend per month.

1    to maintain their business operations and preserve the going-concern values of the Debtors' assets.

2    Based on the operating budgets submitted in connection with the Cash Collateral Motion, approval

3    to pay and/or honor the Wages and Commissions will not render the Debtors' bankruptcy estates

4    administratively insolvent.

5                                                        **II.**

6                                            **DISCUSSION**

7    **A.    Payment Of Certain Pre-Petition Wages Is Permissible Under Section 507(a)(4).**

8             11 U.S.C. § 507(a)(4) provides priority to claimants, up to $15,150 per individual, for

9    wages, salaries, or commissions, including vacation, insurance, and sick leave earned by

10   individuals within 180 days prior to the filing of a case under chapter 11 of the Bankruptcy Code.

11   **B.    This Court Has The Authority To Grant The Relief Requested Herein.**

12            Pursuant to Section 105(a) of the Bankruptcy Code, "the court may issue any order,

13   process, or judgment that is necessary or appropriate to carry out the provisions of this title."

14   The basic purpose of Section 105(a) is "to assure the bankruptcy courts power to take whatever

15   action is appropriate or necessary in aid in their jurisdiction."  2 *Collier on Bankruptcy* ¶ 105.01

16   at 105-3 (15th ed. rev. 1998).   Essentially, Section 105(a) codifies the bankruptcy court's

17   inherent equitable powers. *See Green v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406 (2d

18   Cir. 1985).

19            Where business exigencies require, courts have authorized debtors to pay the pre-petition

20   claims of particular creditors.  *In re Ionosphere Clubs, Inc.*, 98 B.R. l74 (Bankr. S.D.N.Y. l989).

21   The "Necessity of Payment Rule" empowers a court to authorize a debtor to pay pre-petition

22   claims essential to continued operations.  *Id.* at l75-76, *citing Miltenberger v. Logansport, C. &*

23   *S. W .R. Co.*, 106 U.S. 286 (1882):

24                    "The 'necessity of payment' doctrine permits immediate payment of claims

25                    of creditors where those creditors will not supply services or materials

26                    essential to the conduct of the business until their pre-reorganization claims

27                    have been paid."

28

                                                        17

*Ionosphere Clubs*, 98 B.R. at 176, *quoting In re Leigh and New England Railway Company*, 657 F.2d 570, 581 (3rd Cir. 1981).  This rule applies in all chapter 11 cases because "the rationale for the necessity of payment rule, i.e., facilitating the continued operation and rehabilitation of the debtor . . . is . . . a paramount goal of chapter ll." *Ionospere Clubs*, 98 B.R. at 176, citing *Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945), *cert. den'd*, 325 U.S. 873 (1945).  Therefore, where continued operation and rehabilitation of the debtor require payment of pre-petition wages, the Court may authorize such payment under Sections 363 (b) and/or 105(a) of the Bankruptcy Code.

In *Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983), the district court recognized the "special status" of suppliers holding unstayed lien rights, and authorized the debtor to pay their claims in the ordinary course of its business activities. *See also Dave Noake, Inc. v. Harold's Garage, Inc. (In re Dave Noake, Inc.)*, 45 B.R. 555 (Bankr. D. Vt. 1984) (rejecting a challenge under section 549 to post-petition payments made to creditor holding lien rights under local law).  Similarly, one former bankruptcy judge has recognized that when "confronted with special circumstances . . . particularly in the early stages of the case, a court may preserve the potential for rehabilitation."  Ordin, *Finality of Order of Bankruptcy Court*, 54 Am. Bankr. L.J. 173 (1980).

In *In re Gulf Air, Inc.,* 112 B.R.152 (Bankr. W.D. La. 1989), the court noted that cases decided both under the Act and the Code have recognized the "necessity of payment" doctrine under which payment of pre-petition employee claims is authorized prior to the time a plan of reorganization is confirmed so long as absent such payment there is a risk that the services of key employees will be lost to the debtor and without such employees, the debtor's going concern value will be impaired. *Id.* at 153.

/ / /

/ / /

/ / /

**C.      Sufficient Evidence Has Been Provided, In Compliance With Local Bankruptcy Rule 2081-1(a)(6), To Grant The Relief Requested Herein.**

Local Bankruptcy Rule 2081-1(a)(6) provides that motions to pay pre-petition payroll and to honor pre-petition employment procedures must be supported with evidence that establishes:

(i)      The employees are still employed;

(ii)     The necessity for payment;

(iii)    The benefit of the procedures;

(iv)     The prospect of reorganization;

(v)      Whether the employees are insiders;

(vi)     Whether the employees' claims are within the limits established by 11 U.S.C. § 507; and that

(vii)    The payment will not render the estate administratively insolvent.

The foregoing factors are discussed individually below:

1.      <u>The employees are still employed</u>.  Attached as **<u>Exhibit "6"</u>** to the Kramer Declaration is a list of the Debtors' Employees/Contractors, which reflects the amount of Wages estimated to be payable to the Employees/Contractors for each pay period.  As set forth in the Kramer Declaration, all of the Employees/Contractors listed in **<u>Exhibit "6"</u>** are still employed by the Debtors.

Further, attached as **<u>Exhibit "7"</u>** to the Kramer Declaration is a list of the Aftershock Ambassadors, which reflects the amount of Commissions estimated to be payable to the Aftershock Ambassador each pay period.  The Aftershock Ambassadors are not employees of the Debtors, but are paid monthly commissions and bonuses (ranging from approximately $100 to $1,000 per month) based, in part, on the number of physical visits (*i.e.*, $50 per visit) and zoom/phone calls (*i.e.*, $20 per call) made to retail outlets and stores, and appearances at industry events (*i.e.*, $100 per event).  Aftershock is not aware of any Aftershock Ambassadors that intend to stop performing services to it.

