DAVID L. NEALE (SBN 141225)
JEFFREY S. KWONG (SBN 288239)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dln@lnbyg.com; jsk@lnbyg.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>AFTERSHOCK COMICS, LLC, a California limited liability company,<br><br>Debtor and Debtor in Possession. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| In re:<br><br>RIVE GAUCHE TELEVISION, a California corporation,<br><br>Debtor and Debtor in Possession. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ☐ Affects both Debtors<br>☐ Affects AfterShock Comics, LLC only<br>☒ Affects Rive Gauche Television only | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Lead Case No. 1:22-bk-11456-MB

Jointly administered with:
1:22-bk-11457-MB
(Rive Gauche Television).

Chapter 11 Cases

**EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO IMPLEMENT AND MAINTAIN CASH MANAGEMENT SYSTEM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Omnibus Declaration in Support Hereof Filed Concurrently Herewith]

Hearing
DATE:    To Be Determined
TIME:    To Be Determined
PLACE: Courtroom 303
            21041 Burbank Boulevard
            Woodland Hills, CA 91367

## SUMMARY AND MOTION

Pursuant to Local Rules 2081-1(a)(9) and 9075-1 for the United States Bankruptcy Court for the Central District of California (the "Local Rules"), Sections 105, 363(c)(1), and 364(a) of Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Aftershock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together with Aftershock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein, hereby move (the "Motion"), on an emergency basis, for the entry of an order authorizing the Debtors to maintain the modified cash management system proposed in the Motion.

The Debtors filed their voluntary Chapter 11 petition on December19, 2022 (the "Petition Date").  The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (*i.e.*, Aftershock) with a proven film/television production and distribution platform (*i.e.*, RGTV) for a global audience.  ASM has three lines of business:

- ▪ (1) "**Traditional TV Licensing and Advertising Video on Demand (AVOD) Distribution**" related to RGTV's distribution of rights to the RGTV Library (defined below, and which consists primarily of unscripted television programming);

- ▪ (2) "**Retail Comics**" related to Aftershock's sale of comic books and related products through retail channels; and

- ▪ (3) "**Comic Book IP Development and Exploitation**" related to Aftershock's creation, worldwide licensing, and/or sale of comic IP (defined below) for use in scripted television or film programming.

Aftershock is engaged in the business of developing, creating, and publishing comic books and graphic novels, which it sells through retail channels (*e.g.*, bookstores).  Aftershock also creates and owns original intellectual property content related to its comic books ("IP"), which it controls for exploitation in all forms of media.  Exploitation of the IP includes not only Aftershock's ability to sell the IP, but also to license such IP to other companies for conversion to other forms of media such as scripted television and film.  Aftershock currently has interests in more than 150 IP properties (which it expects to increase by approximately 36 IP properties per year).

RGTV is a leading co-producer and distributor of television programing around the world.  Since its founding in 1994, RGTV has acquired distribution rights ("Distribution Rights") to a library of over 166 titles, representing over 2,200 episodes and 1,700 hours of non-scripted television and documentary programming (the "RGTV Library").  Well known series in the RGTV Library include *Dog Whisperer with Cesar Milan*, *Homicide Hunter*, *My Strange Addiction*, *Ice Cold Killers*, and *Sins and Secrets*, and the genres in the RGTV Library include true crime, reality, animal/wildlife, and documentary.  RGTV generates revenue by sublicensing or selling its Distribution Rights to broadcast networks and other licensees in territories around the world.  When RGTV sublicenses or sells distribution rights in a territory, it earns a sales fee and recoups any advances paid to the producers/licensors of the series, as well as any marketing costs advanced.  Active titles in the RGTV Library have generated approximately $102 million in revenue since inception, and $19.4 million in sales over the past five (5) years.

Prior to the Petition Date, RGTV's cash management system was comprised of, among other things, three (3) bank accounts at City National Bank ("CNB") and one (1) bank account at Bank of America ("BofA"), as follows:

- CNB Checking Account No. x4284 (the "Collections Account");
- CNB Checking Account No. x4276 (the "Checking Account");
- CNB CD Account No. x4772 (the "Holding Account"); and
- BofA Checking Account No. 1202 (the "BofA Account").

As discussed above, RGTV generates revenue by sublicensing or selling its Distribution Rights to a large number of broadcast networks and other licensees (the "Customers") in territories around the world.  RGTV's Collections Account functions primarily as a receipt account for, among other things, fees, reimbursements for advances, and other amounts due (the "Customer Fees") from RGTV's Customers, many of whom are foreign entities that conduct business outside of the United States.  In some instances, the amounts due to RGTV would be paid by credit card or PayPal (or another payment processing platform) by Customers, and those funds would be deposited into the Collections Account.  The Fees and other amounts deposited in the Collections Account would oftentimes be subsequently transferred to the Checking Account (*i.e.*, RGTV's primary disbursement account) for the payment of RGTV's operational and other expenses.  RGTV has the Holding Account which was created pursuant to the loan documents with Access Road Capital LLC, a Delaware limited liability company (the "Lender") – whereby the Holding Account was required to have a minimum balance of $660,000, and the Lender is a signatory and has the authority to transfer, dispose, encumber, or control the funds in the Holding Account.  Lastly, the BofA Account holds minimal funds of RGTV (*i.e.*, an amount of less than $200).

