Howard J. Steinberg (SBN 89291)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: 310.586.7700
Facsimile: 310.586.7800
steinbergh@gtlaw.com

Attorneys for Creditor Access Road Capital, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>AFTERSHOCK COMICS, LLC, a California limited liability company,<br><br>      Debtor and Debtor in Possession.<br><br>---<br><br>In re:<br><br>RIVE GAUCHE TELEVISION, a California corporation,<br><br>      Debtor and Debtor in Possession.<br><br>---<br><br>☒ Affects both Debtors<br>☐ Affects AfterShock Comics, LLC only<br>☐ Affects Rive Gauche Television only | CASE NO. 1:22-bk-11456-MB<br><br>Jointly administered with:<br>1:22-bk-11457-MB<br>(Rive Gauche Television)<br>Chapter 11 Cases<br><br>**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (1) AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; (II) GRANTING ADEQUATE PROTECTION REPLACEMENT LIENS: (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**<br><br>DATE:    December 29, 2022<br>TIME:    9:00 a.m.<br>PLACE:  Originating from 303<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA  91367<br><br>(To Be Held Remotely Using ZoomGov Audio and Video) |

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................................... 2

    A.    The Access Secured Claim ................................................................ 2

    B.    The Budget for Debtor Rive Gauche Television .............................. 3

    C.    The Budget for Aftershock Comics, LLC ........................................ 4

    D.    The Debtors' Have No Meaningful Business to Operate .................. 4

III.  ADEQUATE PROTECTION IS NOT PROVIDED TO ACCESS ........................... 5

    A.    Overview ............................................................................................ 5

    B.    The Requirements of Adequate Protection ....................................... 5

    C.    The Debtors' Bear A Substantial Burden of Proof to Establish Adequate Protection ....... 9

    D.    Mere Predictions Are Not Sufficient to Meet the Debtors' Burden of Proof .................. 10

    E.    The Debtors Failed to Demonstrate the Existence of an Equity Cushion ...................... 12

    F.    Payments to Access Should be Required ........................................ 15

    G.    Cash Collateral Should Not be Used to Pay the Debtors, Professionals ...................... 16

IV.   CONCLUSION ........................................................................................................ 16

*ACTIVE 684245463v3*

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Federal Cases**

4

*In re 1606 New Hampshire Ave. Associates*,
5     85 B.R. 298 (E.D. Pa. 1988) ...................................................................................10

6 *Addington v. Texas*,
    441 U.S. 418, 99 S. Ct. 1804, 60 L Ed. 2d 323 (1979) ..........................................9

7 *In re American Mariner Industries*,
    734 F.2d 426, *rev'd and remanded on other grounds*, 734 F.2d 426 (9th Cir. 1984) ..........................8
8

*Associates Commercial Corp. v. Rash*,
9     520 U.S. 953, 117 S. Ct. 1879, 138-L. Ed. 2d 148 (1997) ...................................11

10 *Atencio v. TuneCore, Inc.*,
    CV 16-1925-DMG, 2018 U.S. Dist. LEXIS 223997 (C.D. Cal. Nov. 13, 2018) .............................13

11 *Bankwest N.A. v. Todd*,
12     49 B.R. 633 (D.S.D. 1985)....................................................................................10

13 *In re Berens*,
    41 B.R. 524 (Bankr. D. Minn. 1984) ....................................................................10

14 *In re Century Investment Fund VIII L.P.*,
    155 B.R. 1002 (Bankr. E.D. Wis. 1989), *affd*, 937 F.2d 371 (7th Cir. 1991)......................9
15

*In re Certified Corp.*,
16     51 B.R. 768 (Bankr, D. Hawaii 1985) ...................................................................8

17 *In re Delaney-Morin*,
    304 B.R. 365 (B.A.P. 9th Cir. 2003).......................................................................8

18
*In re Demakes Enterprises, Inc.*,
19     145 B.R. 362 (Bankr. D. Mass. 1992) ..................................................................12

20 *In re DeSardi*,
    340 B.R. 790 (Bankr. S.D. Tex. 2006) ...................................................................8

21 *In re Development, Inc.*,
    36 B.R. 998 (Bankr. D. Hawaii 1984) ....................................................................9
22

*Matter of Earth Lite, Inc.*,
23     9 B.R. 440 (Bankr. M.D. Fla. 1981) .....................................................................15

24 *In re First South Savings Associates*,
    820 F.2d 700 (5th Cir. 1987) .................................................................................8

25 *In re Gavia*,
26     24 B.R. 216 (Bankr. E.D. Cal.), *aff'd*, 24 B.R. 573 (B.A.P. 9th Cir. 1982) .........................7

27 *In re George Ruggiere Chrysler-Plymouth, Inc.*,
    727 F. 2d 1017 (11th Cir. 1984) ........................................................................7, 11

28

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

*In re Greenwood Building Supply, Inc.*,
   23 B.R. 720 (Bankr. W.D. Mo. 1982) ................................................................. 15

*Grubbs v. National Bank of South Carolina*,
   114 B.R. 450 (D.S.C. 1990) ................................................................................. 12

*In re Heatron, Inc.*,
   6 B.R. 493 (Bankr. D. Mo. 1980) ......................................................................... 15

*Herman & Maclean v. Huddleston*,
   459 U.S. 375, 103 S. Ct. 683, 74 L Ed. 2d 548 (1983) ........................................... 9

*Matter of Kain*,
   86 B.R. 506 (Bankr. W.D. Mich. 1988) ................................................................. 8

*King Jewelry v. Federal Express Corp.*,
   166 F. Supp. 2d 1280 (C.D. Cal. 2001) ................................................................ 13

*In re Leavell*,
   56 B.R. 11 (Bankr. S.D. Ill. 1985) ........................................................................ 6

*In re Llewellyn*,
   27 B.R. 481 (W.D. Pa. 1983) ............................................................................... 10

*In re Magnus*,
   50 B.R. 241 (Bankr. D.N.D. 1985) ........................................................................ 7

*In re Martin*,
   761 F.2d 472 (8th Cir. 1985) ................................................................................ 6

*In re Meeks*,
   349 B.R. 19 (Bankr. E.D. Cal. 2006) ................................................................... 13

