1  DAVID L. NEALE (SBN 141225)
   JEFFREY S. KWONG (SBN 288239)
2  LEVENE, NEALE, BENDER, YOO & Golubchik L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234; Facsimile: (310) 229-1244
   Email: dln@lnbyg.com; jsk@lnbyg.com
5
6  Attorneys for Chapter 11 Debtors
   and Debtors in Possession

7
8                **UNITED STATES BANKRUPTCY COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
9                **SAN FERNANDO VALLEY DIVISION**

10 | In re: | ) | Lead Case No.: 1:22-bk-11456-MB |
   | | ) | |
11 | AFTERSHOCK COMICS, LLC, a California | ) | Jointly administered with: |
   | limited liability company, | ) | 1:22-bk-11457-MB |
12 | | ) | (Rive Gauche Television). |
   | Debtor and Debtor in Possession. | ) | Chapter 11 Cases |
13 | | ) | |
   | In re: | ) | |
14 | | ) | **DEBTORS' EMERGENCY MOTION** |
   | RIVE GAUCHE TELEVISION, a California | ) | **FOR ENTRY OF AN ORDER** |
15 | corporation, | ) | **AUTHORIZING THE DEBTORS TO** |
   | | ) | **USE CASH COLLATERAL FOR THE** |
16 | Debtor and Debtor in Possession. | ) | **PERIOD ENDING APRIL 30, 2024;** |
   | | ) | **DECLARATION OF JONATHAN** |
17 | ☒ Affects both Debtors | ) | **KRAMER IN SUPPORT THEREOF** |
   | ☐ Affects AfterShock Comics, LLC only | ) | |
18 | ☐ Affects Rive Gauche Television only | ) | [APPLICATION FOR HEARING ON |
   | | ) | SHORTENED NOTICE FILED |
19 | | ) | CONCURRENTLY HEREWITH] |
   | | ) | |
20 | | ) | |
   | | ) | |
21 | | ) | |
   | | ) | |
22 | | ) | |
   | | ) | |
23 | | ) | |
   | | ) | |
24 | | ) | Emergency Hearing |
   | | ) | DATE:  TBD |
25 | | ) | TIME:  TBD |
   | | ) | PLACE: ZoomGov |
26 | | ) | |

27
28

                            1

# **TABLE OF CONTENTS**

SUMMARY AND MOTION ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 3

I.     STATEMENT OF FACTS ................................................................................ 3

     A.    Background ................................................................................ 3

     B.    The Debtors' Efforts To Consummate A Transaction ............................ 4

     C.    Cash Collateral Issues After The Evidentiary Hearings........................ 7

     D.    This Cash Collateral Motion .................................................................. 9

     E.    The Lender Is Adequately Protected ..................................................... 11

     F.    Compliance with Rule 4001 of the Federal Rules of Bankruptcy Procedure
         and Local Bankruptcy Rule 4001-2 ...................................................... 16

II.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL ........ 18

     A.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH
         COLLATERAL DURING THE PERIOD IN ACCORDANCE WITH
         THE BUDGET.......................................................................................... 18

     B.    THE LENDER'S INTEREST IN CASH COLLATERAL WILL BE ADEQUATELY
         PROTECTED............................................................................................21

     C.    USAGE OF CASH COLLATERAL FOR THE PURPOSE OF PAYING THE
         LIMITED EXPENSES IN THE BUDGET IS CONSISTENT WITH THE TERMS
         OF THE 6/6 STIPULATION ....................................................................24

III.   THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE............................ 25

IV    CONCLUSION.............................................................................................. 26

DECLARATION OF JONATHAN KRAMER........................................................ 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re 499 W. Warren Street Assocs., Ltd. P'ship*,
142 B.R. 53 (Bankr.N.D.N.Y.1992) ........................................................................23

*In re Dynaco Corporation*,
162 B.R. 389 (Bankr. D.N.H. 1993) ...............................................................19, 23

*Federal Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship.*
153 B.R. 204 (N.D. Ill. 1993) ...............................................................................23

*In re Immenhausen Corp.*,
164 B.R. 347 (Bankr. M.D. Fla. 1994) ...............................................................23

*In re McCombs Properties VI, Ltd.*,
88 B.R. 261 (Bankr. C.D. Cal. 1988).............................................................21, 23

*In re McGowan*,
6 B.R. 241 (Bankr. E.D. Pa.1980) .......................................................................21

*In re Mellor*,
734 F.2d 1396 (9th Cir. 1984) ..............................................................................21

*In re Newark Airport/Hotel Ltd. Partnership*,
156 B.R. 444 (Bankr. D.N.J. 1993) .....................................................................23

*In re O'Connor*,
808 F.2d 1393 (10th Cir. 1987) ...........................................................................21

*In re Oak Glen R-Vee*,
8 B.R. 213 (Bankr. C.D. Cal. 1981).....................................................................19

*Matter of Pursuit Athletic Footwear, Inc.*,
193 B.R. 713 (Bankr. D. Del. 1996) ....................................................................23

*Rios v. Linn Star Transfer, Inc.*,
No. 19-CV-07009-JSC, 2020 WL 1677338 (N.D. Cal. Apr. 6, 2020) ...................25

*In re Rogers Development Corp.*,
2 B.R. 679 (Bankr. E.D. Va.1980).......................................................................21

*In re Stein*,
19 B.R. 458. (Bankr. E.D. Pa. 1982) ...................................................................23

*In re Tucson Industrial Partners*,
   129 B.R. 614 (B.A.P. 9th Cir. 1991) .................................................................................19

**California Cases**

*See's Candy Shops, Inc. v. Superior Court*,
   210 Cal. App. 4th 889 (2012) ...........................................................................................25

**Federal Statutes**

11 U.S.C.
   §§ 101, *et seq.* Title 11 Chapter 11 §§ 105(a), 361, 362, and 363 ......................1, 3, 19, 27
   § 107(b)(1) ..............................................................................................................................6
   § 361(2) ................................................................................................................................22
   § 363(a) .....................................................................................................................3, 18, 28
   §§ 363(c) and 363(c)(1) ........................................................................................................18
   § 363(c)(2)(A) and (B) ....................................................................................................18, 19
   §§ 506(c), 544, 545, 547, 548 and 549 ...............................................................................18
   §§ 1107 and 1107(a) ..................................................................................................3, 18, 27
   § 1108 .............................................................................................................................3, 27

**California Statutes**

Cal. Labor Code
   §§ 201 & 204 ........................................................................................................................25
   § 203 .....................................................................................................................................25

California Labor Code
   § 201 .....................................................................................................................................25
   § 204 .....................................................................................................................................25
   § 558 .....................................................................................................................................25

**Other Authorities**

Fed. R. Bankr. Pro. 4001 .................................................................................................................16

Fed. R. Bankr. Pro. 4001(b)(1)(C) ...................................................................................................18

Fed. R. Bankr. Pro. 4001(c)(1)(B) ...................................................................................................16

Fed. R. Bankr. Pro. 4001-2 ..............................................................................................................16

Fed. R. Bankr. Pro. 4001-2(b) and (d) .............................................................................................16

Fed. R. Bankr. Pro. 9018...................................................................................................................6

## **SUMMARY AND MOTION**

AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together with Aftershock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein (the "Debtors"), hereby move (the "Motion"), pursuant to Local Bankruptcy Rules ("LBR") 2081-1, 4001-2, and 9075-1, Federal Rules of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code"),[1] for the entry of an order:

(1)    authorizing the Debtors to use Cash Collateral (as defined under Section 363) in accordance with the terms of the budget attached as **Exhibit "1"** (the "Budget") to the Declaration of Jonathan Kramer (the "Kramer Declaration"), provided that, with regards to the Budget for the period from the week ending March 1, 2024 to the week ending April 30, 2024 (the "Period"),[2] the Debtors shall be entitled to a monthly variance of up to 10% on a line item basis and up to 15% on a collective basis, or such other variance as may be requested by the Debtors and approved by the Court;

(2)    authorizing the Debtors to provide Access Road Capital, LLC (the "Lender") with further adequate protection by granting the Lender replacement liens on, and security interests in, the assets of the Debtors' estates (the "Adequate Protection Liens"), to the extent of any diminution in the Lender's collateral during the Period resulting from the Debtors' use of any Cash Collateral in which the Lender has a valid interest;

(3)    vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the Orders to provide the Lender with the Adequate Protection Liens;

(4)    waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Order; and

(5)    granting related relief.

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.
[2] The hearing on this Motion will take place after the week ending March 1, 2024, and the Debtors are requesting, among other things, authorization for the Debtors to pay the budgeted expenses for that week once the Court approves Cash Collateral usage pursuant to the Budget.

1

As required by LBR 4001-2, attached as **Exhibit "A"** hereto is the Debtors' "*Statement Regarding Cash Collateral Or Debtor In Possession Financing [FRBP 4001; LBR 4001-2].*"

**WHEREFORE**, the Debtors respectfully request that the Court:

(1)     grant the relief requested in the Motion;

(2)     enter an Order in substantially the form attached as **Exhibit "B"** hereto;

(3)     authorize the Debtors' usage of Cash Collateral to pay the expenses set forth in the Budget; and

(4)     grant such further relief as the Court deems just and proper.

Dated: March 6, 2024            AFTERSHOCK COMICS, LLC &
RIVE  GAUCHE TELEVISION

*/s/ Jeffrey S. Kwong*
David L. Neale
Jeffrey S. Kwong
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
Counsel for Debtors and Debtors in Possession

### MEMORANDUM OF POINTS AND AUTHORITIES[3]

### I.

### STATEMENT OF FACTS

**A.    Background.**

1.    Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on December 19, 2022 (the "<u>Petition Date</u>").  The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("<u>ASM</u>") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience.   The Debtors' senior secured lender is Access Road Capital, LLC (the "<u>Lender</u>").

3.    Shortly after the Petition date, on December 21, 2022, the Debtors filed the "*Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief*" [Doc. No. 12] (the "<u>Cash Collateral Motion</u>").

4.    The Court previously held an initial hearing, and an evidentiary hearing that commenced on January 13, 2023 (the "<u>January Evidentiary Hearing</u>") on the Debtors' Cash Collateral Motion seeking interim use of the Lender's "cash collateral" as that term is defined in § 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").   After the conclusion of the January Evidentiary Hearing, the Court concluded that that "the value of the noncash collateral securing the claims of [the Lender] . . . [is] ***no less than $20,000,000***, which provides a substantial equity cushion." *See* 4/6 Transcript pg. 4, lines 8-17; 1/19 Transcript, pg. 18, lines 10-15 (emphasis added). On January 24, 2023, the Court entered the *Interim Order Re: Debtors' Emergency*

---

[3] Capitalized terms not otherwise defined herein have the same meanings as in the preceding Notice of Motion and Motion.

*Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief* [Doc. No. 94] permitting the Debtors to use Cash Collateral on an interim basis.  The relevant pages of the April 6, 2023 and January 12 and 19, 2023 transcripts are attached hereto as **Exhibits "8" and "9,"** respectively.

5.      On April 5 and 6, 2023, the Court conducted another hearing on the Debtors' continued use of Cash Collateral (the "April Evidentiary Hearing, and together with the January Evidentiary Hearing, the "Evidentiary Hearings").   After the April Evidentiary Hearing, the Court relied on the Debtors' "***substantial asset value and equity cushion***" to, again, authorize the Debtors to continue using Cash Collateral.  *See* 4/6 Transcript pg. 11, line 13.  On April 12, 2023, the Court entered the "*Second Interim Order Re: Debtors' Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief In Support Thereof*" [Doc. No. 174] (the "Second Cash Collateral Order") allowing the Debtors to continue using Cash Collateral until May 31, 2023.[4]

**B.      The Debtors' Efforts To Consummate A Transaction.**

6.      Because one of the Debtors' goals in these Cases has been to pay off the Lender's allowed claim, since the Petition Date, the Debtors have been working on identifying third party lenders and/or investors that will provide the necessary funding for the Debtors to repay the Lender, fund a plan of reorganization (including the payment of all administrative expenses in full), and provide sufficient working capital for the Debtors to maintain their operations well into the future.

---

[4] For the sake of brevity, the Debtors will not re-cite the cases, authorities, arguments, and evidence set forth in their previous cash collateral pleadings, and will incorporate them herein by this reference.

7.      As the Court is aware, the Debtors spent considerable time and effort negotiating and obtaining a commitment for post-petition financing.  Unfortunately, as time has passed, it has become clear that the third parties who were to have provided a credit enhancement in connection with the proposed financing were ultimately not able to proceed.  While there is still a possibility that the Debtors will be able to avail themselves of the financing previously approved by the Court with an alternative credit enhancement and/or guarantor, the Debtors have, in the exercise of their sound business judgment, determined that it is necessary to explore other exit strategies.

8.      As a result, the Debtors have solicited proposals from third parties concerning one or more transactions designed to facilitate the Debtors' efforts to propose and confirm a Plan.  Now that the effects of the three (3) year pandemic have subsided and the almost one (1) year long entertainment industry strikes have been resolved, the Debtors have been able to engage with media and entertainment entities (*i.e.*, potential lenders and investors) who have been impressed by the Debtors' accomplishments (despite the negative impacts that the above-mentioned force majeure events have had on the Debtors' businesses).  Specifically, these strategic parties have taken note of the Debtors' recent and demonstrable progress in implementing their business plan, the Debtors' updated cash flow projections, and the Debtors' tangible progress towards production with respect to several of their IP properties.

9.      As set forth more fully in the Kramer Declaration, some of the parties with whom the Debtors are currently in communication had previously expressed interest in a transaction with the Debtors, while others with whom the Debtors are speaking are newly identified.  Two of these parties have negotiated term sheets with the Debtors.  Specifically, the Debtors: (1) have been re-engaged by a party that had previously entered into a term sheet with the Debtors, and that entity is anticipated to be in a position to show proof of funds for the transaction in the near future; (2) have negotiated a term sheet with another party who is currently pursuing funding to back the financing to the Debtors; and (3) entered into non-disclosure agreements with three other parties, one of which is a very significant creditor of the Debtor (who is currently reviewing the Debtors' due diligence materials).  The Debtors are exploring ways to exploit their

existing IP properties in foreign markets specifically; if such a transaction is consummated, the Debtors would realize millions of dollars of revenue from major, credit-worthy companies.

10.    The Debtors are exploring all available financing alternatives to allow for a successful resolution of these cases. The Debtors have endeavored to keep the Committees apprised of their efforts, and have shared financial and other information to support the Debtors' business strategy, and future growth plans and projections.

11.    Given the sensitive nature of these negotiations, the Debtors are not able to provide more detailed information in a public forum concerning the various proposed transactions at this time. However, Debtors' counsel, Committees' counsel, and the Lender have been provided the identities of the potential investors (all of which are strategic media investors).[5]

12.    The Debtors believe that, as the Debtors come into this new year, there is a better appreciation in the marketplace of the Debtors' business strategy. There are several reasons for that: (1) the AVOD revenue actually realized by the Debtors is consistent with the Debtors' growth expectations which were previously questioned as unrealistic (50% calendar year growth from '22 to '23 for RGTV); and (2) the broader acceptance of comic IP as a source of TV and Film partially because of the success of a competitor's comic-based series, "The Boys," which thus far has generated three (3) spinoffs for Amazon. In addition, the entertainment industry has, in general, concluded that although quality must be maintained, production costs need to be contained. This recent realization by the international market necessitates co-production to finance more projects than in the past; this fits RGTV's "sweet spot" of providing that co-production link, and is a key differentiator, that is attractive to potential financiers, licensees and talent alike.

---

[5] Should the Court desire additional information with respect to these proposed transactions, the Debtors would request that the Court authorizing the filing of such information under seal. *See* 11 U.S.C. § 107(b)(1) (Court may, on its own motion, protect an entity with respect to confidential commercial information). The Court may "on its own initiative, with or without notice, … make any order which justice requires (1) to protect the estate or any entity in respect of confidential … commercial information." Fed. R. Bankr. Pro. 9018.

**C.    Cash Collateral Issues After The Evidentiary Hearings.**

13.    After the Evidentiary Hearings, the Debtors and the Lender entered into several Court-approved cash collateral agreements, the most recent of which authorized the Debtors to use Cash Collateral until November 30, 2023.  *See* (Doc. No. 371) (Agreed cash collateral order entered on November 14, 2023).  Specifically, the Court's November 14, 2023 cash collateral order authorized the Debtors to use Cash Collateral until November 30, 2023 (including to make the payroll due to the Debtors' employees on or around October 31, 2023) subject to several conditions, one of which is that "No additional payroll . . . shall be paid by the Debtors, unless the Lender receives a copy of a letter or other communication from the Credit Enhancement issuing bank . . . confirming that the Credit Enhancement is to be issued."  Because the "Credit Enhancement" has not been issued – except for the two (2) individuals consisting of the Debtors' administrative/bookkeeping staff (who the Lender previously authorized payments to) – the Debtors have not been able to pay wages and other benefits to their other employees (the "Unpaid Employees") since November 2023 and through the holiday season.  As discussed further below, despite every effort by the Debtors to retain all of their employees, many senior staff members have pursued other employment opportunities given the Debtors' inability to provide assurance of payment for both back wages and future wages.  It goes without saying that after more than three months of non-payment to the Unpaid Employees, every day that goes by where payroll is not paid makes it more difficult for the Debtors to keep these employees.

14.    Since November 30, 2023, the Debtors have reached out to the Lender several times to try to work out a consensual resolution to the Debtors' cash collateral issues, but have obtained consent to use Cash Collateral to pay for only those minimal expenses to "keep the lights on" during the period for the week ending January 12 and 19, 2024 through the week ending March 1, 2024.  The Debtors are concerned that any potential investor will not be willing to proceed with a transaction unless the Debtors remain going concerns.  The Debtors have pared down their operating expenses to the minimum necessary to sustain operations, negotiate and consummate new sales, and retain critical employees.

15.     Despite the Debtors' efforts to economize and reduce their operating expenses to what is the bare minimum, the Lender has advised the Debtors that it would not consent to the further use of Cash Collateral to pay any material operating costs. The Debtors do not understand the Lender's position, given that the continued operation of the businesses generates additional revenue for the Debtors, and thereby increases the value of the Lender's collateral. ***In fact, since the Petition Date, the Debtors have generated more than \$2.3 million in "new sales" in the form of New Linear Agreements (defined below).*** As a result, despite the fact that the Debtors have been consistently paid by their customers post-petition pursuant to linear agreements, the Debtors' <u>current</u> receivables have nonetheless still increased since the Petition Date (i.e., \$1,754,768.24 million as of the filing of this Motion, as compared to \$564,849.45 as of the Petition Date).  Copies of the Debtors' accounts receivable reports as of March 5, 2024 and April 7, 2023 are attached as **<u>Exhibits "6" and "7"</u>** respectively hereto.  In the event the Debtors are not authorized to pay even the bare minimum expenses necessary to sustain operations, in the event the businesses of the Debtors were to shut down, the Debtors know that the value of their assets would fall substantially,[6] and might naturally lead to the shutdown of their businesses.

16.     The Debtors have spent substantial amounts of time discussing with the Committees the proposed budget; gathering, summarizing, and providing information about the Debtors' business operations and financial condition for/to the Lender; and advising the Lender that all of the potential funders that the Debtors have spoken to regarding a potential transaction would only be interested in the Debtors if they are "going concern" entities (*i.e.*, their business operations, and the requisite employees remain in place to execute on the Debtors' business plan upon exit from bankruptcy). Naturally, this is because, among other reasons, any potential investor does not want to spend months, if not longer, recruiting and training a specialized new

---

[6] Lender's own evidence shows the dramatic negative impact a forced shut down and liquidation of the business would cause.  According to the Lender, in the event the businesses cannot be maintained and the assets liquidated, their value would fall to potentially as low as \$1.25 million. *See Declaration of Roy A. Salter in Support of Objection of Access Road Capital, LLC to Debtors' Motion for Entry of An Order Authorizing Approval of Supplemental Budget in Connection with Continued Use of Cash Collateral* [Doc. No. 124], p. 12.

team of employees, and restarting the Debtors' business operations.  In addition, the Debtors need to be functioning to take advantage of new sales, enter into new transactions and continue to improve their revenue.

**D.      This Cash Collateral Motion.**

17.      As a result, the Debtors were forced to file this Motion, requesting Court authority to use Cash Collateral to pay for expenses pursuant to the budget (the "Budget") attached as **Exhibit "1"** to the Declaration of Jonathan Kramer (the "Kramer Declaration") for the period from the week ending March 1, 2024 to the week ending April 30, 2024 (the "Period").[7]  The Debtors believe that the expenses set forth in the Budget are the "bare bones minimum" that need to be paid to maintain "going concern" operations, and these expenses include, among other things:

- Minimal "Bank [Account] Fees";

- Convention expenses[8];

- Employee payroll, health insurance, and associated costs;[9]

---

[7] The hearing on this Motion will take place after the week ending March 1, 2024, and the Debtors are requesting, among other things, authorization for the Debtors to pay the budgeted expenses for that week once the Court approves Cash Collateral usage pursuant to the Budget.

[8] These expenses comprise of the "MIP" and "Reel Screen" RGTV expense line items on the Budget.  The Debtors' attendance at conventions (like "*MIPCOM*" in October 2023, which generated $850,000 of new sales, and "*Reel Screen*") is crucial from both a revenue generating and transaction standpoint for a variety of reasons.  Attendance at these conventions shows the Debtors' customers that the Debtors are still operating entities (*i.e.*, RGTV is still entering into linear/AVOD/other contracts, and Aftershock is still optioning out its comic IP).  Moreover, historically, 20% of RGTV's expenses have been associated with attending conventions – because these conventions are where most of its sales happen or are at least initiated (from introduction of product, to developing relationships, to closing deals).  The additional benefit is that the Debtors get a better idea of what products customers are looking for, so that they can tailor their ongoing strategy (regarding acquisition decisions, customer contracts, and customer relationships).  The Debtors need to have employees go to these markets so that they can continue to generate revenue and increase the value of the Debtors' assets for the benefit of all creditors.  A byproduct of convention attendance has been, and will continue to be, creating investor interest and significant licensing opportunities for the Debtors' IP properties.

[9] The "Robert Half/Temp Accounting" RGTV expense line item is for one of the Debtors' Remaining Employees who is a member of the Debtors' administrative/bookkeeping staff.  Neither Jon Kramer nor any of the other Unpaid Employees have received any salary or other compensation since November 2023.  Jon Kramer has not been paid for five (5) pay periods, and

- Software and website costs (*e.g.,* Microsoft 360, Dropbox, Slack, Zoom, Adobe, etc.);

- Office rent for storage units to store the Debtors' physical assets;

- Telephone and Internet Service (*i.e.*, Ring Central/T-Mobile, and Synoptek respectively); and

- RGTV Channel management and program material "delivery" vendors (*i.e.*, "Ottera" and "Santa Monica Video"[10] respectively).