2. <u>The necessity for payment</u>. The Debtors believe that significantly all of the: (1) Employees/Contractors will quit if they are not paid their salaries and benefits in full in a timely fashion; and (2) Aftershock Ambassadors will stop performing services to the Debtors if they are not paid their commissions in full in a timely fashion. The Debtors must retain the Employees/Contactors and Aftershock Ambassadors to maintain operations, and to preserve and maximize the values of their assets. The Debtors' personnel are familiar with the Debtors' operations, and are thus essential to the preservation of the Debtors' businesses. The Debtors' failure to pay pre-petition Wages to the Employees, Commissions to the Aftershock Ambassadors, or to honor the Debtors' employment and benefit programs will likely result in personnel quitting (without an ability to quickly or cost-effectively replace such individuals), and will likely result in a shutdown of the Debtors' businesses, to the detriment of creditors. The Debtors' ability to preserve the full value of their businesses and assets depends upon the maintenance of the Debtors' business operations, which cannot occur without the efforts of the Employees/Contractors and Aftershock Ambassadors.

3. <u>The benefit of the procedures</u>. In order to attract and retain the Employees/Contractors, the Debtors maintain what they believe are competitive and reasonable employment and benefit policies. The Debtors believe that maintaining good relationships with, and the morale of, the Employees/Contractors require continuing to honor the employment and benefit policies currently in effect for the Employees/Contractors.

4. <u>The prospect of reorganization</u>. As discussed above, through their respective Chapter 11 cases, the Debtors plan to restructure their financial affairs, obtain possible refinancing of the debt facility (with the Lender or a new lender), seek investors, and/or propose a joint plan which will maximize value and provide recovery for all of the Debtors' creditors.

5. <u>Whether the employees are insiders</u>. As discussed above, the Debtors are not seeking authority to pay the pre-petition priority Wages or Commissions of any individuals who are "insiders" (as defined in the Bankruptcy Code). Approval to pay compensation to "insiders"

will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

6. <u>Whether the claims are within the limits established by 11 U.S.C. § 507</u>. As set forth in the Kramer Declaration, all of the claims for pre-petition Wages and Commissions are within the $15,150 limit established by 11 U.S.C. § 507(a)(4). Notwithstanding the foregoing, the Motion expressly provides that no individual shall receive more than $15,150 on account of pre-petition priority claims for Wages and Commissions.

7. <u>The payment will not render the estates administratively insolvent</u>. As set forth in the Kramer Declaration, based on the cash flow projections for the Debtors, the Debtors do not believe that the payment of pre-petition priority claims for Wages and Commissions, and the honoring of employment and benefit policies will render their bankruptcy estates administratively insolvent.

**D. The Relief Requested Herein Is Necessary To Avoid Immediate And Irreparable Harm And Is Therefore Warranted Under Rule 6003 Of The Federal Rules Of Bankruptcy Procedure.**

Rule 6003 of the Federal Rules of Bankruptcy Procedure states, in relevant part:

> "Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following:
>
> [...]
>
> (b)    a motion to use, sell, lease, or otherwise incur an obligation, regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001; [...]."

Fed. R. Bankr. Pro. 6003.

For the reasons noted above, the Debtors' failure to pay pre-petition Wages and Commissions, and to continue to honor the Debtors' employment and benefit policies will likely result in severe disruptions to the Debtors' businesses and may jeopardize the Debtors' ability to preserve the full going-concern values of their businesses and assets. Accordingly, the Debtors respectfully submit that the payment of the non-insider pre-petition Wages, Commissions, and

the honoring of the Debtors' employment and benefit policies are necessary to avoid immediate and irreparable harm, and are therefore warranted under Rule 6003 of the Federal Rules of Bankruptcy Procedure.

**III.**

**CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that this Court hold an emergency hearing on the Motion and issue an order:

(1)     affirming the adequacy of the notice given;

(2)     finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

(3)     authorizing the Debtors to pay and/or honor all pre-petition Wages of the Employees/Contractors (including any outstanding checks for Wages that were issued prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts to debtor in possession accounts, and to issue replacement checks to the extent necessary to pay such Wages), provided that no individual shall receive more than $15,150 for such Wages;

(4)     authorizing the Debtors to pay all pre-petition Commissions of the Aftershock Ambassadors (including any outstanding checks for Commissions that were issued prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts to debtor in possession accounts, and to issue replacement checks to the extent necessary to pay such Commissions), provided that no individual shall receive more than $15,150 for such Commissions;

(5)     authorizing the Debtors to continue to honor the Debtors' employment and benefit policies in the ordinary course of the Debtors' businesses; and

/ / /

/ / /

(6)      granting such other and further relief as the Court deems just and proper.

Dated: December 21, 2022                    AFTERSHOCK COMICS, LLC &
                                            RIVE  GAUCHE TELEVISION

                                            _/s/ Jeffrey S. Kwong_____
                                                    David L. Neale
                                                    Jeffrey S. Kwong
                                                    LEVENE, NEALE, BENDER, YOO
                                                    & GOLUBCHIK L.L.P.
                                            Proposed  Counsel  for  Debtors  and  Debtors  in
                                            Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled (*specify*): **DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO (1) PAY PRE-PETITION PRIORITY WAGES AND COMMISSIONS; AND (2) HONOR EMPLOYMENT AND BENEFIT POLICIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 21, 2022** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Russell Clementson    russell.clementson@usdoj.gov
- Jeffrey S Kwong    jsk@lnbyg.com, jsk@ecf.inforuptcy.com
- David L. Neale    dln@lnbyg.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

**2. SERVED BY UNITED STATES MAIL**:
On **December 21, 2022,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 21, 2022,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Martin Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 21, 2022 | Damon Woo | /s/ Damon Woo |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**