Pursuant to this Motion, the Debtors seek, among other things, a Court order allowing RGTV to do the following: (1) keep the Collections Account open solely as a receipt account, with receipts subsequently transferred to the DIP Operating Account (defined below)[1]; (2) keep the Holding Account open; (3) close the Checking Account and BofA Account, and transfer the funds therein to RGTV's new debtor-in-possession operating account (the "DIP Operating Account").

RGTV's Collections Account functioned primarily as a receipt account for RGTV's receipt/recovery of, among other things, the Customer Fees from Customers (many of who are foreign entities that conduct business outside of the United States).  Given that RGTV has numerous parties that it does business with, and foreign Customers that have historically paid Customer Fees and/or other amounts to the Collections Account, it would be disruptive to

---

[1] Thus, there is no concern that prepetition debts will be paid without approval of the Court. This would allow RGTV to avoid any interruption in the receipts from Customers.  In addition, all transfers would be reflected in the Debtors' monthly operating reports.

RGTV's operations if RGTV was forced to close the Customer Account and notify all applicable customers, licensees, and vendors to remit payment post-petition to a new debtor-in-possession account.

Further, because the Holding Account was created and is being maintained pursuant to the Loan Documents, whereby the Lender is a signatory and has the authority to transfer, dispose, encumber, or control the funds in the Holding Account, RGTV also proposes that the Court allow this account to remain open, but preclude Lender from accessing those funds without a further order of the Court.[2]

The Debtors' pre-petition cash management system also includes eight (8) credit cards that were used to pay the Debtors' operating and other expenses – five (5) that are in Jonathan Kramer's name, two (2) that are in Martha Kramer's name, and one (1) that is in Aftershock's name (the "Pre-Petition Credit Cards").  Each of the Pre-Petition Credit Cards were used almost exclusively to pay for work-related expenses, such as amounts owed to creators or printers of Aftershock's IP, work-related travel, and other operational expenses (*e.g.*, purchases at trade conventions, and periodic automatic payments to Zoom, Slack, and Dropbox) (the "Debtors' Expenses").[3]  Except for the credit card in Aftershock's name (which is currently suspended), the Debtors' obligations under the Pre-Petition Credit Cards: are (1) fundamentally, "advances" (or short term loans) made by Jonathan Kramer and/or Martha Kramer (the "Kramers") using their credit lines with the credit card companies; (2) invoiced to the Kramers monthly; and (3) are paid – partially or fully – on a monthly basis using the Debtors' funds.  The Debtors' Expenses are "advanced" by the Kramers in this manner in the ordinary course of the Debtors' businesses; this is because, among other reasons, the Debtors were unable to obtain credit lines with credit card companies pre-petition.

---

[2] The Motion does not impact Aftershock's pre-petition bank accounts; those accounts will be closed and the funds therein will be transferred to new debtor-in-possession accounts.

[3] To the extent that the Credit Cards were used for the personal expenses of Jonathan and Martha Kramer, those amounts were paid off monthly pre-petition.

Through this Motion, the Debtors are also seeking authority to continue to use two (2) of the Pre-Petition Credit Cards – the American Express Platinum credit cards issued to Jonathan Kramer and Martha Kramer (collectively, the "Credit Cards") – and to pay down the balances of the Credit Cards for the Debtors' Expenses accruing post-petition in the ordinary course of business and consistent with the Debtors' pre-petition practices. For clarity, the Debtors will not use the Pre-Petition Credit Cards other than the Credit Cards, and will not pay the pre-petition balances of the Credit Cards.

In addition, prior to the Petition Date and in the ordinary course of their businesses, the Debtors managed their cash on a consolidated basis. For example, because the Debtors worked together as the "Aftershock Media" enterprise and Aftershock was a newer and developing company, RGTV funds would at times be used to support Aftershock's operations and to pay for necessary expenses (the "Intercompany Transfers"). The Debtors also propose that, post-petition, they be allowed to continue the system of Intercompany Transfers from RGTV to Aftershock in the ordinary course of their businesses, and in accordance with their proposed cash collateral budgets pursuant to Sections 105 and 363(c) of the Bankruptcy Code. *See* (Kramer Decl. Ex. 2-3).

Allowing the Debtors to maintain and utilize a portion of their existing cash management system (*i.e.*, the Collections Account, Holding Account, Credit Cards, and the system of Intercompany Transfers) along with the DIP Operating Account will (i) ensure the uninterrupted receipts from Customers and other parties, including receipts from the credit card and other payment processing companies, (ii) minimize the disruption which would result from being forced to redirect Customer Fees and other payments, (iii) allow for the fluid continuance of the Debtors' business transactions, including the payment of critical operating expenses, and (iv) assist in the Debtors' smooth transition into and through Chapter 11 as a debtor in possession.

## **ADDITIONAL INFORMATION**

The relief sought in the Motion is based upon Local Rules 2081-1(a)(9) and 9075-1, Sections 105, 363(c)(1), and 364(a) of the Bankruptcy Code, and Bankruptcy Rule 9014, this Motion, the annexed Memorandum of Points and Authorities, the Declaration of Jonathan

Kramer (the "Kramer Declaration") filed concurrently herewith, the arguments and statements of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

For the reasons discussed herein, if the Debtors are not able to continue to use their cash management system as modified (the "Modified Cash Management System") as of the Petition Date, it would cause immediate and irreparable harm to the Debtors and their business operations. For example, the inability of RGTV to maintain the Collections Account could result in loss or delay of nearly all receipts from product sales.