*In re Metromedia Fiber Network, Inc.*,
   290 B.R. 487 (Bankr. S.D.N.Y. 2003) ................................................................... 6

*In re Mickler*,
   9 B.R. 121 (Bankr. M.D. Fla. 1981) ..................................................................... 10

*Matter of Milleson*,
   83 B.R. 696 (Bankr. D. Neb.1988) ........................................................................ 7

*In re Monnier Bros.*,
   755 F.2d 1336 (8th Cir. 1985) ............................................................................... 8

*In re O'Quinn*,
   98 B.R. 86 (Bankr. M.D. Fla. 1989) ............................................................... 11, 12

*Matter of P.C. LT.D.*,
   929 F.2d 203 (5th Cir. 1991) ............................................................................... 16

*In re Philadelphia Consumer Discount Co.*,
   37 B.R. 946 .......................................................................................................... 9

*In re Phoenix Steel Corp.*,
   39 B.R. 218 (D. Del. 1984) ................................................................................. 11

*In re Polzin*,
   49 B.R. 370 (Bankr. D. Minn. 1985) ............................................................... 10, 12

LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION
*ACTIVE 684245463v3*

*In re Q-C Circuits Corp.*,
  231 B.R. 506 (E.D. N.Y. 1999) .................................................................................15

*In re Ranch Partners, LTD*,
  146 B.R. 833 (D. Colo. 1992) .................................................................................16

*In re Rhoades*,
  38 B.R. 63 (Bankr. D. Vt. 1984) ...............................................................................7

*In re Robbins*,
  119 B.R. 1 (Bankr. D. Mass. 1990) ........................................................................12

*In re Robert E. Derecktor, Inc.*,
  137 B.R. 95 (Bankr. D. RI 1992) ............................................................................10

*In re Sharon Steel Corp.*,
  159 B.R. 165 (Bankr. W.D. Pa. 1993) .....................................................................12

*In re Shaw Industries, Inc.*,
  300 B.R. 861 (Bankr. W.D. Pa. 2003) .......................................................................8

*In re Southerton Corp.*,
  46 B.R. 391 (M.D. Pa. 1982) .....................................................................................7

*In re Stacy Farms*,
  78 B.R. 494 (Bankr. S.D. Ohio 1987)......................................................................10

*Stoebner Holdings, Inc. v. Automobile Lamborghini S.P.A.*,
  No. 06-00446 JMS/LEK, 2007 WL 4230824 (Dist. Haw. Nov. 30, 2007) .........................13

*In re THB. Corp.*,
  85 B.R. 192 (Bankr. D. Mass. 1988) .......................................................................12

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
  484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).................................................8

*United States v. 242.93 Acres*,
  No. 10-cv-1133-BEN (CAB), 2012 U.S. Dist. LEXIS 21746 (S.D. Cal.) ........................12

*United States v. Security Industrial Bank*,
  459 U.S. 70, 103 S. Ct. 407, 74 L. Ed. 2d 235 (1982)...................................................7

*In re Weinstein*,
  227 B.R. 284 (B.A.P. 9th Cir. 1998).........................................................................8

**State Cases**

*Everest Stables, Inc. v. Canani*,
  CV 09-9446 DSF (VBKx), 2011 WL 13213657 (C.D. Cal. Oct. 6, 2011) .........................12

**Federal Statutes**

11 U.S.C. § 361.....................................................................................5, 6, 11, 16, 17

11 U.S.C. § 361(3).............................................................................................6

11 U.S.C. § 361(e).............................................................................................8

LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION
*ACTIVE 684245463v3*

11 U.S.C. § 362 ........................................................................................................................6

11 U.S.C. § 363 .........................................................................................................6, 9, 10, 17

11 U.S.C. § 363(a) ....................................................................................................................5

11 U.S.C. § 363(c)(2) ...............................................................................................................6

11 U.S.C. § 363(c)(2)(B) ..........................................................................................................6

11 U.S.C. § 363(e) ....................................................................................................................5

11 U.S.C. § 363(p) ....................................................................................................................9

11 U.S.C. § 364 ........................................................................................................................6

11 U.S.C. § 364(d) ...................................................................................................................6

11 U.S.C. § 503(b)(l) ...............................................................................................................6

11 U.S.C. § 506(a) ..................................................................................................................11

11 U.S.C. § 506(c) ...........................................................................................................5, 16

11 U.S.C. § 507(a)(1) ...............................................................................................................6

11 U.S.C. § 507(b) ...................................................................................................................6

**Rules**

Fed. R. Evid. 701 ...................................................................................................................13

**Other Authorities**

1978 U.S. Code Cong. & Admin. News 5787, 5963, 6295 ......................................................7

H.R. Rep. No. 595, 95th Cong., 1st Sess. 339 (1977) .............................................................7

Senate Report No. 95-989, U.S. Code Cong. & Admin. News 5787 (1978)............................7

Access Road Capital, LLC ("Access") files this limited objection ("Objection") to the Debtors'

Emergency Motion for Entry of an Interim Order: (I) Authorizing Use of Cash Collateral on an Interim

Basis Pending a Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling a

Final Hearing; and (IV) Granting Related Relief (the "Motion")(Doc. No. 12)  In support of the

Objection, Access states as follows:

## I.    **PRELIMINARY STATEMENT**

The fact that the Debtors' needed to bring the Motion is entirely of their own making.

Notwithstanding the fact that counsel for Access had discussions with the Debtors on December 16,

2022, not a word was said by them about a contemplated bankruptcy filing.  Thus, the bankruptcy filings

on December 19, 2022, came as a surprise to Access. The first time Access even saw a proposed cash

collateral budget was when the Motion was filed.  The Debtors' are represented by experienced and

capable bankruptcy counsel and this lack of transparency is no accident.  The Debtors' have

unsuccessfully sought to raise capital for at least 9 months prior to their bankruptcy filing.  Their

operations have been hemorrhaging  cash and they have been unable to set forth any business plan which

demonstrates that these reverses are likely to be corrected. In support of the Motion, they proffer a

declaration which sets forth wildly optimistic valuations of the Debtors' assets which are not based on

admissible evidence, and provide a budget that demonstrates that during the next 13 weeks, even if

business projections are met, the Debtors' cash balance will drop by at least $500,000 in that they will

collect and spend over $1.3 million in accounts receivable. There is no evidence that they are generating

any new receivables to replace existing ones.