18.    All of the expenses in the Budget are reasonable and objectively necessary, with the most important expenses on the Budget being those associated with the Debtors' employees' payroll, health insurance, and associated costs that are currently due, or will be due to be paid during the Period (the "<u>Payroll Expenses</u>").    Importantly, ***except for two (2) of the Debtors' bookkeepers who have been who perform accounting, bookkeeping, and other related duties and tasks taken over from departed colleagues, the Debtors have not been able to obtain authorization to pay the Unpaid Employees***.    The Debtors have communicated this to the Lender, who continues to be unmoved with respect to the Debtors' requests.

19.    Court authority for the Debtors to use Cash Collateral to pay the Payroll Expenses is absolutely critical at this time.    Because of the Debtors' inability to pay their Unpaid Employees since November 2023, many of their employees have either left, or explored the option of leaving, the Debtors.    For example, RGTV has lost three (3) significant employees at the beginning of this year: the EVP of Sales, VP of Business Affairs, and Servicing Director. Similarly, several of Aftershock's employees have left, and one employee recently indicated his

---

incurred personal credit card debt related to, for example, attending MIPCOM on behalf of the Debtors with the expectation that those reasonable expenses would be reimbursed by the Debtors.    However, because of the Debtors' inability to use cash collateral, Mr. Kramer has not even been reimbursed for his out-of-pocket expenses incurred on behalf of the Debtors which contributed directly to sales.

[10] Payment to Santa Monica Video is necessary for RGTV to deliver materials to customers under linear contracts that have been executed (so that these customers can air the licensed program).    The payment of the fees under these customer contracts can only happen after the materials are delivered per the license agreements for the titles.    Without access to RGTV's master materials, RGTV cannot fulfill its new sales because it cannot create materials for each new sale.

intention to leave because he received an offer from another company.  Although the Debtors had twenty-five (25) employees or contractors as of the Petition Date, as of the filing of this motion, only fourteen (14) of those employees or contractors remain (the "Remaining Employees").

20.    The Remaining Employees have gone above and beyond the "call of duty" by continuing to provide essential services to Debtors – despite not being paid since November 2023 – but several of them have expressed to the Debtors that: (1) they need to be paid for their services for their own and their families' financial survival; and (2) they have considered resigning, and/or will resign, from the Debtors if they are not compensated for their services.

21.    All of these Remaining Employees are essential to, and comprise the "core" group of employees that the Debtors need to continue "going concern" business operations to preserve the value of the Debtors' assets.  The Debtors' current roster of Remaining Employees and their job descriptions is attached as **Exhibit "2"** to the Kramer Declaration.

22.    Because the value of the Debtors' businesses derives substantially from certain intellectual property rights – such as the RGTV Library, and Aftershock's comic IP Rights that need to be marketed, licensed, and/or developed for production – the Remaining Employees are critical to the preservation and/or continuance of the Debtors' business operations and value.  *See e.g.* 1/12/23 Transcript pgs. 147-149.

23.    Put simply, if the Debtors are not able to pay the Payroll Expenses to the Remaining Employees, the Debtors will likely face significant business interruptions, and an operational shutdown, which would be detrimental to all creditors and negatively impact the going-concern value of the ASM enterprise.

E.    **The Lender Is Adequately Protected**.

24.    Importantly, as set forth in the Budget, the projected cash balance increases by almost $60,000 during the Period, from approximately $349,775 to $408,002.  During the Period, the Debtors' projected revenues surpass the amount of expenses that they are seeking to pay from the Cash Collateral.  In other words, even if the Debtors were allowed to use Cash Collateral to pay for the necessary expenses in the Budget, there is a projected ***increase*** in the

amount of cash at the end of the Period.

25. Further, as set forth above, on April 6, 2023, the Court previously found that the Lender was adequately protected because, among other reasons, Debtors were worth "no less than $20,000,000,"[11] and the Debtors' financial and other important metrics (*i.e.*, amount of cash, Linear Receivables, etc.) have materially improved since that time. For example, since April 6, 2023:

- The amount owed to the Debtors from linear contracts (the "Linear Receivables") (to which the Debtors have agreed to give the Lender replacement liens on, to the extent that there is any diminution in the Lender's collateral) have increased by $1,189,918.79.

- The amount of cash in the Debtors' bank accounts has also remained constant from March 31, 2023 to the start of the Period.[12]

26. It is also important to note that the Debtors' anticipated collections from their "AVOD" and "Linear Contract" revenue streams (representing more than 70% of the revenue realized by the Debtors in 2023) in the amount of $2,331,649 surpassed previous estimates (set forth in previous cash collateral budgets) of $1,833,408 by ***$498,240***. Specifically, the actual revenues during 2023 from Linear Contracts substantially surpassed projections (*i.e.*, $1,384,234 actual, compared to $690,123 projected), and the actual revenue received from the AVOD format were consistent with previous estimates (*i.e.*, $947,415 actual, compared to $1,143,285 projected). A summary prepared by the Debtors comparing the Debtors' projected to actual revenues (and expenses) for 2023[13] is attached as **Exhibit "3"** hereto.

27. Moreover, as set forth more fully in the Kramer Declaration, the Debtors continue

---

[11] The Debtors believe that they are worth substantially more than $20,000,000, and have recently re-engaged with one investor with an assumed $30 million valuation.

[12] The $343,770 amount excludes the $75,000 that is in a segregated bank account as a carveout for the Committees' professionals' fees and expenses (the "Committee Carveout"). *See* (Aftershock March MOR, Doc. No. 199) (ending cash balance of $5,032); (RGTV March MOR, Doc. No. 22) (ending cash balance of $338,813.35, including the $75,000 as a carveout for the Committees' professionals' fees and expenses). *See also* (Mot. Ex. 1) (cash balance exclusive of the $75,000 Committee Carveout).

[13] This chart includes AVOD revenue from the fourth quarter of 2022. However, it does not include AVOD revenue from the fourth quarter of 2023, because those amounts are paid to the Debtor approximately ninety (90) days after that quarter ends.

to engage in a variety of activities that enhance the value of their assets, such as:

- The Debtors continue to generate income from their customers and other parties.

- RGTV continues to work on adding titles, seasons, and/or episodes to the RGTV Library.  For example, RGTV has two (2) titles – "*My Strange Addiction*" ("MSA," which has already generated $1.2 million in fees) and "*Very Scary People*" ("VSP") – that, between then, will have three (3) new seasons available in 2024 (*i.e.*, MSA Season 7 titled "*Still Addicted*" and VSP Season 4 and 5), and one (1) new season available in 2025 (*i.e.*, VSP Season 6).  For both titles, once these new episodes are added, the term of the underlying licensing contracts will be extended by ten (10) years, and there will be many more hours of content that RGTV can license to its customers as part of linear contracts, or put on the AVOD/FAST channel platform for viewing, which will translate to more revenue earning opportunities.

- RGTV continues to negotiate, enter into, and develop ***new sales*** pursuant to new Agreements entered into post-petition (the "New Linear Agreements").  In fact, just from November 2023 until February 2024, RGTV has closed, or is about to close, on nine (9) New Linear Contracts that are worth more than ***$1.9 million*** (some of the revenue therefrom will be realized during the Period).[14]  Because all of RGTV's customers that are counterparties to the New Linear Agreements are large companies (*e.g.*, Discovery and AETN), the question is not if the payments set forth in these agreements will be made but simply when.  Attached as **Exhibit "4"** to the Kramer Declaration is a summary of the New Linear Agreements that have been agreed upon from November 2023 until February 2024.

- RGTV is expected to receive AVOD revenue in the amount of approximately ***$381,064*** during the Period alone.

- Aftershock continues to exploit its comic IP rights post-petition by, among other things, optioning these IP properties to major studios and streaming services pursuant to option and purchase agreements, and working with these counterparties through the development process so that these IP properties can move into the "production" stages of the television series

---

[14] In contrast, during November 2022 to February 2023, the Debtor only had one new linear agreement sale in the amount of $118,659.72 ($185,000 AUD).

13

or film (and be purchased from Aftershock in the near future).  Specifically, at this time, Aftershock: (1) has negotiated, and is in the process of finalizing, three (3) new contracts to "option" some of its IP properties to certain producers, studios or streaming services; and (2) has eight (8) IP properties that are currently "optioned" to studios and streaming services that are moving rapidly towards production (now that the Hollywood writers' strike has ended), with the expectation that some of these projects will be given the "greenlight" for production in the second half of 2024 and the first half of 2025 (which would generate a large amount of revenue to Aftershock upon the commencement of production).[15]  For example, just last week, one of the Debtors' IP properties "*Astronaut Down*" has attached Scott Fraser as the writer, and the Esmail Company as the Debtors' production partner; the "*Beyond the Breach 1-3 London Content*" project has now resumed the legal work to finish the deal; and two (2) other projects are now in negotiation.  A redacted summary providing recent status updates on some of the Debtors' IP properties that are in the TV/Film development process (the "Comic IP Summary") is attached as **Exhibit "5"** to the Kramer Declaration.

•      In addition, a small team of four (4) individuals from Aftershock attended "Content London" (one of the leading conferences in the global content industry) (the "Conference") at the end of November 2023, and were able to generate three (3) new option/purchase agreements (worth at least $50,000 initially, and as much as $1,000,000 if all of these titles go into production) at that Conference alone.  Also, many of the Conference's attendees advised the Debtors that they were impressed with Aftershock's robust lineup of IP properties.  As a result, several well-known overseas companies have expressed an interest in being potential equity investors or financing sources as part of the Debtors' exit financing. These parties have signed non-disclosure agreements, and are currently evaluating the Debtors' IP properties and financial information.

---

[15] During the period from 2024 to 2026, revenue is projected to be in excess of $10 million from the exploitation of the IP properties for conversion to film and television.  It is notable that this projected figure is based on only twenty (20) of the twenty-seven (27) Debtor's IP properties that are currently under license, and does not attribute any value for the other one hundred and twenty-three (123) IP properties that comprise the Debtors' IP inventory that are not under license.

- RGTV continues to work with several AVOD and "FAST" channel platforms to broadcast its content on new AVOD platforms, territories, and/or channels to create additional streams of revenue pursuant to new post-petition contracts or "amendments." For example, RGTV is preparing to launch additional "FAST" channels in Germany in the near future; and is anticipating to launch these additional AVOD channels in Australia in early to mid-2024 (with more such channels planned in other territories in late 2024). In addition, with the necessary funding and personnel, the Debtors are expecting to launch a YouTube channel as soon as possible.

- Aftershock continues to produce, publish, and sell its comic books through retail channels post-petition, but has paused the publication of new titles pending its exit from bankruptcy to preserve cash.

28. It is important to note that, although the Debtors have successfully negotiated certain RGTV New Linear and/or AVOD Agreements and are projected to receive revenue therefrom, such revenue will be at risk of not being paid during the Period *if* the Debtors are not able to use Cash Collateral according to the Budget to pay wages to the Remaining Employees and other expenses. Entering into the New Linear and/or AVOD Agreements is only the first step; the Debtors' employees and vendors will still have to work on packaging and/or formatting the content "materials" for delivery to customers and, where applicable, to provide accounting for quarterly statements to producers to determine what, if anything, is owed to them for their licensing of the program to the Debtors.

29. As prior testimony has shown, there are various stages for a specific IP property to be converted to film or a television series (which requires, on average, 18 months to complete). As set forth in the Comic IP Summary, the Debtors are optimistic, and are expecting that: (1) 5 of the IP properties will commence production or be close to production in 2024; (2) 9 of the IP properties will commence production or be close to production in 2025; and (3) 6 of the IP properties will commence production or be close to production in 2026. As of the Petition Date, only 4 of the IP properties were in the advanced stages of the production process. If production occurs with respect to the IP properties referenced in this paragraph, the Debtors

expect that revenue from these IP Properties will be in excess of $10 million over a three (3) year period.

30.    Given all of the foregoing (especially given the fact that the Debtors' cash position will increase from the beginning of the Period to the end of the Period)[16], the Debtors assert that the Lender is adequately protected.  The Debtors believe that investors, lenders, and potential IP licensees desire the Remaining Employees to continue providing necessary services before the closing of a financing transaction, to ensure that their capital will be deployed effectively from the outset.

31.    The Debtors further believe that their businesses are finally back on track since October 2023, and expect significantly improved results in the next twelve (12) months now that the COVID-19 pandemic and Hollywood writers' strike have ended.  Despite the Debtors' cash collateral constraints, the Debtors are only starting to achieve "ordinary" pre-pandemic levels of business activity and more interest from potential funders and investors about entering into a transaction with the Debtor, which is a positive indicator for their asset value and growth.

**F.    Compliance with Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 4001-2.**

32.    Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtors submit that the relief requested herein pertaining to the use of cash collateral does not contain any of the following provisions:

/ / /

/ / /

/ / /

/ / /

/ / /

---

[16] Moreover, as set forth in the Budget, the Debtors' anticipated collections from their "AVOD" and "Linear Contract" revenue streams from May 2024 to December 2024 (*i.e.*, after the Period ends) are in amounts of $1,719,000 and $702,826 respectively (totaling total $2,421,826).

16

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |

| Provision | |
|---|---|
| Findings of fact on matters extraneous to the approval process. | No |

33.     Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtors are required to serve a copy of the Motion on any entity with an interest in the Debtors' cash collateral, the Committees, and any other entity that the Court directs.  The Debtors have complied with the foregoing by serving a copy of the Motion on all known secured creditor(s), the Committees, the United States Trustee, and parties requesting special notice.

## II.

## THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

**A.      THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL DURING THE PERIOD IN ACCORDANCE WITH THE BUDGET.**

The Debtors' use of property of the estate is governed by Section 363.  11 U.S.C. § 363(c).  Section 363(c)(1) provides in pertinent part:

"If the business of the debtor is authorized to be operated under section. … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

(A)     each entity that has an interest in such cash collateral consents; or
(B)     the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S. C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its business.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (B.A.P. 9th Cir. 1991).   In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

Here, the only source of funds available to the Debtors to use to maintain and operate their businesses is the Debtors' cash on hand and future payments to the Debtors, including the Debtors' accounts receivable, all of which are purportedly the Lender's Cash Collateral.  As a result, the Debtors cannot preserve the value of their assets (or continue to maintain and operate their business operations to preserve such value) unless the Debtors have the ability to use Cash Collateral to pay the necessary expenses set forth on the Budget.

Importantly, with respect to the Payroll Expenses, because the value of the Debtors' businesses derives substantially from the exploitation of certain intellectual property rights – such as the RGTV Library, and Aftershock's comic IP Rights that need to be marketed, licensed, and/or developed for production – the Remaining Employees are critical to the preservation and/or continuance of the Debtors' business operations and value.  *See e.g.* 1/12/23 Transcript pgs. 147-149.  The Debtors believe that significantly all of the Remaining Employees will quit if they are not paid their wages and other benefits.  For example, as set forth more fully in the Debtor's current employee roster, *see* (Mot. Ex. 2), the Remaining Employees are grouped into five (5) categories:

(1) "Administrative" employees (2 employees): responsible for, among other things, bookkeeping and accounting for the Debtors, importing accounts receivable information, preparing cash flow budgets, processing payroll, working on contract administration with the Debtors' customers, and putting together RGTV producer statements.

(2) "RGTV" employees (2 employees, including Jon Kramer): responsible for, among other things, acquiring content for the RGTV library, marketing and generating sales for licensing broadcast rights, and managing all aspects of RGTV's business operations.

(3) "Aftershock" employees (4 employees): responsible for, among other things, handling and selling the physical inventory of Aftershock (such as comic books), promoting Aftershock's comics in the domestic market, reviewing and editing comics, and managing and selecting the creative team (*e.g.*, writers, artists, etc.) for Aftershock's comics.

(4) "US Film & RV" employees (4 employees): responsible for, among other things, managing and coordinating the licensing and sale of comic IP rights, coordinating with Aftershock's partners to facilitate the conversion of comic IP rights to film and television series, and the acquisition and development of comic IP properties.

(5) "Foreign Film & TV" employees (3 employees): responsible for, among other things, handling the development, optioning, and/or sale of comic IP properties in the foreign market.

Without the Remaining Employees, the Debtors' ability to receive revenue from the New Linear Contracts, AVOD platform, option/purchase contracts, and sale of comic IP properties after production commences will be in jeopardy. The Debtors' personnel are familiar with the Debtors' operations, and are thus essential to the preservation of the Debtors' businesses. The Debtors' failure to pay the wages to the Remaining Employees will likely result in personnel quitting (without an ability to quickly or cost-effectively replace such individuals), and will likely result in a shutdown of the Debtors' businesses, to the detriment of creditors. Although the Debtors had twenty-five (25) employees or contractors as of the Petition Date, as of the filing of this motion, only fourteen (14) of the Remaining Employees remain. The Debtors' ability to preserve the full value of their businesses and assets depends upon the maintenance of the Debtors' business operations, which cannot occur without the continued efforts of the Remaining Employees.

As set forth more fully in paragraphs 30 to 33 of the Kramer Declaration, the Debtors have also continued to operate their businesses as "going concerns" post-petition, so that the values thereof can be preserved. Accordingly, the Debtors respectfully request that the Court enter an order authorizing the Debtors to use Cash Collateral to pay the expenses set forth in the Budget during the Period. Only by doing so will the value of the Debtors be preserved for everyone's benefit.

**B.    THE LENDER'S INTEREST IN CASH COLLATERAL WILL BE ADEQUATELY PROTECTED.**

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral only if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); s*ee also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

Here, the Lender will be adequately protected in three ways, which provides a basis for the immediate and ongoing authorization for the Debtors to use Cash Collateral for the purpose of paying the limited expenses set forth in the Budget. **First,** the Lender will be adequately protected by a large equity cushion well over 20%. The Ninth Circuit made clear in *Mellor* that, in the case of an oversecured creditor, an equity cushion of 20% is considered adequate protection of a secured creditor's interest in cash collateral as a matter of law. *Mellor*, 734 F.2d at 1401; *see also In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa.1980) (holding that a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va.1980) (holding that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor).

As was the case at the April 6, 2023 Evidentiary Hearing, "the value of the noncash collateral securing the claims of [the Lender] . . . [is] ***no less than $20,000,000***, which provides a substantial equity cushion." *See* 4/6 Transcript pg. 4, lines 8-17; 1/19 Transcript, pg. 18, lines 10-15 (emphasis added). There is no evidence that would suggest that the Court's prior conclusion with respect to the value of the Debtors' assets was inaccurate. In fact, as set forth

1  more fully in paragraphs 29 and 30 of the Kramer Declaration the Debtors' financial and other

2  important metrics have materially ***improved*** since the Court's finding.

3      Absent compelling evidence to the contrary, the Court should not change its rulings made

4  at the two (2) prior Evidentiary Hearings that the Debtors' assets are worth at least $20 million,

5  and should continue to allow the Debtors to use Cash Collateral pursuant to the Budget for the

6  Period.  Importantly, the Debtors' financial condition has improved substantially since April 6,

7  2023, and the Debtors firmly believe that their businesses are finally back on track since October

8  2023, and expect significantly improved results in the next twelve (12) months now that the

9  COVID-19 pandemic and Hollywood writers' strike have ended.  In addition to improved

10  financial metrics, this can be shown by the fact that the AVOD revenue actually realized by the

11  Debtors is consistent with the Debtors' growth expectations (50% calendar year growth from '22

12  to '23 for RGTV), and the broader acceptance of comic IP as a source of TV and Film.

13      Since the Lender has an equity cushion greatly exceeding 20%, the Lender is adequately

14  protected as a matter of law; further, as noted below, the Debtors are providing additional forms

15  of adequate protection.

16      **Second,** as additional adequate protection, the Debtors propose that the Court authorize

17  the Debtors to grant and provide the Lender with replacement Adequate Protection Liens on, and

18  security interests in, the assets of the Debtors' estate to secure any diminution in the Lender's

19  collateral during the Period resulting from the Debtors' use of any Cash Collateral in which the

20  Lender has a valid interest.  This form of adequate protection is contemplated and allowed

21  pursuant to Section 361(2) of the Bankruptcy Code.  Among other reasons, this is because from

22  November 2023 until February 2024 alone, RGTV has closed, or is about to close, on nine (9)

23  New Linear Contracts that are worth more than ***$1.9 million*** (approximately $724,856 of which

24  will be realized during the Period).  The Debtors are only proposing to use cash collateral in the

25  total amount of $760,042.

26      In any event, there is no diminution in the Lender's collateral from the Debtor's proposed

27  use of Cash Collateral pursuant to the Budget.  Specifically, as set forth in the Budget, the

28  projected cash balances at the beginning and end of the Period are approximately $349,775 and

$408,002, respectively.  In other words, even if the Debtors were allowed to use Cash Collateral to pay for the necessary expenses in the Budget, there is a projected increase in the amount of cash at the end of the Period of almost $60,000.

**Third,** in addition to the foregoing two forms of adequate protection, the Lender will also be further adequately protected by the Debtors' use of Cash Collateral to maintain operations and preserve the value of the Lenders' collateral.  For example, in *Stein*, *supra*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection.  *Stein*, 19 B.R. at 459.  The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business.  *Id.*; *Federal Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship.* 153 B.R. 204, 214 (N.D. Ill. 1993); *In re 499 W. Warren Street Assocs., Ltd. P'ship,* 142 B.R. 53, 58 (Bankr.N.D.N.Y.1992) (allowing the use of cash collateral to maintain property); *McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.),* 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would increase rent flow even without equity cushion); *Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996) (continued business operations can constitute adequate protection of a secured creditor); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993) (same); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993) (same); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994) (same).

Based on the foregoing, the Debtors submit that the Lender is adequately protected based alone on its equity cushion of well over 20%, and that the Lender is certainly adequately protected by the equity cushion together with the replacement Adequate Protection Liens and continued operations that will maintain and enhance collateral values.  Therefore, the Debtors have satisfied the requirements of Section 363(c)(2) to enable the Debtors to use Cash Collateral to pay the expenses set forth in the Budget.

**C.**   **<u>USAGE OF CASH COLLATERAL FOR THE PURPOSE OF PAYING THE LIMITED EXPENSES IN THE BUDGET IS CONSISTENT WITH THE TERMS OF THE 6/6 STIPULATION.</u>**

The payment of the Budget's "bare bones minimum" expenses that are necessary to support the Debtors' operations is consistent with the stipulation [Doc. No. 230] that the Debtors and the Lender entered into on June 6, 2023 (the "<u>6/6 Stipulation</u>"), which provides that if the Lender is not timely paid off:

> " a.    there shall be no settlement and no releases and all parties to this Stipulation shall reserve their claims, actions, rights, remedies and defenses as if no settlement were negotiated;
> b.    *the Debtors' use of Cash Collateral to fund operations shall cease immediately, except as may be necessary to comply with any applicable state or federal law with respect to such cessation of business operations*;
> c.    *Cash Collateral shall only be used in such limited amount and for such limited time as then agreed upon by the parties or ordered by the Court for the sole purpose of reasonably funding an auction sale of the Debtors' assets*; and
> d.    the deadline for the Committees to challenge ARC's secured claims is extended to August 30, 2023."

(6/6 Stipulation, ¶ 3).