In order to provide maximum notice of this Motion, the Debtors will serve a copy of this Motion and all supporting papers (including notice of the hearing on the Motion) upon the Office of the United States Trustee, all known secured creditor(s), general unsecured creditors, and parties requesting special notice via overnight mail.

**WHEREFORE**, the Debtors respectfully request that the Court hold a hearing on the Motion on an emergency basis and enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion in its entirety;

(3)    authorizing RGTV to: (a) keep the Collections Account open solely as a receipt account, with receipts subsequently transferred to the DIP Operating Account; (b) keep the Holding Account open; and (c) close the Checking Account and BofA Account, and transfer the funds therein to the DIP Operating Account;

(4)    authorizing the Debtors to: (a) continue using the Credit Cards post-petition, and (b) pay down the balances of the Credit Cards for the Debtors' Expenses accruing post-petition in the ordinary course of business and consistent with the Debtors' pre-petition practices;

(5)    authorizing the Debtors to continue the system of Intercompany Transfers in the ordinary course of business and consistent with the Debtors' pre-petition practices;

(6)    finding that grounds exist to except the relief from the 21-day notice requirement of Bankruptcy Rule 6003 and waiving the requirements of Bankruptcy Rules 6003, 6004(a) and (h) to the extent these provisions apply; and

(7)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: December 21, 2022     AFTERSHOCK COMICS, LLC &
             RIVE  GAUCHE TELEVISION

             */s/ Jeffrey S. Kwong*
              David L. Neale
              Jeffrey S. Kwong
              LEVENE, NEALE, BENDER, YOO
              & GOLUBCHIK L.L.P.
             Proposed  Counsel  for  Debtors  and  Debtors  in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES[4]

## I.

## STATEMENT OF FACTS

### A.    GENERAL BACKGROUND.

1.    Rive Gauche Television (the "Debtor" or "RGTV") and Aftershock Comics, LLC ("Aftershock," and together with RGTV, the "Debtors") filed voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on December 19, 2022 (the "Petition Date").  The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience.  ASM has three principal lines of business:

- ▪    (1) "**Traditional TV Licensing and Advertising Video on Demand (AVOD) Distribution**" related to RGTV's distribution of rights to the RGTV Library (defined below, and which consists primarily of unscripted television programming);

- ▪    (2) "**Retail Comics**" related to Aftershock's sale of comic books and related products through retail channels; and

- ▪    (3) "**Comic Book IP Development and Exploitation**" related to Aftershock's creation,  worldwide licensing, and/or sale of comic IP (defined below) for use in scripted television or film programming.

3.    Aftershock is engaged in the business of developing, creating, and publishing comic books and graphic novels, which it sells through retail channels (*e.g.*, bookstores).

---

[4] Capitalized terms not otherwise defined herein have the same meanings as in the preceding Notice of Motion and Motion.

Aftershock also creates and owns original intellectual property content related to its comic books ("IP"), which it controls for exploitation in all forms of media. Exploitation of the IP includes not only Aftershock's ability to sell the IP, but also to license such IP to other companies for conversion to other forms of media such as scripted television and film. Aftershock currently has interests in more than 150 IP properties (which it expects to increase by approximately 36 IP properties per year).

4. Aftershock's affiliate, RGTV, is a leading co-producer and distributor of television programing around the world. Since its founding in 1994, RGTV has acquired distribution rights ("Distribution Rights") to a library of over 166 titles, representing over 2,200 episodes and 1,700 hours of non-scripted television and documentary programming (the "RGTV Library"). Well known series in the RGTV Library include *Dog Whisperer with Cesar Milan*, *Homicide Hunter*, *My Strange Addiction*, *Ice Cold Killers*, and *Sins and Secrets*, and the genres in the RGTV Library include true crime, reality, animal/wildlife, and documentary.

5. RGTV generates revenue by sublicensing or selling its Distribution Rights to broadcast networks and other licensees in territories around the world. When RGTV sublicenses or sells distribution rights in a territory, it earns a sales fee and recoups any advances paid to the producers/licensors of the series, as well as any marketing costs advanced. Active titles in the RGTV Library have generated approximately $102 million in revenue since inception, and $19.4 million in sales over the past five (5) years.

6. The Debtors' senior secured lender is Access Road Capital LLC, a Delaware limited liability company (the "Lender" or "Access Road"). The Debtors originally[5] borrowed money from the Lender in March 2020 in the principal amount of $11,090,000[6] (the "Loan")

---

[5] RGTV and East West Bank ("EWB") previously entered into the "*Amended and Restated Credit and Security Agreement, dat4ed as of November 23, 2012*" (as amended, supplemented, or otherwise modified, the "EWB Credit Agreement"), pursuant to which EWB extended a revolving credit facility to RGTV (the "EWB Loan"). A portion of the proceeds from the Loan (as defined above) were subsequently used for Access Road's purchase of the EWB Loan from EWB.