The Debtors proffer the declaration of their principal, Jonathan Kramer, who attributes large

values to assets without any financial data or projections to support the conclusory statements he makes.

There is a reference in the Kramer declaration to a review of managements' projections and estimates by

a consultant (which is inadmissible hearsay) but it is telling that neither the Kramer declaration nor the

consultant's report set forth any of the financial data underlying the assumptions of value.  Undisclosed

by Mr. Kramer is that in order for the Debtors' to realize the largely speculative future revenues to

support the valuations  in connection with TV licensing,  an influx of nearly $20 million of capital is

required.  The Debtors have been unable to raise capital despite repeated unfulfilled promises over the

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

last nine months.  Further, as acknowledged in the consultant's report, 92% of the projected revenue is estimated to come from advertising video on demand ("AVOD"), which is a new distribution model without a meaningful track record rendering any such projections extremely speculative.  Revenues from the comics and related IP has been moribund for the past two years, failing to meet projections by wide margins yet value attributed to these assets presupposes a significant demand for the IP.  To say that valuations based on the values of these assets is excessively overstated and highly speculative is an understatement.   The Debtors intentionally fail to present any supporting financial information because to do so would underscore the specious basis for their argument that a significant equity cushion exists.

Further troubling is that the Debtors fail to set forth any projected income during this time period so there is no basis for the Court or Access to determine the erosion of cash collateral during this operating period.  Among other things, the budgets that are presented show  line items with significant unexplained expenses and high projected payments for insider compensation. Thus, the Debtors' have created an "emergency" through inaction in the hope that in the early stages of the case, the Court will grant them relief notwithstanding these deficiencies. Absent the retention of a capable professional to oversee an expedited  process in which the Debtors  seek  an equity infusion  while simultaneously marketing their assets for sale, Access will not consent to  use of cash collateral.

## II.    STATEMENT OF FACTS

### A.    The Access Secured Claim

The Debtors acknowledge that Access is a senior secured lender.  Motion at 6: 17. The Debtors' state that the amount owing to Access as of November 2022 is $16,785,928 (Motion at 9: 6-8). The Debtors have failed to make required interest and principal payments since  March 2022.   See Declaration of Ethan Rosenbaum in Support of Limited objection to the Debtors' Emergency Motion for Entry of an Interim Order: (I) Authorizing Use of Cash Collateral on an Interim Basis Pending a Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief ("Rosenbaum Decl."), ¶ 3.   The Debtors have acknowledged the payment defaults.  Motion at 8:9-10.  The Debtors have likewise acknowledged that Access filed financing statements to secure its claim.  Declaration of Jonathan Kramer in Support of Debtors' Emergency "First Day" Motions ("Kramer Decl.")(Doc. No. 11), ¶ 18.

LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION
ACTIVE 684245463v3

### B.    The Budget for Debtor Rive Gauche Television

Attached as Exhibit 3 to the Kramer Dec. is the proposed 13-week budget (the "RGTV Budget") for Rive Gauche Television ("RGTV"). Among other things:

•    The beginning cash balance for Week 1 is $717,969.  The cash balance at the end of Week 13 is $227,904.

•    By Week 9, even assuming the collections set forth in the budget are realized, the cash balance is less than $34,000.

•    During the 13 Week period, RGTV intends to collect nearly $1.3 million from accounts receivable and use those monies to fund operations.

•    RGTV has failed to include in its papers a projected income statement which would show what new replacement receivables can be expected to be generated  to replace the existing receivables that are being expended.  There is no attempt to provide the Court or Access with any information as to the amount by which Access' cash collateral will be diminished during this time period.

•    During Weeks 9-12,  RGTV projects that it will collect over $1.13 million in receivables. It does not explain the likelihood of these collections and absent same, RGTV will have a negative cash balance of in excess of $1 million and no funds with which to pay its obligations.

•    The Debtors propose to pay insider compensation of $37,500 on behalf of RGTV.  The budget for Aftershock Comics, LLC proposes to pay insider compensation during this period of $97,449. Thus, total insider compensation of nearly $135,000 is sought during this time period.  No facts are set forth as to who will receive these monies and whether there has been any adjustments to insider compensation that would otherwise be payable but for the bankruptcy filing.

•    Legal fees for the Debtors' professionals are to be paid during this time period.

•    There are $153,670 in credit card payments to be reimbursed with no breakdown as to what expenses will be incurred to give rise to these obligations. (It should be noted that the credit card account is in the name of Kramer and his wife, even though his wife is not an employee of the Debtors).

•    There are $564,5000 in expenses for "costs of goods sold" with no explanation as to what these expenses are or how they support collateral value.

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

### C.     The Budget for Aftershock Comics, LLC

Attached as Exhibit 2 to the Kramer Dec. is the proposed 13-week budget (the "Aftershock Budget") for Aftershock Comics, LLC ("Aftershock"). Among other things:

•     The beginning cash balance for Week 1 is only $61,675.  The cash balance for Week 13 is $71,724.

•     By Week 9, even assuming the collections set forth in the budget are realized, the cash balance is less than $21,000.

•     During the 13 Week period, Aftershock intends to collect over $250,000 from accounts receivable and use those monies to fund operations. As this is woefully inadequate to fund its operations, Aftershock is also anticipating receiving $641,400.00 from RGTV during the budget period, to keep it afloat.

•     Aftershock has failed to include in its papers a projected income statement which would show what new replacement receivables can be expected to be generated  to replace the existing receivables that are being expended.  There is no attempt to provide the Court or Access with any information as to the amount by which Access' cash collateral will be diminished during this time period.

•     Aftershock does not explain the likelihood of the collection of its accounts receivable  and absent same, Aftershock will have a negative cash balance and no funds with which to pay its obligations.

•     As noted above, Aftershock will pay significant insider compensation.

•     Legal fees for the Debtors' professionals are to be paid during this time period.