*First*, the Debtors' payment of limited expenses in the Budget during the Period is consistent with the "purpose of reasonably funding an auction sale of the Debtors' assets." (6/6 Stipulation ¶ 3 (c)).  As set forth *supra*, the expenses in the Budget are what are absolutely necessary to be paid to continue the Debtors' operations; and if the Remaining Employees are not timely paid, many of them will quit and thus would not only jeopardize the "going concern" or other value of the Debtors, but also any opportunity to conduct any meaningful auction sale of the Debtors' assets contemplated by the 6/6 Stipulation.  The Debtors continue to explore all options to generate a recovery by creditors, including, without limitation, a sale of their assets.

*Second*, the Debtors' payment of the Payroll Expenses is necessary for it to fund operations [as it relates to compliance] with any applicable state or federal law with respect to such cessation of operations." (6/6 Stipulation ¶ 3 (b)).  It cannot be reasonably disputed that the Debtors must timely pay the Owed Wages and Commissions to their Employees and Contractors to comply with applicable California and other labor laws.

1    For example, California Labor Code § 201 "secures an employee's right to the full and

2    prompt payment of final wages '**upon discharge'**," while California Labor Code § 204 requires

3    that "[a]ll wages, other than those mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned

4    by any person in **any employment** are due and payable twice during each calendar month, on

5    days designated in advance by the employer as the regular paydays." *See Rios v. Linn Star*

6    *Transfer, Inc.*, No. 19-CV-07009-JSC, 2020 WL 1677338, at *3 (N.D. Cal. Apr. 6, 2020); *See's*

7    *Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 904-05 (2012) ("sole purpose of

8    [section 204] is to require an employer of labor who comes within its terms to maintain two

9    regular pay days each month, within the dates required in that section.") (internal quotation

10   marks and citation omitted); Cal. Labor Code §§ 201 & 204; *see also* Cal. Labor Code § 203

11   (penalty for the "willful" failure to comply with an obligation to make timely payments).    In

12   addition to employer liability, under California Labor Code Section 558, an employer's failure to

13   timely pay wages and make other payments to employees may subject not only the employer, but

14   also any "other person acting on behalf of an employer," to civil liability and penalty for any

15   applicable violations related underpaying an employee.  Cal. Labor Code § 558.

16   As a result, subject to Court approval, the Debtors' limited request to use Cash Collateral

17   pursuant to the Budget is not only consistent with, but contemplated by, the terms of the 6/6

18   Stipulation.  These are expenses that are "reasonably" necessary to fund "an auction sale of the

19   Debtors' assets," and allow the Debtors to comply with applicable labor laws.  Put simply, if

20   these expenses are not paid, the value of the Debtors cannot be preserved for a meaningful

21   auction sale or otherwise.

22   **III.**

23   **THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE**

24   For the reasons noted herein, the Debtors will suffer immediate and irreparable harm if

25   the Debtors are not able to pay the expenses set forth on the Budget, to ensure the continued

26   operation of the Debtors' businesses and the maintenance of the value thereof.  Based on the

27   foregoing, the Debtors request that any applicable stay, including any stay provided under FRBP

28   4001(b) be waived to allow the Order to become immediately effective.

## IV.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully requests that the Court:

(1)     grant the relief requested in the Motion;

(2)     enter an Order in substantially the form attached as **Exhibit "B"** to the Kramer Declaration;

(3)     authorize the Debtors' usage of Cash Collateral to pay expenses in accordance with the Budget, subject to a monthly expense variance of up to 10% on a line item basis and up to 15% on a collective basis, or such other expense variance as may be requested by the Debtors and approved by the Lender; and

(4)     grant such further relief as the Court deems just and proper.

Dated: March 6, 2024             AFTERSHOCK COMICS, LLC &
RIVE GAUCHE TELEVISION

*/s/ Jeffrey S. Kwong*
David L. Neale
Jeffrey S. Kwong
LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
Counsel for Debtors and Debtors in Possession

1

## DECLARATION OF JONATHAN KRAMER

2        I, Jonathan Kramer, hereby declare as follows:

3        1.      I am over 18 years of age.  I am the Chief Executive Officer and President of

4   AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together

5   with Aftershock, the "Debtors"), respectively, the debtors and debtors in possession in the above-

6   captioned Chapter 11 bankruptcy cases, and am therefore familiar with the business operations

7   and have access to and knowledge regarding the financial books and records of the Debtors.  I

8   have personal knowledge of the facts set forth below and, if called to testify as a witness, I could

9   and would competently testify thereto.

10       2.      I am familiar with the history, organization, operations and financial condition of

11  the Debtors.  The records and documents referred to in this Declaration constitute writings taken,

12  made, or maintained in the regular or ordinary course of the Debtors' business at or near the time

13  of act, condition or event to which they relate by persons employed by the Debtors who had a

14  business duty to the Debtors to accurately and completely take, make, and maintain such records

15  and documents.  The statements set forth in this declaration are based upon my own personal

16  knowledge and my review of the Debtors' books and records.

17       3.      I make this declaration in support of the "*Debtors' Emergency Motion For Entry*

18  *Of An Order Authorizing The Debtors To Use Cash Collateral For The Period Ending April 30,*

19  *2024*" (the "Motion"), and the Debtors' request for Court authority to use the alleged cash

20  collateral of Access Road Capital LLC (the "Lender") in accordance with the terms of the budget

21  attached as **Exhibit "1"** hereto (the "Budget").  The Budget was prepared by employees of the

22  Debtors under my direction and supervision, and has been approved by me.

23       **Background**

24       4.      Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§

25  101 *et seq.* (the "Bankruptcy Code") on December 19, 2022 (the "Petition Date").  The Debtors

26  continue to operate their businesses, manage their financial affairs and operate their bankruptcy

27  estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

28

5.      Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience.

6.      Shortly after the Petition date, on December 21, 2022, the Debtors filed the "*Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief*" [Doc. No. 12] (the "Cash Collateral Motion").

7.      The Court previously held an initial hearing, and an evidentiary hearing that commenced on January 13, 2023 (the "January Evidentiary Hearing") on the Debtors' Cash Collateral Motion seeking interim use of the Lender's "cash collateral" as that term is defined in § 363(a) of the Bankruptcy Code (the "Cash Collateral").  After the conclusion of the January Evidentiary Hearing, the Court concluded that that "the value of the noncash collateral securing the claims of [the Lender] . . . [is] *no less than $20,000,000*, which provides a substantial equity cushion."  *See* 4/6 Transcript pg. 4, lines 8-17; 1/19 Transcript, pg. 18, lines 10-15 (emphasis added). On January 24, 2023, the Court entered the *Interim Order Re: Debtors' Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief* [Doc. No. 94] permitting the Debtors to use Cash Collateral on an interim basis.  The relevant pages of the April 6, 2023 and January 19, 2023 transcripts are attached hereto as **Exhibits "8" and "9,"** respectively.

8.      On April 5 and 6, 2023, the Court conducted another hearing on the Debtors' continued use of Cash Collateral (the "April Evidentiary Hearing, and together with the January Evidentiary Hearing, the "Evidentiary Hearings").  After the April Evidentiary Hearing, the Court relied on the Debtors' "***substantial asset value and equity cushion***" to, again, authorize the Debtors to continue using Cash Collateral.  *See* 4/6 Transcript pg. 11, line 13.  On April 12,

2023, the Court entered the "*Second Interim Order Re: Debtors' Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief In Support Thereof*" [Doc. No. 174] (the "Second Cash Collateral Order") allowing the Debtors to continue using Cash Collateral until May 31, 2023.

### The Debtors' Efforts To Consummate A Transaction.

9.      Because one of the Debtors' goals in these Cases has been to pay off the Lender's allowed claim, since the Petition Date, the Debtors have been working on identifying third party lenders and/or investors that will provide the necessary funding for the Debtors to repay the Lender, fund a plan of reorganization (including the payment of all administrative expenses in full), and provide sufficient working capital for the Debtors to maintain their operations well into the future.

10.      The Debtors spent considerable time and effort negotiating and obtaining a commitment for post-petition financing.  Unfortunately, as time has passed, it has become clear that the third parties who were to have provided a credit enhancement in connection with the proposed financing were ultimately not able to proceed.  While there is still a possibility that the Debtors will be able to avail themselves of the financing previously approved by the Court with an alternative credit enhancement and/or guarantor, the Debtors have, in the exercise of their sound business judgment, determined that it is necessary to explore other exit strategies.

11.      As a result, the Debtors have solicited proposals from third parties concerning one or more transactions designed to facilitate the Debtors' efforts to propose and confirm a Plan. Now that the effects of the three (3) year pandemic have subsided and the almost one (1) year long entertainment industry strikes have been resolved, the Debtors have been able to engage with media and entertainment entities (*i.e.*, potential lenders and investors) who have been impressed by the Debtors' accomplishments (despite the negative impacts that the above-mentioned force majeure events have had on the Debtors' businesses).   Specifically, these strategic parties have taken note of the Debtors' recent and demonstrable progress in

implementing its business plan, the Debtors' updated cash flow projections, and the Debtors' tangible progress towards production with respect to several of their IP properties.

12.    Some of the parties with whom the Debtors are currently in communication had previously expressed interest in a transaction with the Debtors, while others with whom the Debtors are speaking with are newly identified.  Two of these parties have negotiated term sheets with the Debtors.  Specifically, the Debtors: (1) have been re-engaged by a party that had previously entered into a term sheet with the Debtors, and that entity is anticipated to be in a position to show proof of funds for the transaction in the near future; (2) have negotiated a term sheet with another party who is currently pursuing funding to allow it to provide financing to the Debtors; and (3) entered into non-disclosure agreements with three other parties (one of which is a very significant creditor of the Debtors, and this entity is currently reviewing the Debtors' due diligence materials).  The Debtors are exploring ways to exploit their existing IP properties in foreign markets specifically; if such a transaction is consummated, the Debtors would realize millions of dollars of revenue from major, credit-worthy companies.

13.    The Debtors are exploring all available financing alternatives to allow for a successful resolution of these cases.[17]  The Debtors have endeavored to keep the Committees apprised of their efforts, and have shared financial and other information to support the Debtors' business strategy, and future growth plans and projections.

14.    Given the sensitive nature of these negotiations, the Debtors are not able to provide more detailed information in a public forum concerning the various proposed transactions at this time.  However, Debtors' counsel, Committees' counsel, and the Lender have been provided the identities of the potential investors (all of which are strategic media investors).

15.    I believe that, as the Debtors come into this new year, there is a better appreciation in the marketplace of the Debtors' business strategy.  There are several reasons for this: (1) the AVOD revenue actually realized by the Debtors is consistent with the Debtors' growth expectations which were previously questioned as unrealistic (50% calendar year growth

---

[17] In the past, I have even provided funding of the Debtors' expenses to support the Debtors' operations and to increase their asset values.

from '22 to '23 for RGTV); and (2) the broader acceptance of comic IP as a source of TV and Film partially because of the success of a competitor's comic-based series, "The Boys," which thus far has generated three spinoffs for Amazon.  In addition, the entertainment industry has, in general, concluded that although quality must be maintained, production costs need to be contained.  This recent realization by the international market necessitates co-production to finance more projects than in the past; this fits RGTV's "sweet spot" of providing that co-production link, and is a key differentiator, that is attractive to potential financiers, licensees and talent alike.

### Cash Collateral Issues After The Evidentiary Hearings.

16.     After the Evidentiary Hearings, the Debtors and the Lender entered into several Court-approved cash collateral agreements, the most recent of which authorized the Debtors to use Cash Collateral until November 30, 2023.  *See* (Doc. No. 371) (Agreed cash collateral order entered on November 14, 2023).  Specifically, the Court's November 14, 2023 cash collateral order authorized the Debtors to use Cash Collateral until November 30, 2023 (including to make the payroll due to the Debtors' employees on or around October 31, 2023) subject to several conditions, one of which is that "No additional payroll . . . shall be paid by the Debtors, unless the Lender receives a copy of a letter or other communication from the Credit Enhancement issuing bank . . . confirming that the Credit Enhancement is to be issued."  Because the "Credit Enhancement" has not been issued – except for the two (2) individuals consisting of the Debtors' administrative/bookkeeping staff (who the Lender previously authorized payments to) – the Debtors have not been able to pay wages and other benefits to their other employees (the "Unpaid Employees") since November 2023 and through the holiday season.  Notwithstanding the Debtors' inability to pay the Unpaid Employees, some of them have continued to work for the Debtors despite the financial hardships they are experiencing.  As discussed further below, despite every effort by the Debtors to retain all of their employees, many senior staff members have pursued other employment opportunities given the Debtors' inability to provide assurance of payment for both back wages and future wages.  It goes without saying that after more than

three months of non-payment to the Unpaid Employees, every day that goes by where payroll is not paid makes it more difficult for the Debtors to keep these employees.

17.    Since November 30, 2023, the Debtors have reached out to the Lender several times to try to work out a consensual resolution to the Debtors' cash collateral issues, but have obtained consent to use Cash Collateral to pay for only those minimal expenses to "keep the lights on" during the period for the week ending January 19, 2024 through the week ending February 23, 2024.  The Debtors are concerned that any potential investor will not be willing to proceed with a transaction unless the Debtors remain going concerns.  The Debtors have pared down their operating expenses to the minimum necessary to sustain operations, negotiate and consummate new sales, and retain critical employees.

18.    Despite the Debtors' efforts to economize and reduce their operating expenses to what is the bare minimum, the Lender has advised the Debtors that it would not consent to the further use of Cash Collateral to pay any material operating costs. The Debtors do not understand the Lender's position, given that the continued operation of the businesses generates additional revenue for the Debtors, and thereby increases the value of the Lender's collateral. ***In fact, since the Petition Date, the Debtors have generated more than $2.3 million in "new sales" in the form of New Linear Agreements.  As a result, despite the fact that the Debtors have been consistently paid by their customers post-petition pursuant to linear agreements, the Debtors' current receivables have nonetheless still increased since the Petition Date (i.e., $***1,754,768.24 ***as of the filing of this Motion, as compared to $***564,849.45 ***as of the Petition Date).***  True and correct copies of the Debtors' accounts receivable reports as of March 5, 2024 and April 7, 2023 are attached as **__Exhibits "6" and "7"__** respectively hereto.  In the event the Debtors are not authorized to pay even the bare minimum expenses necessary to sustain operations, I know that the value of the Debtors' assets would fall substantially, and might naturally lead to the shutdown of the Debtors' businesses.

19.    The Debtors have spent substantial amounts of time discussing with the Committees the proposed budget; gathering, summarizing, and providing information about the Debtors' business operations and financial condition for/to the Lender; and advising the Lender

1   that all of the potential funders that the Debtors have spoken to regarding a potential transaction

2   would only be interested in the Debtors if they are "going concern" entities (*i.e.*, their business

3   operations, and the requisite employees remain in place to execute on the Debtors' business plan

4   upon exit from bankruptcy).  Naturally, this is because, among other reasons, any potential

5   investor does not want to spend months, if not longer, recruiting and training a specialized new

6   team of employees, and restarting the Debtors' business operations.  In addition, the Debtors

7   need to be functioning to take advantage of new sales, enter into new transactions and continue

8   to improve their revenue.

9        **This Cash Collateral Motion.**

10       20.    As a result, the Debtors were forced to file this Motion, requesting Court authority

11  to use Cash Collateral to pay for expenses pursuant to the budget attached as **Exhibit "1"** hereto

12  (the "Budget") for the period from the week ending March 1, 2024 to the week ending April 30,

13  2024 (the "Period").[18]   The Debtors believe that the expenses set forth in the Budget are the

14  "bare bones minimum" that need to be paid to maintain "going concern" operations, and these

15  expenses include, among other things:

16       • Minimal "Bank [Account] Fees";

17       • Convention expenses[19];

18

19  ───────────────

[18] The hearing on this Motion will take place after the week ending March 1, 2024, and the
20  Debtors are requesting, among other things, authorization for the Debtors to pay the budgeted
    expenses for that week once the Court approves Cash Collateral usage pursuant to the Budget.

21  [19] These expenses comprise of the "MIP" and "Reel Screen" RGTV expense line items on the
22  Budget.  The Debtors' attendance at conventions (like "*MIPCOM*" in October 2023, which
    generated $850,000 of new sales, and "*Reel Screen*") is crucial from both a revenue generating,
23  and transaction standpoint for a variety of reasons.  Attendance at these conventions shows the
    Debtors' customers that the Debtors are still operating entities (*i.e.*, RGTV is still entering into
24  linear/AVOD/other contracts, and Aftershock is still optioning out its comic IP).  Moreover,
    historically, 20% of RGTV's expenses have been associated with attending conventions –
25  because these conventions are where most of its sales happen or are at least initiated (from
    introduction of product, to developing relationships, to closing deals).  The additional benefit is
26  that the Debtors get a better idea of what products customers are looking for, so that they can
    tailor their ongoing strategy (regarding acquisition decisions, customer contracts, and customer
27  relationships).  The Debtors need to have employees go to these markets so that they can
28  continue to generate revenue and increase the value of the Debtors' assets for the benefit of all

- Employee payroll, health insurance, and associated costs;[20]

- Software and website costs (*e.g.,* Microsoft 360, Dropbox, Slack, Zoom, Adobe, etc.);

- Office rent for storage units to store the Debtors' physical assets;

- Telephone and Internet Service (*i.e.*, Ring Central/ T-Mobile, and Synoptek respectively); and

- RGTV Channel management and program material "delivery" vendors (*i.e.*, "Ottera" and "Santa Monica Video"[21] respectively).

21.     I believe that all of the expenses in the Budget are reasonable and objectively necessary, with the most important expenses on the Budget being those associated with the Debtors' employees' payroll, health insurance, and associated costs that are currently due, or will be due to be paid during the Period (the "Payroll Expenses").  Importantly, ***except for two (2) of the Debtors' bookkeepers who have been who perform accounting, bookkeeping, and other related duties and tasks taken over from departed colleagues, the Debtors have not been able to obtain authorization to pay the Unpaid Employees***.  The Debtors have communicated this to the Lender, who continues to be unmoved with respect to the Debtors' requests.

22.     Court authority for the Debtors to use Cash Collateral to pay the Payroll Expenses is absolutely critical at this time.  Because of the Debtors' inability to pay their Unpaid Employees since November 2023, many of their employees have either left, or explored the

---

creditors.  A byproduct of convention attendance has been, and will continue to be, creating investor interest and significant licensing opportunities for the Debtors' IP properties.

[20] The "Robert Half/Temp Accounting" RGTV expense line item is for one of the Debtors' Remaining Employees who is a member of the Debtors' administrative/bookkeeping staff.  Lee Kramer and the Unpaid Employees have not received any salary or other compensation since November 2023.  I have not been paid for five (5) pay periods, and have incurred personal credit card debt related to, for example, attending MIPCOM on behalf of the Debtors with the expectation that those reasonable expenses would be reimbursed by the Debtors.  However, because of the Debtors' inability to use Cash Collateral, I have not even been reimbursed for my out-of-pocket expenses incurred on behalf of the Debtors which contributed directly to sales.

[21] Payment to Santa Monica Video is necessary for RGTV to deliver materials to customers under linear contracts that have been executed (so that these customers can air the licensed program).  The payment of the fees under these customer contracts can only happen after the materials are delivered per the license agreements for the titles.  Without access to RGTV's master materials, RGTV cannot fulfill its new sales because it cannot create materials for each new sale.

option of leaving, the Debtors.  For example, RGTV has lost three (3) significant employees at the beginning of this year: the EVP of Sales, VP of Business Affairs, and Servicing Director. Similarly, several of Aftershock's employees have left, and one employee recently indicated his intention to leave because he received an offer from another company.  Although the Debtors had twenty-five (25) employees or contractors as of the Petition Date, as of the filing of this motion, only fourteen (14) of those employees or contractors remain (the "Remaining Employees").

23.    The Remaining Employees have gone above and beyond the "call of duty" by continuing to provide essential services to Debtors – despite not being paid since November 2023 – but several of them have expressed to the Debtors that: (1) they need to be paid for their services for their own and their families' financial survival; and (2) they have considered resigning, and/or will resign, from the Debtors if they are not compensated for their services.

24.    All of these Remaining Employees are essential to, and comprise the "core" group of employees that the Debtors need to continue "going concern" business operations to preserve the value of the Debtors' assets.  The Debtors' current roster of Remaining Employees and their job descriptions is attached as **Exhibit "2"** hereto.

25.    Because the value of the Debtors' businesses derives substantially from certain intellectual property rights – such as the RGTV Library, and Aftershock's comic IP Rights that need to be marketed, licensed, and/or developed for production – the Remaining Employees are critical to the preservation and/or continuance of the Debtors' business operations and value.  *See e.g.* 1/12/23 Transcript pgs. 147-149.

26.    Put simply, if the Debtors are not able to pay the Payroll Expenses to the Remaining Employees, the Debtors will likely face significant business interruptions, and an operational shutdown, which would be detrimental to all creditors and negatively impact the going-concern value of the ASM enterprise.

**The Lender Is Adequately Protected.**

27.    Importantly, as set forth in the Budget, the projected cash balance increases by almost $60,000 during the Period, from approximately $349,775 to $408,002.    During the

Period, the Debtors' projected revenues surpass the amount of expenses that they are seeking to pay from the Cash Collateral. In other words, even if the Debtors were allowed to use Cash Collateral to pay for the necessary expenses in the Budget, there is a projected increase in the amount of cash at the end of the Period.

28.    Further, as set forth above, on April 6, 2023, the Court previously found that the Lender was adequately protected because, among other reasons, Debtors were worth "no less than $20,000,000,"[22] and the Debtors' financial and other important metrics have materially improved since that time. For example, since April 6, 2023:

- The amount owed to the Debtors from linear contracts (the "Linear Receivables") (to which the Debtors have agreed to give the Lender replacement liens on, to the extent that there is any diminution in the Lender's collateral) have increased by $1,189,918.79.

- The amount of cash in the Debtors' bank accounts has also remained constant from March 31, 2023 to the start of the Period.[23]

29.    It is also important to note that the Debtors' anticipated collections from their "AVOD" and "Linear Contract" revenue streams (representing more than 70% of the revenue realized by the Debtors in 2023) in the amount of $2,331,649 surpassed previous estimates (set forth in previous cash collateral budgets) of $1,833,408 by ***$498,240***. Specifically, the actual revenues during 2023 from Linear Contracts substantially surpassed projections (*i.e.*, $1,384,234 actual, compared to $690,123 projected), and the actual revenue received from the AVOD format were consistent with previous estimates (*i.e.*, $947,415 actual, compared to $1,143,285 projected). A summary prepared by the Debtors comparing the Debtors' projected to actual revenues (and expenses) for 2023[24] is attached as **Exhibit "3"** hereto.

---

[22] The Debtors believe that they are worth substantially more than $20,000,000, and have recently re-engaged with one investor with an assumed $30 million valuation.