[6] The initial Loan amount, as set forth in the Loan Agreement, consists of: (1) $11,000,000 for the "Base Loan Amount"; (2) $35,000 for the Lender's legal fees; and (3) $55,000 for the "BondIt arrangement fee."

pursuant to the "*Second Amended And Restated Credit And Security Agreement*" (the "<u>Loan Agreement</u>," and collectively with the other loan documents, the "<u>Loan Documents</u>"). The Loan Agreement was amended by the "*Amendment To Second Amended And Restated Credit And Security Agreement*" dated October 15, 2021 (the "<u>Amendment</u>") whereby the Lender agreed to lend additional funds to RGTV, in an amount "equal to . . . 85% . . . of [certain] receivables . . . payable to RG[TV] . . . not to exceed . . . $2,392,000[.]" The Debtors are jointly and severally liable to repay the Loan, and Lender asserts that the Loan is secured by all, or substantially all, of the Debtors' assets.

7.    Pursuant to the Loan Documents, the Debtors were required to make: (1) "Required Interest Payments" on "(a) September 26, 2021; (b) March 26, 2022; (c) September 26, 2022; (d) March 26, 2023; (e) September 26, 2023; and (f) March 26, 2024"; and (2) "Principal Payments" on "(a) March 26, 2022; (b) March 26, 2023; and (c) March 26, 2024, but only if the Lender has . . . agreed to extend the Maturity Date by twelve (12) months." (Loan Agreement, pgs. 11 & 15).

8.    Although the Debtors' businesses were highly successful prior to the COVID-19 pandemic (the "<u>Pandemic</u>"), the circumstances surrounding the Pandemic have detrimentally impacted the Debtors' operations and financial condition. For example, after the Pandemic started: (1) RGTV's revenues and sales suffered because channel buyers were taking longer to decide on transactions with RGTV regarding Distribution Rights licenses and sales; and (2) Aftershock's revenues and sales suffered because many of the retail outlets for comic books and related material were closed during the Pandemic, and Aftershock's management was forced to hold back new comic IP releases during the height of the Pandemic.

9.    In addition, the Debtors' financial problems were exacerbated by liquidity problems associated with insufficient junior capital to fund the high cash requirements of their new business ventures that have long investment lead times. For example, regarding ASM's:

- (1) **"Traditional TV Licensing and AVOD Distribution" line of business**: RGTV experienced delayed decisions with clients and broadcasters during the COVID-19

pandemic that led to revenue shortfalls, high upfront AVOD costs, and a longer delivery process for content, and longer payment terms.

- (2) **"Retail Comics" line of business**: Aftershock faced higher printing costs as a result of supply chain issues.  Moreover, Aftershock's liquidity problems can be attributed to substantial investments that are associated with the creation of new comic IP.

- (3) "**Development and Exploitation of Comic IP" line of business**: Aftershock experienced longer than expected negotiations for comic IP "option" deals, and a longer than expected developmental process to convert IP "options" to film and television production.  However, with respect to the IP "options," many of these deals are on the cusp of reaching a steady-state to generate revenue to Aftershock.

10.    As a result of these liquidity and other financial issues, the Debtors were unable to make certain Loan payments to the Lender (and several of their other creditors and vendors).  The Lender asserted that defaults occurred under the Loan, and: (1) provided the Debtors with a written Notice of Default; and (2) on October 10, 2022, initiated an action in the California Superior Court titled "*Access Road Capital, LLC v. Rive Gauche Television, et al.*," LASC Case No.22STCV33196 (the "State Court Action") against the Debtors and other parties.  Although the Debtors attempted pre-petition to negotiate in good faith to reach an agreement with the Lender, those negotiations reached an impasse.

11.    In order to, among other reasons, continue operations and preserve the Debtors' going concern values for their creditors, the Debtors filed for bankruptcy protection on the Petition Date.  In their respective Chapter 11 cases, the Debtors plan to restructure their financial affairs, obtain possible refinancing of the debt facility (with the current Lender or a new lender), seek investors, and/or propose a joint plan which will pay their creditors.

**B.  EXISTING    CASH    MANAGEMENT    SYSTEM    AND    PROPOSED MODIFICATIONS.**

**1.    Overview Of Prepetition Cash Management System.**

12.    Prior to the Petition Date, RGTV's cash management system was comprised of

three (3) bank accounts at City National Bank ("CNB") and one (1) bank account at Bank of America ("BofA"), as follows:

- CNB Checking Account No. x4284 (the "Collections Account");

- CNB Checking Account No. x4276 (the "Checking Account");

- CNB CD Account No. x4772 (the "Holding Account"); and

- BofA Checking Account No. x1202 (the "BofA Account").

CNB and BofA are on the "*Office of the United States Trustee Region 16 Approved Depositories Effective May 10, 2022.*"

13.    As discussed above, RGTV generates revenue by selling its Distribution Rights to a large number of broadcast networks and other licensees (the "Customers") in territories around the world.  RGTV's Collections Account functions primarily as a receipt account for the payment of, among other things, fees, reimbursements for advances, and other amounts due (the "Customer Fees") from RGTV's Customers, many of whom are foreign entities that conduct business outside of the United States.  In some instances, the amounts due to RGTV would be paid by credit card or PayPal (or another payment processing platform) by Customers, and those funds would be deposited into the Collections Account.  The Fees and other amounts deposited in the Collections Account would oftentimes be subsequently transferred to the Checking Account (*i.e.*, RGTV's primary disbursement account) for the payment of RGTV's operational and other expenses.  RGTV has the Holding Account which was created pursuant to the Loan Documents – whereby the Holding Account was required to have a minimum balance of $660,000, and the Lender is a signatory and has the authority to transfer, dispose, encumber, or control the funds in the Holding Account.  Lastly, the BofA Account holds minimal funds of RGTV (*i.e.*, in an amount of less than $200).