•     No credit card expenses are allocated to Aftershock's operations.  If there were such an allocation, Aftershock's cash position (separate and apart from its receivable position) will likewise have deteriorated during the budget period.

### D.     The Debtors' Have No Meaningful Business to Operate

In the Kramer Decl., the vast majority of the Debtors' alleged collective value is held by RGTV. (Kramer Decl., ¶ 16)  This said, RGTV only has 4 non-insider employees.  Kramer Decl., ¶ 23.  No rationale is set forth why the overhead and expenses associated with the licensing of the RGTV Library makes even has a modicum of economic sense.  There are other means to license such rights without

4

lining the pockets of the insider, Mr. Kramer.  Given the limited resources of Aftershock and its failure to generate meaningful revenues, the notion of overseeing 40 sales representatives who make very little monthly wages (averaging $133 to $1,000/month:  Kramer Decl., ¶ 22), likewise makes little sense.

## III.    ADEQUATE PROTECTION IS NOT PROVIDED TO ACCESS

### A.    Overview

For the next 13 weeks the Debtors seek to pay a variety of expenses with Access' cash collateral, including their professionals, while Access is to receive no interest payments and no payments for its professionals. There is no admissible evidence proffered in support of the Motion that the Debtors will generate any revenues which could provide a basis for a replacement lien. Rather, the Debtors offer only the following conclusion in the Kramer Decl.:

"19.  …  I believe that  the Debtors' continued operations shall generate sufficient funds during those periods (the 13-week period) to cover the Debtors' costs for such operations."

Not a word is said about the generation of revenues.  The only grounds to support usage of cash collateral is an alleged equity cushion.  However, there is likewise no admissible evidence to demonstrate the existence of an equity cushion.  Mr. Kramer  offers unsupported conclusory statements about the value of the Debtors' assets to support this notion.  Access intends to depose Mr. Kramer and any other witness who is offered on these issues prior to the final hearing.

### B.    The Requirements of Adequate Protection

Pursuant to 11 U.S.C. §§ 361 and 363(e), Access seeks adequate protection of its interests as a condition to any use of cash collateral (as such term is defined in 11 U.S.C. § 363(a)) on terms that are acceptable to Access and which are approved by the Court. This includes (a) replacement of its lien with a "blanket" lien on the Debtors' assets to the same extent of its lien on the Debtors' prepetition assets, including (a) current payment of interest on its loan  and a cash retainer for Access's legal professionals and other advisors and current reimbursement of such expenses on a monthly basis, (b) an acknowledgement that no amounts expended by any party may be surcharged against the collateral under Section  506(c) of the Bankruptcy Code and that no professional fees be paid out of the collateral; until Access's liens have been paid in full, (c) provision for Access to have immediate free and unfettered access to the Debtors' books and records: (d) a deadline by which objections, if any, to the extent, validity

and priority of Access's liens must be filed; and  (e) entry of an Order providing Access with usual and customary protections afforded in cases such as this (such Order to be presented at the final hearing of this matter).

Pursuant to Section 363(c)(2), a debtor may not use, sell or lease cash collateral unless each entity that has an interest in such cash collateral consents, or the Court, after notice and a hearing, authorizes such use, sale or lease. Because cash collateral, once spent, is impossible to recover, the Bankruptcy Code strictly conditions a debtor's use of cash collateral upon the secured creditor receiving adequate protection of its interest in such collateral. 11 U.S.C. § 363(c)(2)(B). The Bankruptcy Code does not define the term "adequate protection," but Section 361 of the Bankruptcy Code lists examples of how adequate protection may be provided: (a) requiring the debtor to make a cash payment or periodic cash payments to such entity, to the extent that the stay under Section 362, the use, sale or lease under Section 363, or the grant of a lien under Section 364 results in a decrease in the value of such entity's interest in such property; (b) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property; or (c) granting such other relief, other than entitling such entity to compensation allowable under Section 503(b)(l) of the Bankruptcy Code as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property. While "adequate protection" may be a flexible concept, this flexibility cannot operate to the detriment of the secured creditor. E.g., *In re Martin*, 761 F.2d 472,477 (8th Cir. 1985). Regardless of the form that adequate protection takes, the secured creditor is entitled to receive the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3); see *In re Metromedia Fiber Network, Inc.*, 290 B.R. 487,491 (Bankr. S.D.N.Y. 2003) (adequate protection is mandatory); *In re Leavell,* 56 B.R. 11, 13 (Bankr. S.D. Ill. 1985) (same).

Further, Section 507(b) of the Bankruptcy Code provides that if adequate protection is afforded to the holder of a claim secured by a lien on property of the debtor, and if, notwithstanding such protection, such creditor has a claim allowable under Section 507(a)(1) of the Bankruptcy Code, arising from the stay of action against such property under Section 362, from the use, sale, or lease of such property under

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

Section 363, or from the granting of a lien under Section 364(d), then such creditor's claim is entitled to priority over every other claim allowable under such subsection.

Ensuring adequate protection of Access' interests before the Debtors use, consume, sell or otherwise dispose of any of the collateral is critical. Though a creature of the Bankruptcy Code, the concept of "adequate protection" is rooted in the Fifth Amendment's prohibition against the taking of private property without just compensation.  See Notes of Committee on the Judiciary, Senate Report No. 95-989, U.S. Code Cong. & Admin. News 5787 (1978); see, e.g., *Matter of Milleson*, 83 B.R. 696, 700 (Bankr. D. Neb.1988); *In re Southerton Corp.*, 46 B.R. 391, 397-98 (M.D. Pa. 1982); *In re Rhoades*, 38 B.R. 63, 65 (Bankr. D. Vt. 1984). As the Supreme Court stated in *United States v. Security Industrial Bank*, 459 U.S. 70, 103 S. Ct. 407, 74 L. Ed. 2d 235 (1982), "[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation." 459 U.S. at 75, 103 S. Ct. at 410, 74 L. Ed. 2d 235. Security interests unquestionably are "property rights" protected by the Fifth Amendment. E.g., *In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F. 2d 1017, 1019 (11th Cir. 1984).