[23] The $343,770 amount excludes the $75,000 that is in a segregated bank account as a carveout for the Committees' professionals' fees and expenses (the "Committee Carveout"). *See* (Aftershock March MOR, Doc. No. 199) (ending cash balance of $5,032); (RGTV March MOR, Doc. No. 22) (ending cash balance of $338,813.35, including the $75,000 as a carveout for the Committees' professionals' fees and expenses). *See also* (Mot. Ex. 1) (cash balance exclusive of the $75,000 Committee Carveout).

[24] This chart includes AVOD revenue from the fourth quarter of 2022. However, it does not

30.    The Debtors continue to engage in a variety of activities that enhance the value of their assets, such as:

• The Debtors continue to generate income from their customers and other parties.

• RGTV continues to work on adding titles, seasons, and/or episodes to the RGTV Library.  For example, RGTV has two (2) titles – "*My Strange Addiction*" ("MSA," which has already generated $1.2 million in fees) and "*Very Scary People*" ("VSP") – that, between then, will have three (3) new seasons available in 2024 (*i.e.*, MSA Season 7 titled "*Still Addicted*" and VSP Season 4 and 5), and one (1) new season available in 2025 (*i.e.*, VSP Season 6).  For both titles, once these new episodes are added, the term of the underlying licensing contracts will be extended by ten (10) years, and there will be many more hours of content that RGTV can license to its customers as part of linear contracts, or put on the AVOD/FAST channel platform for viewing, which will translate to more revenue earning opportunities.

• RGTV continues to negotiate, enter into, and develop ***new sales*** pursuant to new Agreements entered into post-petition (the "New Linear Agreements").  In fact, just from November 2023 until February 2024, RGTV has closed, or is about to close, on nine (9) New Linear Contracts that are worth more than ***$1.9 million*** (approximately $724,856 of which will be realized during the Period).[25]  Because all of RGTV's customers that are counterparties to the New Linear Agreements are large companies (*e.g.*, Discovery and AETN), the question is not if the payments set forth in these agreements will be made but simply when.  Attached as **Exhibit "4"** hereto is a summary of the New Linear Agreements that have been agreed upon from November 2023 until February 2024.

• RGTV is expected to receive AVOD revenue in the amount of approximately **$381,064** during the Period alone.

• Aftershock continues to exploit its comic IP rights post-petition by, among other things, optioning these IP properties to major studios and streaming services pursuant to option

---

include AVOD revenue from the fourth quarter of 2023, because those amounts are paid to the Debtor approximately ninety (90) days after that quarter ends.

[25] In contrast, during November 2022 to February 2023, the Debtor only had one new linear

and purchase agreements, and working with these counterparties through the development process so that these IP properties can move into the "production" stages of the television series or film (and be purchased from Aftershock in the near future).  Specifically, at this time, Aftershock: (1) has negotiated, and is in the process of finalizing three (3) new contracts to "option" some of its IP properties to certain producers, studios or streaming services; and (2) has eight (8) IP properties that are currently "optioned" to studios and streaming services that are moving rapidly towards production (now that the Hollywood writers' strike has ended), with the expectation that some of these projects will be given the "greenlight" for production in the second half of 2024 and the first half of 2025 (which would generate a large amount of revenue to Aftershock upon the commencement of production)[26].  In addition, just last week, one of the Debtors' IP properties "*Astronaut Down*" has attached Scott Fraser as the writer, and the Esmail Company as the Debtors' production partner; the "*Beyond the Breach 1-3 London Content*" project has resumed, and the Debtors are working with their legal team to finish the deal; and two other projects involving the Debtors' IP properties are now in negotiation.  A redacted summary providing recent status updates on some of the Debtors' IP properties that are in the TV/Film development process (the "Comic IP Summary") is attached as **Exhibit "5"** hereto.

- In addition, a small team of four (4) individuals from Aftershock attended "Content London" (one of the leading conferences in the global content industry) (the "Conference") at the end of November 2023, and were able to generate three (3) new option/purchase agreements (worth at least $50,000 initially, and as much as $1,000,000 if all of these titles go into production) at that Conference alone.  Also, many of the Conference's attendees advised the Debtors that they were impressed with Aftershock's robust lineup of IP properties.  As a result, several well-known overseas companies have expressed an interest in being potential equity investors or financing sources as part of the Debtors' exit financing.

---

agreement sale in the amount of $118,659.72 ($185,000 AUD).

[26] During the period from 2024 to 2026, revenue is projected to be in excess of $10 million from the exploitation of the IP properties for conversion to film and television.  It is notable that this projected figure is on only twenty (20) of the twenty-seven (27) Debtor's IP properties that are currently under license, and does not attribute any value for the other one hundred and twenty-three (123) IP properties that comprise the Debtors' IP inventory that are not under license.

These parties have signed non-disclosure agreements, and are currently evaluating the Debtors' IP properties and financial information.

- RGTV continues to work with several AVOD and "FAST" channel platforms to broadcast its content on new AVOD platforms, territories, and/or channels to create additional streams of revenue pursuant to new post-petition contracts or "amendments." For example, RGTV is preparing to launch additional "FAST" channels in Germany in the near future; and is anticipating to launch these additional AVOD channels in Australia in early to mid-2024 (with more such channels planned in other territories in late 2024). In addition, with the necessary funding and personnel, the Debtors are expecting to launch a YouTube channel as soon as possible.

- Aftershock continues to produce, publish, and sell its comic books through retail channels post-petition, but has paused the publication of new titles pending its exit from bankruptcy to preserve cash.

31. It is important to note that, although the Debtors have successfully negotiated certain RGTV New Linear and/or AVOD Agreements and are projected to receive revenue therefrom, such revenue will be at risk of not being paid during the Period *if* the Debtors are not able to use Cash Collateral according to the Budget to pay wages to the Remaining Employees and other expenses. Entering into the New Linear and/or AVOD Agreements is only the first step; the Debtors' employees and vendors will still have to work on packaging and/or formatting the content "materials" for delivery to customers and, where applicable, to provide accounting for quarterly statements to producers to determine what, if anything, is owed to them for their licensing of the program to the Debtors.

32. As prior testimony has shown, there are various stages for a specific IP property to be converted to film or a television series (which requires, on average, 18 months to complete). As set forth in the Comic IP Summary, the Debtors are optimistic, and are expecting that: (1) 5 of the IP properties will commence production or be close to production in 2024; (2) 9 of the IP properties will commence production or be close to production in 2025; and (3) 6 of the IP properties will commence production or be close to production in 2026. As of the Petition

Date, only 4 of the IP properties were in the advanced stages of the production process. If production occurs in all of the IP properties referenced in this paragraph, the Debtors expect that revenue from these IP properties will be in excess of $10 million over a three (3) year period.

33.    Given all of the foregoing (especially given the fact that the Debtors' cash position will increase from the beginning of the Period to the end of the Period)[27], the Debtors assert that the Lender is adequately protected. The Debtors believe that investors, lenders, and potential IP licensees desire the Remaining Employees to continue providing necessary services before the closing of a financing transaction, to ensure that their capital will be deployed effectively from the outset.

34.    I believe that the Debtors' businesses are finally back on track since October 2023, and expect significantly improved results in the next twelve (12) months now that the COVID-19 pandemic and Hollywood writers' strike have ended. Despite the Debtors' cash collateral constraints, the Debtors are only starting to achieve "ordinary" pre-pandemic levels of

///
///
///
///
///
///
///
///
///
///
///
///

---

[27] Moreover, as set forth in the Budget, the Debtors' anticipated collections from their "AVOD" and "Linear Contract" revenue streams from May 2024 to December 2024 (*i.e.*, after the Period ends) are in amounts of $1,719,000 and $702,826 respectively (totaling total $2,421,826).

business activity and more interest from potential funders and investors about entering into a transaction with the Debtor, which is a positive indicator for their asset value and growth.

**Valuation Of Debtors' Primary Assets, Including The RGTV Library**

35.    My conclusion and belief as to the value of the Debtors' primary assets (*i.e.*, the RGTV Library, Aftershock's retail comic business, and Aftershock's IP property) have not changed since the April Evidentiary Hearing, and are set forth on page 41 of Exhibit "10" attached to the Debtors' Evidentiary Hearing Exhibits (the so-called Forest Road Presentation). In fact, given that the COVID-19 pandemic has negatively affected the Debtors' businesses by delaying revenue growth by approximately a year, as I expected, the Debtors' 2023 revenues totaling $3,211,056 is in line with the projected revenue of $3,292,903 for 2022 set forth in the Forest Road Presentation. *See* (Evidentiary Hearings Exhibits 10 and 11). The Debtors' have not lost any of their Distribution Rights or IP property rights, but have expended efforts to increase their value. Further, Aftershock has several projects regarding its IP that have moved closer to production which is expected to be an important revenue generating milestone. Specifically, I believe that the Debtors' assets continue to be worth substantially more than the amount owed to the Lender.

36.    I expect that once the Debtors exit bankruptcy, the underlying value of their companies will be realized. I do not understand why the Lender (under a once in a generational worldwide disruptive event) is not allowing the Debtors to use Cash Collateral – especially where the Debtors need to use Cash Collateral to pay the minimal expenses requested in the Budget to move through bankruptcy in an orderly, revenue generating, and asset enhancing manner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of March, 2024 at Sherman Oaks, California.

_____
JONATHAN KRAMER

business activity and more interest from potential funders and investors about entering into a

transaction with the Debtor, which is a positive indicator for their asset value and growth.

**Valuation Of Debtors' Primary Assets, Including The RGTV Library**

35.    My conclusion and belief as to the value of the Debtors' primary assets (*i.e.*, the RGTV Library, Aftershock's retail comic business, and Aftershock's IP property) have not changed since the April Evidentiary Hearing, and are set forth on page 41 of Exhibit "10" attached to the Debtors' Evidentiary Hearing Exhibits (the so-called Forest Road Presentation). In fact, given that the COVID-19 pandemic has negatively affected the Debtors' businesses by delaying revenue growth by approximately a year, as I expected, the Debtors' 2023 revenues totaling $3,211,056 is in line with the projected revenue of $3,292,903 for 2022 set forth in the Forest Road Presentation. *See* (Evidentiary Hearings Exhibits 10 and 11). The Debtors' have not lost any of their Distribution Rights or IP property rights, but have expended efforts to increase their value. Further, Aftershock has several projects regarding its IP that have moved closer to production which is expected to be an important revenue generating milestone. Specifically, I believe that the Debtors' assets continue to be worth substantially more than the amount owed to the Lender.

36.    I expect that once the Debtors exit bankruptcy, the underlying value of their companies will be realized. I do not understand why the Lender (under a once in a generational worldwide disruptive event) is not allowing the Debtors to use Cash Collateral -- especially where the Debtors need to use Cash Collateral to pay the minimal expenses requested in the Budget to move through bankruptcy in an orderly, revenue generating, and asset enhancing manner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of March, 2024 at Sherman Oaks, California.

JONATHAN KRAMER

43

# EXHIBIT "1"

**AfterShock Media**

| | 2/23/2024 | 3/1/2024 | 3/8/2024 | 3/15/2024 | 3/22/2024 | 3/29/2024 | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 4/30/2024 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | 349,775 | 349,775 | 423,795 | 388,357 | 182,908 | 178,860 | 105,763 | 245,775 | 568,443 | 436,923 | 431,556 | |
| **Cash Inflows** | | | | | | | | | | | | |
| Rive Gauche Receivables | | 85,575 | 3,298 | 159,360 | 3,799 | | 119,993 | 332,175 | 18,383 | | 2,273 | 724,856 |
| Rive Gauche Estimated Receivables | | | | | | | | | | | | - |
| Rive Gauche AVOD | | | 243,607 | 3,001 | 1,459 | 2,170 | 130,827 | | | | | 381,064 |
| Other Reimbursements (other inflows) | | | | | | | | | | | | - |
| Production Services, Pit Bulls S12/S13, net | | | | | | | | | | | | - |
| New Comic Sales (Diamond) | | | | | | | | | | | | - |
| Comic Sales (Comixology/Amazon) | - | 658 | | | | | | | | | | 658 |
| Aftershock - Comic Sales - Foreign | | | | | | | | | | | | - |
| Other Comic Revenues (Variant Covers, etc) | - | - | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 270 |
| Conventions | | | | | | | | | | | | - |
| Option Fees Film/TV | - | - | - | - | 15,764 | - | 35,000 | - | - | - | - | 50,764 |
| Dip Loan | | | | | | | | | | | | - |
| Purchase Price - With Rights | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchase Price | - | - | - | - | - | - | - | - | - | - | - | - |
| LG/BG Issuer Fee | | | | | | | | | | | | - |
| Work Fee Sandton | | | | | | | | | | | | - |
| Guarantee Finders Fee | | | | | | | | | | | | - |
| Forest Road | | | | | | | | | | | | - |
| Total Income | - | 86,233 | 246,935 | 162,391 | 21,052 | 2,200 | 285,850 | 332,205 | 18,413 | 30 | 2,303 | 1,157,611 |

| | 2/23/2024 | 3/1/2024 | 3/8/2024 | 3/15/2024 | 3/22/2024 | 3/29/2024 | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 4/30/2024 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | 349,775 | 349,775 | 423,795 | 388,357 | 182,908 | 178,860 | 105,763 | 245,775 | 568,443 | 436,923 | 431,556 | |
| **Cash Outflows** | | | | | | | | | | | | |
| Comic Creation Costs | | | 460 | | | | | | | | | |
| Comic Printing Costs (rolled up in creation) | | | | | | | | | | | | |
| Working Capital (SG&A, Prepaid and Recoupable Costs, etc) | - | 12,212 | 281,914 | 210,880 | 25,099 | 4,297 | 28,118 | 9,537 | 149,933 | 5,397 | 25,857 | |
| **AfterShock Comics** | - | 11,802 | 20,807 | 17,969 | 371 | 771 | 10,750 | 371 | 13,062 | 1,871 | 371 | |
| Bank fees | | 65 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 785 |
| Convention expense | | | | | | | | | | | | - |
| Business Meetings/Meals | | | | 1,500 | | | 1,500 | | | 1,500 | | 4,500 |
| Copyright Expense | | | | | | 300 | 300 | | | | | 600 |
| Entertainment | | | | | | | | | | | | - |
| Insurance | | | | | | | | | | | | - |
| Health | | | 3,375 | 2,625 | | | 3,375 | | 3,025 | | | 12,400 |
| Liability | | | | 3,547 | | | | | | | | 3,547 |
| Legal - Sacker | | | | | | | | | | | | - |
| Legal (Neale) | | | | | | | | | | | | - |
| UK Legal | | 11,927 | | | | | | | | | | 11,927 |
| Marketing | | | 100 | | | 100 | | | | | | 200 |
| Computer software utilities | | | 600 | | | | 600 | | | | | 1,200 |
| Microsoft 360 | | | 580 | | | | 580 | | | | | 1,160 |
| Dropbox | | | 380 | | | | 380 | | | | | 760 |
| Slack | | | 335 | | | | 335 | | | | | 670 |
| Zoom | | | 35 | | | | 35 | | | | | 70 |
| Baseline (studio system) | | | | | | | | | | | | - |
| Adobe | | | 15 | | | | 15 | | | | | 30 |
| Docusign (paid annually in 2022) | | | | | | | | | | | | - |
| Web site hosting | | | 750 | | | | 750 | | | | | 1,500 |
| Website maintenance | | | | | | | | | | | | - |
| E.L.I (advisor/Rekant) | | | | | | | | | | | | - |
| US Trustees | | | | | | | | | | | | - |
| Office rent | | | 3,319 | 200 | | | 1,769 | | 200 | | | 5,488 |
| Office supplies | | | | | | | | | | | | - |
| Public relations | | | | 5,000 | | | | | 5,000 | | | 10,000 |
| Research materials / Decks | | | 20 | | | | 20 | | | | | 40 |
| Shipping, postage | | | 2,075 | | | | 75 | | | | | 2,150 |
| Social Media | | | | | | | | | | | | - |
| Subscriptions | | | 520 | | | | 520 | | | | | 1,040 |
| Telephone (King Central) | | | 125 | | | | 125 | | | | | 250 |
| Taxes - business (rose synder) & various | | | | | | | | | | | | - |
| **Tax and accounting** | - | (190) | 4,498 | 5,017 | 291 | 291 | 291 | 291 | 4,757 | 291 | 291 | 15,828 |
| Travel | | | | | | | | | | | | - |
| Airfare | | | | | | | | | | | | - |
| Lodging | | | | | | | | | | | | - |
| Local transportation | | | | | | | | | | | | - |
| Travel-Other | | | 4,000 | | | | | | | | | 4,000 |
| Amex - Unclassified aftershock | | | | | | | | | | | | - |
| Web site design/hosting OLD Catergory dont use | | | | | | | | | | | | - |
| Other expense | | | | | | | | | | | | - |
| Variant Cover Expense OLD Catergory dont use | | | | | | | | | | | | - |
| **Total Aftershock Expenses** | | | | | | | | | | | | **78,145** |

| Beginning Balance | 349,775 | 349,775 | 423,795 | 388,357 | 182,908 | 178,860 | 105,763 | 245,775 | 568,443 | 436,923 | 431,556 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2/23/2024 | 3/1/2024 | 3/8/2024 | 3/15/2024 | 3/22/2024 | 3/29/2024 | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 4/30/2024 | Totals |
| **Rive Gauche** | - | 410 | 127,511 | 63,042 | 24,728 | 3,526 | 17,368 | 9,166 | 9,688 | 3,526 | 25,486 | |
| US PO Box | | | | | | | | | | | | - |
| Bank fees | | 15 | 150 | 500 | 150 | 150 | 150 | 150 | 150 | 150 | | 1,565 |
| UnitedHealthCare/ Health insurance | | | | | | | | | | | | - |
| Liability insurance | | | | 11,830 | | | | | | | | 11,830 |
| Bob Chapman (Sauer & Wagner) | | | | | | | | | | | | - |
| City Of Of Los Angeles / Franchise Tax Board | | | | | | | | | | | | - |
| Copyrights | | | | | | | | | | | | - |
| Dinter Inc. (fso Tomas Silva) | | | | | | | | | | | | - |
| Direct TV | | | | | | | | | | | | - |
| Fotokem | | | | | | | | | | | | - |
| Phil Fiers from Focus Advisory Jawad | | | | | | | | | | | | - |
| US Trustees | | | | | | | | | | | | - |
| Jon Kramer - Medical | | | 762 | 762 | | | | | 762 | | | 2,286 |
| Reimburse Jon Kramer | | | | | | | | | | | | - |
| AMEX reimb Delta #1 | | | | | | | | | | | | - |
| AMEX reimb Platinum #2 | | | | | | | | | | | | - |
| AMEX reimb Delta #2 | | | | | | | | | | | | - |
| Chase 5026 | | | | | | | | | | | | - |
| Chase 5135 | | | | | | | | | | | | - |
| Chase 8313 | | | | | | | | | | | | - |
| Julie Cawood Development | | | | | | | | | | | | - |
| Marketing | | | | | | | | | | | | - |
| Computer software utilities: | | | | | | | | | | | | - |
| Microsoft 360 | | | 550 | | | | 550 | | | | | 1,100 |
| Dropbox | | | | | | | | | | | | - |
| Slack | | | | | | | | | | | | - |
| Zoom | | | 162 | | | | 162 | | | | | 324 |
| Comet, Saturn Software annual subscription | | | 5,400 | | | | | | | | | 5,400 |
| Adobe | | | 20 | | | | 20 | | | | | 40 |
| Docusign (paid annually) | | | | | | | | | | | | - |
| Web site hosting | | | 100 | | | | 100 | | | | | 200 |
| Website maintenance | | | | | | | | | | | | - |
| Markets/Conventions | | | 19,467 | | | | | | | | | 19,467 |
| T-Mobile (due the 9th) | | | 506 | | | | | 506 | | | | 1,012 |
| Michael Bales & other Legal | | | | | | | | | | | | - |
| Legal (Neale) | | | | | | | | | | | | - |
| Office Supplies | | | | | | | | | | | | - |
| Rent - storage unit | | | | | | | | | | | | - |
| Ottera | | | 28,658 | 5,400 | | | | | 5,400 | | | 39,458 |
| Parking | | | 889 | | | | | | | | | 889 |
| Professional Subscription (C21) annual | | | | | | | | | | | | - |
| Prudential - key man insurance | | | | | | | | | | | | - |
| **Robert Half/Temp Accounting** | | | 9,002 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 34,722 |
| Rose, Snyder and Jacobs | | | | | 15,000 | | | | | | | 15,000 |
| Santa Monica Video (Icogs) | | | 1,000 | 10,134 | | | 5,000 | 5,134 | | 10,000 | | 31,268 |
| Synoptek | | | 6,157 | 2,110 | | | 2,110 | | | 2,110 | | 12,487 |
| MIP (booth construction) & Other | | | 12,481 | 18,000 | | | | | | 10,000 | | 40,481 |
| Reed Midem - MIP (booth registration) | | | 6,202 | | 6,202 | | | | | | | 12,404 |
| Payroll Costs (Taxes and Workers Comp) | - | 395 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 1,844 |
| MIP travel/hotel costs | | | 3,321 | 10,930 | | | | 900 | | | | 15,151 |
| MIP meals | | | 3,554 | | | | 5,000 | | | | | 8,554 |
| Reel Screen Travel & Expense | | | 13,000 | | | | | | | | | 13,000 |
| TBI - Mipcom advertising | | | | | | | | | | | | - |
| T&E reimbursements | | | | | | | | | | | | - |
| World Screen | | | | | | | | | | | | - |
| Other Expense | | | 4,969 | | | | | | | | | 4,969 |
| AVOD Costs - Creation and Delivery Costs | | | 11,000 | | | | | | | | | 11,000 |
| AVOD Costs - Access Costs | | | | | | | | | | | | - |
| AVOD Costs - Dinter Dubbing | | | | | | | | | | | | - |
| **RGTV Expenses** | | | | | | | | | | | | **284,451** |
| **AfterShock Media Combined Salaries** | - | - | 133,596 | 129,869 | - | - | - | - | 127,183 | - | - | **390,648** |

| | | | 2/23/2024 | 3/1/2024 | 423,795 | 388,357 | 182,908 | 178,860 | 105,763 | 245,775 | 568,443 | 436,923 | 431,556 | |
| Beginning Balance | 349,775 | 349,775 | 3/8/2024 | 3/15/2024 | 3/22/2024 | 3/29/2024 | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 4/30/2024 | Totals |
| **Total During Period** | - | - | | | | | | | | | | 759,344 |
| Other Investor Interest and Loan Payments | - | - | - | - | - | - | - | - | - | - | | |
| **Growth, Development and Consolidation** | | | | | | | | | | | | |
| | 1/1/1900 | | | | | | | | | | | |
| Rive Gauche Royalties and MG Payables | - | - | - | 156,960 | - | 71,000 | 117,720 | - | - | - | - | |

| | 2/23/2024 | 3/1/2024 | 3/8/2024 | 3/15/2024 | 3/22/2024 | 3/29/2024 | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 4/30/2024 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | 349,775 | 349,775 | 423,795 | 388,357 | 182,908 | 178,860 | 105,763 | 245,775 | 568,443 | 436,923 | 431,556 | |
| Estimated Quarterly Royalties (Escrow holding acct) | - | - | - | - | - | - | - | - | - | - | - | |
| Total Expense | - | 12,212 | 282,374 | 367,840 | 25,099 | 75,297 | 145,838 | 9,537 | 149,933 | 5,397 | 25,857 | |
| Monthly Cash Movement | - | 74,021 | (35,439) | (205,449) | (4,047) | (73,097) | 140,012 | 322,668 | (131,520) | (5,367) | (23,554) | |
| Total Cash Balance | 349,775 | 423,795 | 388,357 | 182,908 | 178,860 | 105,763 | 245,775 | 568,443 | 436,923 | 431,556 | 408,002 | |

*Items highlighted in green were previuosly approved, but not paid or partial
payment was made.