14.    The Debtors' pre-petition cash management system also includes eight (8) credit cards that were used to pay the Debtors' operating and other expenses – five (5) that are in Jonathan Kramer's name, two (2) that are in Martha Kramer's name, and one (1) that is in Aftershock's name (the "Pre-Petition Credit Cards").  Each of the Pre-Petition Credit Cards were

used almost exclusively to pay for work-related expenses, such as amounts owed to creators or printers of Aftershock's IP, work-related travel, and other operational expenses (*e.g.*, purchases at trade conventions, and periodic automatic payments to Zoom, Slack, and Dropbox) (the "<u>Debtors' Expenses</u>").[7]  Except for the credit card in Aftershock's name (which is currently suspended), the Debtors' obligations under the Pre-Petition Credit Cards: are (1) fundamentally, "advances" (or short term loans) made by Jonathan Kramer and/or Martha Kramer (the "<u>Kramers</u>") using their credit lines with the credit card companies; (2) invoiced to the Kramers monthly; and (3) are paid – partially or fully – on a monthly basis using the Debtors' funds.  The Debtors' Expenses are "advanced" by the Kramers in this manner in the ordinary course of the Debtors' businesses; this is because, among other reasons, the Debtors were unable to obtain credit lines with credit card companies pre-petition.

     **2.**        **Proposed Post-petition Cash Management System.**

     15.     Pursuant to this Motion, the Debtors seek, among other things, authority to use their modified cash management system (the "<u>Modified Cash Management System</u>"), and for a Court order allowing RGTV to do the following: (1) keep the Collections Account open solely as a receipt account, with receipts subsequently transferred to the DIP Operating Account (defined below)[8]; (2) keep the Holding Account open; and (3) close the Checking Account and BofA Account, and transfer the funds therein to RGTV's new debtor-in-possession operating account (the "<u>DIP Operating Account</u>").  For clarification, this Motion is not seeking relief to keep any of the Aftershock pre-petition bank accounts open.

     16.     RGTV's Collections Account functioned primarily as a receipt account for RGTV's receipt/recovery of, among other things, the Customer Fees from Customers (many of who are foreign entities that conduct business outside of the United States).  Given that RGTV has numerous parties that it does business with, and foreign Customers that have historically paid

---

[7] To the extent that the Credit Cards were used for the personal expenses of Jonathan and Martha Kramer, those amounts were paid off monthly pre-petition.

[8] Thus, there is no concern that prepetition debts will be paid without approval of the Court. This would allow RGTV to avoid any interruption in the receipts from Customers.

Customer Fees and/or other amounts to the Collections Account, it would be disruptive to RGTV's operations if RGTV was forced to close the Customer Account, and notify all applicable customers, licensees, and vendors to remit payment post-petition to a new debtor-in-possession account.

17. Further, because the Holding Account was created and being maintained pursuant to the Loan Documents, whereby the Lender is a signatory and has the authority to transfer, dispose, encumber, or control the funds in the Holding Account, the Debtors also propose that the Court allow this account to remain open.

18. Moreover, through this Motion, the Debtors are also seeking authority to continue to use two (2) of the Pre-Petition Credit Cards – the American Express Platinum credit cards issued to Jonathan Kramer and Martha Kramer (collectively, the "Credit Cards") – and to pay down the balances of the Credit Cards for the Debtors' Expenses accruing post-petition in the ordinary course of business and consistent with the Debtors' pre-petition practices. For clarity, the Debtors will not use the Pre-Petition Credit Cards other than the Credit Cards, and will not pay the pre-petition balances of the Credit Cards.

19. In addition, prior to the Petition Date and in the ordinary course of their businesses, the Debtors managed their cash on a consolidated basis. For example, because the Debtors worked together as the "Aftershock Media" enterprise and Aftershock was a newer and developing company, RGTV funds would at times be used to support Aftershock's operations and to pay for necessary expenses (the "Intercompany Transfers"). The Debtors also propose that, post-petition, they be allowed to continue the system of Intercompany Transfers from RGTV to Aftershock in the ordinary course of their businesses, and in accordance with their proposed cash collateral budgets pursuant to Sections 105 and 363(c) of the Bankruptcy Code. *See* (Kramer Decl. Ex. 2-3).

20. Authority for the Debtors to maintain and utilize a portion of their existing cash management system (*i.e.*, the Collections Account, Holding Account, Credit Cards, and the system of Intercompany Transfers) along with the DIP Operating Account will (i) ensure the

uninterrupted receipts from Customers and other parties, including receipts from the credit card and other payment processing companies, (ii) minimize the disruption which would result from being forced to redirect Customer Fees and other payments, (iii) allow for the fluid continuance of the Debtors' business transactions, including the payment of critical operating expenses, and (iv) assist in the Debtors' smooth transition into and through Chapter 11 as a debtor in possession.