Accordingly, the Court cannot allow Access' interests in its collateral to be diminished by the Debtors' use while under the protection of the Bankruptcy Code's automatic stay.  See *In re Magnus*, 50 B.R. 241, 243 (Bankr. D.N.D. 1985) (adequate protection "encompasses the basic constitutional requirement that a creditor's interest in property cannot be in any respect impaired or subjected to increased risk without assurance that the creditor will realize the benefit of its bargain") (emphasis added) (citations omitted). The Debtors own projections show a deterioration of the business over the 13 week projected period.

Aside from its Fifth Amendment underpinnings, adequate protection also is based on the strong policy that a secured creditor should not be deprived of the benefit of its bargain. E.g., *In re Gavia*, 24 B.R. 216, 217 (Bankr. E.D. Cal.), aff'd, 24 B.R. 573 (B.A.P. 9th Cir. 1982). As stated in the legislative history for the Bankruptcy Code:  Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or detrimental to the bankruptcy laws. Thus, this section recognized alternative means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the

purpose of the section is to insure that the secured creditor receives in value essentially what he bargained

for. H.R. Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), 1978 U.S. Code Cong. & Admin. News 5787,

5963, 6295. One of the principal purposes of adequate protection, then, is to ensure that the secured

creditor receives in value essentially what it bargained for and that the secured creditor's economic

position is not worsened because of the bankruptcy case and the debtor's use of the collateral. E.g., *In re

Shaw Industries, Inc*., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003); *In re DeSardi,* 340 B.R. 790, 797

(Bankr. S.D. Tex. 2006).

To satisfy the Fifth Amendment and the "indubitable equivalence" standard of Section 361(e),

adequate protection must compensate the secured creditor for any decrease in the value of its collateral as

a result of the use, deterioration, depreciation, destruction or any other caused reduction in value during

the bankruptcy case. E.g., *United Savings Association of Texas v. Timbers of Inwood Forest Associates,

Ltd.*, 484 U.S. 365, 370, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) (adequate protection is essentially the

amount of the collateral's decrease in value from the petition date); *In re First South Savings Associates,*

820 F.2d 700, 710 (5th Cir. 1987) (the measure of the adequate protection required is determined by the

extent of the anticipated or actual decrease in value of the secured creditor's collateral during the

bankruptcy case); *In re American Mariner Industries,* 734 F.2d 426, 433, rev'd and remanded on other

grounds, 734 F.2d 426, 435 (9th Cir. 1984) (required adequate protection must compensate the secured

creditor for the present value of the collateral and ensure the safety of the principal); *In re Monnier Bros.,*

755 F.2d 1336, 1339 (8th Cir. 1985); *Matter of Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988)

(adequate protection compensates secured creditor for any diminution in value of collateral as a result of

use, depreciation, destruction or other reduction in value); *In re Weinstein*, 227 B.R. 284, 296 (B.A.P. 9th

Cir. 1998) ("Adequate protection is provided to safeguard the creditor against depreciation in the value of

its collateral during the reorganization process").

A secured creditor lacks adequate protection for its security interests if there is a threat of decline

in the value of the collateral based on such factors as the debtor's depletion of the collateral or the

debtor's failure to maintain insurance on the collateral. E.g., *In re Delaney-Morin*, 304 B.R. 365, 370 n.3

(B.A.P. 9th Cir. 2003). If the Debtors' use of the collateral will diminish the value of that property, such

use cannot be permitted unless the Debtors adequately protect Access' interests in the collateral. See *In re

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

*Certified Corp.,* 51 B.R. 768, 771 (Bankr, D. Hawaii 1985) (the protection to be afforded to secured creditor to permit debtor's use of cash collateral must result in the indubitable equivalent of the secured creditor's interest in the property). The Debtors' strategy of using Access' cash collateral as their own personal piggy bank violates Access' rights as a secured creditor.

### C.    The Debtors' Bear A Substantial Burden of Proof to Establish Adequate Protection

The Debtors' bear the burden of establishing that Access' interests in the collateral will be adequately protected, 11 U.S.C. § 363(p) (debtor has burden of proof on "issue of adequate protection"); e.g., *In re Century Investment Fund VIII L.P.,* 155 B.R. 1002 (Bankr. E.D. Wis. 1989), affd, 937 F.2d 371 (7th Cir. 1991); In re Philadelphia Consumer Discount Co., 37 B.R. 946, 949 (E.D. Pa. 1984) (debtor had the burden to show  that its proposed use of collateral would adequately protect the creditor's interest in collateral); *In re Development, Inc.,* 36 B.R. 998, 1006 (Bankr. D. Hawaii 1984) (burden was upon debtor to establish that creditor's interest in property was adequately protected).

To sustain this burden, the Debtors must demonstrate, by clear and convincing evidence, that Access' interests in the collateral are adequately protected. The determination of adequate protection implicates particularly important individual interests, namely the creditor's Fifth Amendment right not to have its property taken without just compensation, and is a special bankruptcy proceeding, not just a "typical civil case involving a monetary dispute between private parties." *Addington v. Texas*, 441 U.S. 418. 423, 99 S. Ct. 1804, 1808, 60 L Ed. 2d 323 (1979); e.g., *Herman & Maclean v. Huddleston*, 459 U.S. 375,389, 103 S. Ct. 683,691, 74 L Ed. 2d 548 (1983) ("Thus, we have required proof by clear and convincing evidence where particularly important individual interests or rights are at stake."). As the Supreme Court noted in *Addington*, the standard of proof "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington*, 441 U.S. at 423, 99 S. Ct. at 1808. With a "preponderance of the evidence" standard, the parties "share the risk of error in roughly equal fashion," because "society has a minimal concern with the outcome ...." Id. When the interests at stake are more substantial, however, such as here where the secured creditor's 5th Amendment rights are at stake, the clear and convincing standard is required.

This heightened standard of proof is especially appropriate when a debtor intends to use the secured creditor's cash collateral, due to the special nature of this type of collateral. As noted by one

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

court: Congress in enacting §363 of the Code gave a special treatment to "cash collateral" for the obvious reason that cash collateral is highly volatile, subject to rapid dissipation and requires special protective safeguards in order to assure that a holder of lien on "cash collateral" is not deprived of its collateral through unprotected use by the Debtor. *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).