# Budget With Projected "Inflows" Until End Of 2024

**AfterShock Media**

Beginning Balance

**Cash Inflows**

| | | | | | | | | | | | | Totals | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Total Income



| | 2/13/2024 | 3/1/2024 | 3/8/2024 | 3/15/2024 | 3/22/2024 | 3/29/2024 | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 4/30/2024 | Totals | 5/31/2024 | 6/30/2024 | 7/31/2024 | 8/31/2024 | 9/30/2024 | 10/31/2024 | 11/30/2024 | 12/31/2024 | Feb-Dec 2024 Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | 346,773 | 346,773 | 423,793 | 388,337 | 163,998 | 178,840 | 435,742 | 345,773 | 568,440 | 456,933 | 431,016 | | 409,932 | 1,216,060 | 1,475,371 | 1,648,614 | 2,030,337 | | 2,127,459 | 2,330,382 | 3,821,385 |
| Estimated Quarterly Royalties (Escrow holding acct) | | | | | | | | | | | | | | | | | | | | | |
| Total Expense | | 13,232 | 161,974 | 167,649 | 21,059 | 75,197 | 135,858 | 9,527 | 100,030 | 5,307 | 35,857 | | | | | | | | | | |
| Monthly Cash Movement | | 74,310 | 135,456 | (205,448) | 16,847 | 175,097 | 348,812 | 162,808 | (111,128) | 71,867 | (33,556) | | 806,063 | 257,396 | 176,843 | 383,023 | 187,923 | | 2,959 | 389,923 | 313,718 |
| Total Cash Balance | 346,773 | 423,793 | 388,337 | 163,998 | 178,840 | 435,742 | 345,773 | 568,440 | 456,933 | 431,016 | 409,932 | | 1,216,060 | 1,475,371 | 1,648,614 | 2,059,337 | 2,127,459 | | 2,330,382 | 2,631,385 | 3,821,039 |

*Items highlighted in green were previously approved, but not paid or partial payment was made.

**EXHIBIT "2"**

| | | |
|---|---|---|
| Admin | Cathy Guthrie<br>Robert Half<br>(Bookkeeper - Temporary agency) | Is handling the accounting for RGTV including the importing of AR information from sales licensing database, preparing cashflow budgets for ASM, processing ASM payroll through ADP and AP processing.  Responsible for Producer statements for RGTV titles. |
| Admin | Lisa Moody<br>Accounting/ Finance | Responsible for handling all of the accounting for ASC including recording bank deposits, AR, AP, contract administration of foreign publishing license agreements with foreign publishers, administering contractual obligations of creators, handling subscription licensing, Creator profit loss statements, recording sales information from Diamond and foreign publishers, recording all costs, and payroll for all contractors. |
| **Rive Gauche Television** | | |
| | Justina Hemperek<br>Executive VP, Acquisition & Sales | Handles the acquisitions of programming and/or original productions for distribution by RGTV.  Also, handles sales for licensing broadcast rights in selected European countries. |
| | Jon Kramer<br>CEO (ASC), President and CEO (RGTV) | CEO for both ASC & RGTV and manages all operations for both companies. Senior sales person handling major market relationships and sales. |
| **Aftershock Comics** | | |
| | Sarah Pruett<br>Publishing Assistant (Full Time) | handles physical inventory at ASC warehouse in Georgia and shipping of comic books for direct sales and fulfillment to Diamond. |
| | Kelly Diodati<br>Ambassador Outreach Manager | Manages and supervises Ambassador program for comic book retail stores and the promotion of ASC comics in U.S. retail market. |
| | Brian Cunningham<br>Editor in Chief | Editor of story and art work for all comic books, responsible for negotiating publishing agreements, assigning and hiring creative team for each comic book, manages the publication of all comic books, manages production and publication calendars, and supervises Publishing department.  Liason with Diamond, creators, writers, artists, colorists, letterers, etc. |
| | Steve Rotterdam<br>Senior VP, Sales and Marketing | Manages and supervises Marketing department for ASC including merchandise and promotional items for all comic book retail stores, press releases and ads in all trades, news and social media outlets and manages marketing calendar in corrdination with publishing department.  Primary focus is Retail business. |
| **US Film & TV** | | |
| | Lee Kramer<br>ASC President | As ASC's President, handles the Film and TV Division for the option/purchase of IP rights throughout the world. |
| | Max Zupanovic<br>Director of Development, Film & TV | manages and coordinates the licensing and sale for the option/purchase of IP rights for U.S. film and TV projects to U.S. producers, studios and production companies, includes creating pitch decks and pitching projects.  Liason with agents, managers, writers and producers. |
| | David Sigurani<br>Executive VP, Film and TV | Contractor handling optioning and development of IP for Film and TV primarily in the U.S. and selected international countries. |
| | Ryan Carroll<br>Director of Comics/Film & TV Liason | Handles the acquisition and development of comic book properties for publication by ASC, which includes hearing pitches from creators and presenting them to the ASC team.  Position handles title clearances of each book, contract administration of all publishing agreements.  Liason with writers, artists and creators.  Also, coordinates the comic book information between publishing division and Film & TV division. |
| **Foreign Film & TV** | | |
| | Jon Kramer<br>CEO (ASC), President and CEO (RGTV) | CEO for both ASC & RGTV and manages all operations for both companies. Senior sales person handling major market relationships and sales. |
| | Madelyn Starr<br>Creative Executive, Global Film & TV | Quit as of December 6th.  She managed and coordinated the process of the option/purchase of IP rights for foreign film & TV projects, prepared pitch decks and information for the sale of IP rights for film and TV. Liason with foreign producers and managers. |
| | Jeff Ford<br>Senior Executive Film & TV, UK | Contractor handling optioning and development of IP for Film and TV in the UK and Europe. |
| | Dan Shires<br>VP Film & TV, UK | Contractor handling optioning and development of IP for Film and TV in the UK and Europe. |

# EXHIBIT "3"

## Cash Inflows

| | Actuals | Budget Totals | Difference |
|---|---|---|---|
| Rive Gauche - Receivables | 1,384,234 | 690,123 | (694,110) |
| Rive Gauche - AVOD | 947,415 | 1,143,285 | 195,870 |
| Rive Gauche - Other Reimbursements (funds in Holding Account) | 662,708 | 662,539 | (169) |
| Rive Gauche - Production Services, Pit Bulls S12/S13, net | - | - | - |
| Aftershock - New Comic Sales (Diamond) | - | - | - |
| Aftershock - Comic Sales (Comixology/Amazon) | 17,027 | 16,234 | (793) |
| Aftershock - Comic Sales - Foreign | 16,124 | 50,968 | 34,844 |
| Aftershock - Other Revenues (Variant Covers, Conventions, etc) | 16,123 | 44,819 | 28,696 |
| Aftershock - Conventions | - | - | - |
| Aftershock - Option Fees Film/TV | 167,427 | 142,148 | (25,279) |
| Equity Investment | | | |
| Aftershock - Purchase Price - With Rights | | | |
| **Total Income** | **3,211,056** | **2,750,116** | **(460,940)** |

## Cash Outflows

| | Actuals | Budget Totals | Difference |
|---|---|---|---|
| **AfterShock Comics Creator and Printing Costs** | | | |
| Aftereshock Comic Creator Costs | **67,480** | 175,920 | 108,440 |
| Aftershock Comic Printing Costs | - | 65,000 | 65,000 |
| **AfterShock Comics (Subtotals Excluding Creator and Printing Costs)** | **323,397** | **572,655** | **249,258** |
| Bank fees | 2,399 | 3,980 | 1,581 |
| Convention expense | 18,068 | 19,088 | 1,019 |
| Business Meetings/Meals | 11,253 | 28,193 | 16,940 |
| Copyright Expense | - | 2,700 | 2,700 |
| Entertainment | - | - | - |
| Insurance | 3,727 | 3,727 | - |
| Health | 55,078 | 65,257 | 10,179 |
| Liability | 3,547 | 2,265 | (1,282) |
| Legal | 14,250 | 57,000 | 42,750 |
| Legal (Neale) | 2,250 | - | (2,250) |
| UK Legal | - | 12,500.00 | 12,500 |
| Marketing | 6,948 | 58,400 | 51,452 |
| Computer software utilities | 3,571 | 1,600 | (1,971) |
| Microsoft 360 | 3,932 | 4,748 | 816 |
| Dropbox | 3,530 | 3,800 | 270 |
| Slack | 3,013 | 4,605 | 1,591 |
| Zoom | 839 | 984 | 145 |
| Baseline | 4,305 | 2,133 | (2,172) |
| Adobe | 55 | 175 | 120 |
| Docusign | 960 | 340 | (620) |
| Web site hosting | 6,608 | 7,500 | 892 |
| Website maintenance | 2,188 | - | (2,188) |
| Stuart Rekant DIP Loan Advisor | 10,000 | 25,000 | 15,000 |
| US Trustees | 6,854 | 5,168 | (1,686) |
| Office rent | 33,095 | 22,550 | (10,545) |
| Office supplies | 379 | 225 | (154) |
| Public relations | 45,000 | 50,000 | 5,000 |
| Research materials / Decks | 180 | 140 | (40) |
| Shipping, postage | 1,417 | 1,158 | (259) |
| Social Media | - | - | - |
| Subscriptions | 3,461 | 1,740 | (1,721) |
| Telephone (Ring Central) | 1,395 | 4,722 | 3,326 |
| Taxes - business (rose synder) | 3,482 | 3,321.00 | (161) |
| Tax and accounting | 57,134 | 67,569 | 10,435 |

| | | | | |
|---|---|---|---|---|
| Travel | | 2,466 | 9,500 | 7,034 |
| Airfare | | - | - | - |
| Lodging | | - | - | - |
| Local transportation | | - | - | - |
| Travel-Other | | 960 | 6,000 | 5,040 |
| Amex - Unclassified aftershock | | - | - | - |
| Web site design/hosting | | - | - | - |
| Other expense | | 11,052 | 96,568 | 85,516 |
| Variant Cover Expense | | - | - | - |
| | | | | |
| **Rive Gauche  (Subtotals)** | | **673,976** | **948,086** | **274,111** |
| USPS PO Box | | - | - | - |
| Bank fees | | 5,535 | 7,825 | 2,290 |
| UnitedHealthCare/ Health Insurance | | 15,592 | 14,129 | (1,463) |
| Liability Insurance | | 11,830 | 14,420 | 2,590 |
| Bob Chapman (Sauer & Wagner) | | - | - | - |
| City of Of Los Angeles / Franchise Tax Board | | 2,769 | 2,200 | (569) |
| Copyrights | | - | - | - |
| Dinter Inc. (fso Tomas Silva) | | - | - | - |
| Direct TV | | - | - | - |
| Fotokem | | - | - | - |
| Phil Fiers from Focus Advisory | | - | 12,000 | 12,000 |
| US Trustees | | 11,064 | 6,844 | (4,220) |
| Jon Kramer - Medical | | 7,620 | 7,620 | - |
| AMEX reimb Platinum #1 | | - | - | - |
| AMEX reimb Delta #1 | | - | - | - |
| AMEX reimb Platinum #2 | | - | - | - |
| AMEX reimb Delta #2 | | - | - | - |
| Chase 5026 | | - | - | - |
| Chase 5135 | | - | - | - |
| Chase 8313 | | - | - | - |
| Julie Cawood Development | | - | - | - |
| Marketing | | - | - | - |
| Computer software utilities: | | 631 | - | (631) |
| Microsoft 360 | | 4,049 | 2,746 | (1,304) |
| Dropbox | | 320 | 160 | (160) |
| Slack | | 217 | 1,331 | 1,114 |
| Zoom | | 1,034 | 854 | (179) |
| Comet, Saturn Software | | 5,400 | 5,400 | - |
| Adobe | | 180 | 175 | (5) |
| Docusign | | 480 | 340 | (140) |
| Web site hosting | | 1,175 | 1,000 | (175) |
| Website maintenance | | 780 | 3,750 | 2,970 |
| Markets/Conventions | | 12,537 | 13,200 | 663 |
| T-Mobile | | 5,619 | 4,555 | (1,064) |
| Michael Bales & other Legal | | 2,500 | 5,000 | 2,500 |
| Legal (LNBYG) | | - | - | - |
| Rent - storage unit | | - | - | - |
| Ottera | | 39,661 | 32,000 | (7,661) |
| Parking | | - | - | - |
| Professional Subscription (C21) annual | | 869 | 900 | 31 |
| Prudential - key man insurance | | 8,265 | 8,261 | (4) |
| **Robert Half/Temp Accounting** | | 136,413 | 139,400 | 2,987 |
| Rose, Snyder and Jacobs | | - | - | - |
| Santa Monica Video ()cogs | | 29,944 | 56,200 | 26,256 |

| | | | | |
|---|---|---|---|---|
| | Synoptek | 40,382 | 61,237 | 20,855 |
| | **Tangram - MIP (booth construction)** | 51,465 | 74,800 | **23,335** |
| | Reed Midem - MIP (booth registration) | 53,868 | 60,526 | 6,658 |
| | Payroll Costs (Taxes and Workers Comp) | 33,467 | 28,044 | (5,423) |
| | **MIP travel/hotel costs** | 35,817 | 28,350 | **(7,467)** |
| | MIP meals | 7,500 | 9,000 | 1,500 |
| | Reel Screen Travel & Expense | 8,513 | 9,800 | 1,287 |
| | TBI - Mipcom advertising | - | 5,000 | 5,000 |
| | T&E reimbursements | 1,657 | 7,500 | 5,843 |
| | World Screen | 2,500 | 2,500 | - |
| | Other - Expense | 126,143 | 5,000 | (121,143) |
| | AVOD Costs - Creation and Delivery Costs | 8,180 | 172,020 | 163,840 |
| | AVOD Costs - Access Costs | - | 94,000 | 94,000 |
| | AVOD Costs - Dinter Dubbing | - | 50,000 | 50,000 |
| | AfterShock and Rive Gauche Combined Salaries | **1,914,954** | 1,931,830 | 16,876 |
| | **Totals** | **2,979,807** | **3,693,492** | **713,685** |

# EXHIBIT "4"

**"New Sales"**

**Attached Agreements**

| | | | |
|---|---|---|---|
| Very Scary People | Discovery | $ 156,000.00 | partially signed (waiting for other side's signature) |
| Strange Addiction | Discovery | $ 85,600.00 | signed |
| HH 1 +3 | Multicanal | $ 71,584.00 | 66,000 Euro, signed |
| My Strange Addiction (Still Addicted) | Discovery | $ 392,400.00 | signed |
| Very Scary People | AETN | $ 364,620.00 | 291636 GBP |
| **Others (in the process of being documented)** | | | |
| Very Scary People S4 | Bell Canada | $75,600 | |
| HH (Various Seasons) | AETN | $673,390 | |
| Various | Discovery Italy | $ 108,000.00 | (not executed) |
| | | | |
| | | | |
| | | | |
| **Total** | | $ 1,927,194.00 | |
| | | | |

# EXHIBIT "5"

**From:** AfterShock Media
**Date:** 2/23/24
**Re:** Film/TV Project Breakdown

# TITLES IN DEVELOPMENT

## PREP/PRODUCTION IN 2024

### TV
**A CALCULATED MAN** by Paul Tobin is a live-action series set up at 20th Century TV with Hulu as the network.  Warren Littlefield (former Head of NBCUniversal, EP of "Fargo," "The Handmaid's Tale," "The Old Man") is our producing partner and our showrunner is Peter Calloway ("Marvel's Cloak & Dagger," "American Gods," "Legion").

UPDATES:
We received the latest draft of the pilot on 11/3, worked with Peter and 20th to implement notes, then sent Hulu.  We met with Hulu on 11/20 to discuss their thoughts, which Peter implemented in the new draft we received on 12/20.  We read and discussed the latest draft with our partners on 1/10/24 and sent back to Hulu.  We had a meeting with Hulu on 2/12/24 to discuss their thoughts, which Peter is currently implementing while we await his new draft.  Once the pilot is approved, they will either have Peter write a second episode script or start the process of opening a writers room.  As Hulu picks shows every quarter we should know if we have the go ahead by March of 24, if all goes as planned prep and production could start by the end of 24.

**JIMMY'S BASTARDS** by Garth Ennis is a live-action series set up at AMC Studios.  Bigbaldhead (actor Norman Reedus from "The Walking Dead" and producer Amanda Verdon) are our producing partners and Taika Waititi (THOR RAGNAROK, THOR LOVE & THUNDER, JOJO RABBIT, WHAT WE DO IN THE SHADOWS) is showrunning (co-writing with Matt Schatz and Donnetta Grays) and directing.

UPDATES:
We received the first draft of the pilot on 11/28, created and sent notes, then met with our producing partners to discuss on 12/5.  We received an updated draft with the previous notes incorporated on 2/21/24, and are quickly reading and doing a new set of notes which we'll send by the top of next week.

### FILM
**PARTY & PREY** by Steve Orlando and Steve Foxe is a live-action feature set up at Legendary.  Patrick Brice (CREEP 1 & 2, THE OVERNIGHT, THERE'S SOMEONE INSIDE YOUR HOURSE) is attached to direct and Rob Forman ("iZombie," "Ancient Aliens," "Army Wives") is our writer.

UPDATES:
We spoke to our point exec on 12/14 and had a casting meeting on 1/8/24.  We're currently casting and went out to our top choice for the lead role in January (confidentially, actor ███████████████████████████████████
██  .  We should hear back from Murray and his team soon.  Prep and potentially production could start by the end of 2024.

**KAIJU SCORE** by James Patrick is a live-action feature set up at Sony.  Escape Artists (THE EQUALIZER Trilogy, PIG, BEING THE RICARDOS) are our producing partners and Will Spec and Josh Gordon (LYLE LYLE CROCODILE, OFFICE CHRISTMAS PARTY, THE SWITCH, BLADES OF GLORY) are directing.  We have a great draft by Shay Hatten (JOHN WICK 3 & 4, ARMY OF THE DEAD, DAY SHIFT) and have begun exploring high caliber genre writers to boost up the horror element of the story.

UPDATES:
Escape sent us the updated writers list with our additions on 11/30.  We had meetings with two potential writers on 1/11/24 and 1/12/24, then a second meeting with one of those writers (confidentially, ████████████████████

on 1/26/24.  We're moving forward in attaching Sean.  Our Sony executive is currently making the deal with him for a polish on the script.  A strong polish could lead to prep in 2024.

**GOD COUNTRY** by Donny Cates is a live-action feature set up at Netflix and Legendary (co-financing).  Jim Mickle ("Sweet Tooth" showrunner, WE ARE WHAT WE ARE, STAKE LAND) is directing and writing the latest draft.

UPDATES:
Jim completed the first draft on 12/14 and we completed notes that we sent to Legendary that week.  We had a notes meeting with Legendary on 1/4/24 and delivered the draft to Netflix that month.  Currently waiting on Netflix's official response and thoughts.

## PREP/PRODUCTION IN 2025

### TV

**UNDONE BY BLOOD** by Zac Thompson & Lonnie Nadler is set up at AMC Studios and we're negotiating with Peacock to partner.  Bigbaldhead (actor Norman Reedus from "The Walking Dead" and producer Amanda Verdon) are our producing partners and Tony Tost ("The Terror," "Damnation" creator, "Longmire") is our showrunner.

UPDATES:
We have a strong draft of the pilot completed and are waiting for the deal to close with Peacock before implementing any of their potential creative changes.

**DEAD DAY** by Ryan Parrot is a live-action series set up at UTV.  Julie Plec & Kevin Williamson ("Vampire Diaries" creators/showrunners, Kevin also created the SCREAM franchise) are showrunning and producing under their companies My So-Called Company ("Vampire Diaries," "Legacies," "The Originals") and Outerbanks (SICK, SCREAM 4, VENOM, "Vampire Diaries") respectively.

UPDATES:
Julie and Kevin wrote a pilot which is in fantastic shape.  We'll be taking out to buyers this year.

**DARK RED** by Tim Seeley is a live-action series set up at Blumhouse TV with Amazon as the network.  Ryan O'Nan ("Big Sky," "Wu-Tang: An American Saga," "Queen of the South") is showrunning.

UPDATES:
Ryan developed a pilot outline which we did notes on and met to discuss on 11/21.  After receiving the updated version on 12/5, we sent Ryan additional notes to execute on 12/7.  The latest version was delivered to Amazon on 12/15.  Amazon approved, and Ryan was commenced to write the pilot script as of 1/29/24.  Awaiting the pilot draft.

**REPLICA** by Paul Jenkins is a live-action series set up at Amazon.  Matt Sazama & Burk Sharpless ("Lost in Space" creators, MORBIUS, POWER RANGERS, GODS OF EGYPT) are showrunning.

UPDATES:
We received the pilot outline on 11/29 and met on 12/1 to discuss our notes.  They implemented notes on the pilot outline, and we received a new draft on 2/9/24.  We had a pre-call with Amazon on 2/20/24, then met with the writers and Amazon on 2/21/21 to discuss our notes.  The writers have been commenced as of 2/21/24 and are writing the pilot script.

**CHICKEN DEVIL** by Brian Buccellato is a live-action series set up at Village Roadshow.  Happy Madison (actor Adam Sandler's company, credits include HUSTLE, MURDER MYSTERY 1 & 2, "The Goldbergs") are our producing partners and Robert Munic ("Power Book IV" creator/showrunner, FIGHTING, "Empire," "The Cleaner" creator) is showrunning.

UPDATES:

We had a meeting with Happy Madison and Robert Munic on 1/12/24 and are executing a plan to pitch potential buyers. Our targets are Amazon (we submitted material on 2/6/24), Peacock, HBO and MGM+.

**YOU ARE OBSOLETE** by Mathew Klickstein is a live-action series.  Sienna Films (SWEETNESS IN THE BELLY, "Sort Of," "Cardinal") and SAM Productions ("The Nurse," "Borgen") are producing with us and Steve Cochrane ("The Porter," "The Hardy Boys," "Ransom") is writing.  TV4 is our broadcaster.

UPDATES:
We've submitted the pilot to them and they want to move forward.

**PESTILENCE** by Eric Bromberg & Frank Tieri is a live-action series.  Philip Koch ("Tribes of Europa" creator, FRIEND REQUEST, PICCO) is attached to write and produce and we have a shopping agreement with Nocturna Pictures (Germany).  Sebastian Marka & Erol Yesilkaya (creators of Amazon Germany show The Gryphon), director/EP Marvin Kren (Freud, 4 Blocks), and actor Mickey Rourke.