## II.    DISCUSSION

### A.    The Court Should Waive The U.S. Trustee's Requirements For RGTV To Close All Pre-Petition Accounts.

Pursuant to Section 28 U.S.C. § 586, the U.S. Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things: (a) close all existing bank accounts; (b) open a minimum of three new debtor in possession accounts under the debtor name as a debtor in possession (general, payroll and tax) at an approved depository (the "DIP Accounts"), and that all disbursements must be made out of one of these DIP Accounts; and (c) obtain checks from the DIP accounts (which must "indicate that the account is a 'debtor in possession account' and must include the Chapter 11 case number in the account name."[9]

RGTV seeks a waiver of the U.S. Trustee's requirement that all bank accounts be closed, and request that two of its pre-petition bank accounts, *i.e.*, the Collections Account and Holding Account, remain open in accordance with this Court's order on this Motion. If the requirement to close all prepetition bank accounts is enforced in this case, such requirement would cause enormous disruption in RGTV's business, and would impair RGTV's efforts to pursue alternatives to maximize the value of its estate.

/ / /

/ / /

---

[9] *See Guidelines And Requirements For Chapter 11 Debtors In Possession*, pages 2 & 4, *available at*:
https://www.justice.gov/ust-regions-r16/file/ch11_debtors_possession.pdf/download.

**B.      RGTV Should Be Granted Authority To Use Its Modified Cash Management System.**

RGTV seeks authority to use its modified cash management system, and for a Court order allowing it to do the following: (1) keep the Collections Account open solely as a receipt account, with receipts subsequently transferred to the DIP Operating Account (defined below)[10]; (2) keep the Holding Account open; and (3) close the Checking Account and BofA Account, and transfer the funds therein to a new debtor-in-possession operating account (the "DIP Operating Account") created by RGTV.

Section 363(c) of the Bankruptcy Code permits a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c). "Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets."  *In re Roth Am.* 975 F.2d 949, 952 (3d Cir. 1992).  A debtor's proposal to continuing using its pre-petition cash management system has been held to be consistent with Section 363(c).  *See In re Charter Co.*, 778 F.2d 617, 618 (11th Cir. 1985) ("Both the April 20 order and the amended order, however, merely authorized the debtor to utilize a routine cash management system 'as has been usual and customary in the past.' This is entirely consistent with the statute, which allows a debtor in possession to 'use property of the estate in the ordinary course of business without notice or a hearing.' 11 U.S.C. § 363(c)(1) (1982)."); *see also Charter Co.*, 778 F.2d at 618 (debtors requested authority "to maintain their existing bank accounts and continue to consolidate cash management for the entire group, transferring monies among the affiliated entities as had been their practice and custom.").

As described in more detail above, the Modified Cash Management System is essentially the same system that RGTV utilized pre-petition in the ordinary course of its business.  Except for the closure of the Checking Account and BofA Account, RGTV will still have the

---

[10] Thus, there is no concern that prepetition debts will be paid without approval of the Court. This would allow RGTV to avoid any interruption in the receipts from Customers.  In addition, all transfers would be reflected on the Debtors' monthly operating reports.

"Collections Account" open for receipts, the DIP Operating Account for disbursements, and the Holding Account open and maintained pursuant to the Loan Documents. Courts have acknowledged that a bankruptcy court has the discretionary authority to allow the continued use of existing, prepetition bank accounts.[11] In several cases, courts in this district have recognized that the strict enforcement of the requirement that a debtor in possession close its bank accounts does not serve the rehabilitative process of chapter 11, and have waived such requirements and replaced them with alternative procedures.[12]

Authority for RGTV to use the Modified Cash Management System will: (i) ensure the uninterrupted receipts from Customers and other parties, including receipts from the credit card and other payment processing companies, (ii) minimize the disruption which would result from being forced to redirect Customer Fees and other payments, (iii) allow for the fluid continuance of RGTV's business transactions, including the payment of critical operating expenses, and (iv) assist in RGTV's smooth transition into and through Chapter 11 as a debtor in possession.

Further, this Court has authority to grant the requested relief regarding approval of the Modified Cash Management System pursuant to its equitable powers under section 105(a) of the Bankruptcy Code. Section 105(a) provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The relief requested herein is both necessary and

---

[11] 11 U.S.C. § 105(a); *See, In re Safety-Kleen Corp.*, Case No. 00-02303(PJW), Docket No. 20, (Bankr. D. Del. June 13, 2000); *In re Eagle Food Centers, Inc.*, Case No. 00-01311(RRN), Docket No. 27, (D. Del. March 2, 2000); *In re Philip Services (Delaware), Inc.*, Case No. 99-02385(MEW), Docket No. 143, (Bankr. D. Del. June 30, 1999); *see also*, *In re New York City Shoes, Inc.*, 78 B.R. 426, 427 (Bankr. E.D. Pa. 1987) (debtor depositing postpetition funds into prepetition bank accounts); *In re Grant Broadcasting of Philadelphia, Inc.*, 75 B.R. 819 (E.D. Penn. 1987); *Charter*, 778 F.2d 617.

[12] *See, In re Evergreen Oil, Inc.*, Case No. 8:13-bk-13163-SC, Docket No. 31 (Bankr. C.D. Cal. April 10, 2013); *In re Shilo Inn, Diamond Bar, LLC,* Case No. 2:10-bk-60884-VZ, Docket No. 38, (Bankr. C.D. Cal. January 14, 2011); *In re Shoe Pavilion, Inc.*, Case No. 1:08-bk-14939-MT, Docket No. 39, (Bankr. C.D. Cal. July 22, 2008); *In re Plaza Healthcare Center, LLC,* Case No. 8:14-bk-11335-CB, Docket No. 57, (Bankr. C.D. Cal. March 13, 2014); *In re Krystal Koach Inc.*, Case No. 8:10-bk-26547-CB, Docket No. 40, (Bankr. C.D. Cal. December 6, 2010); *In re North American Health Care, Inc.* Case No. 8:15-bk-10610-MW, Docket No. 50, (Bankr. C.D. Cal. February 19, 2015).

appropriate to: (1) allow RGTV to successfully administer its Chapter 11 Case; (2) optimize their post-petition business performance and to maximize the value of RGTV's estate; and (3) facilitate RGTV's smooth transition to bankruptcy by allowing it to, among other things, continue to collect funds deposited into the Collections Account, which promotes RGTV's business operations and the success of its case.