For this reason, courts have recognized that "[t]he debtor's burden is greater in succeeding in a cash collateral motion than in withstanding a §362(d) motion [to lift the automatic stay]." *In re 1606 New Hampshire Ave. Associates*, 85 B.R. 298, 309 (E.D. Pa. 1988). As acknowledged by these courts, Congress has provided special protection for a secured creditor's interest in cash collateral, as opposed to other types of collateral, indicating that courts should apply a stricter standard of proof than may by applied in other contested matters. See *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987) ("[i]t is axiomatic that cash collateral is special in nature and must be well protected"); *In re Berens*, 41 B.R. 524 (Bankr. D. Minn. 1984) (definition of adequate protection in the context of section 363 is considered to be uncompromising, in contrast to the standard under other sections of the Bankruptcy Code, because the debtor proposes to consume and use up cash collateral in its entirety); *In re Polzin*, 49 B.R. 370 (Bankr. D. Minn. 1985) (same). Unlike the depreciation of tangible assets, once cash collateral is spent, it can never be recovered, which heightens the danger of injury to of protecting against such injury.

### D.  Mere Predictions Are Not Sufficient to Meet the Debtors' Burden of Proof

To sustain its burden, regardless of whether a "clear and convincing" or "preponderance of the evidence" standard applies, the Debtors cannot simply offer unsubstantiated lay testimony based upon mere hopeful predictions. To prove adequate protection exists, the Debtors "must go beyond simply estimating what they hope they can harvest and what they hope the market will bring for it." *Bankwest N.A. v. Todd*, 49 B.R. 633,635 (D.S.D. 1985). See also, *In re Llewellyn*, 27 B.R. 481,487 (W.D. Pa. 1983) (unsubstantiated projections do not suffice); *In re Robert E. Derecktor, Inc.*, 137 B.R. 95 (Bankr. D. RI 1992) (moving papers which just ask for authority to use such collateral because the debtor "needs" to use it is not sufficient). Rather, the Debtors must support their allegations with objective and convincing evidence that Access' interests in the collateral will not be depreciated or eroded by the Debtors use and consumption of this property.

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

The question whether any protection proposed by the Debtors for their use of the collateral will be sufficient necessitates a determination of the value of Access' security interests in the collateral and whether the Debtors proposed use of the collateral threatens that value. See, e.g., *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F. 2d 1017, 1019 (11th Cir. 1984). None is offered to Access by the Debtors. Sections 361 and 363, while requiring that the value of the secured creditor's interests in its collateral be adequately protected, do not specify a standard of valuation. Instead, [v]aluation in a given case depends on that calculation which properly reflects a secured creditor's true state of protection.... The "true state of protection" depends largely upon such factors as the nature of the debtors' business, general prospects for reorganization, the time lapsed since the filing of the petition, and the existence, or lack of, an equity cushion. *In re O'Quinn*, 98 B.R. 86, 89 (Bankr. M.D. Fla. 1989) (internal quotations omitted) (citing *In re Phoenix Steel Corp.,* 39 B.R. 218, 224 (D. Del. 1984)). As the Supreme Court observed in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S. Ct. 1879, 138-L. Ed. 2d 148 (1997), "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." *Rash*, 520 U.S. at 962, 117 S. Ct. at 1885; see 11 U.S.C. § 506(a) (the value of a secured claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use").

Because the focus of adequate protection is on protecting the creditor's interest in the collateral, preventing an unconstitutional taking of the creditor's property, and preserving the benefit of the creditor's bargain, only net liquidation value -- the amount Access would realize if it foreclosed upon the collateral in a commercially reasonable manner, after deducting foreclosure costs -- is the appropriate standard. See *In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019-20 (11th Cir. 1984) (purpose of adequate protection is to compensate the creditor and protect from risk the present value of the creditor's interest in property). The risk being guarded against is that, if a debtor's efforts to reorganize ultimately are unsuccessful, the value of the secured creditor's collateral will have decreased during the course of the bankruptcy case, and the secured creditor, upon foreclosure on its collateral, will recover less than the secured creditor could have realized on this collateral at the time the bankruptcy case was filed and the automatic stay went into effect. The valuation methodology, then, should look to the value that the secured creditor is being required to forego by the imposition of the stay and the

11

debtor's continued use of the collateral. That value is the net recovery on the secured creditor's collateral in a commercially reasonable foreclosure sale context. In other words, the proposed "disposition or use" of the collateral for adequate protection purposes is a liquidation by Access, rather than retention by the Debtors. Only by the use of a net liquidation value standard can the Court be assured that Access' constitutionally protected interests will not be impaired by the Debtors use of the collateral. See, e.g., *In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ("[Creditor] asserts that liquidation value is the appropriate yardstick by which to measure the value of the Debtor's assets. We agree."); *In re O'Quinn*, 98 B.R. 86, 89 (Bankr. M.D. Fla. 1989) (collateral appraised at liquidation value for adequate protection purposes); *In re Polzin*, 49 B.R. 370, 373 (Bankr. D. Minn. 1985) (adequate protection valuation must take foreclosure costs into account); *In re Demakes Enterprises, Inc.*, 145 B.R. 362, 365 (Bankr. D. Mass. 1992) (valuing meat processing plant at liquidation value); *In re Robbins*, 119 B.R. 1, 5 (Bankr. D. Mass. 1990) (valuing Chapter 11 Debtor's investment property at foreclosure value); *In re THB. Corp.*, 85 B.R. 192, 196 (Bankr. D. Mass. 1988) ("the fact that the Debtor is a going concern is no reason to value the collateral under the going concern standard unless it appears likely that the secured party would actually receive that value from its collateral through a pending sale").  As one court has noted, "creditors are not in the business of selling at retail and have not shown the capacity to do so," and "creditors cannot reasonably be said to 'stand in the shoes' of the [debtor], so as to justify a retail valuation ...."

> *Grubbs v. National Bank of South Carolina,* 114 B.R. 450, 452 (D.S.C. 1990).