UPDATES:
Discussing strategy and budget.

## FILM

**THE MAN WHO F'D UP TIME** by John Layman is a live-action feature currently set up at Netflix with Berlanti Productions (MOONSHOT, MY POLICEMAN, FREE GUY, "Riverdale," "You") as are our producing partners.  Jeremiah Friedman & Nick Palmer ("Muscle Beach," ALPHA SQUAD SEVEN) wrote the first draft.

UPDATES:
We heard back from Netflix and they aren't going to move forward with the project, but have interest from other studios which we will explore further once the title is clean.  We also sent Berlanti additional projects they were interested in as they'd like to stay in business with us.

**HORDE** by Marguerite Bennett & Leila Leiz is a live-action feature optioned by Ambience Entertainment (INTERCEPTOR, KILLER ELITE, THE LOVED ONES), our Australian-based producing partners.  Ambience is working on getting development funding from Australia.  Catherine Smyth-McMullen ("Sandman," THE OTHER LAMB) is attached to adapt.

UPDATES:
We met with Ambience on 11/16 and they are checking in with Catherine to keep the process moving forward.  We had another meeting with them on 12/19 to discuss updates, and as of 1/28/24, Michael is discussing next steps with Catherine.

## PREP/PRODUCTION IN 2026

## TV
**THE NAUGHTY LIST** by Nick Santora ("Reacher" creator/showrunner, "Most Dangerous Game" creator/showrunner) is a live-action series set up at Skydance.  Nick is attached to adapt and show run.

UPDATES:
We're discussing strategy with Nick and Skydance in terms of bringing on a network.

**WE LIVE** by Inaki and Roy Miranda is being developed as an animated series and we're partnered with Powerhouse Animation ("Castlevania," "Blood of Zeus").

UPDATES:
We sent the material to Shay Hatten (JOHN WICK 3 & 4, ARMY OF THE DEAD, DAY SHIFT) on 2/2/24 to potentially adapt. Shay is reading and should have an answer for us in a couple of weeks.

**MARY SHELLEY: MONSTER HUNTER** by Adam Glass ("Supernatural," "In from the Cold" creator/showrunner) &
Olivia Cuartero-Briggs is a live-action series set up at BBC Studios.  Rachel Anthony ("The Vanishing Triangle," "Cobra,"
"Ransom") is adapting in addition to Adam and Olivia.

UPDATES:
We're discussing potentially taking the project out in the US with BBCS.

**THE NORMALS** by Adam Glass ("Supernatural," "In from the Cold" creator/showrunner) is a live-action series set up at
SBS.  Werner Films ("The Newsreader," "Surviving Summer") is our producing partner and Australian writer Louise Fox
("Glitch" creator, "Camelot") is coming on board.

**MIDNIGHT VISTA** by Eliot Rahal and Clara Meath is a live-action series set up at ABC Signature Studios.

UPDATES:
Discussing next steps with ABCS.

**BEYOND THE BREACH** by Ed Brisson is a series that will include live-action and mixed media.  We've partnered with Blink
Studios and Simon Cartwright (MANOMAN) is attached to direct.

UPDATES:
Simon developed a full pitch and we're strategizing.

## TITLES IN ADVANCED STAGES/ACTIVE DISCUSSIONS

### TV

**KILLER GROOVE** by Ollie Masters is a live-action series.  New Zealand showrunners Tom Hern & Halaifonua "Nua" Finau
("The Panthers") are attached to write, showrun and produce.  Travon Free & Martin Roe ("Single Drunk Female,"
"Harlem," TWO DISTANT STRANGERS) are attached to direct and EP.

UPDATES:
The showrunners and directors are working on final updates to the pitch and we had a strategy meeting on 2/22/24 to
discuss buyers to approach.  We have our top tier list of buyers and will take the project out in mid-March.

**HOT LUNCH SPECIAL** is a live-action series.  Rainforest Entertainment is our producing partner with company principal
Rob Hardy ("Power" series, "Stargirl," "Doom Patrol," "Vampire Diaries," "The Flash") attached to direct and produce.

UPDATES:
We currently have preliminary interest from Starz and are exploring showrunners simultaneously.  We came up with a
list of showrunners and met with Rob to discuss on 12/6.  Rob did an availability check on our top ideas, and we have
the order of who we'll approach.  Confidentially, ██████████████
████████████████████████████████████████

**SHADOW DOCTOR** by Peter Calloway ("Marvel's Cloak & Dagger," "American Gods," "Legion") is a live-action series
previously set up at WBTV.  JusticeRX (Dr. Philip Goff is the Principal) are our producing partners and Peter is attached as
the showrunner.

UPDATES:
We met with Peter to hear his latest pitch on 12/5.  Peter presented his updated series pitch to WBTV on 1/5/24.  Due to
WBTV's new mandate and executive changes, they've decided to let go of the project.  However, we'll actively explore
other buyers and previously interested buyers once it's available.  This is a high quality show, so we (and Peter) are
confident we will find a better home for it.

**MOTH & WHISPER** by Ted Anderson and Rye Hickman is a live-action series.  We've partnered with RDF (Simon Barry's company, credits include "Warrior Nun") to produce and Jem Garrard ("Nancy Drew," "Motherland: Fort Salem," "Charmed") is adapting.

UPDATES:
Discussing next steps with RDF.

**INSEXTS** by Marguerite Bennett is a live-action series.  Gary Pearl ("Flowers in the Attic," "Jane the Virgin") is our producing partner and Abram Cox and Derek Beumer ("Black Summer," "Z Nation") are our showrunners.

UPDATES:
Abram and Derek have completed a pilot script and a series bible, which we will use to approach additional talent (pilot directors, cast) and buyers at the top of this year.  We're approaching Lionsgate first as our partner has a strong relationship there.

**SEARCH FOR HU** by John Tsuei & Steve Orlando is a live-action series.  Aaron Lam ("The Continental," "Jack Ryan," "Ash vs Evil Dead") is attached to adapt.

UPDATES:
Aaron developed a strong take which we will take back out to market this year.  Currently exploring Amazon as they are looking for a big, international action series like this.  We reached out on 2/2/24 to discuss.

**THE HEATHENS** by Cullen Bunn & Heath Amodio is a live-action series.  Ryan C. Murphy (READY OR NOT, "Castle Rock," "Stan Against Evil") is attached to adapt.

UPDATES:
Ryan has developed a pitch which we have started to take out to production companies, like Point Grey (Seth Rogen & Evan Goldberg's company) who we pitched on 11/15 after having two practice pitches with Ryan before.  As of this month, we're currently setting a pitch with 7 Bucks (Dwayne Johnson's company) who are very interested.  This month, we also submitted the material to Rough House (David Gordon Green, Danny McBride, and Jody Hill's company) and Fuzzy Door (Seth MacFarlane's company) who had preliminary interest and are reviewing the material before setting pitches.

**MILES TO GO** by B. Blay Moore is a live-action series.  RDF is interested with Simon Barry ("Warrior Nun") writing/showrunning.

UPDATES:
We're hearing Simon's updated pitch soon.

**BLOOD BLISTER** by Phil Hester is a live-action series.  Alex Flatt is writing.

UPDATES:
Alex has a visual pitch doc to go with his pages.  We've started sending it out and shopping it around.

**BLACK-EYED KIDS** by Joe Pruett is a live-action series.  Vicki Madden ("The Gloaming" creator/showrunner, "The Kettering Incident" creator/showrunner) is writing and producing, and Screen Tasmania (THE NIGHTENGALE, "Rosehaven," "The Gloaming") is producing and paying for Vicki's development.

UPDATES:
We have Vicki's latest pages and are discussing next steps.

**KNOCK EM DEAD** by Elliot Rahal is a live-action series.  Sebastian Sariñana ("VGLY," "Daughter from Another Mother") is attached as the showrunner and Fernando Sariñana is our producing partner.

UPDATES:
We have a full developed pitch which we're taking out further this year.

**SECOND SIGHT** by David Hine is a live-action series.  Simon Duric ("The Innocents" creator, THE TAKE) is attached to adapt.

UPDATES:
We're continuing to take out his pitch.

**MONSTRO MECHANICA** by Paul Allor & Chris Evenhuis is series we're exploring for live-action and potentially animation.  FM DeMarco ("Dreamworks' Dragons," "Where's Waldo," "Spy Kids: Mission Critical) is attached as the showrunner.

UPDATES:
FM has a pitch that we'll continue to take our for potential co-productions.

**SIDE EFFECTS** by Ted Anderson is a series that we're exploring in the US and UK.

UPDATES:
In the US, Rooster Teeth ("Transformers: War for Cybertron," "Gen:LOCK") is interested in optioning and packaging with us.  Also chasing responses in the UK.

**LAND OF THE LIVING GODS** by Isaac Mogajane (KIZAZI MOTO: GENERATION FIRE) is a series we're exploring for live-action and potentially animation.  Isaac is attached to adapt and produce alongside us and Diprente Films ("Queen Sono," "Classified").

UPDATES:
Working with Isaac's agent at CAA to strategize, package and take out his pitch.  Jon met with Isaac in person on 2/9/24 to discuss.

**LAST LINE** by Richard Dinnick is a live-action series.

UPDATES:
We're currently exploring interest from prominent UK companies (including BBCS and Heyday Films).

**FEAR OF A RED PLANET** by Mark Sable is a live-action series.  Gaspin Media (THE TINDER SWINDLER, "To Tell the Truth") is interested in producing with Georgia Lee ("Partner Track" showrunner/creator, "The 100," "The Expanse") showrunning and Chad Kennedy ("The 100") co-writing/developing with her.

UPDATES:
Discussing next steps as Gaspin could potentially option the material.

**THERE'S SOMETHING WRONG WITH PATRICK TODD** by Ed Brisson is a live-action series.

UPDATES:
No Trace Camping (THE BROKEN HEARTS GALLERY, KIN, GOON 1 & 2) is interested in producing and has sent the material to a notable writer.  Waiting for writer's response on the material before moving forward.

**THE 06 PROTOCOL** by Lee Turner is a live-action series.  Nick Santora ("Reacher" creator/showrunner, "Most Dangerous Game" creator/showrunner) is attached to EP and will potentially co-showrun.

UPDATES:
As Nick is in a deal with Skydance, we will take elsewhere once he's ready and able.

**LOLLIPOP KIDS** by Adam & Aiden Glass is a series we're exploring for live-action and potentially animation.  Adam Glass ("Supernatural," "In from the Cold" creator/showrunner) is attached to adapt.

UPDATES:
Adam has a pitch which we will continue to take out to producing partners this year.

**BACKWAYS** by Justin Jordan is a live-action series.  Terri Hughs Burton ("Star Trek: Discovery," "Warrior Nun," "The 100," "Hunters") is attached as the writer/showrunner.

UPDATES:
Terri is currently working on a pitch which we'll take out when ready (likely mid-2024).

**DARK ARK** by Cullen Bunn is a series we're exploring for both live-action and animation.

UPDATES:
Sony TV is interested in it for live-action, and we're exploring writers/showrunners who move the needle.  Simultaneously, we're discussing the title with Powerhouse animation who is interested.

**CLANS OF BELARI** by Rob & Peter Blackie ("Frontier" creators) is a series we're exploring for live-action and potentially animation.

UPDATES:
Rob and Peter are attached as showrunners and are currently working on a pitch.  We're currently setting a time to hear their updated version.

## FILM

**ALL NIGHT & EVERY DAY** by Ray Fawkes is a live-action feature.  Divide/Conquer (TOTALLY KILLER, M3GAN, FREAKY) are our producing partners.

UPDATES:
We've submitted the project to multiple notable filmmakers and are waiting on responses.  Once we have a filmmaker and a pitch, we'll bring it to Amazon and Universal first as both studios have preliminary interest.  Divide/Conquer is also feeling out Amazon to see if they want to take it off of the table now.

**EDEN** by Cullen Bunn is a live-action feature.  Writer Tina Easley Hastings (EVENSONG, "Smila's Sense of Snow" showrunner) is attached to adapt.

UPDATES:
Tina has developed a strong pitch which we will continue to take out to potential producing partners this year.  We will first reengage producing partners who were interested prior to the strike, as they're notable companies who want to hear the pitch.

**BUNNY MASK** by Paul Tobin is a live-action feature.

UPDATES:
We have strong interest from renowned genre producer Roy Lee (BARBARIAN, IT 1 & 2, GODZILLA VS KONG) to produce.  We also have strong interest from Powerhouse Animation to make as an adult animated feature.

**ASTRONAUT DOWN** by James Patrick is a live-action feature.  Esmail Corp (Sam Esmail's company, creator of "Mr. Robot") are our producing partners.

UPDATES:
We're currently exploring top tier directors/writers and have interest from Legendary.  Esmail Corp reengaged writer F. Scott Frazier (COLLIDE, XXX: RETURN OF XANDER CAGE) and met with him on 1/29/24 to discuss.  As of 2/21/24, he's very interested in attaching to the project and Esmail Corp is meeting with him again next week to discuss.

**A WALK THROUGH HELL** by Garth Ennis is a live-action feature.  Jon Silk (THE BLACK DEMON, NIGHTRIDE, IT) is our producing partner and we're working to go out to top tier directors.

UPDATES:
We had a strategy meeting with Jon on 1/30/24 and went out to Adam Wingard (GODZILLA VS KONG, BLAIR WITCH, THE GUEST) on 1/31/24.  Adam team read and are very interested for him.  We also received interest from David Bruckner (HELLRAISER, NIGHT HOUSE, THE RITUAL) to direct and his partner Zoe Cooper (BLAIR WITCH REMAKE) to adapt.  Zoe loved the material and David is reviewing again (we should have an answer within the next couple of weeks).  We're discussing further with all as well as continuing to go out to more high-level filmmakers.

**MANIAC OF NEW YORK** by Elliot Kalan (former writer for Jon Stewart) is a live-action feature.  Elliot is attached to adapt.

UPDATES:
Elliot has developed a fantastic pitch that we will take out further in 2024.

**WORLD READER** by Jeff Loveness (ANT-MAN & THE WASP: QUANTAMANIA, "Rick & Morty") is a project we previously considered for TV, but will likely explore as a feature.  Jeff is attached to adapt.

UPDATES:
We are regrouping with Jeff to strategize in this year and work around his schedule.

**ANIMOSITY** by Marguerite Bennett is currently being explored as a live-action feature.  Producer Jon Silk (THE BLACK DEMON, NIGHTRIDE, IT) is engaging and received interest from filmmaker David Yarovesky, (BRIGHTBURN).

UPDATES:
David is currently working on a pitch and we're meeting with him on 3/5/24 to discuss.  David has also sent the book to a few A-list writers who are reviewing.  We've also sent the book to Powerhouse Animation and are discussing the possibility of doing it as an adult animated series.  We also sent the book to Berlanti on 12/15 as they want a project like this.

**BEYONDERS** by Paul Jenkins is a live-action feature.

UPDATES:
We have initial interest from Square One Germany (ONE TRUE LOVERS, MAFIA MAMMA, THE LODGE) to partner.

**WITCH HAMMER** by Cullen Bunn is a live-action feature.

UPDATES:
We have initial interest from Square One Germany (ONE TRUE LOVERS, MAFIA MAMMA, THE LODGE) to partner.

## ADDITIONAL BUSINESS

**FERAL** is a pilot and bible by Mike Deas set up at Paramount TV with Robert Zotnowski ("1983," "House of Cards") producing.

UPDATES:

We're currently negotiating with Paramount to adapt as a comic series and attach as creative producers of the TV series. We met with them on 11/3, 11/17, and 12/1 to discuss in depth.

# EXHIBIT "6"

10:40 AM
03/05/24

Case 1:22-bk-11456-MB    Doc 407    Filed 03/06/24    Entered 03/06/24 16:33:21    Desc
Main Document    Page 78 of 113

Rive Gauche Television
A/R Aging Summary
As of April 7, 2023

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| 5360 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5365 | 0.00 | 0.00 | 0.00 | 0.00 | 35,460.00 | 35,460.00 |
| 5420 Voyage | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5624 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99percentperfect Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| A E Ole Networks LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| A.S. Media S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 8,900.02 | 8,900.02 |
| AB Droits Audiovisuels | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABS-CBN Broadcasting Corp/Studio 22, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | -500.00 | -500.00 |
| AE Yayincilik Film Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AETN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AETN Italia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AETN UK | 0.00 | -37,093.99 | -62,860.96 | 0.00 | 379,278.29 | 279,323.34 |
| AFL Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Africa Channels SPTI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Africa TV Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| African Business Channel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AfterShock | 0.00 | 0.00 | 0.00 | 0.00 | 1,913,366.09 | 1,913,366.09 |
| Agonset | 0.00 | 0.00 | 0.00 | 0.00 | 244.12 | 244.12 |
| AK Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| All-Time Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AMP International LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Ananey Communications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Anderson Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Antena 3 Television | 0.00 | 0.00 | 0.00 | 0.00 | -99,461.06 | -99,461.06 |
| Antenna TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Apus Enterprises, Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Art Sound | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Artist View Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Arts & Sciences Television Intl. S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AS Kanal 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Asharq News Svcs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Astral Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Astral Media - Canal Z | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Atrium Prods KFT (Beep Om) | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 |
| Atrium Productions Kft. | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.09 |
| Atrium RETI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ATV   Asia Television Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Avianca Airlines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AXN Holdings, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AXN Italy | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| B 3 Com | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Beyond Home Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Blue Ant TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Blue Eyes Film & Television GmbH | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| BMI Broadcasting Music, Inc | 0.00 | 0.00 | 0.00 | 0.00 | -729.61 | -729.61 |
| British Sky Broadcasting Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| C8 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Caaliope | 0.00 | 0.00 | 0.00 | 0.00 | -0.02 | -0.02 |
| Canal 10 | 0.00 | 0.00 | 0.00 | 0.00 | -3,077.23 | -3,077.23 |
| Canal 12 de TV S.A. de C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Canal+ Polska SA | 4,640.38 | 0.00 | 0.00 | 0.00 | 0.00 | 4,640.38 |
| Canal+ Thematiques | 0.00 | 0.00 | -17,888.78 | 23,851.71 | 0.00 | 5,962.93 |
| Canwest TVWorks Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CBS Reality | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CBS Studios Inc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Celebrity Video Distribution | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CET 21 spol. s.r.o. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Channel 5 Broadcasting | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Channel Four Finland | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cheers Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Chellozone | 0.00 | 0.00 | 0.00 | 0.00 | -40,500.00 | -40,500.00 |
| Chilevision SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

10:40 AM
03/05/24

Rive Gauche Television
A/R Aging Summary
As of April 7, 2023

Case 1:22-bk-11456-MB    Doc 407    Filed 03/06/24    Entered 03/06/24 16:33:21    Desc
Main Document    Page 79 of 113

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| China LIC Hong Kong Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 170.00 | 170.00 |
| Cineplex Company Limited | 0.00 | 0.00 | 0.00 | 0.00 | 37,600.00 | 37,600.00 |
| Cineplex Company Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | -37,600.00 | -37,600.00 |
| Citi Kino | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CLT-UFA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CMT - Country Music Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cohengen Holdings Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Coign Media Inc | 0.00 | 0.00 | 0.00 | 0.00 | 4,840.00 | 4,840.00 |
| Collaboration Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Compact Collections | 0.00 | 0.00 | 0.00 | 0.00 | -41.84 | -41.84 |
| Compania CM Ricacruz LTDA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Compania International Comm | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Complete Back Office Solution, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| COMTV Corp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Corima Produzioni | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Couch Potatoes (Customer) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Crescent Commercial & Maritime | 0.00 | 0.00 | 0.00 | 0.00 | -0.30 | -0.30 |
| CTV Television Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| D-Smart Mozaik Iletisim H. A.S | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| D.B.S. Satellite Services | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Daro | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Deferred AR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Delta TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Direct Star | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discover NZ Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery Communications (Customer) | 0.00 | 0.00 | 0.00 | 0.00 | -7,180.04 | -7,180.04 |
| Discovery Communications Europ | 0.00 | 60,000.00 | 0.00 | 0.00 | -91,000.00 | -31,000.00 |
| Discovery Communications Europe | 0.00 | 0.00 | 0.00 | 0.00 | 118,874.31 | 118,874.31 |
| Discovery Communications, Inc. - UK | 0.00 | 0.00 | 0.00 | 0.00 | -2,000.00 | -2,000.00 |
| Discovery Communications, LLC | 0.00 | 0.00 | 0.00 | 0.00 | -30,100.00 | -30,100.00 |
| Discovery Content UK Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery Networks Asia | 0.00 | 0.00 | 0.00 | 0.00 | -720.00 | -720.00 |
| Discovery Networks Europe | 0.00 | 0.00 | 0.00 | 0.00 | 4,633.39 | 4,633.39 |
| Discovery Networks International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery Video | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery.com LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DNC Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Docs de Cologne | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dodo Media LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dvi | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| E-TV Pty Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Eagle Entertainment (Aus) P/L | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Eastwest Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Elite Film AG | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Endemol Italia S.r.l. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Endemol Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Entertainment Ntwrks UK LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Esquire Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Estoaat B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 219,469.99 | 219,469.99 |
| Europe Images | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Europroducciones TV S.L. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Explora | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Filmlux S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 |
| Finzioni srl. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| First Automotive TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| First HDTV Russia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Flamingo Features FTV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Flextech Television | 0.00 | 0.00 | 0.00 | 0.00 | -3,124.95 | -3,124.95 |
| Fokus TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Formulation Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fox International Channels (US) Inc. | 0.00 | 0.00 | 0.00 | 0.00 | -1,680.00 | -1,680.00 |
| Fox International Channels Italy s.r.l. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fox Networks Group Mid East | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FOXTEL | 0.00 | 0.00 | 0.00 | 0.00 | -235,146.68 | -235,146.68 |

10:40 AM
03/05/24

Case 1:22-bk-11456-MB    Doc 407    Filed 03/06/24    Entered 03/06/24 16:33:21    Desc
Main Document    Page 80 of 113