Given all of the foregoing, the Court should authorize RGTV to use the Modified Cash Management System.

**C. RGTV Should Be Granted Authority To Continue To Use Existing Business Forms And Checks at the Prepetition Bank Accounts that Will Remain Open.**

RGTV requests that all of its prepetition bank accounts that will remain open be deemed debtor-in-possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms those employed during the prepetition period, be authorized. Where possible, RGTV will designate on these forms its status as a "debtor in possession."

Changing correspondence and business forms would be expensive, unnecessary, and burdensome to RGTV's estate and disruptive to RGTV's business operations and would not confer any benefit upon those dealing with RGTV. Further, parties doing business with RGTV undoubtedly will be aware of RGTV's status as a debtor in possession.  Moreover, RGTV's vendors will receive direct notice of the commencement of these cases.

Courts in other cases have routinely granted the same or similar relief to chapter 11 debtors.  *See, e.g., Kmart Corp., et. al.,* Case No. 02-B02474(SS) (Bankr. N.D. Ill. January 22, 2002); *Comdisco, Inc.,* Case No. 01-24795 (RB) (Bankr. N.D. Ill. July 17, 2001); *In re Interco Inc.,* 130 B.R. 301 (Bankr. E.D. Mo. 1991)(Motion Letter H); *In re Johnson*, 106 B.R. 623 (Bankr. D. Neb. 1989)(debtors not required to obtain new checks imprinted with "debtor in possession"); *In re Apex Oil Co.*, Ch. 11 Case No. 87-3804-BA-C (Banker. E.D. Mo. 1987).

**D.  The Debtors Should Be Granted Authority To Continue To Use The Credit Cards, And To Continue The System Of Intercompany Transfers.**

As discussed above: (1) Section 363(c) of the Bankruptcy Code permits a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing," so that debtors are given flexibility to engage in ordinary course transactions that are required for it to operate its business without undue supervision by creditors or the court[13]; and (2)  Section 105(a) provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  In addition, Section 364(a) of the Bankruptcy Code allows debtors to "obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense" without a court order.   11 U.S.C. § 364(a).

As part of the Debtors' cash management system and in addition to RGTV's bank accounts, the Debtors used eight (8) Pre-Petition Credit Cards to pay for the Debtors' Expenses, such as amounts owed to creators of Aftershock's IP, work-related travel, and other operational expenses (*e.g.*, purchases at trade conventions, and periodic payments to Zoom, Slack, and Dropbox).  Except for the credit card in Aftershock's name (which is currently suspended), the Debtors' obligations under the Pre-Petition Credit Cards: are (1) fundamentally, "advances" (or short term loans) made by the Kramers using their credit lines with the credit card companies; (2) invoiced to the Kramers monthly; and (3) are paid – partially or fully – on a monthly basis using the Debtors' funds.  The Debtors' Expenses are "advanced" by the Kramers in this manner in the ordinary course of the Debtors' businesses.  This is because, among other reasons, the Debtors were unable to obtain credit lines with credit card companies.  The usage of these Pre-Petition Credit Cards not only allow the Debtors to purchase goods and services from vendors, but also serves as a "short term loan" to assist their cash flow needs by giving them a period of time to make payments to the credit card companies on account of these good and services.  The Debtors

---

[13] *See* 11 U.S.C. § 363(c); *Roth Am.* 975 F.2d at 952.

1    believe that the post-petition usage and payment of obligations under the Credit Cards are ordinary

2    course transactions that are permitted pursuant to Section 363(c) of the Bankruptcy Code.

3        In addition, the post-petition usage and payment of post-petition obligations under the

4    Credit Cards can also be properly characterized as a short-term post-petition loan, and Section

5    364(a) of the Bankruptcy Code provides that debtors may "obtain unsecured credit and incur

6    unsecured debt in the ordinary course of business allowable under section 503(b)(1)."  11 U.S.C. §

7    364(a).  All of the post-petition Debtors' Expenses incurred will: (1) have been incurred post-

8    petition; and (2) be entitled to administrative priority pursuant to Section 503(b)(1)(A) of the

9    Bankruptcy Code for being "actual, [and] necessary costs and expenses of preserving the estate."

10   *See* 11 U.S.C. § 503(b)(1)(A).

11       Specifically, the continued usage of the Credit Cards will assist the Debtors' smooth

12   transition into bankruptcy, and essential to the stability of the Debtors' business.  If the Debtors are

13   not able to use the Credit Cards post-petition, they would have: (1) a difficult time making timely

14   or any purchases from those vendors that require payment by credit cards; (2) to unnecessarily

15   spend valuable time that could be devoted to the Debtors' reorganization to having to transition the

16   accounts where automatic payments are tied to the Credit Cards (*e.g.*, Zoom, Slack, and Dropbox)

17   to their bank accounts, assuming that doing so is even possible; and (3) a difficult time paying for

18   necessary work-related travel expenses for their management and/or employees because such

19   expenses were ordinarily paid using the Credit Cards pre-petition.  As a result, the inability of the

20   Debtors to use the Credit Cards post-petition would cause significant disruptions to the Debtors'

21   business.