### E.    The Debtors Failed to Demonstrate the Existence of an Equity Cushion

The Debtors' proffer no expert testimony to support the notion that Access is protected by an equity cushion.  The only evidence offered in support of this proposition is the Kramer Decl.  As set forth in the accompanying Evidentiary Objections to the Declaration of Jonathan Kramer In Support of Debtors' Emergency "First Day" Motions, at most, the Kramer Decl. is admissible as testimony of a lay witness and even under these circumstances, only so if the witness demonstrates that he has particularized knowledge as a result of his experience. *United States v. 242.93 Acres*, No. 10-cv-1133-BEN (CAB), 2012 U.S. Dist. LEXIS 21746, at *6 (S.D. Cal.).  In this instance, no facts have been set forth in the declaration which establish these predicate facts. Mr. Kramer states that he relied upon a

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

report prepared by a consultant to come up with his values.  This renders Mr. Kramer's opinion inadmissible hearsay. *Everest Stables, Inc. v. Canani*, CV 09-9446 DSF (VBKx), 2011 WL 13213657, at *6 (C.D. Cal. Oct. 6, 2011) citing *Stoebner Holdings, Inc. v. Automobile Lamborghini S.P.A.,* No. 06-00446 JMS/LEK, 2007 WL 4230824, at *2 (Dist. Haw. Nov. 30, 2007) (excluding lay opinion valuation testimony to the extent it is based on hearsay).  A lay opinion of a debtor's principal unsupported by data is not credible evidence of value. *In re Meeks*, 349 B.R. 19, 22 (Bankr. E.D. Cal. 2006).

While the Court cannot consider the valuation of the consultant whose report is attached as an exhibit to the Kramer Decl. as it is unsubstantiated hearsay, even if the Court did so, the consultant set forth no facts setting forth how he derived his valuation numbers.  As such, his report has no evidentiary value. *King Jewelry v. Federal Express Corp.,* 166 F. Supp. 2d 1280, 1282 n. 1 (C.D. Cal. 2001) ("Opinions and conclusions without foundation…are inadmissible under Federal Rule of Evidence 701."); see also *Atencio v. TuneCore, Inc.*, CV 16-1925-DMG (MRWx), 2018 U.S. Dist. LEXIS 223997, at *26 (C.D. Cal. Nov. 13, 2018) (providing the accurate and reliable valuation of a company requires technical or specialized knowledge).

By contrast, as set forth in the Rosenbaum Decl., there is a substantial question whether there is any equity cushion.  The Debtors' projections concerning the value of the TV library is based upon income generation.  Income to be realized from the TV library has consistently been overstated.  Further, an underlying (but undisclosed) assumption in the Debtors' projections is a need to raise $20 million in capital.  There is no basis to conclude the Debtors' will be able to raise any capital, let alone this enormous sum. With respect to the  TV library, while there is no basis to determine what underlying assumptions support the alleged value, past assumptions of value provided to Access by RGTV provided that only approximately 6% of projected revenues come from resale of existing territory rights and fully 94% comes from AVOD, an area in which RGTV has no track record and which is purely speculative. The inadmissible report of the consultant attached as an exhibit to the Kramer Decl. assumes 92% of revenues will come from AVOD. RGTV has not provided Access with information to  establish that Access even has  AVOD rights to sell. RGTV currently only appears to have AVOD rights licensed on one site, Pluto TV, and Access has been unable to confirm the revenue per hour of programming assumption that Access was provided by Pluto.  Even accepting the Debtors' overstated valuation, only

about $3.3m of that value is attributable to RGTV's current licensing business and is substantiated by any historical track record.  The remaining value is attributable to a business model that RGTV only entered into little over a year ago and has only generated about $400,000 in receipts (through August of this year). The IP owned by Aftershock is largely unexploited and of highly speculative value.  Aftershock has  significantly underperformed on its revenues projections and there is simply no basis to conclude that there will be the type of demand implicit in the value assumptions for its IP assets.

The following points underscore some of the deficiencies in the consultant's inadmissible analysis:

RGTV

1. The consultant  did not value the library; he only reviewed assumptions and methodologies. Report, Page 1.

2. The consultant  apparently reviewed a management valuation or excel spreadsheet but Debtors decided not to attach that to their filing.

3. The consultant   concedes  that of the projected revenues, only 6% comes from "the resale of territory rights" (i.e. RGTV's existing business of licensing rights) and 94% comes from AVOD (Advertising Video on Demand), a totally new business for RGTV where it doesn't earn a sales agency fee (its traditional model) but a share of advertising revenues. RGTV has little to no historical experience from which to project these revenues (but as set forth below, believes there will be spectacular growth).

4. This AVOD revenue (which the consultant concedes is "a relatively new distribution channel for the Company") accounts for 92% of the projected value of the film library (i.e. the value of the library attributable to the historical sales model is less than $3.3m-and this is the only part of the projection for which there is any historical support).

5. Despite the highly speculative nature of almost all of the projected cash flows, the projections use a discount rate of 10%, which is considerably less than the  Debtors' cost of capital from Access.

6. Although the Debtors did not attach the model that the consultant reviewed, Access assumes it is the same, or substantially the same as a presentation given by the Debtors to Access  dated 8/29/22, (attached to the Rosenbaum Declaration as Exhibit ("_"), which has a base case valuation for the library of $41 million (page 41), the same number as used in their filing.

14

7. What the presentation discloses (but which was not disclosed in the Debtors' cash collateral filings) are the material assumptions behind the base case valuation (page 52), which include the following:

a. a $20 million equity infusion (including $10 million in 2022-which has not happened-Page 55).

b. a 73.2% 3-year compounded annual growth rate (CAGR) for AVOD revenue. RGTV's AVOD revenue for the first 6-9 months of operation was $409,309 (page 18);

c. an increase in net income from an estimated loss of $4.1 million in 2022 to $40 million in 2025.

8. What Debtors are in fact projecting are cash needs of almost $10 million through the end of 2023 (page 36); hence the need for an immediate $10 million capital infusion.

<u>Comic Books and Comic Book IP</u>

1. Kramer testifies that these assets have been "independently valued" at approximately $17.2 million but does not say by whom. The statement is inadmissible hearsay.