Rive Gauche Television
A/R Aging Summary
As of April 7, 2023

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| France 5 Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FremantleMedia Worldwide Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Friday TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FTV Prima | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fujisoft ABC, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Game One | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Globosat | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| GMA Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Grindle Resources | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Groupe TVA, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Grupo Onet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Guate Vision SA de CV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| HBO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| HBO Ole | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Henry Advertising & Marketing | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| HRT Croatian Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| i-CABLE News Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Icelandic TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| IGMAR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Independent International TV, Inc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Inter Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| International Film and Arts | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Intra Communications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Israel Broadcasting Authority | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ITV Digital Channels | 0.00 | 0.00 | 0.00 | 0.00 | 373.28 | 373.28 |
| ITV Rights Ltd | 0.00 | -60,699.25 | 0.00 | 0.00 | 182,097.75 | 121,398.50 |
| Jake Productions SARL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Janson Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Jimmy-Comedie | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Joint Stock Co TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Justice Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kabel Eins | 0.00 | 0.00 | 0.00 | 0.00 | -860.88 | -860.88 |
| Kaleidoscope Entertainment Inc. | 0.00 | 0.00 | 0.00 | 0.00 | -0.04 | -0.04 |
| Kei Intermedia, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kenny & Co. Entertainment Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| KEY Intermedia Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kim Media | 0.00 | 0.00 | 0.00 | 0.00 | 3,077.22 | 3,077.22 |
| Kino Polska TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| KM Services, SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| La Cinquieme | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| La Compagnie des Taxi-Brousse | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| La Competencia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| La Sexta | 0.00 | 0.00 | 0.00 | 0.00 | 99,760.27 | 99,760.27 |
| LA7 Spa | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lasso Group | 0.00 | 0.00 | 0.00 | 0.00 | -5.24 | -5.24 |
| Lativi Medi Karya | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Leda Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Ler Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Les Chaines Tele Astral | 0.00 | 0.00 | -10,911.74 | 0.00 | 21,823.48 | 10,911.74 |
| Lifetime Movies | 0.00 | 20,000.00 | 0.00 | 0.00 | 0.00 | 20,000.00 |
| M6 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Made In Spanish Antigua Dinter | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Manson Media International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Materials | 0.00 | 0.00 | 0.00 | 0.00 | 8,690.00 | 8,690.00 |
| MCM SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MEBN Inc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Media Universal Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mediacorp TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Medialaan | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mediaplex Grouop | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mediaset Espana | 0.00 | 0.00 | 0.00 | 0.00 | -0.25 | -0.25 |
| Metropolis Television Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MGM Latin America | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Milenium Cine & TV S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

10:40 AM
03/05/24

Case 1:22-bk-11456-MB    Doc 407    Filed 03/06/24    Entered 03/06/24 16:33:21    Desc
Main Document    Page 81 of 113

Rive Gauche Television
A/R Aging Summary
As of April 7, 2023

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| MotorVision | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Movie Central Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Movie World, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MPB Primedia Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MTV Networks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MTV Networks LA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MTV Networks UK & Ireland | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 |
| MTV OY | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Multicanal Iberia SLU | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| multiThematiques | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Multivision Digital | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| n-tv Germany | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| N24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| National TV Co Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NBC Studios, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NBC Universal Global Networks Deutschland | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Network Ten Pty Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| New Media International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NGC | 0.00 | 0.00 | 0.00 | 0.00 | 15.99 | 15.99 |
| NGC Network US | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nine Network Australia PTY Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nine Network Australia Pty. Li | 0.00 | 0.00 | -18,179.17 | 0.00 | 55,266.24 | 37,087.07 |
| Nine Network Australia Pty. Limited | 0.00 | 0.00 | 0.00 | 0.00 | -0.03 | -0.03 |
| Noble Entertainmnet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Norwegian Broadcasting Corp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NTV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NTV International Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| O' Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| One Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ORF Fernsehprogramm Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Origo LTD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Paris Premiere | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Paul Womba | 0.00 | 0.00 | 0.00 | 0.00 | 3,189.46 | 3,189.46 |
| Photoplay productions Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Planete Cable | 0.00 | 0.00 | 0.00 | 0.00 | 30,078.33 | 30,078.33 |
| Polsat License Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pramer | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Prima TV Romania | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Prime Television (NZ) Ltd | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| Pro Sieben Media AG | 0.00 | 0.00 | 0.00 | 0.00 | 860.89 | 860.89 |
| ProSieben | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| PT Cakrawala Persona Jaya Film | 0.00 | 0.00 | 0.00 | 0.00 | -1,875.00 | -1,875.00 |
| Pulso TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pyramid Entertainment Exports | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Quantas Airways Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| R.T.I. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RCSand RDS SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Record TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Red Uno de Bolivia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Redback Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Regal Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rogers Media Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 |
| Rosnay International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rounding Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.08 |
| RTI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTL CBS Asia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTL Television GMBH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTSI   Televisione Svissera | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RWI Enterprises | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| S&E Media Project Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | -36,400.00 | -36,400.00 |
| Samsung Mexico | 16,793.04 | 0.00 | 0.00 | 0.00 | 0.00 | 16,793.04 |
| Sanoma | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sato Co. Ltd-SC Comunicacoes | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS-TV | 0.00 | 0.00 | 0.00 | 0.00 | -0.02 | -0.02 |

Rive Gauche Television
A/R Aging Summary
As of April 7, 2023

|  | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| SBS Belgium | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS Danish Television Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS Discovery TV Oy | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS Productions B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Scanbox | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sci-Fi Channel Europe LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Screen Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Screenrights | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Scripps Ntwrks Asia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sea Movies, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Segmento Directo | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| Serie Club | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Seven Network (Operations) Limited | 0.00 | 0.00 | 0.00 | 0.00 | -144.75 | -144.75 |
| Shaw Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Showlab Srl | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Silver Spring Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sinerji Film Yapim | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sky Italia S.r.l. | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| Sky New Zealand | 0.00 | 0.00 | 0.00 | 0.00 | -12,787.97 | -12,787.97 |
| SNDA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sociedad Independente de Comunicacao SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sociedad Televisora Larranaga | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sociedad Televisora Nacional S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Societe Radio-Canada | 0.00 | 0.00 | 0.00 | 0.00 | 9,512.48 | 9,512.48 |
| Sogecable, S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 |
| Solar Entertainment Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sony Pictures TV UK Rights Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sparrowhawk | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SPE Networks Russia LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SPORT1 GmbH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Starling | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Starz LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| STB | 0.00 | 0.00 | 0.00 | 0.00 | 36,400.00 | 36,400.00 |
| Step By Step Co., Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Story House Prods | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Strengholt Multimedia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Studio 89 - M6 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Studio U-7TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sun Media | 0.00 | 0.00 | 0.00 | 0.00 | 156.25 | 156.25 |
| Sundance Channel L.L.C. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Super RTL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| T Star Global | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Talpa TV  B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tandem Communications GmbH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tansy Trading | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Target Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Teleamazonas SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telefutura Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telesis International, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Television Broadcasts Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Television Quatre Saisons | 0.00 | 0.00 | 0.00 | 0.00 | 350.19 | 350.19 |
| Telewizja Puls Sp. Zo.o. | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| TEVA SEDI TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TF1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The History Channel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The History Channel Germany | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The History Channel Iberia B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The Weather Channel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Three Lines Pictures | 0.00 | 0.00 | 0.00 | 0.00 | -3,189.45 | -3,189.45 |
| Tiberius Film | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Titan Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tohokushinhsa Film Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tokyovision | 0.00 | 0.00 | 0.00 | 0.00 | -3,000.00 | -3,000.00 |
| Top TV Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**
**A/R Aging Summary**
As of April 7, 2023

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Total Sports Asia Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Trans TV, | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Triton Television Yayincilik A.S. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| True4U Station Co Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TSR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tunrer Asia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Turner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Turner Broadcasting | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Turner International, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV 5 Finland | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| TV and R 2x2 LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Asahi | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Corp of Ecuador | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Danmark | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Norge A/S | 0.00 | 0.00 | 0.00 | 0.00 | -42,000.00 | -42,000.00 |
| TV2 Danmark | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| TV2 Hungary | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV2 Norway | 0.00 | 0.00 | 0.00 | 0.00 | -1,400.97 | -1,400.97 |
| TV3 Malaysia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV3 Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV4 Sweden | 0.00 | 0.00 | -60,000.00 | 0.00 | 60,000.01 | 0.01 |
| TV6 AB - Viasat Broadcasting UK Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVI SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVN - Canal 7 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVN SA (Poland) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVNZ   Television New Zealand | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVNZ   Television New Zealand Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| U 7 Group est. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| UKTV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| United Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Universidad Catolica de Valpar | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| UTV Software Communications Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Via Vision Entertainment PTY LTD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Viasat Broadcasting UK Limited | 0.00 | 0.00 | 0.00 | 0.00 | -11,224.40 | -11,224.40 |
| Viasat Broadcasting UK Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 3,894.40 | 3,894.40 |
| Viasat Hungaria Rt. | 0.00 | 0.00 | 0.00 | 0.00 | 4,080.00 | 4,080.00 |
| Videx International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Virgin Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Visionary thinking D.O.O. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VITAYA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Vlaamse Media Maatschappij | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VTM Belgium | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| W9 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Woollyworks, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Wuhan TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| XET XENTERVISION CO. LTD. | 0.00 | 0.00 | 0.00 | 0.00 | -1,650.00 | -1,650.00 |
| Xyznetworks Pty Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| YAM112003 Srl | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| YLE Finnish Broadcasting Company | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Z | 0.00 | 0.00 | 0.00 | 0.00 | 3,127.27 | 3,127.27 |
| Zebracom SAS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zed | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zippy Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zonemedia Broadcasting Limited | 0.00 | 0.00 | 0.00 | 0.00 | 42,375.00 | 42,375.00 |
| TOTAL | 21,433.42 | -17,793.24 | -169,840.65 | 23,851.71 | 2,620,564.30 | 2,478,215.54 |
| less Aftershock | | | | | | 1,913,366.09 |
| | | | | | | 564,849.45 |

# EXHIBIT "7"

**Rive Gauche Television**
**A/R Aging Summary**
As of March 5, 2024

|  | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| 5360 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5365 | 0.00 | 0.00 | 0.00 | 0.00 | 35,460.00 | 35,460.00 |
| 5420 Voyage | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5624 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99percentperfect Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| A E Ole Networks LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| A.S. Media S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 8,900.02 | 8,900.02 |
| AB Droits Audiovisuels | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ABS-CBN Broadcasting Corp/Studio 22, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | -500.00 | -500.00 |
| AE Yayincilik Film Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AETN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AETN Italia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AETN UK | 0.00 | 0.00 | 0.00 | -47,210.54 | 243,165.83 | 195,955.29 |
| AFL Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Africa Channels SPTI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Africa TV Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| African Business Channel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AfterShock | 0.00 | 0.00 | 0.00 | 842,607.21 | 1,913,366.09 | 2,755,973.30 |
| Agonset | 0.00 | 0.00 | 0.00 | 0.00 | 244.12 | 244.12 |
| AK Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| All-Time Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AMP International LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Ananey Communications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Anderson Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Antena 3 Television | 0.00 | 0.00 | 0.00 | 0.00 | -99,461.06 | -99,461.06 |
| Antenna TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Apus Enterprises, Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Art Sound | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Artist View Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Arts & Sciences Television Intl. S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AS Kanal 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Asharq News Svcs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Astral Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Astral Media - Canal Z | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Atrium Prods KFT (Beep Om) | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 |
| Atrium Productions Kft. | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.09 |
| Atrium RETI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ATV  Asia Television Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Avianca Airlines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AXN Holdings, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AXN Italy | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| B 3 Com | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Beyond Home Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Blue Ant TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Blue Eyes Film & Television GmbH | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| BMI Broadcasting Music, Inc | 0.00 | 0.00 | 0.00 | 0.00 | -729.61 | -729.61 |
| British Sky Broadcasting Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| C8 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Caaliope | 0.00 | 0.00 | 0.00 | 0.00 | -0.02 | -0.02 |
| Canal 10 | 0.00 | 0.00 | 0.00 | 0.00 | -3,077.23 | -3,077.23 |
| Canal 12 de TV S.A. de C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Canal+ Polska SA | 0.00 | 0.00 | 0.00 | 3,987.80 | 0.00 | 3,987.80 |
| Canal+ Thematiques | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Canwest TVWorks Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CBS Reality | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**
**A/R Aging Summary**
As of March 5, 2024

|  | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| CBS Studios Inc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Celebrity Video Distribution | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CET 21 spol. s.r.o. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Channel 5 Broadcasting | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Channel Four Finland | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cheers Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Chellozone | 0.00 | 0.00 | 0.00 | 0.00 | -40,500.00 | -40,500.00 |
| Chilevision SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| China LIC Hong Kong Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 170.00 | 170.00 |
| Cineplex Company Limited | 0.00 | 0.00 | 0.00 | 0.00 | 37,600.00 | 37,600.00 |
| Cineplex Company Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | -37,600.00 | -37,600.00 |
| Citi Kino | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CLT-UFA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CMT  -  Country Music Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cohengen Holdings Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Coign Media Inc | 0.00 | 0.00 | 0.00 | 0.00 | 4,840.00 | 4,840.00 |
| Collaboration Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Compact Collections | 0.00 | 0.00 | 0.00 | 0.00 | -41.84 | -41.84 |
| Compania CM Ricacruz LTDA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Compania International Comm | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Complete Back Office Solution, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| COMTV Corp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Corima Produzioni | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Couch Potatoes (Customer) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Crescent Commercial & Maritime | 0.00 | 0.00 | 0.00 | 0.00 | -0.30 | -0.30 |
| CTV Television Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| D-Smart Mozaik Iletisim H. A.S | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| D.B.S. Satellite Services | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Daro | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Deferred AR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Delta TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Direct Star | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discover NZ Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery Communications (Customer) | 0.00 | 0.00 | 0.00 | 0.00 | -7,180.04 | -7,180.04 |
| Discovery Communications Europ | 0.00 | 0.00 | 85,600.00 | 0.00 | -91,000.00 | -5,400.00 |
| Discovery Communications Europe | 0.00 | 0.00 | 0.00 | 0.00 | 118,874.31 | 118,874.31 |
| Discovery Communications, Inc. - UK | 0.00 | 0.00 | 0.00 | 0.00 | -2,000.00 | -2,000.00 |
| Discovery Communications, LLC | 0.00 | 0.00 | 0.00 | 0.00 | -30,100.00 | -30,100.00 |
| Discovery Content UK Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery Networks Asia | 0.00 | 0.00 | 0.00 | 0.00 | -720.00 | -720.00 |
| Discovery Networks Europe | 0.00 | 0.00 | 0.00 | 0.00 | 4,633.39 | 4,633.39 |
| Discovery Networks Internation | 0.00 | 0.00 | 510,120.00 | 0.00 | 0.00 | 510,120.00 |
| Discovery Networks International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery Video | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Discovery.com LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DNC Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Docs de Cologne | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dodo Media LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dvi | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| E-TV Pty Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Eagle Entertainment (Aus) P/L | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Eastwest Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Elite Film AG | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Endemol Italia S.r.l. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Endemol Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Entertainment Ntwrks UK LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**

**A/R Aging Summary**

**As of March 5, 2024**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Esquire Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Estoaat B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 219,469.99 | 219,469.99 |
| Europe Images | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Europroducciones TV S.L. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Explora | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Filmlux S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 |
| Finzioni srl. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| First Automotive TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| First HDTV Russia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Flamingo Features FTV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Flextech Television | 0.00 | 0.00 | 0.00 | 0.00 | -3,124.95 | -3,124.95 |
| Fokus TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Formulation Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fox International Channels (US) Inc. | 0.00 | 0.00 | 0.00 | 0.00 | -1,680.00 | -1,680.00 |
| Fox International Channels Italy s.r.l. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fox Networks Group Mid East | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FOXTEL | 0.00 | 0.00 | 0.00 | 0.00 | -235,146.68 | -235,146.68 |
| France 5 Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FremantleMedia Worldwide Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Friday TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FTV Prima | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fujisoft ABC, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Game One | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Globosat | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| GMA Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Grindle Resources | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Groupe TVA, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Grupo Onet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Guate Vision SA de CV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| HBO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| HBO Ole | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Henry Advertising & Marketing | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| HRT Croatian Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| i-CABLE News Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Icelandic TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| IGMAR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Independent International TV, Inc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Inter Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| International Film and Arts | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Intra Communications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Israel Broadcasting Authority | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ITV Digital Channels | 0.00 | 0.00 | 0.00 | 0.00 | 373.28 | 373.28 |
| ITV Rights Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Jake Productions SARL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Janson Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Jimmy-Comedie | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Joint Stock Co TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Justice Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kabel Eins | 0.00 | 0.00 | 0.00 | 0.00 | -860.88 | -860.88 |
| Kaleidoscope Entertainment Inc. | 0.00 | 0.00 | 0.00 | 0.00 | -0.04 | -0.04 |
| Kei Intermedia, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kenny & Co. Entertainment Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| KEY Intermedia Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Kim Media | 0.00 | 0.00 | 0.00 | 0.00 | 3,077.22 | 3,077.22 |
| Kino Polska TV | 0.00 | 0.00 | 2,400.00 | 0.00 | 0.00 | 2,400.00 |
| KM Services, SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**

**A/R Aging Summary**

As of March 5, 2024

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| La Cinquieme | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| La Compagnie des Taxi-Brousse | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| La Competencia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| La Sexta | 0.00 | 0.00 | 0.00 | 0.00 | 99,760.27 | 99,760.27 |
| LA7 Spa | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lasso Group | 0.00 | 0.00 | 0.00 | 0.00 | -5.24 | -5.24 |
| Lativi Medi Karya | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Leda Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Ler Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Les Chaines Tele Astral | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lifetime Movies | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| M6 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Made In Spanish Antigua Dinter | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Manson Media International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Materials | 0.00 | 0.00 | 0.00 | 0.00 | 8,690.00 | 8,690.00 |
| MCM SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MEBN Inc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Media Universal Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mediacorp TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Medialaan | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mediaplex Grouop | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mediaset Espana | 0.00 | 0.00 | 0.00 | 0.00 | -0.25 | -0.25 |
| Metropolis Television Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MGM Latin America | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Milenium Cine & TV S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MotorVision | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Movie Central Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Movie World, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MPB Primedia Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MTV Networks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MTV Networks LA | 0.00 | 0.00 | 0.00 | 29,508.15 | -29,508.15 | 0.00 |
| MTV Networks UK & Ireland | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 |
| MTV OY | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Multicanal Iberia SLU | 0.00 | 0.00 | -9,119.21 | 79,267.05 | 0.00 | 70,147.84 |
| multiThematiques | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Multivision Digital | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| n-tv Germany | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| N24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| National TV Co Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NBC Studios, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NBC Universal Global Networks Deutschland | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Network Ten Pty Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| New Media International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NGC | 0.00 | 0.00 | 0.00 | 0.00 | 15.99 | 15.99 |
| NGC Network US | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nine Network Australia PTY Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nine Network Australia Pty. Li | 0.00 | 0.00 | 0.00 | 0.00 | 728.73 | 728.73 |
| Nine Network Australia Pty. Limited | 0.00 | 0.00 | 0.00 | 0.00 | -0.03 | -0.03 |
| Noble Entertainmnet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Norwegian Broadcasting Corp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NTV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NTV International Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| O' Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| One Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ORF Fernsehprogramm Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Origo LTD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**
**A/R Aging Summary**
As of March 5, 2024

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Paris Premiere | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Paul Womba | 0.00 | 0.00 | 0.00 | 0.00 | 3,189.46 | 3,189.46 |
| Photoplay productions Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Planete Cable | 0.00 | 0.00 | 0.00 | 0.00 | 30,078.33 | 30,078.33 |
| Polsat License Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pramer | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Prima TV Romania | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Prime Television (NZ) Ltd | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| Pro Sieben Media AG | 0.00 | 0.00 | 0.00 | 0.00 | 860.89 | 860.89 |
| ProSieben | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| PT Cakrawala Persona Jaya Film | 0.00 | 0.00 | 0.00 | 0.00 | -1,875.00 | -1,875.00 |
| Pulso TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pyramid Entertainment Exports | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Quantas Airways Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| R.T.I. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RCSand RDS SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Record TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Red Uno de Bolivia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Redback Films | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Regal Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rogers Media Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 |
| Rosnay International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rounding Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.08 |
| RTI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTL CBS Asia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTL Television GMBH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RTSI   Televisione Svissera | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RWI Enterprises | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| S&E Media Project Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | -36,400.00 | -36,400.00 |
| Samsung Mexico | 0.00 | 0.00 | 2,169.67 | 0.00 | 3,000.98 | 5,170.65 |
| Sanoma | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sato Co. Ltd-SC Comunicacoes | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS-TV | 0.00 | 0.00 | 0.00 | 0.00 | -0.02 | -0.02 |
| SBS Belgium | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS Danish Television Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS Discovery TV Oy | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SBS Productions B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Scanbox | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sci-Fi Channel Europe LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Screen Media | 0.00 | 0.00 | 0.00 | 0.00 | 718.00 | 718.00 |
| Screenrights | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Scripps Ntwrks Asia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sea Movies, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Segmento Directo | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| Serie Club | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Seven Network (Operations) Limited | 0.00 | 0.00 | 0.00 | 0.00 | -144.75 | -144.75 |
| Shaw Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Showlab Srl | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Silver Spring Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sinerji Film Yapim | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sky Italia S.r.l. | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| Sky New Zealand | 0.00 | 0.00 | 0.00 | 0.00 | -12,787.97 | -12,787.97 |
| SNDA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sociedad Independente de Comunicacao SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sociedad Televisora Larranaga | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sociedad Televisora Nacional S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**

**A/R Aging Summary**

**As of March 5, 2024**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Societe Radio-Canada | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sogecable, S.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 |
| Solar Entertainment Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sony Pictures TV UK Rights Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sparrowhawk | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SPE Networks Russia LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SPORT1 GmbH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Stan Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 23,729.96 | 23,729.96 |
| Starling | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Starz LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| STB | 0.00 | 0.00 | 0.00 | 0.00 | 36,400.00 | 36,400.00 |
| Step By Step Co., Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Story House Prods | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Strengholt Multimedia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Studio 89 - M6 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Studio U-7TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sun Media | 0.00 | 0.00 | 0.00 | 0.00 | 156.25 | 156.25 |
| Sundance Channel L.L.C. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Super RTL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| T Star Global | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Talpa TV  B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tandem Communications GmbH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tansy Trading | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Target Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Teleamazonas SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telefutura Network | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telesis International, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Television Broadcasts Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Television Quatre Saisons | 0.00 | 0.00 | 0.00 | 0.00 | 350.19 | 350.19 |
| Telewizja Puls Sp. Zo.o. | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| TEVA SEDI TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TF1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The History Channel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The History Channel Germany | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The History Channel Iberia B.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| The Weather Channel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Three Lines Pictures | 0.00 | 0.00 | 0.00 | 0.00 | -3,189.45 | -3,189.45 |
| Tiberius Film | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Titan Television | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tohokushinhsa Film Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tokyovision | 0.00 | 0.00 | 0.00 | 0.00 | -3,000.00 | -3,000.00 |
| Top TV Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Sports Asia Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Trans TV, | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Triton Television Yayincilik A.S. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| True4U Station Co Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TSR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tunrer Asia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Turner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Turner Broadcasting | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Turner International, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV 5 Finland | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| TV and R 2x2 LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Asahi | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Corp of Ecuador | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV Danmark | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Rive Gauche Television**
**A/R Aging Summary**
As of March 5, 2024

|  | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| TV Norge A/S | 0.00 | 0.00 | 0.00 | 0.00 | -42,000.00 | -42,000.00 |
| TV2 Danmark | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 |
| TV2 Hungary | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV2 Norway | 0.00 | 0.00 | 0.00 | 0.00 | -1,400.97 | -1,400.97 |
| TV3 Malaysia | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV3 Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TV4 Sweden | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| TV6 AB - Viasat Broadcasting UK Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVI SA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVN - Canal 7 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVN SA (Poland) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVNZ   Television New Zealand | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TVNZ   Television New Zealand Limited | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| U 7 Group est. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| UKTV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| United Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Universidad Catolica de Valpar | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| UTV Software Communications Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Via Vision Entertainment PTY LTD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Viasat Broadcasting UK Limited | 0.00 | 0.00 | 0.00 | 0.00 | -11,224.40 | -11,224.40 |
| Viasat Broadcasting UK Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 3,894.40 | 3,894.40 |
| Viasat Hungaria Rt. | 0.00 | 0.00 | 0.00 | 0.00 | 4,080.00 | 4,080.00 |
| Videx International | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Virgin Media | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Visionary thinking D.O.O. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VITAYA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Vlaamse Media Maatschappij | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VTM Belgium | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| W9 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Woollyworks, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Wuhan TV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| XET XENTERVISION CO. LTD. | 0.00 | 0.00 | 0.00 | 0.00 | -1,650.00 | -1,650.00 |
| Xyznetworks Pty Ltd | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| YAM112003 Srl | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| YLE Finnish Broadcasting Company | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Z | 0.00 | 0.00 | 0.00 | 0.00 | 3,127.27 | 3,127.27 |
| Zebracom SAS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zed | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zippy Productions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zonemedia Broadcasting Limited | 0.00 | 0.00 | 0.00 | 0.00 | 42,375.00 | 42,375.00 |
| TOTAL | 0.00 | 0.00 | 591,170.46 | 908,159.67 | 2,154,421.41 | 3,653,751.54 |
| less aftershock |  |  |  |  |  | 2,755,973.30 |
|  |  |  |  |  |  | 897,778.24 |
| new sales |  |  |  |  |  | 75,600.00 |
|  |  |  |  |  |  | 673,390.00 |
|  |  |  |  |  |  | 108,000.00 |
| **Total AR** |  |  |  |  |  | **1,754,768.24** |

# EXHIBIT "8"

```
1                    UNITED STATES BANKRUPTCY COURT

2        CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY

3                            --oOo--

4    In Re:                    )  Case No. 1:22-bk-11456-MB
                               )
5    AFTERSHOCK COMICS, LLC,    )  Chapter 11
                               )
6    Debtor,                   )  Woodland Hills, California
                               )  April 6, 2023
7    ----------------------------X  Thursday, 1:30 p.m.

8
                                  EVIDENTIARY HEARING RE:
9                                 DEBTOR'S MOTION FOR
                                  CONTINUED USE OF CASH
10                                COLLATERAL

11

12             PARTIAL TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MARTIN R. BARASH
13               UNITED STATES BANKRUPTCY JUDGE

14
     APPEARANCES:
15
     For the Debtor:          DAVID NEALE, ESQ.
16                            JEFFREY S. KWONG, ESQ.
                              Levene Neale Bender Yoo &
17                              Golubchik, LLP
                              2818 La Cienega Avenue
18                            Los Angeles, California  90034

19   For Official Committee    ROBBIN ITKIN, ESQ.
     of Unsecured Creditors:  Sklar Kirsh
20                            1880 Century Park East
                              Suite #300
21                            Los Angeles, California  90067

22

23

24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.
```

Page                                                                            4

1   The -- it's treated as a flexible concept.  There are

2   different kinds of adequate protection.  Sometimes adequate

3   protection is shown through the -- you know, demonstrate

4   that their use of cash will -- collateral will generate new

5   replacement collateral of equal or greater amount over the

6   time of the proposed use pursuant to the terms of the

7   proposed use, but it's not the only way.