22       For clarity, the Debtors will not use the Pre-Petition Credit Cards other than the Credit

23   Cards, and will not pay the pre-petition balances of the Credit Cards.  Based on all of the

24   foregoing, the Court should authorize the Debtors to continue using the Credit Cards post-petition,

25   and pay down the balances of the Credit Cards for the Debtors' Expenses accruing post-petition in

26   the ordinary course of business and consistent with the Debtors' pre-petition practices pursuant to

27   Sections 105, 363(c), and/or 364(a) of the Bankruptcy Code.

28

In addition, prior to the Petition Date and in the ordinary course of their businesses, the Debtors managed their cash on a consolidated basis. For example, because the Debtors worked together as the "Aftershock Media" enterprise and Aftershock was a newer and developing company, RGTV funds would at times be used to support Aftershock's operations and to pay for necessary expenses. The ability to continue with the system of Intercompany Transfers, subject to the amounts in the Debtors' proposed cash collateral budgets, ensures the continued operations of Aftershock and the ASM enterprise, that will allow the Debtors to generate revenue to pay creditors, continue operations, and reorganize. As a result, the Debtors also propose that, post-petition, they be allowed to continue the system of Intercompany Transfers from RGTV to Aftershock in the ordinary course of their businesses, and in accordance with their proposed cash collateral budgets, *see* (Kramer Decl. Ex. 2-3), pursuant to Sections 105 and 363(c) of the Bankruptcy Code.

**E.    Necessity for Immediate Relief and Effectiveness of the Order.**

Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition grant  . . . (b) a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003. For the reasons discussed herein, if the Debtors are not able to continue to use their cash management system, as modified as of the Petition Date, it would cause immediate and irreparable harm to the Debtors and their business operations. Most significantly, the inability to maintain the Collections Account could result in loss of nearly all receipts from product sales. Further, the Holding Account is requested to remain open and maintained pursuant to the Loan Documents. In addition, the Debtors require the usage of the Credit Cards to make purchases from, and payments to certain of their vendors that provide necessary post-petition goods and services. Accordingly, the relief requested herein meets the requirements for immediate relief to "avoid immediate and irreparable harm" pursuant to Bankruptcy Rule 6003.

Further, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing use sale, or lease of property under Bankruptcy Rule 6004(h), to the extent those rules are applicable.

### III.CONCLUSION

**WHEREFORE**, the Debtors respectfully requests that the Court hold a hearing on the Motion on an emergency basis and enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion in its entirety;

(3)    authorizing RGTV to: (a) keep the Collections Account open solely as a receipt account, with receipts subsequently transferred to the DIP Operating Account; (b) keep the Holding Account open; and (c) close the Checking Account and BofA Account, and transfer the funds therein to the DIP Operating Account;

(4)    authorizing the Debtors to: (a) continue using the Credit Cards post-petition, and (b) pay down the balances of the Credit Cards for the Debtors' Expenses accruing post-petition in the ordinary course of business and consistent with the Debtors' pre-petition practices;

(5)    authorizing the Debtors to continue the system of Intercompany Transfers in the ordinary course of business and consistent with the Debtors' pre-petition practices;

(6)    finding that grounds exist to except the relief from the 21-day notice requirement of Bankruptcy Rule 6003 and waiving the requirements of Bankruptcy Rules 6003, 6004(a) and (h) to the extent these provisions apply; and

/ / /

/ / /

/ / /

/ / /

/ / /

1    (7)    granting such other and further relief as the Court deems just and proper under the

2  circumstances.

3  Dated: December 21, 2022                    AFTERSHOCK COMICS, LLC &
                                              RIVE  GAUCHE TELEVISION
4

5                                              */s/ Jeffrey S. Kwong*
                                              David L. Neale
6                                              Jeffrey S. Kwong
                                              LEVENE, NEALE, BENDER, YOO
7                                              & GOLUBCHIK L.L.P.

8                                              Proposed  Counsel  for  Debtors  and  Debtors  in
                                              Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled (*specify*): **EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO IMPLEMENT AND MAINTAIN CASH MANAGEMENT SYSTEM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On ***December 21, 2022*** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On ***December 21, 2022,*** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***December 21, 2022,*** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

| | |
|---|---|
| **Honorable Martin Barash**<br>United States Bankruptcy Court<br>Central District of California<br>21041 Burbank Boulevard, Suite 342 / Courtroom 303<br>Woodland Hills, CA 91367 | |

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| ***December 21, 2022*** | ***Jason Klassi*** | /s/ Jason Klassi |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

1

2    **1:22-bk-11456-MB Notice will be electronically mailed to:**

3    Russell Clementson on behalf of U.S. Trustee United States Trustee (SV)
     russell.clementson@usdoj.gov

4
     Jeffrey S Kwong on behalf of Debtor AfterShock Comics, LLC
5    jsk@lnbyg.com, jsk@ecf.inforuptcy.com

6    David L. Neale on behalf of Debtor AfterShock Comics, LLC
     dln@lnbyg.com
7
     United States Trustee (SV)
8    ustpregion16.wh.ecf@usdoj.gov

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28