2. Again, this valuation seems to come from the Debtors' own estimates. In the August presentation, Comic IP was valued at $13.7 million (page 43) and the comic book business at about $3.5 million (page 45).

3. While the Debtors' disclosures to the Court to do not disclose the underlying assumptions, the August, 2022 presentation does: (a) growth in comic publishing at a 3 year CAGR of 38.9% (page 52); (b) monetization of 18 Comic book IP rights in 2023-4 (page 52), increasing revenue from an estimated $321,500 in 2022 (page 43) to $4 million next year and $22 million in 2024 (page 52).

**F.    Payments to Access Should be Required**

The Debtors have not offered to make any payments to Access from future cash on hand. As the court in *Matter of Earth Lite, Inc.*, 9 B.R. 440, 444 (Bankr. M.D. Fla. 1981), stated, "the Debtor should not be permitted to use cash collateral without making some payments to the secured party just because it ha[d], at the commencement of the case, a meaningful equity cushion in the collateral. To accept this proposition would mean that a debtor may freely use cash collateral until the collateral is reduced to the amount of the indebtedness during which time the secured party is deprived of income, for which it bargained when the loan was granted. Access must not be forced to watch its equity cushion (even

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

assuming one exists) evaporate. See also *In re Greenwood Building Supply, Inc.*, 23 B.R. 720 (Bankr. W.D. Mo. 1982) (requiring weekly payments to secured creditor of an amount equal to 20% of amounts collected by the debtor as adequate protection of secured creditor's interest notwithstanding evidence of equity cushion); *In re Q-C Circuits Corp.*, 231 B.R. 506, 511 (E.D. N.Y. 1999) (payments may be required); *In re Heatron, Inc.*, 6 B.R. 493, 494 (Bankr. D. Mo. 1980) (payments required).

### G.    Cash Collateral Should Not be Used to Pay the Debtors, Professionals

Access objects to the payment of any professional fees out of its cash collateral and will seek to recover any retainers already paid out of its cash collateral. While Access does not generally object to allowance of the professional fees as an administrative expense, Access strongly objects to the payment of the professional fees from its cash collateral. *In re Ranch Partners, LTD*, 146 B.R. 833 (D. Colo. 1992) (debtor prohibited from paying bankruptcy professional fees out of secured creditor's cash collateral); *Matter of P.C. LT.D.*, 929 F.2d 203, 205 (5th Cir. 1991) (absent extraordinary circumstances, administrative expenses must be satisfied out of the bankruptcy estate not from secured creditor's collateral).  Payment of the professional fees from Access' cash collateral is tantamount to the imposition of a Section 506(c) surcharge upon Access' cash collateral. However, under Section 506(c), a debtor must show a benefit to the secured creditor by the proposed expense. *Matter of P.C. L.TD.*, 929 F.2d at 205. Here, the Debtors' use of the cash collateral to pay the professional fees has no corresponding benefit to Access. To the contrary, the payment of professional fees from its cash collateral will only further deplete Access' collateral position (of which Access has a blanket lien). The Debtors here have pointed to no collateral that would increase in value. To the extent equity is applied to this analysis, it should weigh heavily in favor of LLCP and prevent the Debtors from profiting from their breaches of the underlying loan agreement by utilizing Access' cash collateral for their own benefit and depriving Access of its secured creditor rights under the Bankruptcy Code and other applicable law.

## IV.    <u>CONCLUSION</u>

In agreeing to extend credit to the Debtors, Access bargained for certain rights, including the right to collect and foreclose upon its security interests in the collateral if the Debtors defaulted. The Debtors are running out of cash, are in payment default to Access, and have defaulted on numerous other covenants and agreements. As discussed above, Access' rights as a secured creditor are protected by the

1    Fifth Amendment and cannot be taken without compensation. Upon the Debtors' filing for bankruptcy

2    relief, the automatic stay bars Access from exercising these constitutionally protected lien rights. Now, in

3    addition to prohibiting Access from exercising its rights as a secured creditor, the Debtors propose to use

4    and consume the collateral, including the cash proceeds of such collateral. The adequate protection

5    required by the Fifth Amendment and Sections 361 and 363 must guard against a decline in the value of

6    Access' interest in the collateral during the pendency of the bankruptcy case while the automatic stay is

7    in effect. Access should be no worse off after the Debtors use any of the collateral than if Access was

8    permitted to exercise its state law collection and foreclosure rights today. If the Debtors cannot provide

9    this protection for Access' interests in the collateral, then the Debtors are not entitled to use the collateral.

10           WHEREFORE, Access respectfully requests that the Court enter an Order:

11           Requiring the Debtor to provide Access with adequate protection of Access' interests in the

12    collateral pursuant to 11 U.S.C. §§ 361 and 363 as a condition to Debtors' continued use, consumption or

13    other disposition of such property, in a form acceptable to Access and as requested above; and

14           Granting Access such other and further relief as the Court deems just and equitable or to which

15    Access may be entitled.

16

17

18    DATED:  December 28, 2022                    GREENBERG TRAURIG, LLP

19

20                                                By */s/ Howard J. Steinberg*_____
                                                  Howard J. Steinberg
21                                                Attorneys for Creditor Access Road Capital, LLC

22

23

24

25

26

27

28

**LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION**
*ACTIVE 684245463v3*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Greenberg Traurig LLP, 1840 Century Park East, Suite 1900, Los Angeles, CA  90067

A true and correct copy of the foregoing document entitled (*specify*): **LIMITED OBJECTION OF ACCESS ROAD CAPITAL, LLC TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (1) AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; (II) GRANTING ADEQUATE PROTECTION REPLACEMENT LIENS: (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 12/28/22, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Russell Clementson**   russell.clementson@usdoj.gov
- **Jeffrey S Kwong**   jsk@lnbyg.com, jsk@ecf.inforuptcy.com
- **David L. Neale**   dln@lnbyg.com
- **United States Trustee (SV)**   ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 12/28/22, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
VIA MESSENGER
Honorable Martin Barash
USBC. Central District of California
21041 Burbank Blvd., Suite 342, Ctrm 303
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/28/22 | Terrine Pearsall | /s/ Terrine Pearsall |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.