8           And at the last hearing at the conclusion of the

9   sort of first -- hearing on the first interim period of

10  use, I concluded that there was an equity cushion that the

11  value of the company's assets really was, you know,

12  substantially in excess of the amount of the debt, and I am

13  not going to repeat all of my findings from that hearing.

14  They speak for themselves.

15          The question, as I see it today, is whether the

16  evidence and arguments persuade me to change that view and,

17  on the record before me, I have not changed my view.  I

18  believe there's substantial value here in excess of the

19  amount of the debt and that cushion is adequate to protect

20  the secured lender's interest.

21          Again, I said I wouldn't repeat them but, you

22  know, my observations at the end of the last hearing

23  included -- I spoke of Mr. Cramer's qualifications and his

24  contribution to evaluation opinion and I addressed

25  Mr. Arno's (phonetic) contributions to my opinion of value.

Page                                                                11

1  evidence.

2        I actually thought the evidence, although again

3  they missed income -- certain income projections.  I

4  thought there was an explanation for at least some of it

5  that seemed like a reasonable explanation.  Some of it --

6  look, I understand.  If you're going tell me you're going

7  to sell a script like, maybe that doesn't happen, it's not

8  money in the bank.  Okay, but I think some of the things

9  were timing issues and I don't think that the -- I think

10 that the projection for this interim period through May 31

11 is reasonable.

12       Again, ultimately I'm relying on what I believe

13 is substantial asset value and equity cushion, but, you

14 know, I -- this -- I think it's commendable that the debtor

15 has managed his expenses in the manner that it has and it's

16 not ideal.  It's not the state in which it's going to, you

17 know, successfully emerge, but I think they are preserving

18 the value inherent in these assets while they take

19 advantage of the tools that Congress gave them.

20       The budget goes through 531.  There is no

21 settlement for a longer period and I'm not going to give

22 one.  I can't make the parties agree to that.  I'm going to

23 set on the calendar a subsequent cash collateral hearing --

24 a continued cash collateral hearing for Wednesday, June

25 7th, beginning at 10:00 a.m.

# EXHIBIT "9"

1             UNITED STATES BANKRUPTCY COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  --oOo--

4  In Re:                  )  Case No. 1:22-bk-11456-MB
                         )
5  AFTERSHOCK COMICS, LLC,    )  Chapter 11
                         )
6        Debtor.        )  Woodland Hills, California
  _____)  Thursday, January 12, 2023
7                            9:30 a.m.

8

9                      EVID HRG RE: DEBTOR'S
                      EMERGENCY MOTION FOR ENTRY OF
                      AN INTERIM ORDER: (1)
10                    AUTHORIZING THE DEBTORS TO USE
                      CASH COLLATERAL ON AN INTERIM
11                    BASIS PENDING A FINAL HEARING;
                      (II) GRANTING ADEQUATE
12                    PROTECTION REPLACEMENT LIENS;
                      (III) SCHEDULING A FINAL
13                    HEARING; AND (IV) GRANTING
                      RELATED RELIEF
14

15                      DEBTOR'S EMERGENCY MOTION FOR
                      AUTHORITY (1) PAY PRE-PETITION
                      PRIORITY WAGES AND
16                    COMMISSIONS; AND (2) HONOR
                      EMPLOYMENT AND BENEFIT
17                    POLICIES

18                      DEBTOR'S EMERGENCY MOTION FOR
                      ENTRY OF AN ORDER AUTHORIZING
19                    DEBTORS TO IMPLEMENT AND
                      MAINTAIN CASH MANAGEMENT
20                    SYSTEM

21             TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE MARTIN R. BARASH
22            UNITED STATES BANKRUPTCY JUDGE

23

24

  Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

147

1 money.

2 Q    If you are able to hire more employees, would that have

3 an impact on let's say the Rive Gauche business first?

4 A    Yeah.  I mean, we're operating with five employees, and

5 some of the Rive Gauche employees are back office functions

6 for AfterShock.  So, in business affairs and sales and

7 accounting, we could use another person.  In IP placements,

8 the more people we have, the better we do.  You know, this

9 has been a long period so far, and I know there's a lot more

10 to go, but you -- you might have remembered that I said that

11 besides the 28 options, we have 15 projects that we're

12 preparing to go out with.  If we had more than five people

13 there, we would do a better job placing IP's.

14 Q    What about in AfterShock, would it -- would it improve

15 the business if you were able to hire more employees?

16 A    There are a few more employees we need in AfterShock.

17 Q    If the business were shut down today, what is your view

18 on the impact -- the impact that would have on the value of

19 the assets of Rive Gauche and AfterShock?

20 A    It would be very detrimental.

21 Q    Can you quantify that?

22 A    Well, I mean, you have an active staff who have clearly

23 proven they're very successful at placing IP's.  You don't

24 just come in -- what I found with AfterShock is that the

25 reason we place a lot of IP is that our process goes from

*Briggs Reporting Company, Inc.*

148

1 the development of the comic is more efficient than other

2 companies because we intentionally have hired people who not

3 only know film and television but also know comics and have

4 gone down the path of how we've developed the comics.  And

5 it's easier to explain it to film and television that way.

6 So, that would be missing.  I don't see the other companies

7 have that, and if the IP was left on its own, I'm not sure

8 what would happen to it.

9      In terms of the comic business, we spent seven years

10 and a lot of money building up the trust of the retailers.

11 And, you know, right now, because of our situation, we have

12 to retain the trust of the retailers because the -- the

13 thing that the retailer fears most is getting the anger of

14 their customers, and if we stopped printing after book two

15 and stock one and two and there's no book three, four, and

16 five, that's a big problem to them and their relationships.

17 And we already have a problem with the creators.  So, you

18 know, that's an issue.

19      In the Rive Gauche business, if myself and my

20 colleagues aren't around, the relationships with the people

21 who supply us products are going to be a real issue.  I

22 didn't mention this, but the Rive Gauche staff has been

23 together 12 years as a group.  The relationship with the

24 producers, some of them go back to 2004, and there's a trust

25 between us and them, and in a way, that's how we've been

149

1 able to last so long in this situation.

2 Q   So, if you could just expand on that a little bit.  Do

3 your -- do your personal relationships factor into the --

4 the successful operation of the business?

5 A   Well, honestly, the answer's of course.  I mean, you

6 know, what I've been telling you here is that I have some

7 brands in Rive Gauche that have a lot of episodes that have

8 performed well over and over again since 2004, 2009, which

9 means I've been paying royalties since that time.  In our

10 business, a company that's paying royalties becomes very

11 trustworthy.

12          MR. NEALE:  Your Honor, I have no further

13 questions for Mr. Kramer.

14          THE COURT:  Okay.  Well, I'm not surprised that

15 wasn't a half an hour, but that's okay.  I went into it eyes

16 wide open.

17          Let us take a break.  Let us reconvene at 2:30.  I

18 know it's not a lot of time, but -- but we're trying to

19 cover a lot of ground.  We -- we will pick up with Mr.

20 Neale's -- the next of his other witnesses who have a

21 limited time availability, and hopefully they are -- the

22 testimony is -- is more compact.  We'll have direct and

23 cross of those and try to get those people out of here.  And

24 then at some point we will pick up with Mr. Kramer's cross

25 examination, to be determined once we see how long these

1                   UNITED STATES BANKRUPTCY COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4   In Re:                        )   Case No. 1:22-bk-11456-MB
                                  )
5   AFTERSHOCK COMICS, LLC,       )   Chapter 11
                                  )
6           Debtor.               )   Woodland Hills, California
    _____)   Thursday, January 19, 2023
7                                     9:00 a.m.

8                                 EVID HRG - RE: DEBTORS
                                  EMERGENCY MOTION FOR ENTRY OF
9                                 AN INTERIM ORDER: (I)
                                  AUTHORIZING THE DEBTORS TO USE
10                                CASH COLLATERAL ON AN INTERIM
                                  BASIS PENDING A FINAL HEARING;
11                                (II) GRANTING ADEQUATE
                                  PROTECTION REPLACEMENT LIENS;
12                                (III) SCHEDULING A FINAL
                                  HEARING; AND (IV) GRANTING
13                                RELATED RELIEF

14                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MARTIN BARASH
15                UNITED STATES BANKRUPTCY JUDGE

16  APPEARANCES:

17  For the Debtor:               DAVID L. NEALE, ESQ.
                                  JEFFREY S. KWONG, ESQ.
18                                Levene, Neale, Bender, Yoo
                                    & Golubchik, LLP
19                                2818 La Cienega Avenue
                                  Los Angeles, California 90034
20                                (310) 229-1234

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

18

1        Anyway, he also testified, and there was some

2   discussion of that yesterday, that -- his belief that that

3   the claim was secured, but not significantly oversecured,

4   which is interesting, but, ultimately, I don't think

5   represents expert valuation opinion.

6        Ultimately, the Court concludes that there is an

7   adequate equity cushion here to protect the secured creditor

8   with respect to diminution resulting from the proposed use

9   of cash during the interim period.

10       For purposes of this interim relief, I conclude

11  that the value of the noncash collateral securing the claims

12  of Access Road as of the petition date was no less than

13  $20,000,000, which provides a substantial equity cushion,

14  more than equity cushion, if one assumes that the use of

15  $675,800 results in a diminution of $675,800.

16       Now I'm going to try to provide you, in the last

17  20 minutes I have allotted to our time -- give you some

18  insight into how I saw the evidence with respect to value.

19  There are really two competing views of value, the companies

20  represented or supported by Mr. Kramer's testimony and

21  Access Road's view of value, although I think it's fair to

22  say it evolved somewhat by Mr. Levy.  I say it "evolved"

23  because Mr. Rosenbaum expressed his view that it was in

24  excess of $16,000,000, and Mr. Levy had a substantially

25  lower number as a result of his analysis, and that appears

# EXHIBIT "A"

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| DAVID L. NEALE (SBN 141225)<br>JEFFREY S. KWONG (SBN 288239)<br>LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.<br>2818 La Cienega Avenue<br>Los Angeles, California 90034<br>Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244<br>Email: dln@lnbyg.com; jsk@lnbyg.com | |

☐ *Individual appearing without attorney*
☒ *Attorney for:* Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA -  SAN FERNANDO VALLEY DIVISION

| In re:<br><br>AFTERSHOCK COMICS, LLC, a California limited liability company,<br><br>_____<br><br>In re:<br><br>RIVE GAUCHE TELEVISION, a California corporation,<br><br>X Affects both Debtors<br><br><br><br>Debtor(s). | CASE NO.:  1:22-bk-11456-MB (Lead)<br>CHAPTER:  11 |
|---|---|
| | **STATEMENT REGARDING<br>CASH COLLATERAL OR<br>DEBTOR IN POSSESSION FINANCING<br>[FRBP 4001; LBR 4001-2]** |
| | DATE:                                                              TBD<br>TIME:                                                              TBD<br>COURTROOM:  303<br>ADDRESS:      21041 Burbank Blvd.<br>                        Woodland Hills, CA 91367<br>                        (or by ZoomGov) |

Secured party(ies): Access Road Capital, LLC

The Debtor has requested the approval of either (1) a motion for use of cash collateral, or postpetition financing, or both, or (2) through a separately-filed motion, a stipulation providing for the use of cash collateral, or postpetition financing, or both.  The proposed form of order on the motion or the stipulation contains the following provisions or findings of fact:

| Disclosures Tracking FRBP 4001(c)(1)(B)(i) through (xi) and (d)(1)(B) | Page No.: | Line No. (if applicable) |
|---|---|---|
| ☐ (i): "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)" | | |
| ☐ (ii): "[T]he providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim"<br><br>☐  Cross-collateralization, *i.e.,* clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law<br><br>☐  Roll-up, *i.e.,* provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other than as provided in § 552(b) | | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| | | |
|---|---|---|
| *Continued from page 1* | | |
| ☐ Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | | |
| ☐ (iii): "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim" | | |
| ☒ (iv): "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay"<br>☐ Automatic relief from the automatic stay upon occurrence of certain events. | Proposed Order ¶¶2 & 3 - only to perfect Adequate Protection Liens | |
| ☐ (v): "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364" | | |
| ☐ (vi): "[T]he establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order" | | |
| ☒ (vii): "[A] waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien" | Proposed Order ¶¶2 & 3 - only to perfect Adequate Protection Liens | |
| ☐ (viii): "[A] release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action" | | |
| ☐ (ix): "[T]he indemnification of any entity" | | |
| ☐ (x): "[A] release, waiver, or limitation of any right under § 506(c)"<br>☐ The granting of any lien on any claim or cause of action arising under § 506(c) | | |
| ☐ (xi): "The granting of any lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)" | | |
| **Additional Disclosures Required by LBR 4001-2** | **Page No.:** | **Line No. (if applicable)** |
| ☐ With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor | | |
| ☐ Pay down prepetition principal owed to a creditor | | |
| ☐ Findings of fact on matters extraneous to the approval process | | |

03/06/2024 ___ Jeffrey S. Kwong _____    /s/ Jeffrey S. Kwong _____
*Date*        *Printed Name*                *Signature*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document entitled: **STATEMENTREGARDING CASH COLLATERAL OR DEBTOR IN POSSESSION FINANCING [FRBP 4001; LBR 4001-2]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____    _____    _____
Date              Printed Name                          Signature

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT "B"

DAVID L. NEALE (SBN 141225)
JEFFREY S. KWONG (SBN 288239)
LEVENE, NEALE, BENDER, YOO & Golubchik L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dln@lnbyg.com; jsk@lnbyg.com

Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Lead Case No.: 1:22-bk-11456-MB |
| AFTERSHOCK COMICS, LLC, a California limited liability company, | Jointly administered with:<br>1:22-bk-11457-MB<br>(Rive Gauche Television). |
| Debtor and Debtor in Possession. | Chapter 11 Cases |
| In re: | |
| RIVE GAUCHE TELEVISION, a California corporation, | **ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL FOR THE PERIOD ENDING APRIL 30, 2024** |
| Debtor and Debtor in Possession. | |
| ☒ Affects both Debtors<br>☐ Affects AfterShock Comics, LLC only<br>☐ Affects Rive Gauche Television only | |
| | Emergency Hearing<br>DATE:  TBD<br>TIME:  TBD<br>PLACE: ZoomGov |

1

A hearing was held at the above-referenced date, time, and location for the Court to consider the emergency motion (the "Motion")[1] [Doc. No. __] of AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together with Aftershock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein (the "Debtors"), pursuant to LBR 2081-1, 4001-2, and 9075-1, FRBP 2002, 4001, and 9014, and Bankruptcy Code Sections 105(a), 361, 362, and 363, for the entry of an order:

(1)    authorizing the Debtors to use Cash Collateral (as defined under Section 363) in accordance with the terms of the budget attached to the Kramer Declaration as **Exhibit "1"** (the "Budget") for the period from the week ending March 1, 2024 to the week ending April 30, 2024 (the "Period"), provided that, the Debtors shall be entitled to a monthly variance of up to 10% on a line item basis and up to 15% on a collective basis, or such other variance as may be requested by the Debtors and approved by the Court;

(2)    authorizing the Debtors to provide Access Road Capital, LLC (the "Lender") with further adequate protection by granting the Lender replacement liens on, and security interests in, the assets of the Debtors' estates (the "Adequate Protection Liens"), to the extent of any diminution in the Lender's collateral during the Period resulting from the Debtors' use of any Cash Collateral in which the Lender has a valid interest;

(3)    vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the Orders to provide the Lender with the Adequate Protection Liens;

(4)    waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Order; and

(5)    granting related relief.

---

[1] Any capitalized term used herein which is not defined herein but which is defined in the Motion shall be deemed to have the same meaning as ascribed to such term in the Motion.

1    Appearances at the hearing on the Motion were made as set forth on the record of the

2  Court.

3    The Court, having considered the Motion and all of the pleadings filed by the Debtors in

4  support of the Motion, all oppositions filed to the Motion (if any), the statements, arguments and

5  representations of the parties made at the hearing on the Motion, and good cause appearing,

6    **HEREBY FINDS AS FOLLOWS:**

7    A.    This Court has jurisdiction over the Debtors' cases, the Motion, and the parties

8  and property affected thereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the

9  Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue is proper

10  before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11    B.    Notice of the Motion, the relief requested therein and the hearing on the Motion,

12  was adequate and in compliance with applicable FRBP and LBR.

13    C.    The Debtors have an immediate need to use Cash Collateral to pay the expenses

14  set forth in the Budget.  Payment of such expenses is necessary to enable the Debtors to avoid

15  immediate and irreparable harm to the Debtors and their estates.

16    D.    The Debtors have requested immediate entry of this Order pursuant to Bankruptcy

17  Rule 4001(b)(2).   Absent granting the relief set forth in this Order, the Debtors' estates will be

18  immediately and irreparably harmed.

19    E.    Authorizing the Debtors to use Cash Collateral to pay the expenses set forth in the

20  Budget is in the best interests of the Debtors' estates.

21    F.    Good cause has been shown for the entry of this Order.

22    Based upon the foregoing findings and conclusions, and upon the record made before this

23  Court at the hearing on the Motion, and good and sufficient cause appearing therefor, **THIS**

24  **COURT HEREBY ORDERS, DETERMINES, AND DECREES AS FOLLOWS:**

25    i.    The Motion is hereby granted in its entirety on the terms and conditions set forth

26  in this Order, with the foregoing findings incorporated herein by reference.  This Order shall be

27  valid and binding on all parties-in-interest and fully effective immediately upon its entry;

28

3

ii.    The Debtors are hereby authorized to use Cash Collateral (as defined under Section 363) in accordance with the terms of the Budget, provided that, with regards to the Budget for the Period, the Debtors shall be entitled to a monthly variance of up to 10% on a line item basis and up to 15% on a collective basis, or such other variance as may be requested by the Debtors and approved by the Court

iii.    The Debtors are hereby authorized to provide the Lender with further adequate protection by granting the Lender Adequate Protection Liens, to the extent of any diminution in the Lender's collateral during the Period resulting from the Debtors' use of any Cash Collateral in which the Lender has a valid interest.

iv.    Any applicable stay, including under FRBP 4001(b) and (c), is hereby waived, and this Order is immediately effective upon entry.

**IT IS SO ORDERED.**

###

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled (*specify*): **DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL FOR THE PERIOD ENDING APRIL 30, 2024; DECLARATION OF JONATHAN KRAMER IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 6, 2024** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Jessica L Bagdanov    jbagdanov@bg.law, ecf@bg.law**
- **Keith Patrick Banner    kbanner@greenbergglusker.com, calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com**
- **Sara Chenetz    schenetz@perkinscoie.com, docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **Alan W Forsley    alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com**
- **Evelina Gentry    evelina.gentry@akerman.com, rob.diwa@akerman.com**
- **Tracy Green    tgreen@fennemorelaw.com, ecfbankruptcy@fennemorelaw.com**
- **Robbin L. Itkin    ritkin@sklarkirsh.com, mduran@sklarkirsh.com;KFRAZIER@SKLARKIRSH.COM**
- **Michael S Kogan    mkogan@koganlawfirm.com**
- **Jeffrey S Kwong    jsk@lnbyg.com, jsk@ecf.inforuptcy.com**
- **Timothy McMahon    tmcmahon@sklarkirsh.com, mduran@sklarkirsh.com**
- **David L. Neale    dln@lnbyg.com**
- **Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**:
On **March 6, 2024,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Blvd, Suite 342
Woodland Hills, CA 91367

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 6, 2024** I will serve the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Service via Email**

Robbin Itkin and Kelly Frazier, Counsel for the Committees
ritkin@sklarkirsh.com; kfrazier@sklarkirsh.com

Howard Steinberg, Counsel for Access Road Capital, LLC
steinbergh@gtlaw.com

Russell Clementson, Trial Attorney for the U.S. Trustee's Office
Russell.Clementson@usdoj.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 6, 2024 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**