DAVID L. NEALE (SBN 141225)
JEFFREY S. KWONG (SBN 288239)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dln@lnbyg.com; jsk@lnbyg.com

Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>AFTERSHOCK COMICS, LLC, a California limited liability company,<br><br>　　　　Debtor and Debtor in Possession.<br><br>In re:<br><br>RIVE GAUCHE TELEVISION, a California corporation,<br><br>　　　　Debtor and Debtor in Possession.<br><br>☒ Affects both Debtors<br>☐ Affects AfterShock Comics, LLC only<br>☐ Affects Rive Gauche Television only | Lead Case No.: 1:22-bk-11456-MB<br><br>Jointly administered with:<br>1:22-bk-11457-MB<br>(Rive Gauche Television).<br>Chapter 11 Cases<br><br>**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER ENFORCING THE "ORDER GRANTING STIPULATION AMONG DEBTORS, OFFICIAL COMMITTEES OF UNSECURED CREDITORS AND ACCESS ROAD CAPITAL, LLC REGARDING SETTLEMENT WITH ACCESS ROAD AND DEBTORS' CONTINUED USE OF CASH COLLATERAL," AND AUTHORIZING CASH COLLATERAL USAGE THROUGH THE WEEK OF AUGUST 30, 2024; DECLARATION OF JONATHAN KRAMER IN SUPPORT THEREOF**<br><br><br>Emergency Hearing<br>DATE:    TBD<br>TIME:    TBD<br>PLACE: ZoomGov |

# TABLE OF CONTENTS

SUMMARY AND MOTION ................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 3

I.    STATEMENT OF FACTS ....................................................................... 3

    A.    Background ................................................................................... 3

    B.    The Court Approved 6/6 Stipulation ............................................ 3

    C.    The Debtors' Cash Collateral Issues, And Multiple Attempts To
        Resolve These Issues With ARC ................................................. 5

    D.    The Debtors' Attempts To Commence Discussions With ARC
        Regarding The Sale Process, And Meeting With SSG .................. 9

    E.    The Mediation ............................................................................ 10

    F.    The First Enforcement Motion .................................................. 11

    G.    The Debtors' Continued Efforts To Move Forward With The
        Sale Process Contemplated By The 6/6 Stipulation .................. 12

    H.    The Budget And This Motion ..................................................... 15

    I.    Compliance with Rule 4001 of the Federal Rules of Bankruptcy
        Procedure and Local Bankruptcy Rule 4001-2 .......................... 16

II.   ARGUMENT ......................................................................................... 18

    A.    THE COURT SHOULD ENTER AN ORDER COMPELLING
        ENFORCEMENT OF THE 6/6 STIPULATION ORDER ................... 18

    B.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE
        CASH COLLATERAL TO PAY THE EXPENSES SET FORTH
        IN THE BUDGET ..................................................................... 19

    C.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE
        CASH COLLATERAL TO PAY WAGES TO EMPLOYEES,
        AND, OWED BACKPAY TO FORMER AND CURRENT
        EMPLOYEES ........................................................................... 21

    D.    ARC IS ADEQUATELY PROTECTED ....................................... 22

III.  THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE ................. 23

i

    IV.    CONCLUSION.................................................................................................. 23

DECLARATION OF JONATHAN KRAMER........................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re 499 W. Warren Street Assocs., Ltd. P'ship,*
    142 B.R. 53 (Bankr.N.D.N.Y.1992) ..................................................................23

*In re McCombs Properties VI, Ltd.,*
    88 B.R. 261 (Bankr. C.D. Cal. 1988)...........................................................20, 23

*In re Mellor,*
    734 F.2d 1396 (9th Cir. 1984) ........................................................................20

*In re O'Connor,*
    808 F.2d 1393 (10th Cir. 1987) ......................................................................20

*Matter of Pursuit Athletic Footwear, Inc.,*
    193 B.R. 713 (Bankr. D. Del. 1996) ................................................................23

*Rios v. Linn Star Transfer, Inc.,*
    No. 19-CV-07009-JSC, 2020 WL 1677338 (N.D. Cal. Apr. 6, 2020) ....................22

*In re Seifert,*
    No. ADV. LA 10-02359-RN, 2012 WL 1108992, at *6 (B.A.P. 9th Cir. Apr. 3,
    2012) .........................................................................................................18

*Shuffler v. Heritage Bank,*
    720 F.2d 1141 (9th Cir. 1983) ........................................................................18

**California Cases**

*See's Candy Shops, Inc. v. Superior Court,*
    210 Cal. App. 4th 889 (2012) .........................................................................22

**Federal Statutes**

11 U.S.C.
  §§ 101, *et seq.* Title 11 Chapter 11 §§ 105(a), 361, 362, and 363 ........................................1, 3
  § 105(a) ..........................................................................................................................18
  § 361(2) ..........................................................................................................................23
  § 363(a) ..........................................................................................................................19
  § 363(c) ..........................................................................................................................19
  § 363(c)(1) ......................................................................................................................19
  § 363(c)(2)(A ..................................................................................................................19
  § 363(c)(2)(B) ...........................................................................................................17, 19
  § 506(c) ..........................................................................................................................17
  §§ 506(c), 544, 545, 547, 548 and 549 ..........................................................................17
  § 1107 ..............................................................................................................................3
  § 1107(a) ........................................................................................................................19
  § 1108 ..............................................................................................................................3

**California Statutes**

Cal. Labor Code
  §§ 201 .............................................................................................................................22
  § 203 ...............................................................................................................................22
  § 204 ...............................................................................................................................22
  § 558 ...............................................................................................................................22

**Other Authorities**

Fed. R. Bankr. P. 4001 ..........................................................................................................16

Fed. R. Bankr. P. 4001(b)(1)(C) ...........................................................................................17

Fed. R. Bankr. P. 4001(c)(1)(B) ...........................................................................................16

Fed. R. Bankr. P.4001-2 .......................................................................................................16

Local Bankruptcy Rule 4001-2(b) and (d) ............................................................................16

## **SUMMARY AND MOTION**

AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and together with Aftershock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein (the "Debtors"), hereby move (the "Motion"), pursuant to Local Bankruptcy Rules ("LBR") 2081-1, 4001-2, and 9075-1, Federal Rules of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code"),[1] for the entry of an order: (1) enforcing the order [Doc. No. 241] (the "6/6 Stipulation Order") approving the "*Stipulation Among Debtors, Official Committees Of Unsecured Creditors And Access Road Capital, LLC Regarding Settlement With Access Road And Debtors' Continued Use Of Cash Collateral*" [Doc. No. 230] filed on June 6, 2023 (the "6/6 Stipulation"); and (2) authorizing the Debtors to use Cash Collateral to pay certain expenses set forth in the budget attached as **Exhibit "1"** hereto (the "Budget") to "reasonably fund an auction sale of the Debtors' assets" in accordance with the 6/6 Stipulation.

Specifically, the 6/6 Stipulation provides that, in the event that the Debtors' lender, Access Road Capital, LLC ("ARC") was not paid off in accordance with its terms,

> "[T]he Debtors' use of Cash Collateral to fund operations shall cease immediately, except as may be necessary to comply with any applicable state or federal law with respect to such cessation of business operations;
> . . . [and] Cash Collateral shall only be used in such limited amount and for such limited time as then agreed upon by the parties or ordered by the Court for the sole purpose of reasonably funding an auction sale of the Debtors' assets[.]"

*See* (Mot. Ex. 2 & 3). Because the Debtors have not paid ARC pursuant to the 6/6 Stipulation, shortly after the March 7, 2024 hearing on the Debtors' emergency motion for authority to use cash collateral [Doc. No. 411], the Debtors and the Official Committees of Unsecured Creditors appointed in the Debtors' cases (the "Committees," and together with the Debtors and ARC, the "Parties") have attempted multiple times to have discussions with ARC about a process to sell the Debtors' assets (the "Sale Process") and the details related thereto (*e.g.*, the identity of the

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

1

sales agent that will be running the Sale Process; the timing for the commencement of the Sale Process; the amount of time that is necessary to sell the Debtors' assets; ARC's ability to credit bid its claim; and the division and distribution of the sale proceeds).  However, ARC continues to act as a "roadblock" to the Sale Process contemplated by the 6/6 Stipulation and has, instead, stated on multiple occasions that it would not consent to the use of any Cash Collateral to fund the Sale Process (and to pay the Debtors' employees, so that the Debtors can comply with the relevant state and federal laws pending a sale).

As a result, once again, the Debtors are forced to bring this Motion, on an emergency basis,[2] for a Court order to enforce the 6/6 Stipulation Order, and authorize the Debtors to use Cash Collateral pursuant to the Budget for the purposes of allowing them to comply with "applicable state and/or federal law," and fund a sale of their assets.[3]

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1)      granting the relief requested in the Motion;

(2)      compelling ARC to comply with the terms of the 6/6 Stipulation;

(3)      authorizing the Debtors to use Cash Collateral to pay the expenses set forth in the Budget for a period of approximately sixty (60) days in accordance with the 6/6 Stipulation; and

(4)      granting such further relief as the Court deems just and proper.

Dated: June __, 2024                          AFTERSHOCK COMICS, LLC &
                                              RIVE  GAUCHE TELEVISION

                                              _/s/ Jeffrey S. Kwong_____
                                                    David L. Neale
                                                    Jeffrey S. Kwong
                                                    LEVENE, NEALE, BENDER, YOO
                                                    & GOLUBCHIK L.L.P.
                                              Counsel for Debtors and Debtors in Possession

---

[2] The Debtors' authority to use Cash Collateral expired on June 21, 2024.

[3] The Debtors have sought to obtain ARC's consent to use cash collateral in accordance with the terms of the 6/6 Stipulation, and hope to obtain such consent prior to any hearing on this Motion. ARC imposed significant conditions to the use of cash collateral that made any agreement imprudent and impractical. Since the Debtors must pay certain critical expenses, including, without limitation, the salaries for those employees who have remained with the Debtors and who will be necessary to assist with any Sale Process, the Debtors have filed this Motion on an emergency basis.

# MEMORANDUM OF POINTS AND AUTHORITIES[4]

## I.

## STATEMENT OF FACTS

### A.    Background.

1.    Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on December 19, 2022 (the "<u>Petition Date</u>").  The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("<u>ASM</u>") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience.  The Debtors' senior secured lender is Access Road Capital, LLC ("<u>ARC</u>").

### B.    The Court Approved 6/6 Stipulation.

3.    At the outset of the Debtors' cases (the "<u>Cases</u>"), ARC's aggressive litigation tactics and refusal to consent to any Cash Collateral usage by the Debtors forced the Debtors to participate in several multi-day Evidentiary Hearings, the result of which authorized the Debtors to use Cash Collateral through May 31, 2023.

4.    On June 6, 2023, the Debtors, the Official Committees of Unsecured Creditors appointed in these Cases (the "<u>Committees</u>"), and ARC (collectively, the "<u>Parties</u>") entered into a stipulation [Doc. No. 230] (the "<u>6/6 Stipulation</u>") to, among other things, allow the Debtors to use Cash Collateral until the week of July 28, 2023.  The settlement (the "<u>Settlement</u>") set forth in the 6/6 Stipulation and the related Release Agreement, represented a "global resolution" between the Parties if: (1) a transaction was consummated, and (2) the proceeds of the transaction were used to timely pay off ARC's claim in the amount of $14 million by the September 15, 2023 payoff deadline (the "<u>9/15 Payoff Deadline</u>").  (Mot. Ex. 2) (6/6 Stipulation,

---

[4] Capitalized terms not otherwise defined herein have the same meanings as in the preceding Notice of Motion and Motion.

Doc. No. 230 ¶ 3) (emphasis added).  Further, the 6/6 Stipulation provided that, in the event that ARC was not timely paid off:

> "[T]he Debtors' use of Cash Collateral to fund operations shall cease immediately, except as may be ***necessary to comply with any applicable state or federal law*** with respect to such cessation of business operations;
> . . . [and]

> Cash Collateral shall only be used in such limited amount and for such limited time as then agreed upon by the parties or ordered by the Court for the sole purpose of ***reasonably funding an auction sale of the Debtors' assets***[.]"

(Mot. Ex. 2) (6/6 Stipulation, ¶ 3) (emphasis added).  Moreover, if ARC was not timely paid off, the 6/6 Stipulation also contemplated that there would be a continued Cash Collateral hearing for the purpose of determining "the amount of Cash Collateral reasonably necessary to be utilized to fund an auction sale of the Debtors' assets, the deadline for such auction sale . . . and the allocation and disposition of any proceeds from the sale of the Debtors' assets.  (Mot. Ex. 2) (6/6 Stipulation, ¶ 4).  The Court's order approving the 6/6 Stipulation [Doc. No. 241] (the "6/6 Stipulation Order") was entered on June 12, 2023.  True and correct copies of the 6/6 Stipulation and the 6/6 Stipulation Order are attached respectively as **Exhibits "2" and "3"** hereto.

5.    Because the Debtors were not able to close on a transaction that would allow them to timely pay off ARC's claim pursuant to the 6/6 Stipulation, their authority to use Cash Collateral under that Stipulation ceased shortly after September 15, 2023.[5]

---

[5] The extension of the payoff and cash collateral deadline from June 30, 2024 to September 15, 2024 was previously agreed upon by the parties, the terms of which were read into the record at the August 1, 2024 hearing.

**C.   The Debtors' Cash Collateral Issues, And Multiple Attempts To Resolve These Issues With ARC.**

6.    Over the next several months after the Debtors' authorization to use Cash Collateral under the 6/6 Stipulation ceased, the Debtors continued their efforts to try to work with ARC to resolve their cash collateral issues without the need for Court intervention.

7.    In these efforts – and almost without fail – after the Debtors sent a request to ARC for consent to use cash collateral, ARC would: (1) request a significant amount of information and documents from the Debtors (the "Requested Documents"); and (2) make certain representations or take actions that reasonably led the Debtors to believe that, once the Requested Documents were provided, ARC would grant the Cash Collateral request. As a result, in reliance upon ARC's actions and representations (and, in an attempt to reach a resolution without Court intervention), the Debtors worked to provide ARC with the Requested Documents, expecting that ARC would subsequently consent to Cash Collateral usage.

8.    The reality, however, was quite different from what the Debtors were led to believe. Specifically, after Requested Documents were provided to ARC, ARC would either request even more information and documents from the Debtors, deny the Cash Collateral usage request, and/or impose extreme conditions to Cash Collateral usage that could never be agreed to – which not only caused disruptions to the Debtors' operations, but delay in the Cases. There are many instances where ARC engaged in such conduct, for example:

•    In **October 2023**, because ARC conditioned the use of Cash Collateral on providing it with documents and answers in response to its ten (10) requests and questions (the "Questions"), the Debtors spent two (2) weeks (with the help of their employees) diligently working to provide ARC with the documents and answers necessary to respond to the Questions. These answers and documents included more than ten (10) lengthy email exchanges, and more than a dozen documents which, for the most part, were not in existence and the Debtors were required to create in order to respond to the Questions. Unfortunately, despite the Debtors

5

delivery of all the material necessary to respond to the Questions within the time required by ARC, ARC ultimately refused to consent to the Debtors' request for Cash Collateral usage to pay employees wages due on October 31, 2023, which forced the Debtors to file an emergency motion [Doc. No. 359] with the Court to pay these wages on November 6, 2023.[6] [7]

- In **December 2023**, Debtors' counsel sent an email to ARC dated December 11, 2023 which requested ARC's consent to use Cash Collateral to pay, among other things, "the payroll for the work already done in November and for the work being done through the end of [the] first payroll period in December," and provided ARC with a variety of Requested Documents which included: (1) "an updated payroll schedule for the second half of November and the first half of December;" (2) the "December budget . . . based on a reduced staff;" and (3) "an explanation of the services performed by each of the retained employees."  However, ARC denied that request in a December 12, 2023 email which stated that ARC would not consent "to the requested payroll, particularly when we still don't have access to the dataroom or the financials we requested."  However, once ARC was provided with access to the "dataroom," and after the Debtors notified ARC that it was on the cusp of losing some key employees if payroll was not timely made, ARC again stated that it would not consent to use of Cash Collateral to pay payroll and denied the Debtors' request for Cash Collateral usage to pay their employees because it only "really care[d] about" the "skeletal crew" (*i.e.*, only a subset of the Debtors' employees to provide *future* services).[8]

---

[6] This motion was resolved based on the terms agreed upon by the Debtors and ARC at the November 9, 2023 hearing.  *See* (Doc. No. 371) (cash collateral order entered on November 14, 2023).

[7] ARC likely did not want the Debtors to pay their employees because payroll is Debtors' largest expense item.  In fact, in a November 14, 2023 email, ARC stated that it "appreciate[d] the responses [from the Debtors], but . . . want to confirm that the debtors *will be holding off making payroll tomorrow.*"  The November 14, 2023 email is attached as **Exhibit "4"** hereto.

[8] The December 2023 emails referenced in this section are attached collectively as **Exhibit "5"** hereto.  As shown by these emails, the Debtors always wanted to pay their employees and had the cash to do so, but ARC refused to consent to Cash Collateral usage for this purpose (which resulted in the Debtors' inability to use Cash Collateral to pay certain wages to current and former employees in November and December 2023).  The Court has, on numerous occasions, expressed its dissatisfaction with the manner in which payroll was handled in the past which has led to employee compensation that still remains unpaid.  The Debtors have always made the payment of their employees' wages a priority and continue to do so.  On numerous occasions, the Debtors have requested ARC to approve the payment of such accrued wages

9.      As if there were any doubt that ARC's strategy is to make things as difficult as possible for the Debtors, two emails from ARC – one dated October 27, 2023 (the "October Email")[9] and the other dated February 9, 2024 (the "February Email")[10] – lay those doubts to rest.  Specifically, when Mr. Kramer informed Mr. Zachary Tarica (the CEO of ARC) that the Debtors needed to use Cash Collateral because "without [cash collateral] approval now[,] we will miss payroll again," Mr. Tarica responded in the October Email by saying: "***Missing payroll is your problem, not ours**. Been 100% clear on this from the day we asked for the information . . . . Let me know how I can be clearer on the position for you.*"  (Mot. Ex. 6) (emphasis added).

10.     Further, when Debtors' counsel asked ARC's General Counsel again for authority to use cash collateral to pay necessary expenses and payroll, ARC's General Counsel responded in the February Email by stating, among other things, that: "We are willing to consent to the remainder of the requested amounts if Jon [Kramer] agrees to **turn over his house** to us so that we can end the separate litigation against him and both sides can stop incurring those costs.  We are willing to take it subject to the existing liens and the homestead exemption."  (Mot. Ex. 7) (emphasis added).[11]

11.     Holding the payment of employee wages hostage and asking Mr. Kramer to "turn over his house" (which is not even an asset of the Estates) as a condition for Cash Collateral usage is not only unconstructive, but more importantly shows ARC's unreasonable demands and indifferent attitude towards the payment of wages to the Debtors' employees for services

---

(and had the cash to do so), but ARC refused those requests.  In response, the Debtors have raised the issue of unpaid payroll obligations with the Court on numerous occasions, and continue to seek authority to pay the unpaid payroll (and have the cash available to do so).

[9] The October Email is attached as **Exhibit "6"** hereto.

[10] The February Email is attached as **Exhibit "7"** hereto.

[11] ARC commenced an action in State Court against Mr. Kramer, and has attempted to use such litigation to coerce Mr. Kramer to act in a manner contrary to the best interests of the Debtors.  Mr. Kramer has resisted those efforts, despite the fact that ARC has now consistently refused to allow Mr. Kramer to be compensated at all, despite Mr. Kramer's importance to the operation of the business and any sale process.  ARC is forcing Mr. Kramer to incur costs in the State Court litigation while using its position in the Cases to prevent Mr. Kramer from receiving any compensation whatsoever.

1  performed.  On many occasions, these responses to the Debtors were sent *after* the Debtors

2  complied with ARC's prior request for certain Requested Documents.

3        12.    These aggressive positions were taken, even though ARC had knowledge that: (1)

4  more than half of the Debtors' employees had left to pursue other employment opportunities

5  (due, in large part, to the non-payment of their wages); (2) the Debtors have pared down their

6  operating expenses to the minimum necessary to sustain operations, negotiate and consummate

7  new sales, and retain critical employees; and (3) potential investors (including all of those that

8  the Debtors have spoken to) are only interested in entering into a transaction with the Debtors if

9  they remain going concerns.

10        13.    Due to ARC's repeated refusal to allow for the Debtors to use Cash Collateral for

11  virtually anything, the Debtors were forced to file several emergency motions for authorization

12  to use cash collateral (the "Emergency Cash Collateral Motions"), which include, among other

13  pleadings filed by the Debtors requesting Court authorization to use of Cash Collateral, the:

14       •    (1) "*Debtors' Emergency Motion For Entry Of An Order Authorizing The*

15  *Debtors To Use Cash Collateral On An Interim Basis*" [Doc. No. 342] filed on September 23,

16  2023, which stated that the Debtors were "forced to bring th[e] Motion" because of the "Lender's

17  refusal to consent to the Debtors' continued Cash Collateral usage during the [one week] Period"

18  from October 1, 2023 to October 6, 2023.  (Doc. No. 342, p. 11).

19       •    (2) "*Debtors' Emergency Motion For Entry Of An Order Authorizing The*

20  *Debtors To Use Cash Collateral To Pay Owed Wages And Commissions*" [Doc. 359] filed on

21  November 6, 2023, where the Debtors requested, given ARC's refusal to authorize the payment

22  of wages, that the Court authorize the Debtors to, among other things, ***pay their employees and***

23  ***contractors post-petition compensation due to them on or around October 31, 2023 for***

24  ***services already performed***.  This was so even though: (1) the Debtors (with the help of their

25  employees) negotiated and entered into a non-disclosure agreement with ARC, and worked

26  diligently to provide ARC prompt answers and documents responsive to ARC's various requests

27  and questions; and (2) ARC was repeatedly informed that nonpayment "would cause the

28

Employees and Contractors not to be paid on a timely basis, and could result in certain of these individuals quitting (which, in turn, could potentially cause an operational shutdown and an erosion of value in the value of the Debtors)."  (Doc. No. 359, p. 9).  In the motion, the Debtors also argued that the payment of employee owed wages was necessary for them to comply with applicable state and federal law as contemplated by the 6/6 Stipulation.  (Doc. No. 359, p. 17-18).  Importantly, the Debtors had the funds available to pay payroll, but could not obtain ARC's consent to use of such funds for that purpose.

- (3) "*Debtors' Emergency Motion For Entry Of An Order Authorizing The Debtors To Use Cash Collateral For The Period Ending April 30, 2024*" [Doc. No. 403] (the "March CC Motion") filed on March 6, 2024, where the Debtors sought use of cash collateral for the period from the week ending March 1, 2024 to the week ending April 30, 2024.  ***Again, in this motion and at the hearing thereon that took place on March 7, 2024, the Debtors repeatedly stressed the necessity of having their employees paid***.  Each of the Emergency Cash Collateral Motions were resolved by agreement, but it is very clear that the only reason the Debtors were unable to pay their employees on a timely basis was ARC's refusal to allow the Debtors to use the cash that they otherwise had available for that purpose.

### D.    The Debtors' Attempts To Commence Discussions With ARC Regarding The Sale Process, And Meeting With SSG.

14.    After the March 7, 2024 hearing on the March CC Motion – given the Court's comments at that hearing that the Debtors were bound by the terms of the 6/6 Stipulation – the Debtors and the Committees attempted multiple times to have meaningful discussions with ARC about a process to sell the Debtors' assets (the "Sale Process") and the details related thereto (*e.g.*, the identity of the sales agent that will be running the Sale Process; the timing for the commencement of the Sale Process; the amount of time that is necessary to sell the Debtors' assets; ARC's ability to credit bid its claim; and the division and distribution of the sale proceeds).

15.    In fact, at that time, the Debtors were talking to SSG Capital Advisors, LLC ("SSG") to help run the Sale Process, and invited the Committees and ARC to participate in a meeting with SSG regarding SSG's retention proposal which took place on March 14, 2024. Although the Committees and Debtors were open to the idea of moving forward with a Sale Process, ARC would not allow for the use of Cash Collateral to fund that process or pay SSG.

16.    At the hearing on March 15, 2024, the Court ordered that it was in the best interests of the estates and creditors for the parties to participate in a mediation to, among other things, agree upon the exit strategy for the Debtors' bankruptcy cases.

### E.    The Mediation.

17.    On April 24, 2024, the Parties participated in a Court ordered mediation before the Hon. Sheri Bluebond.  Because the Parties believed that progress was made at the mediation, the Parties agreed to continue the mediation to, and re-commence on May 16, 2024.  As a result of the continuance, subject to certain conditions, the Parties agreed to participate in a further mediation session on May 16, 2024.  Subject to certain conditions, the Parties agreed that the Debtors would be allowed to use Cash Collateral through the week ending May 17, 2024 to allow the Debtors to continue operating pending the further mediation session.

18.    Prior to the May 16, 2024 mediation (the "Continued Mediation"), the Committees suggested potentially retaining Hilco Global ("Hilco) to assist with running the Sale Process and, as a result, the Debtors promptly provided Hilco with access to their virtual data room.  As discussed more fully below, the Debtors also spent significant amounts of time reviewing the credentials of Hilco and other potential sales agents, meeting with Hilco, and providing Hilco with information and documents about, among other things, their operations and assets in furtherance of the Sale Process.

19.    At the Continued Mediation, among other proposals and exit strategies considered, the Debtors discussed the commencement of a Sale Process to sell the Debtors as a whole and/or their assets.  Although the Debtors and Committees were ready to discuss and formulate terms for the sale and to have the Sale Process begin, ARC was unwilling to

participate in such discussions.  ARC advised the Debtors and the Committees that it would not consent to use of cash collateral beyond the May 17, 2024 date.

### F.    The First Enforcement Motion.

20.    After the Continued Mediation, the Debtors sent multiple emails to ARC to see if a resolution could be reached with ARC to allow for Cash Collateral to be used to preserve the value of the Debtors' assets and to fund the Sale Process contemplated by the 6/6 Stipulation.

21.    After not hearing from ARC for several days, on May 21, 2024, ARC notified the Debtors that it would not consent to the Debtors' use of Cash Collateral unless the principals of the Debtors, Jonathan and Lee Kramer (the "Principals"), agreed to forgo all of their salaries (that is, to work for free).

22.    As a result, on May 21, 2024, the Debtors filed an emergency motion [Doc. No. 445] (the "First Enforcement Motion") for an order enforcing the 6/6 Stipulation, and authorizing the Debtors to use Cash Collateral to pay certain expenses pursuant to a proposed budget to "reasonably fund an auction sale of the Debtors' assets" in accordance with the 6/6 Stipulation. The Enforcement Motion was set for hearing on May 28, 2024 (the "May Hearing").

23.    After the Debtors filed the First Enforcement Motion, and over the next week, the Parties engaged in multiple discussions in an attempt to resolve that motion.  Shortly before the May Hearing, the parties reached an agreement that allowed the Debtors to use Cash Collateral to pay certain expenses through the week of June 7, 2024, subject to two conditions demanded by ARC, that: (1) the "Other Expense – Sales Process" line item in the Budget in the amount of $50,000 would not be paid during the period covered by the First Enforcement Motion, but would remain subject to further discussion among the Parties; (2) the Debtors were only authorized to use Cash Collateral to pay seventy percent (70%) of the salary of Lee Kramer; and (3) the Debtors would not use Cash Collateral to pay any portion of the salary of Jonathan Kramer.  *See* (Doc. No. 454) (Agreed Order entered on May 28, 2024).

Case 1:22-bk-11456-MB    Doc 460    Filed 06/26/24    Entered 06/26/24 17:44:40    Desc
Main Document    Page 17 of 108

**G.    The Debtors' Continued Efforts To Move Forward With The Sale Process Contemplated By The 6/6 Stipulation.**

24.    Although ARC stated at the May Hearing that it was "open" to the idea of commencing a Sale Process, their actions show otherwise; ARC appears to be more interested in impeding the efforts by the Debtors and Committees to move the Sale Process along. Specifically, the following summary of events demonstrates ARC's true intentions:

- On **May 28, 2024**, Hilco sent to the Parties some introductory materials related to their potential engagement to run the Sale Process.

- On **May 31, 2024**, Hilco participated in an introductory group call with the Parties (the "<u>First Group Call</u>") regarding, among other things, Hilco's credentials and experience, and a preliminary assessment of a Sale Process of the Debtors' assets.  During and after the First Group Call, ARC stated that it was "open" to a Sale Process conducted by Hilco. However, ARC: (1) wanted Hilco to review and analyze more information about the Debtors before ARC would make a decision on Hilco's retention; and (2) expressed its concerns about Hilco's requested "Retainer Fee" of $125,000, and suggested exploring a bifurcated process where the Debtors would "pay[] a smaller retainer to get through [Hilco's] basic due diligence period to confirm there is in fact a go to market plan that ARC will support," and pay the remainder around the time when Hilco was ready to publically commence the Sale Process (the "<u>Bifurcated Proposal</u>").  A copy of ARC's email dated June 5, 2024 is attached as **Exhibit "8"** hereto.

- As a result of ARC's concerns, the Debtors (along with their financial advisor) subsequently provided Hilco with a substantial amount of documents (including access to the Debtors' data room containing thousands of documents), and participated in meetings with Hilco regarding, among other things, the Debtors' business operations, assets, revenue forecasts, and other financial information on **June 5 and 6, 2024.**

- On **June 7, 2024**, the Debtors sent to Hilco some additional information, including the Debtors' extended cash flow statement and projections regarding Aftershock's intellectual property and options and purchases.

- On **June 13, 2024**, Hilco determined that it was prepared to move forward as the sales agent to run the Sale Process, and sent to the Debtors a draft engagement agreement. Importantly, after discussions between the Debtors and Hilco regarding ARC's Bifurcated Proposal, Hilco agreed to bifurcate its "Retention Fee" of $125,000 as follows: "(i) $62,500 shall be paid on the date two business days after court approval of the retention of HCF and (ii) the remaining $62,500 shall be paid on the earlier to occur of (i) a closing of a Transaction or (ii) thirty days after court approval of the retention of HCF."  A copy of the Hilco draft retention agreement is attached as **Exhibit "9"** hereto.  Shortly thereafter, Hilco told the Debtors that it was ready to have a second group call with the Parties (the "Second Group Call").

- The Second Group Call, attended by Hilco and the Parties, took place on **June 18, 2024**.  Unfortunately, instead of working constructively with the other Parties to move forward with a Sale Process, ARC (through its CEO, Mr. Tarica) expressed its skepticism about the Sale Process, pointedly criticized the Debtors, questioned Hilco aggressively about the Debtors and the Sale Process, and even appeared to oppose the idea of commencing a Sale Process.  In addition, ARC essentially sought from Hilco a valuation of the Debtors' assets, despite the fact that Hilco was not to be retained for that purpose.  Due in large part to ARC's conduct on the Second Group Call, shortly after that call, Hilco informed the Debtors that it would voluntarily withdraw itself from consideration as sales agent to run the Sale Process.  Hilco's decision to withdraw is especially illuminating (at least with respect to ARC's intentions and actions to derail the Sale Process) given that Hilco's decision was made only after: (1) previously concluding that it was ready to proceed with the engagement; (2) it spent a significant amount of time meeting with the Debtors, and analyzing a substantial amount of information and documents provided to it by the Debtors over a 3-week period – without receiving any compensation; and (3) ARC's interactions with Hilco at the Second Group Meeting.

- As if there was any doubt regarding ARC's real intentions of serving as a barrier to commencement of the Sale Process, ARC's **June 19, 2024** email (the "June Email") to the Debtors and Committees shows that it was never "open" to the idea of a Sale Process for the Debtor's assets, despite leading the Debtors and Committees to believe the contrary. Specifically, in the June Email, ARC made an outrageous proposal regarding credit bidding that would undoubtedly chill bidding, and stated that: "We would still plan to waive our ability to credit bid above a certain price (which may be the minimum for purposes of Hilco's success fee but may also be a greater amount) for certain buyers but this would be done on an ad hoc basis as we evaluate the seriousness of various buyers and their plans," and even acknowledged that its proposal to "set [the] reserve price [at] $14m" would mean that "Hilco won't take the engagement."[12]

25.    Unfortunately, after the Debtors expended substantial amounts of time and effort working with Hilco to provide Hilco with the information they needed, Hilco is no longer interested in moving forward to run the Sale Process.  The delay in commencing and moving forward with the Sale Process is due to ARC serving as a roadblock to this process.  At this time, the Debtors need approximately sixty (60) days to find a new sales agent to run the Sale Process contemplated by the 6/6 Stipulation, negotiate the terms of sales agent's engagement, attempt to obtain ARC's and the Committees' consent to the retention, and file an application to employ the sales agent.  The timing of any Sale Process would, in large measure, be dictated by the sales agent, so it is impossible to know at this time whether a sale could be completed within the sixty (60) day time period.  Thus, in the event that the Debtors are able to find a new sales agent and such sales agent will not be met by additional hostility from ARC, the Debtors will likely need to use Cash Collateral beyond the sixty (60) days, but the Debtors will limit their current request sixty (60) days so that they can report back to court as to developments occurring during the Period.

---

[12] A copy of the June Email is attached as **Exhibit "10"** hereto.

**H.    The Budget And This Motion.**

26.    Pursuant to this Motion, the Debtors are requesting Cash Collateral solely to enforce the 6/6 Stipulation Order, and to allow them to use Cash Collateral to pay for the expenses to "keep the lights on" set forth in the budget (the "<u>Budget</u>") for the period commencing on the week of June 21, 2024 through the week of August 30, 2024 (the "<u>Period</u>") attached as **Exhibit "1"** hereto, that would allow them to comply with "applicable state and/or federal law," and proceed with the selection and retention of a sale agent to move forward with a sale process.    To be clear, other than basic operating expenses (including the payroll of the critical remaining employees whose services will be needed in conjunction with the sale process) the Debtors are limiting their request to use Cash Collateral solely and exclusively in compliance with the terms of the 6/6 Stipulation.

27.    The Debtors are requesting authority to use cash collateral for a period of approximately sixty (60) days because the Debtors cannot continue to request consent and approval for use of Cash Collateral every couple of weeks; and the Debtors believe that they need at least sixty (60) days to find a new sales agent to run the Sale Process contemplated by the 6/6 Stipulation, negotiate the terms of sales agent's engagement, attempt to obtain ARC's and the Committees' consent to the retention, and file an application to employ the sales agent. Moreover, as set forth in the Budget, the Debtors are requesting authority to use Cash Collateral to pay, among other expenses: (1) one hundred percent (100%) of employee salaries and benefits that have or will become due during the Period; (2) two periods of "back pay" (the "<u>Back Pay</u>") from November and December 2023 owed to its current and former employees for prior pay periods (*see* week of July 5 and August 30 in the Budget).  With respect to the Back Pay, the Debtors' plan is to completely repay these owed amounts over a three (3) month period (these Back Pay payments are proposed to be made on the weeks that the Debtors are not scheduled to make payments for regular payroll) commencing during this Period.  A chart showing the names of the current and former employees, and the Back Pay amounts owed to these employees through April 2024 are attached as **Exhibit "11"** hereto.

28.     Although the Principals previously agreed to defer payment of all or a portion of their salaries during previous Cash Collateral periods so that the Debtors' other employees could be paid,[13] the Debtors are also requesting that the Principals be paid one hundred percent (100%) of their salaries and benefits during the Period.  The Principals are essential to the Sale Process and have intimate and specialized knowledge about the Debtors' operations and assets, and they should be paid along with all of the other employees for their services.  In fact, in an email dated June 5, 2024, ARC has acknowledged that it needs the full cooperation from the Debtors (*i.e.*, the Principals) through the contemplated Sale Process, and has not contended otherwise.  A true and correct copy of the June 7, 2024 email is attached as **Exhibit "12"** hereto.

**I.     Compliance with Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 4001-2.**

29.     Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtors submit that the relief requested herein pertaining to the use of Cash Collateral does not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of | No |

---

[13] Jon Kramer and Lee Kramer, who have not been paid for six months and three months respectively, and were only paid 70% of their regular salaries.  ARC made a condition to the Debtors' use of Cash Collateral to, among other things, meet its current payroll obligations the Kramers' reduction or suspension of their pay.  In the interests of the Debtors and their current employees, the Kramers agreed to the condition imposed by ARC.  However, it is not economically reasonable to expect Jon Kramer to continue to manage the businesses, deal with information requests by ARC and others, and work with any potential sales agent (something Hilco expressly said was necessary) for no compensation whatsoever.  This is a particularly abusive position for ARC to take with respect to Jon Kramer's compensation and appears related to ARC's strategy in the ongoing litigation in State Court.

| **Provision** | |
|---|---|
| any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

30.     Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtors are required to serve a copy of the Motion on any entity with an interest in the Debtors' cash collateral, the Committees, and any other entity that the Court directs.  The Debtors have complied with the foregoing by

1    serving a copy of the Motion on all known secured creditor(s), the Committees, the United States

2    Trustee, and parties requesting special notice.

3                                                      **II.**

4                                                **ARGUMENT**

5    A.        **THE COURT SHOULD ENTER AN ORDER COMPELLING**

6    **ENFORCEMENT OF THE 6/6 STIPULATION ORDER**

7           Section 105(a) provides as follows:

8           The court may issue any order, process, or judgment that is necessary or
             appropriate to carry out the provisions of this title.  No provision of this title
9           providing for the raising of an issue by a party in interest shall be construed to
             preclude the court from, *sua sponte*, **taking any action or making any**
10          **determination necessary or appropriate to enforce or implement court orders** or
             rules, or to prevent an abuse of process.
11

12
      11 U.S.C. § 105(a) (emphasis added).  Bankruptcy courts "retain[] jurisdiction to interpret . . .
13
      Settlement Order[s] and to determine whether [they] should be enforced." *In re Seifert*, No.
14
      ADV. LA 10-02359-RN, 2012 WL 1108992, at *6 (B.A.P. 9th Cir. Apr. 3, 2012).  There is a
15
      presumption that a party subject to a court order shall "take 'all the reasonable steps within [his]
16
      power to insure compliance with the [court's] order.'" *Shuffler v. Heritage Bank*, 720 F.2d 1141,
17
      1146 (9th Cir. 1983) quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976).
18
             Here, the 6/6 Stipulation and Order provided that, if the Debtors were not able to timely
19
      pay off ARC, Cash Collateral would only be used for the Debtors to "comply with any
20
      applicable state or federal law with respect to . . . cessation of business operations" and to
21
      "reasonably fund[] an auction sale of the Debtors' assets."  ARC has on several occasions (and
22
      recently at the May 16, 2024 mediation, and the June 18, 2024 Second Group Call with Hilco)
23
      unambiguously stated that it would not consent to the use of any Cash Collateral to fund the Sale
24
      Process despite its prior consent to the use of Cash Collateral for such purpose set forth in the 6/6
25
      Stipulation.  ARC's actions are in clear violation of the 6/6 Stipulation Order, and this Court
26
      should compel compliance with that order.
27
             Importantly, because paragraph 4 of the 6/6 Stipulation provided that the Court would
28

                                                      18

consider at a continued Cash Collateral hearing "***the amount of Cash Collateral reasonably necessary to be utilized to fund an auction sale of the Debtors' assets***, the deadline for such auction sale . . . and the allocation and disposition of any proceeds from the sale of the Debtors' assets," the Court has authority to determine the amount of Cash Collateral that is necessary to fund the Sale Process – whether conducted by SSG, Hilco, or some other sales agent that needs to be identified and retained – and should authorize the Debtors to use Cash Collateral to pay the expenses in the "bare bones" Budget to "keep the lights on" during the Period pending the sale.

**B.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE CASH COLLATERAL TO PAY THE EXPENSES SET FORTH IN THE BUDGET.**

The Debtors' use of property of the estate is governed by Section 363.  11 U.S.C. § 363(c).  Section 363(c)(1) provides in pertinent part:

> "If the business of the debtor is authorized to be operated under section. … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S. C. §363(c)(2)(A) and (B).

19

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral only if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); s*ee also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

Here, the 6/6 Stipulation already contemplates the use of Cash Collateral to "fund an auction sale of the Debtors' assets" and, as a result, the Court should find that ARC previously consented to the use of Cash Collateral to pay for the expenses in the Budget. The expenses set forth in the Budget are the "bare bones minimum" that need to be paid to preserve the value of the Debtors' assets pending a sale of such assets. For example, these expenses include, among other things:

- Minimal "Bank [Account] Fees";
- Employee payroll, health insurance, and associated costs;[14]
- Software and website costs (*e.g.,* Microsoft 360, Dropbox, Slack, Zoom, Adobe, etc.);
- Office rent for storage units to store the Debtors' physical assets;
- Telephone and Internet Service (*i.e.*, Ring Central/T-Mobile, and Synoptek respectively);
- RGTV Channel management and program material "delivery" vendors (*i.e.*, "Ottera" and "Santa Monica Video"[15] respectively);
- Post-petition taxes; and
- Retention fee of the sales agent selected to run the Sale Process (which fee is estimated to be at least $125,000 based on Hilco's proposal).

---

[14] The Budget includes amounts to pay: (1) one hundred percent (100%) of employee salaries and benefits that have or will become due during the Period; and (2) two (2) periods of "back pay" (the "Back Pay") from November and December 2023 owed to its current and former employees for prior pay periods (*see* week of July 5 and August 30 in the Budget).

[15] Payment to Santa Monica Video is necessary for RGTV to deliver materials to customers under linear contracts that have been executed (so that these customers can air the licensed program). The payment of the fees under these customer contracts can only happen after the materials are delivered per the license agreements for the titles. Without access to RGTV's master materials, RGTV cannot fulfill its new sales because it cannot create materials for each new sale.

1    ARC should be estopped from making any argument that it has not consented to the use of Cash

2    Collateral to fund the Sale Process.

3        **C.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE**

4    **CASH COLLATERAL TO PAY WAGES TO EMPLOYEES, AND OWED BACKPAY**

5    **TO FORMER AND CURRENT EMPLOYEES.**

6        The request to use Cash Collateral to pay 100% of employee salaries that have or will

7    come due during the Period is especially important.[16]  These employees (and especially the

8    Principals) are essential to the Sale Process and have intimate and specialized knowledge about

9    the Debtors' operations and assets, and will be necessary to provide, among other things: (1)

10    ARC with any future Requested Documents; and (2) the sales agent with information and

11    documents related to the Sale Process contemplated by the 6/6 Stipulation.   ARC has

12    acknowledged that it needs the full cooperation of the Debtors (*i.e.*, the Principals) through the

13    contemplated Sale Process, and has not contended otherwise.   *See* (Mot. Ex. 12).

14        Through the Motion, the Debtors are also requesting authority to use Cash Collateral to

15    commence implementing its plan to fully repay the Back Pay owed to its former or current

16    employees from November and December 2023.  It has always been the Debtors' position that

17    there was sufficient cash available to pay payroll when it was due, and that the only reason

18    employees were not paid was because ARC would not consent to the use of Cash Collateral for

19    that purpose.  The Debtors have advised the Court of this situation on numerous occasions, and

20    have worked hard to protect the interests of both their current and former employees.   The

21    Debtors anticipate that the complete implementation of its plan to repay Back Wages would

22    allow employees to be fully paid in approximately three (3) months without affecting the

23    Debtors' financial performance over that period.

24        Importantly, the 6/6 Stipulation provides that Cash Collateral may be used as is

25

26    [16] Although the Debtors are hopeful that the Parties can reach a resolution with respect to consent
     to use Cash Collateral during the Period, ARC has thus far conditioned the use of cash collateral
     on, among other things: (1) the Debtor not making any payments to amounts owed to employees

27    for Back Pay; (2) less than 100% of employee salaries; and (3) a credit bid/ distribution scheme
     that is unrelated to Cash Collateral usage that neither the Debtors nor the Committees find

28    acceptable or reasonable.

"necessary to comply with any applicable state or federal law with respect to such cessation of business operations," which includes the payment of employee wages for the payrolls due during the Period (the "<u>Payroll Expenses</u>").  It cannot be reasonably disputed that the Debtors must timely pay the Payroll Expenses to their employees to comply with applicable California and other labor laws.  In fact, the Court has acknowledged the Debtors' legal obligations to timely pay employee wages at prior hearings.

For example, California Labor Code § 201 "secures an employee's right to the full and prompt payment of final wages '***upon discharge'***," while California Labor Code § 204 requires that "[a]ll wages, other than those mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned by any person in ***any employment*** are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays."  *See Rios v. Linn Star Transfer, Inc.*, No. 19-CV-07009-JSC, 2020 WL 1677338, at *3 (N.D. Cal. Apr. 6, 2020); *See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 904-05 (2012) ("sole purpose of [section 204] is to require an employer of labor who comes within its terms to maintain two regular pay days each month, within the dates required in that section.") (internal quotation marks and citation omitted); Cal. Labor Code §§ 201 & 204; *see also* Cal. Labor Code § 203 (penalty for the "willful" failure to comply with an obligation to make timely payments).  In addition to employer liability, under California Labor Code Section 558, an employer's failure to timely pay wages and make other payments to employees may subject not only the employer, but also any "other person acting on behalf of an employer," to civil liability and penalty for any applicable violations related underpaying an employee.  Cal. Labor Code § 558.

As a result, subject to Court approval, the Debtors' limited request to use Cash Collateral pursuant to the Budget is not only consistent with, but contemplated by, the terms of the 6/6 Stipulation.  These are expenses that are "reasonably" necessary to fund "an auction sale of the Debtors' assets," and allow the Debtors to comply with applicable labor laws.

## D.    <u>ARC IS ADEQUATELY PROTECTED.</u>

Further, even putting aside the fact that ARC previously committed to allow the use of

Cash Collateral to reasonably fund a Sale Process, ARC will be adequately protected, which provides a basis for the immediate and ongoing authorization for the Debtors to use Cash Collateral for the purposes of paying the limited sale related expenses set forth in the Budget.

**First,** ARC will be adequately protected by the Debtors' use of Cash Collateral to preserve the value of ARC's collateral pending a sale. *See In re 499 W. Warren Street Assocs., Ltd. P'ship,* 142 B.R. 53, 58 (Bankr.N.D.N.Y.1992) (allowing the use of cash collateral to maintain property); *McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.),* 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would increase rent flow even without equity cushion); *Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996).

**Second,** as additional adequate protection, the Debtors propose that the Court authorize the Debtors to grant and provide ARC with replacement Adequate Protection Liens on, and security interests in, the assets of the Debtors' estate to secure any diminution in ARC's collateral during the Period resulting from the Debtors' use of any Cash Collateral in which ARC has a valid interest. This form of adequate protection is contemplated and allowed pursuant to Section 361(2) of the Bankruptcy Code.

**III.**

**<u>THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE</u>**

For the reasons noted herein, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth on the Budget to preserve the value of the Debtors' assets pending a sale. Based on the foregoing, the Debtors request that any applicable stay, including any stay provided under FRBP 4001(b) be waived to allow the Order to become immediately effective.

**IV.**

**<u>CONCLUSION</u>**

**WHEREFORE**, the Debtors respectfully requests that the Court enter an order:

(1)    granting the relief requested in the Motion;

1   (2)  compelling ARC to comply with the terms of the 6/6 Stipulation;

2   (3)  authorizing the Debtors to use Cash Collateral to pay the expenses set forth in the

3 Budget in accordance with the 6/6 Stipulation; and

4   (4)  granting such further relief as the Court deems just and proper.

5

6 Dated: June 26, 2024     AFTERSHOCK COMICS, LLC &
             RIVE GAUCHE TELEVISION

7

8            _/s/ Jeffrey S. Kwong_
             David L. Neale

9             Jeffrey S. Kwong
             LEVENE, NEALE, BENDER, YOO

10             & GOLUBCHIK L.L.P.
           Counsel for Debtors and Debtors in Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **<u>DECLARATION OF JONATHAN KRAMER</u>**

2  I, Jonathan Kramer, hereby declare as follows:

3  1.      I am over 18 years of age.  I am the Chief Executive Officer and President of

4  AfterShock Comics, LLC ("<u>Aftershock</u>") and Rive Gauche Television ("<u>RGTV</u>," and together

5  with Aftershock, the "<u>Debtors</u>"), respectively, the debtors and debtors in possession in the above-

6  captioned Chapter 11 bankruptcy cases, and am therefore familiar with the business operations

7  and have access to and knowledge regarding the financial books and records of the Debtors.  I

8  have personal knowledge of the facts set forth below and, if called to testify as a witness, I could

9  and would competently testify thereto.

10  2.      I am familiar with the history, organization, operations and financial condition of

11  the Debtors.  The records and documents referred to in this Declaration constitute writings taken,

12  made, or maintained in the regular or ordinary course of the Debtors' business at or near the time

13  of act, condition or event to which they relate by persons employed by the Debtors who had a

14  business duty to the Debtors to accurately and completely take, make, and maintain such records

15  and documents.  The statements set forth in this declaration are based upon my own personal

16  knowledge and my review of the Debtors' books and records.

17  3.      I make this declaration in support of the "*Debtors' Emergency Motion For Entry*

18  *Of An Order Enforcing The 'Order Granting Stipulation Among Debtors, Official Committees Of*

19  *Unsecured Creditors And Access Road Capital, LLC Regarding Settlement With Access Road*

20  *And Debtors' Continued Use Of Cash Collateral,' And Authorizing Cash Collateral Usage*

21  *Through The Week Of August 30, 2024.*" (the "<u>Motion</u>").

22  4.      Among other things, the Motion requests the entry of an order enforcing the order

23  [Doc. No. 241] (the "<u>6/6 Stipulation Order</u>") approving the "*Stipulation Among Debtors, Official*

24  *Committees Of Unsecured Creditors And Access Road Capital, LLC Regarding Settlement With*

25  *Access Road And Debtors' Continued Use Of Cash Collateral*" [Doc. No. 230] filed on June 6,

26  2023 (the "<u>6/6 Stipulation</u>"), and authorizing the Debtors to use Cash Collateral to pay certain

27  expenses set forth in the budget attached as **<u>Exhibit "1"</u>** hereto (the "<u>Budget</u>") to "reasonably

28

fund an auction sale of the Debtors' assets" in accordance with the 6/6 Stipulation. The Budget was prepared by employees of the Debtors under my direction and supervision, and has been approved by me.

**Background**

5.    Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on December 19, 2022 (the "Petition Date"). The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.    Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience. The Debtors' senior secured lender is Access Road Capital, LLC ("ARC").

**The Court Approved 6/6 Stipulation.**

7.    At the outset of the Debtors' cases (the "Cases"), ARC's aggressive litigation tactics and refusal to consent to any Cash Collateral usage by the Debtors forced the Debtors to participate in several multi-day Evidentiary Hearings, the result of which authorized the Debtors to use Cash Collateral through May 31, 2023.

8.    On June 6, 2023, the Debtors, the Official Committees of Unsecured Creditors appointed in these Cases (the "Committees"), and ARC (collectively, the "Parties") entered into a stipulation [Doc. No. 230] (the "6/6 Stipulation") to, among other things, allow the Debtors to use Cash Collateral until the week of July 28, 2023. The settlement (the "Settlement") set forth in the 6/6 Stipulation and the related Release Agreement, represented a "global resolution" between the Parties if: (1) a transaction was consummated, and (2) the proceeds of the transaction were used to timely pay off ARC's claim in the amount of $14 million by the September 15, 2023 payoff deadline (the "9/15 Payoff Deadline"). (Mot. Ex. 2) (6/6 Stipulation, Doc. No. 230 ¶ 3) (emphasis added). Further, the 6/6 Stipulation provided that, in the event that ARC was not timely paid off:

"[T]he Debtors' use of Cash Collateral to fund operations shall cease

immediately, except as may be ***necessary to comply with any applicable state or federal law*** with respect to such cessation of business operations;
. . . [and]

Cash Collateral shall only be used in such limited amount and for such limited time as then agreed upon by the parties or ordered by the Court for the sole purpose of ***reasonably funding an auction sale of the Debtors' assets***[.]"

(Mot. Ex. 2) (6/6 Stipulation, ¶ 3) (emphasis added).  Moreover, if ARC was not timely paid off, the 6/6 Stipulation also contemplated that there would be a continued Cash Collateral hearing for the purpose of determining "the amount of Cash Collateral reasonably necessary to be utilized to fund an auction sale of the Debtors' assets, the deadline for such auction sale . . . and the allocation and disposition of any proceeds from the sale of the Debtors' assets.  (Mot. Ex. 2) (6/6 Stipulation, ¶ 4).  The Court's order approving the 6/6 Stipulation [Doc. No. 241] (the "6/6 Stipulation Order") was entered on June 12, 2023.  True and correct copies of the 6/6 Stipulation and the 6/6 Stipulation Order are attached respectively as **Exhibits "2" and "3"** hereto.

9.      Because the Debtors were not able to close on a transaction that would allow them to timely pay off ARC's claim pursuant to the 6/6 Stipulation, their authority to use Cash Collateral under that Stipulation ceased shortly after September 15, 2023.[17]

**The Debtors' Cash Collateral Issues, And Multiple Attempts To Resolve These Issues With ARC.**

10.     Over the next several months after the Debtors' authorization to use Cash Collateral under the 6/6 Stipulation ceased, the Debtors continued their efforts to try to work with ARC to resolve their cash collateral issues without the need for Court intervention.

11.     In these efforts – and almost without fail – after the Debtors sent a request to ARC for consent to use cash collateral, ARC would: (1) request a significant amount of information and documents from the Debtors (the "Requested Documents"); and (2) make certain representations that reasonably led the Debtors to believe that, once the Requested Documents

---

[17] The extension of the payoff and cash collateral deadline from June 30, 2024 to September 15, 2024 was previously agreed upon by the parties, the terms of which were read into the record at the August 1, 2024 hearing.

were provided, ARC would grant the Cash Collateral request.  As a result, in reliance upon ARC's actions and representations (and, in an attempt to reach a resolution without Court intervention), the Debtors worked to provide ARC with the Requested Documents, expecting that ARC would subsequently consent to Cash Collateral usage.

12.    The reality, however, was quite different from what the Debtors were led to believe.  Specifically, after Requested Documents were provided to ARC, ARC would either request even more information and documents from the Debtors, deny the Cash Collateral usage request, and/or impose extreme conditions to Cash Collateral usage that could never be agreed to – which not only caused disruptions to the Debtors' operations, but delay in the Cases.  There are many instances where ARC engaged in such conduct, for example:

•    In **October 2023**, because ARC conditioned the use of Cash Collateral on providing it with documents and answers in response to its ten (10) requests and questions (the "Questions"), the Debtors spent two (2) weeks (with the help of their employees) diligently working to provide ARC with the documents and answers necessary to respond to the Questions. These answers and documents included more than ten (10) lengthy email exchanges, and more than a dozen documents which, for the most part, were not in existence and the Debtors were required to create in order to respond to the Questions. Unfortunately, despite the Debtors delivery of all the material necessary to respond to the Questions within the time required by ARC, ARC ultimately refused to consent to the Debtors' request for Cash Collateral usage to pay employees wages due on October 31, 2023, which forced the Debtors to file an emergency motion [Doc. No. 359] with the Court to pay these wages on November 6, 2023.[18] [19]

•    In **December 2023**, Debtors' counsel sent an email to ARC dated December 11, 2023 which requested ARC's consent to use Cash Collateral to pay, among other things, "the

---

[18] This motion was resolved base on the terms agreed upon by the Debtors and ARC at the November 9, 2023 hearing.  *See* (Doc. No. 371) (cash collateral order entered on November 14, 2023).

[19] ARC likely did not want the Debtors to pay their employees because payroll is Debtors' largest expense item.  In fact, in a November 14, 2023 email, ARC stated that it "appreciate[d] the responses [from the Debtors], but . . . want to confirm that the debtors **will be holding off making payroll tomorrow.**"  The November 14, 2023 email is attached as **Exhibit "4"** hereto.

payroll for the work already done in November and for the work being done through the end of [the] first payroll period in December", and provided ARC with a variety of Requested Documents which included: (1) "an updated payroll schedule for the second half of November and the first half of December;" (2) the "December budget . . . based on a reduced staff;" and (3) "an explanation of the services performed by each of the retained employees." However, ARC denied that request in a December 12, 2023 email which stated that ARC would not consent "to the requested payroll, particularly when we still don't have access to the dataroom or the financials we requested." However, once ARC was provided with access to the "dataroom," and after the Debtors notified ARC that it was on the cusp of losing some key employees if payroll was not timely made, ARC again stated that it would not consent to use of Cash Collateral to pay payroll and denied the Debtors' request for Cash Collateral usage to pay their employees because it only "really care[d] about" the "skeletal crew" (*i.e.*, only a subset of the Debtors' employees to provide *future* services).[20]

13.    Two emails from ARC – one dated October 27, 2023 (the "October Email")[21] and the other dated February 9, 2024 (the "February Email")[22] – show that ARC was on a mission to make things as difficult as it can for the Debtors. Specifically, when I informed Mr. Zachary Tarica (the CEO of ARC) that the Debtors needed to use Cash Collateral because "without [cash collateral] approval now[,] we will miss payroll again," Mr. Tarica responded in the October Email by saying: "***Missing payroll is your problem, not ours****. Been 100% clear on this from the

---

[20] The December 2023 emails referenced in this section are attached collectively as **Exhibit "5"** hereto. As shown by these emails, the Debtors always wanted to pay their employees and had the cash to do so, but ARC refused to consent to Cash Collateral usage for this purpose (which resulted in the Debtors' inability to use Cash Collateral to pay certain wages to current and former employees in November and December 2023). The Court has, on numerous occasions, expressed its dissatisfaction with the manner in which payroll was handled in the past which has led to employee compensation that still remains unpaid. The Debtors have always made the payment of their employees' wages a priority and continue to do so. On numerous occasions, the Debtors have requested ARC to approve the payment of such accrued wages (and had the cash to do so), but ARC refused those requests. In response, the Debtors have raised the issue of unpaid payroll obligations with the Court on numerous occasions, and continue to seek authority to pay the unpaid payroll (and have the cash available to do so).
[21] The October Email is attached as **Exhibit "6"** hereto.
[22] The February Email is attached as **Exhibit "7"** hereto.

29

day we asked for the information . . . . Let me know how I can be clearer on the position for you." (Mot. Ex. 6) (emphasis added).

14.    Further, when Debtors' counsel asked ARC's General Counsel again for authority to use cash collateral to pay necessary expenses and payroll, ARC's General Counsel responded in the February Email by stating, among other things, that: "We are willing to consent to the remainder of the requested amounts if Jon [Kramer] agrees to ***turn over his house*** to us so that we can end the separate litigation against him and both sides can stop incurring those costs. We are willing to take it subject to the existing liens and the homestead exemption." (Mot. Ex. 7) (emphasis added).[23]

15.    On many occasions, these responses to the Debtors were sent ***after*** the Debtors complied with ARC's prior request for certain Requested Documents.

16.    These aggressive positions were taken, even though ARC had knowledge that: (1) more than half of the Debtors' employees had left to pursue other employment opportunities (due, in large part, to the non-payment of their wages); (2) the Debtors have pared down their operating expenses to the minimum necessary to sustain operations, negotiate and consummate new sales, and retain critical employees; and (3) potential investors (including all of those that the Debtors have spoken to) are only interested in entering into a transaction with the Debtors if they remain going concerns.

17.    Due to ARC's repeated refusal to allow for the Debtors to use Cash Collateral for virtually anything, the Debtors were forced to file several emergency motions for authorization to use cash collateral (the "Emergency Cash Collateral Motions"), which include, among other pleadings filed by the Debtors requesting Court authorization to use of Cash Collateral, the:

---

[23] ARC commenced an action in State Court against me, and has attempted to use such litigation to coerce me to act in a manner contrary to the best interests of the Debtors. I resisted those efforts, despite the fact that ARC has now consistently refused to allow me to be compensated at all, despite my importance to the operation of the business and any sale process. ARC is forcing me to incur costs in the State Court litigation while using its position in the Cases to prevent me from receiving any compensation whatsoever.

- (1) "*Debtors' Emergency Motion For Entry Of An Order Authorizing The Debtors To Use Cash Collateral On An Interim Basis*" [Doc. No. 342] filed on September 23, 2023, which stated that the Debtors were "forced to bring th[e] Motion" because of the "Lender's refusal to consent to the Debtors' continued Cash Collateral usage during the [one week] Period" from October 1, 2023 to October 6, 2023.  (Doc. No. 342, p. 11).

- (2) "*Debtors' Emergency Motion For Entry Of An Order Authorizing The Debtors To Use Cash Collateral To Pay Owed Wages And Commissions*" [Doc. 359] filed on November 6, 2023, where the Debtors requested, given ARC's refusal to authorize the payment of wages, that the Court authorize the Debtors to, among other things, ***pay their employees and contractors post-petition compensation due to them on or around October 31, 2023 for services already performed***.  This was so even though: (1) the Debtors (with the help of their employees) negotiated and entered into a non-disclosure agreement with ARC, and worked diligently to provide ARC prompt answers and documents responsive to ARC's various requests and questions; and (2) ARC was repeatedly informed that nonpayment "would cause the Employees and Contractors not to be paid on a timely basis, and could result in certain of these individuals quitting (which, in turn, could potentially cause an operational shutdown and an erosion of value in the value of the Debtors)."  (Doc. No. 359, p. 9).  In the motion, the Debtors also argued that the payment of employee owed wages was necessary for them to comply with applicable state and federal law as contemplated by the 6/6 Stipulation.  (Doc. No. 359, p. 17-18).  Importantly, the Debtors had the funds available to pay payroll, but could not ARC's consent to use of such funds for that purpose.

- (3) "*Debtors' Emergency Motion For Entry Of An Order Authorizing The Debtors To Use Cash Collateral For The Period Ending April 30, 2024*" [Doc. No. 403] (the "March CC Motion") filed on March 6, 2024, where the Debtors sought use of cash collateral for the period from the week ending March 1, 2024 to the week ending April 30, 2024.  ***Again, in this motion and at the hearing thereon that took place on March 7, 2024, the Debtors repeatedly stressed the necessity of having their employees paid***.  Each of the Emergency Cash

Collateral Motions were resolved by agreement, but it is very clear that the only reason the Debtors were unable to pay their employees on a timely basis was ARC's refusal to allow the Debtors to use the cash that they otherwise had available for that purpose.

**The Debtors' Attempts To Commence Discussions With ARC Regarding The Sale Process, And Meeting With SSG.**

18.    After the March 7, 2024 hearing on the March CC Motion – given the Court's comments at that hearing that the Debtors were bound by the terms of the 6/6 Stipulation – the Debtors and the Committees attempted multiple times to have meaningful discussions with ARC about a process to sell the Debtors' assets (the "<u>Sale Process</u>") and the details related thereto (*e.g.*, the identity of the sales agent that will be running the Sale Process; the timing for the commencement of the Sale Process; the amount of time that is necessary to sell the Debtors' assets; ARC's ability to credit bid its claim; and the division and distribution of the sale proceeds).

19.    In fact, at that time, the Debtors were talking to SSG Capital Advisors, LLC ("<u>SSG</u>") to help run the Sale Process, and invited the Committees and ARC to participate in a meeting with SSG regarding SSG's retention proposal which took place on March 14, 2024. Although the Committees and Debtors were open to the idea of moving forward with a Sale Process, ARC would not allow for the use of Cash Collateral to fund that process or pay SSG.

20.    At the hearing on March 15, 2024, the Court ordered that it was in the best interests of the estates and creditors for the parties to participate in a mediation to, among other things, agree upon the exit strategy for the Debtors' bankruptcy cases.

**The Mediation.**

21.    On April 24, 2024, the Parties participated in a Court ordered mediation before the Hon. Sheri Bluebond.  Because the Parties believed that progress was made at the mediation, the Parties agreed to continue the mediation to, and re-commence on May 16, 2024.  As a result of the continuance, subject to certain conditions, the Parties agreed to participate in a further mediation session on May 16, 2024.  Subject to certain conditions, the Parties agreed that the

Debtors would be allowed to use Cash Collateral through the week ending May 17, 2024 to allow the Debtors to continue operating pending the further mediation session.

22.    Prior to the May 16, 2024 mediation (the "Continued Mediation"), the Committees suggested potentially retaining Hilco Global ("Hilco) to assist with running the Sale Process and, as a result, the Debtors promptly provided Hilco with access to their virtual data room.  As discussed more fully below, the Debtors also spent significant amounts of time reviewing the credentials of Hilco and other potential sales agents, meeting with Hilco, and providing Hilco with information and documents about, among other things, their operations and assets in furtherance of the Sale Process.

23.    At the Continued Mediation, among other proposals and exit strategies considered, the Debtors discussed the commencement of a Sale Process to sell the Debtors as a whole and/or their assets.  Although the Debtors and Committees were ready to discuss and formulate terms for the sale and to have the Sale Process begin, ARC was unwilling to participate in such discussions.  ARC advised the Debtors and the Committees that it would not consent to use of cash collateral beyond the May 17, 2024 date.

**The First Enforcement Motion.**

24.    After the Continued Mediation, the Debtors sent multiple emails to ARC to see if a resolution could be reached with ARC to allow for Cash Collateral to be used to preserve the value of the Debtors' assets and to fund the Sale Process contemplated by the 6/6 Stipulation.

25.    After not hearing from ARC for several days, on May 21, 2024, ARC notified the Debtors that it would not consent to the Debtors' use of Cash Collateral unless the principals of the Debtors, Lee Kramer and I (the "Principals"), agreed to forgo all of our salaries (that is, to work for free).

26.    As a result, on May 21, 2024, the Debtors filed an emergency motion [Doc. No. 445] (the "First Enforcement Motion") for an order enforcing the 6/6 Stipulation, and authorizing the Debtors to use Cash Collateral to pay certain expenses pursuant to a proposed budget to

"reasonably fund an auction sale of the Debtors' assets" in accordance with the 6/6 Stipulation. The Enforcement Motion was set for hearing on May 28, 2024 (the "<u>May Hearing</u>").

27.    After the Debtors filed the First Enforcement Motion, and over the next week, the Parties engaged in multiple discussions in an attempt to resolve that motion.  Shortly before the May Hearing, the parties reached an agreement that allowed the Debtors to use Cash Collateral to pay certain expenses through the week of June 7, 2024, subject to two conditions demanded by ARC, that: (1) the "Other Expense – Sales Process" line item in the Budget in the amount of $50,000 will not be paid during the period covered by the First Enforcement Motion, but would remain subject to further discussion among the Parties; (2) the Debtors were only authorized to use Cash Collateral to pay seventy percent (70%) of the salary of Lee Kramer; and (3) the Debtors would not use Cash Collateral to pay any portion of my salary.  *See* (Doc. No. 454) (Agreed Order entered on May 28, 2024).

**The Debtors' Continued Efforts To Move Forward With The Sale Process Contemplated By The 6/6 Stipulation.**

28.    Although ARC stated at the May Hearing that it was "open" to the idea of commencing a Sale Process, their actions show otherwise; ARC appears to be more interested in impeding the efforts by the Debtors and Committees to move the Sale Process along. Specifically, the following summary of events demonstrates ARC's true intentions:

- On **May 28, 2024**, Hilco sent to the Parties some introductory materials related to their potential engagement to run the Sale Process.

- On **May 31, 2024**, Hilco participated in an introductory group call with the Parties (the "<u>First Group Call</u>") regarding, among other things, Hilco's credentials and experience, and a preliminary assessment of a Sale Process of the Debtors' assets.  During and after the First Group Call, ARC stated that it was "open" to a Sale Process conducted by Hilco. However, ARC: (1) wanted Hilco to review and analyze more information about the Debtors before ARC would make a decision on Hilco's retention; and (2) expressed its concerns about Hilco's requested "Retainer Fee" of $125,000, and suggested exploring a bifurcated process

where the Debtors would "pay[] a smaller retainer to get through [Hilco's] basic due diligence period to confirm there is in fact a go to market plan that ARC will support," and pay the remainder around the time when Hilco was ready to publically commence the Sale Process (the "Bifurcated Proposal").  A copy of ARC's email dated June 5, 2024 is attached as **Exhibit "8"** hereto.

- As a result of ARC's concerns, the Debtors (along with their financial advisor) subsequently provided Hilco with a substantial amount of documents (including access to the Debtors' data room containing thousands of documents), and participated in meetings with Hilco regarding, among other things, the Debtors' business operations, assets, revenue forecasts, and other financial information on **June 5 and 6, 2024.**

- On **June 7, 2024**, the Debtors sent to Hilco some additional information, including the Debtors' extended cash flow statement and projections regarding Aftershock's intellectual property and options and purchases.

- On **June 13, 2024**, Hilco determined that it was prepared to move forward as the sales agent to run the Sale Process, and sent to the Debtors a draft engagement agreement. Importantly, after discussions between the Debtors and Hilco regarding ARC's Bifurcated Proposal, Hilco agreed to bifurcate its "Retention Fee" of $125,000 as follows: "(i) $62,500 shall be paid on the date two business days after court approval of the retention of HCF and (ii) the remaining $62,500 shall be paid on the earlier to occur of (i) a closing of a Transaction or (ii) thirty days after court approval of the retention of HCF."  A copy of the Hilco draft retention agreement is attached as **Exhibit "9"** hereto.  Shortly thereafter, Hilco told the Debtors that it was ready to have a second group call with the Parties (the "Second Group Call").

- The Second Group Call, attended by Hilco and the Parties, took place on **June 18, 2024**.  Unfortunately, instead of working constructively with the other Parties to move forward with a Sale Process, ARC (through its CEO, Mr. Tarica) expressed its skepticism about the Sale Process, pointedly criticized the Debtors, questioned Hilco aggressively about the Debtors and the Sale Process, and even appeared to oppose the idea of commencing a Sale Process.  In

addition, ARC essentially sought from Hilco a valuation of the Debtors' assets, despite the fact that Hilco was not to be retained for that purpose.  Due in large part to ARC's conduct on the Second Group Call, shortly after that call, Hilco informed the Debtors that it would voluntarily withdraw itself from consideration as sales agent to run the Sale Process.  Hilco's decision to withdraw is especially illuminating (at least with respect to ARC's intentions and actions to derail the Sale Process) given that Hilco's decision was made only after: (1) previously concluding that it was ready to proceed with the engagement; (2) it spent a significant amount of time meeting with the Debtors, and analyzing a substantial amount of information and documents provided to it by the Debtors over a 3-week period – without receiving any compensation; and (3) ARC's interactions with Hilco at the Second Group Meeting.

- ARC sent an email to the Debtors and the Committers on **June 19, 2024** (the "June Email") stating that: "We would still plan to waive our ability to credit bid above a certain price (which may be the minimum for purposes of Hilco's success fee but may also be a greater amount) for certain buyers but this would be done on an ad hoc basis as we evaluate the seriousness of various buyers and their plans," and even acknowledged that its proposal to "set [the] reserve price [at] $14m" would mean that "Hilco won't take the engagement."[24]

29.    Unfortunately, after the Debtors expended substantial amounts of time and effort working with Hilco to provide Hilco with the information they needed, Hilco is no longer interested in moving forward to run the Sale Process.  The delay in commencing and moving forward with the Sale Process is due to ARC serving as a roadblock to this process.  At this time, the Debtors need approximately sixty (60) days to find a new sales agent to run the Sale Process contemplated by the 6/6 Stipulation, negotiate the terms of sales agent's engagement, attempt to obtain ARC's and the Committees' consent to the retention, and file an application to employ the sales agent.  The timing of any Sale Process would, in large measure, be dictated by the sales agent, so it is impossible to know at this time whether a sale could be completed within the sixty (60) day time period.  Thus, in the event that the Debtors are able to find a new sales agent and

---

[24] A copy of the June Email is attached as **Exhibit "10"** hereto.

1   such sales agent will not be met by additional hostility from ARC, the Debtors will likely need to

2   use Cash Collateral beyond the sixty (60) days, but the Debtors will limit their current request

3   sixty (60) days so that they can report back to court as to developments occurring during the

4   Period.

5          **The Budget And This Motion.**

6          30.     The Debtors' authority to use Cash Collateral expired on June 21, 2024.

7          31.     Pursuant to this Motion, the Debtors are requesting Cash Collateral solely to

8   enforce the 6/6 Stipulation Order, and to allow them to use Cash Collateral to pay for the

9   expenses to "keep the lights on" set forth in the budget (the "Budget") for the period

10  commencing on the week of June 21, 2024 through the week of August 30, 2024 (the "Period")

11  attached as **Exhibit "1"** hereto, that would allow them to comply with "applicable state and/or

12  federal law," and proceed with the selection and retention of a sale agent to move forward with a

13  sale process.   To be clear, other than basic operating expenses (including the payroll of the

14  critical remaining employees whose services will be needed in conjunction with the sale process)

15  the Debtors are limiting their request to use Cash Collateral solely and exclusively in compliance

16  with the terms of the 6/6 Stipulation.

17         32.     The Debtors are requesting authority to use cash collateral for a period of

18  approximately sixty (60) days because the Debtors cannot continue to request consent and

19  approval for use of Cash Collateral every couple of weeks; and the Debtors believe that they

20  need at least sixty (60) days to find a new sales agent to run the Sale Process contemplated by the

21  6/6 Stipulation, negotiate the terms of sales agent's engagement, attempt to obtain ARC's and the

22  Committees' consent to the retention, and file an application to employ the sales agent.

23  Moreover, as set forth in the Budget, the Debtors are requesting authority to use Cash Collateral

24  to pay, among other expenses: (1) one hundred percent (100%) of employee salaries and benefits

25  that have or will become due during the Period; (2) two periods of "back pay" (the "Back Pay")

26  from November and December 2023 owed to its current and former employees for prior pay

27  / / /

28

periods (*see* week of July 5 and August 30 in the Budget).  With respect to the Back Pay, the Debtors' plan is to completely repay these owed amounts over a three (3) month period (these Back Pay payments are proposed to be made on the weeks that the Debtors are not scheduled to make payments for regular payroll) commencing during this Period.  A chart showing the names of the current and former employees, and the Back Pay amounts owed to these employees through April 2024 are attached as **Exhibit "11"** hereto.

33.    Although the Principals previously agreed to defer payment of all or a portion of their salaries during previous Cash Collateral periods so that the Debtors' other employees could be paid,[25] the Debtors are also requesting that the Principals be paid one hundred percent (100%) of their salaries and benefits during the Period.  The Principals are essential to the Sale Process and have intimate and specialized knowledge about the Debtors' operations and assets, and they should be paid along with all of the other employees for their services.  In fact, in an email dated June 5, 2024, ARC has acknowledged that it needs the full cooperation from the Debtors (*i.e.*, the Principals) through the contemplated Sale Process, and has not contended otherwise.  A true and correct copy of the June 7, 2024 email is attached as **Exhibit "12"** hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of June, 2024 at Sherman Oaks, California.


_____

JONATHAN KRAMER

---

[25] I and Lee Kramer have not been paid for six months and three months respectively, and were only paid 70% of their regular salaries.  ARC made a condition to the Debtors' use of Cash Collateral to, among other things, meet its current payroll obligations the Principals' reduction or suspension of their pay.  In the interests of the Debtors and their current employees, the Principals agreed to the condition imposed by ARC.  However, it is not economically reasonable to expect me to continue to manage the businesses, deal with information requests by ARC and others, and work with any potential sales agent (something Hilco expressly said was necessary) for no compensation whatsoever.  This is a particularly abusive position for ARC to take with respect to my compensation and appears related to ARC's strategy in the ongoing litigation in State Court.

periods (see week of July 5 and August 30 in the Budget). With respect to the Back Pay, the Debtors' plan is to completely repay these owed amounts over a three (3) month period (these Back Pay payments are proposed to be made on the weeks that the Debtors are not scheduled to make payments for regular payroll) commencing during this Period. A chart showing the names of the current and former employees, and the Back Pay amounts owed to these employees are attached as **Exhibit "11"** hereto.

33.    Although the Principals previously agreed to defer payment of all or a portion of their salaries during previous Cash Collateral periods so that the Debtors' other employees could be paid,[25] the Debtors are also requesting that the Principals be paid one hundred percent (100%) of their salaries and benefits during the Period. The Principals are essential to the Sale Process and have intimate and specialized knowledge about the Debtors' operations and assets, and they should be paid along with all of the other employees for their services. In fact, in an email dated June 5, 2024, ARC has acknowledged that it needs the full cooperation from the Debtors (i.e., the Principals) through the contemplated Sale Process, and has not contended otherwise. A true and correct copy of the June 7, 2024 email is attached as **Exhibit "12"** hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of June, 2024 at Sherman Oaks, California.

JONATHAN KRAMER

---

[25] I and Lee Kramer have not been paid for six months and three months respectively, and were only paid 70% of their regular salaries. ARC made a condition to the Debtors' use of Cash Collateral to, among other things, meet its current payroll obligations the Principals' reduction or suspension of their pay. In the interests of the Debtors and their current employees, the Principals agreed to the condition imposed by ARC. However, it is not economically reasonable to expect me to continue to manage the businesses, deal with information requests by ARC and others, and work with any potential sales agent (something Hilco expressly said was necessary) for no compensation whatsoever. This is a particularly abusive position for ARC to take with respect to my compensation and appears related to ARC's strategy in the ongoing litigation in State Court.

# EXHIBIT "1"

**AfterShock Media Payroll and Mip**

| Beginning Balance | 423,259 6/28/2024 | 457,931 7/5/2024 | 190,700 7/12/2024 | 507,420 7/19/2024 | 493,173 7/26/2024 | 613,058 8/2/2024 | 471,355 8/9/2024 | 461,328 8/16/2024 | 369,883 8/23/2024 | 363,636 8/30/2024 | Line Totals | 310,928 9/6/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Inflows** | | | | | | | | | | | | |
| Rive Gauche Receivables | 212,982 | 876 | 441,671 | 117,720 | 242,720 | | 876 | - | | | 1,016,845 | - |
| Rive Gauche Estimated Receivables | | | | - | | | | | | | | |
| Rive Gauche AVOD | 69,202 | | | | | | | | | 210,090 | 279,292 | |
| Other Reimbursements (other inflows) | | | | | | | | | | | - | |
| New Comic Sales (Diamond) | | | | | | | | | | | - | |
| Comic Sales (Comixology/Amazon) | | 500 | | | | | 500 | | | | 1,000 | 500 |
| Aftershock - Comic Sales - Foreign | | | | | | | | | | | - | |
| Other Comic Revenues (Variant Covers, etc) | - | - | - | - | - | - | - | - | - | - | - | - |
| Conventions | | | | | | | | | | | - | |
| Option Fees Film/TV | - | 25,000 | - | - | - | - | - | - | - | 35,000 | 60,000 | - |
| Revolver Loan - no loan | - | - | - | - | - | - | - | - | - | | - | |
| Purchase Price - With Rights | - | - | - | - | - | - | - | - | - | - | - | |
| **Purchase Price** | - | - | - | - | - | - | - | - | - | | - | - |
| LG/BG Issuer Fee | - | - | - | - | - | - | - | - | - | | - | |
| Work Fee Sandton | - | - | - | - | - | - | - | - | - | | - | |
| Guarantee Finders Fee | - | - | - | - | - | - | - | - | - | | - | |
| Forest Road | | | | | | | | | | | - | |
| **Total Income** | 282,184 | 26,376 | 441,671 | 117,720 | 242,720 | - | 1,376 | - | - | 245,090 | 1,357,136 | 500 |

| Beginning Balance | 423,259 6/28/2024 6.30 pr | 457,931 7/5/2024 Nov23 PR | 190,700 7/12/2024 7.15 pr | 507,420 7/19/2024 - | 493,173 7/26/2024 7.30 pr | 613,058 8/2/2024 - | 471,355 8/9/2024 - | 461,328 8/16/2024 8.15 pr | 369,883 8/23/2024 - | 363,636 8/30/2024 8.30 pr/Dec 23 pr | Line Totals | 310,928 9/6/2024 - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Outflows** | | | | | | | | | | | | |
| Comic Creation Costs | | | | | | | | | | | | |
| Comic Printing Costs (rolled up in creation) | | | | | | | | | | | | |
| **Working Capital (SG&A, Prepaid and Recoupable Costs, etc)** | 124,166 | 228,607 | 74,950 | 14,247 | 97,515 | 141,703 | 11,403 | 91,444 | 6,247 | 297,799 | | 21,079 |
| AfterShock Comics | 25,064 | 24,652 | 22,485 | 10,371 | 12,344 | 8,043 | 2,371 | 24,485 | 2,371 | 17,054 | 149,241 | 12,553 |
| Bank fees | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 800 | 80 |
| Convention expense | | | | 10,000 | | | | | | | 10,000 | |
| Business Meetings/Meals | 500 | 389 | 1,000 | - | | | | 1,000 | | 17 | 2,906 | |
| Copyright Expense | 3,400 | - | 2,000 | - | 2,000 | | 2,000 | | 2,000 | | 11,400 | 2,000 |
| Entertainment | | | | | | | | | | | - | |
| Insurance | | | | | | | | | | | | |
| Health | | 5,622 | 3,025 | | | 2,253 | | 3,025 | | 2,969 | 16,894 | 2,253 |
| Liability | | - | - | | - | | | | | - | - | |
| Legal - Sacker | - | 7,500 | | - | - | | | 7,500 | | - | 15,000 | |
| Legal (Neale) | | | | | | | | | | | - | |
| UK Legal | | | 100 | - | | | | | | | - | |
| Marketing | - | - | 100 | - | - | | | 100 | | - | 200 | |
| Computer software utilities | 600 | | | | 600 | | | | | | 600 | 1,800 |
| Microsoft 360 | 580 | | | | 580 | | | | | | 580 | 1,740 |
| Dropbox | 380 | | | | 380 | | | | | | 380 | 1,140 |
| Slack | 335 | | | | 335 | | | | | | 335 | 1,004 |
| Zoom | 114 | | | | 114 | | | | | | 114 | 343 |
| Baseline (studio system) | | | | | | | | | | | | 2,100 |
| Adobe | 15 | | | | 15 | | | | | | 15 | 45 |
| Docusign (paid annually in 2022) | | | | | | | | | | | | |
| Web site maintenance | 750 | | | | 750 | | | | | | 750 | 2,250 |
| Website maintenance | | | | | | | | | | | - | |
| Stuart Rekant DIP Loan Advisor | | - | - | - | - | | | - | - | | - | |
| **US Trustees** | | 855 | | | | | | | | | 855 | |
| Office rent | 1,020 | 2,029 | 1,230 | | 200 | 1,419 | | 1,230 | | 400 | 7,528 | 1,829 |
| Office supplies | | | | | | | | | | | - | |
| Public relations | 5,000 | | | | 5,000 | | | | | | 5,000 | 15,000 |
| Research materials / Decks | 20 | | | | 20 | | | | | | 20 | 60 |
| Shipping, postage | 10,075 | | 10,000 | | 75 | | | 10,000 | | 75 | 30,225 | |
| Social Media | | | | | | | | | | | - | |
| Subscriptions | 520 | | | | 520 | | | | | | 520 | 1,560 |
| Telephone (Ring Central) | 125 | | | | 125 | | | | | | 125 | 375 |
| Taxes - business (rose synder) & various | | 3,392 | 3,500 | | | | | | | | 6,892 | |
| Tax and accounting | 1,550 | 4,786 | 1,550 | 291 | 1,550 | 291 | 291 | 1,550 | 291 | 5,074 | 17,224 | 291 |
| Travel | | | | | | | | | | | - | |
| Airfare | | | | | | | | | | | - | |
| Lodging | | | | | | | | | | | - | |
| Local transportation | | | | | | | | | | | - | |
| Travel-Other | | | | | 4,000 | | | | | | 4,000 | 4,000 |
| Amex - Unclassified aftershock | | | | | | | | | | | - | |
| Web site design/hosting OLD Catergory dont use | | | | | | | | | | | - | |
| Other expense | - | | | | | | | - | - | | - | |
| Variant Cover Expense OLD Catergory dont use | | | | | | | | | | | - | |

| Beginning Balance | 423,259 6/28/2024 | 457,931 7/5/2024 | 190,700 7/12/2024 | 507,420 7/19/2024 | 493,173 7/26/2024 | 613,058 8/2/2024 | 471,355 8/9/2024 | 461,328 8/16/2024 | 369,883 8/23/2024 | 363,636 8/30/2024 | Line Totals | 310,928 9/6/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rive Gauche** | 31,354 | 27,641 | 9,842 | 3,876 | 20,798 | 133,660 | 9,032 | 24,336 | 3,876 | 54,247 | 318,663 | 8,526 |
| US PO Box | | | | | | | | | | | - | |
| Bank fees | 150 | 150 | 150 | 500 | 150 | 150 | 150 | 150 | 500 | 150 | 2,200 | 150 |
| UnitedHealthCare/ Health Insurance | | 400 | | | | | | | | 200 | 600 | |
| Liability Insurance | | | | | | | | | | | | |
| Bob Chapman (Sauer & Wagner) | - | | | | | | | - | - | | - | |
| City of Of Los Angeles / Franchise Tax Board | | 2,800 | | | | | | | | | 2,800 | |
| Copyrights | | | | | | | | | | | - | |
| Dinter Inc. (fso Tomas Silva) | | | | | | | | | | | - | |
| Direct TV | | | | | | | | | | | - | |
| Fotokem | | | | | | | | | | | - | |
| Phil Fiers from Focus Advisory Jawad | | | | | | | | - | - | | - | |
| **US Trustees** | | 2,467 | | | | | | | | | 2,467 | |
| Jon Kramer - Medical | 762 | 762 | | | 762 | | | | | 1,524 | 3,810 | |
| Reimburse Jon Kramer | | | | | | | | | | | - | |
| AMEX reimb Delta #1 | | | | | | | | | | | - | |
| AMEX reimb Platinum #2 | | | | | | | | | | | - | |
| AMEX reimb Delta #2 | | | | | | | | | | | - | |
| Chase 5026 | | | | | | | | | | | - | |
| Chase 5135 | | | | | | | | | | | - | |
| Chase 8313 | | | | | | | | | | | - | |
| Julie Cawood Development | | | | | | | | | | | - | |
| Marketing | | | | | | | | | | | - | |
| Computer software utilities: | | | | | | | | | | | | |
| Microsoft 360 | 550 | | | | 550 | | | | | 550 | 1,650 | |
| Dropbox | | | | | | | | | | | - | |
| Slack | | | | | | | | | | | - | |
| Zoom | 162 | | | | 162 | | | | | 162 | 486 | |
| Comet, Saturn Software | | | | | | | | | | | | |
| Adobe | 20 | | | | 20 | | | | | 20 | 60 | |
| Docusign (paid annually) | | | | | | | | | | | - | |
| Web site hosting | 100 | | | | 100 | | | | | 100 | 300 | |
| Website maintenance | | | | | | | | | | | | |
| Markets/Conventions | | | | | | | | | | | | |
| T-Mobile (due the 9th) | | | 506 | | | | 506 | | | | 1,012 | |
| Michael Bales & other Legal | - | | | | | | | | | | - | |
| Legal (Neale) | | | | | | | | | | | | |
| Office Supplies | - | | | | | | | - | - | | - | |
| Rent - storage unit | | | | | | | | | | | - | |
| Ottera | 5,400 | | 5,400 | | | | | 5,400 | | | 16,200 | |
| Parking | | | | | | | | | | | - | |
| Professional Subscription (C21) annual | | | | | | | | | | | - | |
| Prudential - key man insurance | | | | | | | | | | | | |
| **Robert Half/Temp Accounting** | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 3,215 | 32,150 | 3,215 |
| Rose, Snyder and Jacobs | | 10,000 | | | | | | 15,000 | | | 25,000 | |
| Santa Monica Video (xcogs | 5,134 | 5,000 | | | | 5,134 | 5,000 | | - | 5,134 | 25,402 | 5,000 |
| Synoptek | 1,700 | | 410 | | 1,700 | | | 410 | | 1,700 | 5,920 | |
| MIP (booth construction) & Other | | | | | | | | | | 25,000 | 25,000 | |
| Reed Midem - MIP (booth registration) | | | | | 13,978 | | | | | 13,978 | 27,956 | |
| Payroll Costs (Taxes and Workers Comp) | 161 | 2,847 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 2,514 | 6,649 | 161 |
| MIP travel/hotel costs | | | | | | | | | | | - | |
| MIP meals | | | | | | | | | | | - | |
| Real Screen Travel & Expense | | | | | | | | | | | - | |
| TBI - Mipcom advertising | | | | | | | | | | | - | |
| T&E reimbursements | | | | | | | | - | - | - | - | - |
| World Screen | | | | | | | | | | | - | |
| **Other Expense Sales Agent Retainer** | | | | | | 125,000 | | - | | | 125,000 | |
| AVOD Costs - Creation and Delivery Costs | | | | | | | | | | | - | |
| AVOD Costs - Access Costs | 14,000 | | | | | | | | | | 14,000 | |
| AVOD Costs - Dinter Dubbing | | | | | | | | | | | - | |
| **AfterShock Media Combined Salaries** | 67,748 | 176,313 | 42,623 | - | 64,373 | - | - | 42,623 | - | 226,497 | 620,178 | - |

| Beginning Balance | 423,259 6/28/2024 | 457,931 7/5/2024 | 190,700 7/12/2024 | 507,420 7/19/2024 | 493,173 7/26/2024 | 613,058 8/2/2024 | 471,355 8/9/2024 | 461,328 8/16/2024 | 369,883 8/23/2024 | 363,636 8/30/2024 | Line Totals | 310,928 9/6/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | - | - | - | - | - | - | - | - | - | - |  | - |
| Other Investor Interest and Loan Payments | - | - | - | - | - | - | - | - | - | - |  | - |
| **Growth, Development and Consolidation** |  |  |  |  |  |  |  |  |  |  |  |  |
| Capex Investments (New office FF&E and LHI, IT Hardware) |  |  |  |  |  |  |  |  |  |  |  |  |
| Rive Gauche Royalties and MG Payables | 186,960 | 65,000 | 50,000 | 117,720 | 25,320 | - | - | - | - | - | 445,000 | - |
| **MG's** | 186,960 | 65,000 | 50,000 | 117,720 | 25,320 | - | - | - | - | - | 445,000 | - |
| Donal Macintre's Murder Files 2 - CBS AMC Neworks |  |  |  |  |  |  |  |  |  |  |  |  |
| Donal Macintre's Murder Files 1 - CBS AMC Neworks |  |  |  |  |  |  |  |  |  |  |  |  |
| Disaster déjà vu - Farpoint Films |  |  |  |  |  |  |  |  |  |  |  |  |
| Discovery Networks - Evil Twins 2 |  |  |  |  |  |  |  |  |  |  |  |  |
| Homicide Hunter 7- Jupiter Entertainment |  |  |  |  |  |  |  |  |  |  |  |  |
| Homicide Hunter 8- Jupiter Entertainment |  |  |  |  |  |  |  |  |  |  |  |  |
| Homicide Elite (aka Hotlanta) - Jupiter Entertainment |  |  |  |  |  |  |  |  |  |  |  |  |
| Homicide Elite (aka Hotlanta) Season 2- Jupiter Entertainment |  |  |  |  |  |  |  |  |  |  |  |  |
| Homicide Elite (aka Hotlanta) Season 3- Jupiter Entertainment |  |  |  |  |  |  |  |  |  |  |  |  |
| Homicide Elite (aka Hotlanta) Season 4- Jupiter Entertainment |  |  |  |  |  |  |  |  |  |  |  |  |
| I Saw The Unknown - Hit + Run Creative |  |  |  |  |  |  |  |  |  |  |  |  |
| Killer Truth - CNN |  |  |  |  |  |  |  |  |  |  |  |  |
| My Strange Addiction Still Addicted | 156,960 |  |  | 117,720 | 25,320 |  | - |  |  |  |  |  |
| Something's Killing Me 3 - HLN Network (CNN-TBS, Inc) |  |  |  |  |  |  |  |  |  |  |  |  |
| Trace of Evil - AMC Networks UK |  |  |  |  |  |  |  |  |  |  |  |  |
| Trace of Evil 2 - AMC Networks UK |  |  |  |  |  |  |  |  |  |  |  |  |
| Trace of Evil 3 - AMC Networks UK |  |  |  |  |  |  |  |  |  |  |  |  |
| Very Scary People 1 - CNN Productions |  |  |  |  |  |  |  |  |  |  |  |  |
| Very Scary People 2 - CNN Productions |  |  |  |  |  |  |  |  |  |  |  |  |
| Very Scary People 3 - CNN Productions |  |  |  |  |  |  |  |  |  |  |  |  |
| Very Scary People 4 - CNN Productions | 30,000 | 50,000 | 50,000 |  |  |  | - |  |  |  |  |  |
| Very Scary People 5 - CNN Productions |  | - |  |  |  |  |  |  |  |  |  |  |
| In Their Own Words - Lower Canada Productions Inc. |  |  |  |  |  |  |  |  |  |  |  |  |
| Constand vs. Cosby , Prosperpo |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD - UR Obsolete |  | 15,000 |  |  |  |  |  |  |  |  |  |  |

| | | | | | | | | | | | Line Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | 423,259 | 457,931 | 190,700 | 507,420 | 493,173 | 613,058 | 471,355 | 461,328 | 369,883 | 363,636 | | **310,928** |
| | 6/28/2024 | 7/5/2024 | 7/12/2024 | 7/19/2024 | 7/26/2024 | 8/2/2024 | 8/9/2024 | 8/16/2024 | 8/23/2024 | 8/30/2024 | | 9/6/2024 |
| Estimated Quarterly Royalties (Escrow holding acct) | | | | - | - | - | - | - | - | - | | - |
| | | | | | | | | | | | | |
| **Total Expense** | 311,126 | 293,607 | 124,950 | 131,967 | 122,835 | 141,703 | 11,403 | 91,444 | 297,799 | | 1,533,082 | 21,079 |
| | | | | | | | | | | | | |
| Monthly Cash Movement | (28,943) | (267,231) | 316,720 | (14,247) | 119,885 | (141,703) | (10,027) | (91,444) | (6,247) | (52,709) | (175,946) | (20,579) |
| | | | | | | | | | | | | |
| **Total Cash Balance** | 457,931 | 190,700 | 507,420 | 493,173 | 613,058 | 471,355 | 461,328 | 369,883 | 363,636 | 310,928 | | 290,349 |
| | 75000 | 75000 | 75000 | 75000 | 75000 | 75000 | 75000 | 75000 | 75000 | 75000 | | 75000 |
| **Total Cash Balance without 75K** | 382,931 | 115,700 | 432,420 | 418,173 | 538,058 | 396,355 | 386,328 | 294,883 | 288,636 | 235,928 | | 215,349 |
| | 6/28/2024 | 7/5/2024 | 7/12/2024 | 7/19/2024 | 7/26/2024 | 8/2/2024 | 8/9/2024 | 8/16/2024 | 8/23/2024 | 8/30/2024 | | 9/6/2024 |
| **New Headcount** | 6.30 pr | Nov23 PR | 7.15 pr | | 7.30 pr | | | 8.15 pr | | 8.30 pr/Dec 23 pr | | |
| Ambassador Network - 100 Visits/month | | 10,500 | | | | | | | | | | 9,820 |
| Sarah Pruett | 1,760 | 3,080 | 1,760 | | 1,760 | | | 1,760 | | 5,000 | | |
| Gigi | | 473 | | | | | | | | 536 | | |
| Anne | | 4,833 | | | | | | | | 4,834 | | |
| Kelly | | 5,000 | | | | | | | | 5,000 | | |
| Teddy | | 5,167 | | | | | | | | 5,167 | | |
| Atom Freeman/Prana | | - | | | | | - | | | | | |
| | | - | | | | | | | | | | |
| Lisa Moody | 3,080 | | 3,080 | | 3,080 | | | 3,080 | | 3,080 | | |
| | | | | | | | | | | | | |
| **Scripted Film/Television Development** | | | | | | | | | | | | |
| Dan Shires, VP UK (wire) | 10,000 | 10,000 | | | 10,000 | | | | | | | 20,000 |
| | | | | | | | | | | | | |
| **Lee's Department** | | | | | | | | | | | | |
| Madelyn | | 5,373 | | | | | | | | | | 1,343 |
| David Sigurani (ach) | | 6,500 | 6,500 | | | | | 6,500 | | 6,500 | | |
| | | | | | | | | - | | | | |
| Max Zupanovic - Director, Film/TV | 3,000 | 6,000 | 3,000 | | 3,000 | | | 3,000 | | 9,000 | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **RGTV** | 6.30 pr | Nov23 PR | 7.15 pr | 0 | 7.30 pr | 0 | 0 | 8.15 pr | 0 | 8.30 pr/Dec 23 pr | | 0 |
| Justina Hembrik | 6,200 | 12,400 | 6,200 | | 6,200 | | | 6,200 | | 18,600 | | |
| Jeff Ford | 4,500 | | | | 4,500 | | | | | 4,500 | | |
| | | | | | | | | | | | | |
| **Existing Headcount** | 39,208 | 106,988 | 22,083 | - | 35,833 | - | - | 22,083 | - | 133,117 | | - |
| | | | | | | | | | | | | |
| Joe Pruett | | 8,733 | | | | | | | | 8,733 | | |
| Katherine Jamison | 2,083 | 4,167 | 2,083 | | 2,083 | | | 2,083 | | 6,250 | | |
| Lee Kramer, Amnesia Inc (ach) | 3,375 | 11,250 | 11,250 | | | | | 11,250 | | 11,250 | | |
| Marc Hammond | - | 4,167 | | | - | | | - | | 4,167 | | |
| Brian Cunningham | | 8,333 | | | | | | | | 8,333 | | |
| Ryan Carroll | 3,125 | 6,250 | 3,125 | | 3,125 | | | 3,125 | | 3,125 | | |
| Steve Rotterdam, Bonfire Agency LLC (ach) | 5,625 | 11,250 | 5,625 | | 5,625 | | | 5,625 | | 16,875 | | |
| Jon Kramer Dist - ASC | 12,500 | 12,500 | | | 12,500 | | | | | 25,000 | | |
| Jon Kramer Dist - RGTV | 12,500 | 12,500 | | | 12,500 | | | | | 25,000 | | |
| Antonia | | 8,096 | | | | | | | | 14,513 | | |
| Laurie | | 6,200 | | | | | | | | 3,100 | | |
| Marine | - | 13,542 | - | | | | | - | | 6,771 | | |
| | | | | | | | | | | | | |
| **Hourly Employees** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total Salaries** | 67,748 | 176,313 | 42,623 | - | 64,373 | - | - | 42,623 | - | 226,497 | | - |
| **Total FICA Employer Share** | 2,394 | 8,460 | 1,935 | - | 2,394 | - | - | 1,935 | - | 9,816 | | - |

**EXHIBIT "2"**

**SKLAR KIRSH, LLP**
Robbin L. Itkin (SBN 117105)
*ritkin@sklarkirsh.com*
Kelly Frazier (SBN 212527)
*kfrazier@sklarkirsh.com*
Timothy K. McMahon (SBN 342843)
*tmcmahon@sklarkirsh.com*
1880 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 845-6416
Facsimile: (310) 929-4469

Attorneys for Official Committees of Unsecured
Creditors for Rive Gauche Television and
AfterShock Comics, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:22-bk-11456-MB |
| AFTERSHOCK COMICS, LLC, a California limited liability company,, | Jointly administered with: 1:22-bk-11457-MB (Rive Gauche Television) |
| Debtor and Debtor in Possession. | Chapter 11 |
| In re | **STIPULATION AMONG DEBTORS, OFFICIAL COMMITTEES OF UNSECURED CREDITORS AND ACCESS ROAD CAPITAL, LLC REGARDING SETTLEMENT WITH ACCESS ROAD AND DEBTORS' CONTINUED USE OF CASH COLLATERAL** |
| RIVE GAUCHE TELEVISION, a California corporation, | |
| Debtor and Debtor in Possession. | |
| ☒ Affects both Debtors<br>☐ Affects Aftershock Comics, LLC only<br>☐ Affects Rive Gauche Television only | Hearing Date: June 7, 2023<br>Time: 10:00 a.m.<br>Place: Via ZoomGov<br>Courtroom 303<br>21041 Burbank Boulevard<br>Woodland Hills, CA  91367 |

4886-8235-5048.2
*ACTIVE 687984196v2*

1    AfterShock Comics, LLC ("AfterShock") and Rive Gauche Television ("RGTV," and

2    together with AfterShock, the "Debtors"), the Chapter 11 debtors and debtors in possession herein,

3    the Official Committees of Unsecured Creditors for RGTV and AfterShock (the "Committees"),

4    and Access Road Capital, LLC ("ARC"), each hereby stipulate (the "Stipulation") as follows:

5    **I.    RECITALS**

6    A.    The Debtors commenced the above captioned bankruptcy cases by the filing of

7    voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 19, 2022 (the

8    "Petition Date"), in the United States Bankruptcy Court for the Central District of California, San

9    Fernando Valley Division (the "Court").

10    B.    Since the Petition Date, the Debtors have operated their businesses and managed

11    their affairs as a debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No

12    trustee or examiner has been appointed in the Debtors' bankruptcy cases.

13    C.    On or about January 17, 2023, the United States Trustee appointed the Committees.

14    D.    Aftershock is in the comic creation and publishing business, and RGTV is a

15    film/television production and distribution platform.

16    E.    ARC is the Debtors' senior secured lender. The Debtors originally borrowed money

17    from the Lender in March 2020 in the principal amount of $11,090,000 (the "Loan") pursuant to the

18    "*Second Amended And Restated Credit And Security Agreement*" (the "Loan Agreement," and

19    collectively with the other loan documents, the "Loan Documents"). ARC and the Debtors entered

20    into a subsequent agreement that provided the Debtors with a line of credit in the amount of

21    $2,392,000.  Pursuant to the Loan Documents, the Debtors are jointly and severally liable to repay

22    the Loan, and Lender asserts that the Loan is secured by all, or substantially all, of the Debtors'

23    assets.  ARC filed duplicate proofs of claims in each of the Debtors' bankruptcy cases in the amount

24    of $15,651,159.02 as secured claims.  (Case No. 22-11457-MB, Claim 9-1; Case No. 22-bk-11456-

25    MB, Claim 24-1).

26    F.    On December 21, 2022, the Debtors filed the "*Emergency Motion For Entry Of An*

27    *Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending*

28    *A Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final*

1  *Hearing; And (IV) Granting Related Relief*" [Doc. No. 12] (the "Cash Collateral Motion").

2        G.    The Court previously held an initial hearing, and an evidentiary hearing (the

3  "Evidentiary Hearing") on the Debtors' Cash Collateral Motion seeking interim use of the Senior

4  Secured Lender's "cash collateral" as that term is defined in § 363(a) of the Bankruptcy Code (the

5  "Cash Collateral"). At the conclusion of the Evidentiary Hearing, on January 24, 2023, the Court

6  entered the *Interim Order Re: Debtors' Emergency Motion For Entry Of An Interim Order: (I)*

7  *Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing;*

8  *(II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final Hearing; And (IV)*

9  *Granting Related Relief* [Doc. No. 94] permitting the Debtors to use Cash Collateral on an interim

10  basis.

11        H.    On April 5 and 6, 2023, the Court conducted another hearing on the Debtors'

12  continued use of Cash Collateral (the "Continued Hearing").  After the Continued Hearing, the Court

13  entered the *Second Interim Order Re: Debtors' Emergency Motion For Entry Of An Interim Order:*

14  *(I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing;*

15  *(II) Granting Adequate Protection Replacement; (III) Scheduling A Final Hearing; And (IV)*

16  *Granting Related Relief In Support Thereof* [Dkt. No. 174] allowing the Debtors to continue using

17  Cash Collateral until May 31, 2023.

18        I.    On May 19, 2023, the Debtors filed their *Submission in Support of "Debtors'*

19  *Emergency Motion for Entry of an Interim Order: (I) Authorizing Debtor[s] to Use Cash Collateral*

20  *on an Interim Basis Pending a Final Hearing; (II) Granting Adequate Protection Replacement*

21  *Liens; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief"* [Dkt. No. 213] (the

22  "Submission In Support").

23        J.    Another hearing on the Debtors' Cash Collateral Motion based on the Submission

24  in Support is calendared for June 7, 2023, at 10:00 a.m.

25        K.    This Stipulation has been negotiated at arms-length and is consented to by all

26  parties in good faith, and good cause exists for the entry of an order approving this Stipulation.

27

28

SKLAR KIRSH, LLP
ATTORNEYS AT LAW

4886-8235-5048.2
*ACTIVE 687984196v2*

3

## II.    STIPULATION

Based on the foregoing, the parties stipulate that:

1.    Subject to the terms below, the Debtors are authorized to continue using Cash Collateral through the week of July 28, 2023, in accordance with the proposed budget attached to the Submission In Support.  For purposes of settlement under the terms hereof only, and in full satisfaction and settlement of the claims of ARC against the Debtors and Jon Kramer pursuant to Jon Kramer's personal guaranties, the Debtors shall pay ARC on account of its asserted secured claim, the amount of $14,000,000.00 (the "Settlement Payment") by June 30, 2023 ("Settlement Payment Deadline").  Prior thereto and as a condition hereof, the Debtors and Committees shall file a motion pursuant to Bankruptcy Rule 9019 and obtain an order approving the terms of paragraphs 1 and 2 of this Stipulation.

2.    Upon the Debtors' payment of the Settlement Payment by the Settlement Payment Deadline, ARC shall forever release any and all claims, actions, rights, remedies and defenses that it may have against the Debtors, the Debtors' estates, the Committees and Jon Kramer arising from the Loan Documents and its asserted liens and payment due from the Debtors and/or Jon Kramer; and the Debtors, the Committees and Jon Kramer shall forever release any and all claims, actions, rights, remedies and defenses that they may have against ARC arising from the Loan Documents and ARC's asserted liens and payment due from Debtors and Jon Kramer. As a condition hereof, the Debtors, Committees, ARC and Kramer shall execute a release agreement in form and content acceptable to the parties and following receipt of the Settlement Payment, ARC shall forthwith dismiss the lawsuit currently pending in Los Angeles Superior Court, captioned *Access Road Capital, LLC v. Rive Gauche Television, Aftershock Comics, LLC, Jonathan M. Kramer, et al.*, Case No. 22STCV33196, with each party to bear its own legal fees and costs.

3.    If the Debtors do not timely pay the Settlement Payment by the Settlement Payment Deadline, which deadline can be extended at ARC's election for up to 15 days provided a per diem payment of $2800 is added to the Settlement Payment, then:

a.    there shall be no settlement and no releases and all parties to this Stipulation shall reserve their claims, actions, rights, remedies and defenses as if no settlement were

1    negotiated;

2            b.      the Debtors' use of Cash Collateral to fund operations shall cease

3    immediately, except as may be necessary to comply with any applicable state or federal law

4    with respect to such cessation of business operations;

5            c.      Cash Collateral shall only be used in such limited amount and for such

6    limited time as then agreed upon by the parties or ordered by the Court for the sole purpose

7    of reasonably funding an auction sale of the Debtors' assets; and

8            d.      the deadline for the Committees to challenge ARC's secured claims is

9    extended to August 30, 2023.

10    4.      The Cash Collateral hearing scheduled for June 7, 2023 shall be continued to June 22,

11    2023, or such date as soon thereafter that the Court is available, for the purpose of determining (i)

12    the status of the Debtors' ability to pay the Settlement Payment by the Settlement Payment Deadline,

13    and (ii) absent an agreement among the parties with respect thereto, the amount of Cash Collateral

14    reasonably necessary to be utilized to fund an auction sale of the Debtors' assets, the deadline for

15    such auction sale should the Settlement Payment not be made by the Settlement Payment Deadline,

16    and the allocation and disposition of any proceeds from the sale of the Debtors' assets.

17    5.      In light of the Settlement Payment Deadline, the Debtors' motion to approve the

18    investment or funding transaction that will provide the Debtors with sufficient funds for, among

19    other things, the ability to pay the Settlement Payment by the Settlement Payment Deadline, and a

20    motion to approve the compromise referenced herein, may be heard on an emergency or expedited

21    basis subject to the Court's availability.

22    6.      All parties reserve their rights with respect to any motion filed by the Debtors for

23    approval of an investment or funding transaction that serves as the basis for the Settlement Payment,

24    provided, however, that ARC may not object to any such motion to the extent it provides for a

25    payment in accordance with the terms hereof.

26

27

28

1  DATED:  June 6, 2023                    SKLAR KIRSH, LLP

2

3                                          By:  _____
                                                    */s/ Robbin L. Itkin*
4                                               ROBBIN L. ITKIN
                                                TIMOTHY MCMAHON
5                                               Attorneys for Official Committees of Unsecured
                                                Creditors for Rive Gauche Television and
6                                               AfterShock Comics, LLC

7  DATED:  June ___, 2023                  LEVENE, NEALE, BENDER, YOO
8                                          & GOLUBCHIK L.L.P.

9

10                                         By:  _____
11                                              DAVID L. NEALE
                                                JEFFREY S. KWONG
12                                              Attorneys for Debtors and Debtors in Possession

13

14  DATED:  June ___, 2023                 GREENBERG TRAURIG LLP

15

16

17                                         By:  _____
                                                HOWARD STEINBERG
18                                              Attorneys for Access Road Capital, LLC

19

20

21

22

23

24

25

26

27

28

1    DATED:  June ___, 2023            SKLAR KIRSH, LLP

2

3                                      By:  _____

4                                           ROBBIN L. ITKIN
                                            TIMOTHY MCMAHON
5                                           Attorneys for Official Committees of Unsecured
                                            Creditors for Rive Gauche Television and
6                                           AfterShock Comics, LLC

7    DATED:  June _6__, 2023           LEVENE, NEALE, BENDER, YOO
8                                      & GOLUBCHIK L.L.P.

9

10                                     By:  _____

11                                          DAVID L. NEALE
                                            JEFFREY S. KWONG
12                                          Attorneys for Debtors and Debtors in Possession

13

14   DATED:  June ___, 2023            GREENBERG TRAURIG LLP

15

16

17                                     By:  _____

18                                          HOWARD STEINBERG
                                            Attorneys for Access Road Capital, LLC

19

20

21

22

23

24

25

26

27

28

SKLAR KIRSH, LLP
ATTORNEYS AT LAW          4886-8235-5048.2                      6
                          *ACTIVE 687984196v2*

1  DATED:  June ___, 2023          SKLAR KIRSH, LLP

2

3                                           By: _____

4                                               ROBBIN L. ITKIN
                                                TIMOTHY MCMAHON
5                                               Attorneys for Official Committees of Unsecured
                                                Creditors for Rive Gauche Television and
6                                               AfterShock Comics, LLC

7
   DATED:  June ___, 2023          LEVENE, NEALE, BENDER, YOO
8                                     & GOLUBCHIK L.L.P.

9

10                                          By: _____

11                                              DAVID L. NEALE
                                                JEFFREY S. KWONG
12                                              Attorneys for Debtors and Debtors in Possession

13

14  DATED:  June  6 , 2023          GREENBERG TRAURIG LLP

15

16

17                                          By: _____
                                                HOWARD STEINBERG
18                                              Attorneys for Access Road Capital, LLC

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

1880 Century Park East, Suite 300, Los Angeles, California 90067

A true and correct copy of the foregoing document entitled (*specify*) **STIPULATION AMONG DEBTORS, OFFICIAL COMMITTEES OF UNSECURED CREDITORS AND ACCESS ROAD CAPITAL, LLC REGARDING SETTLEMENT WITH ACCESS ROAD AND DEBTORS' CONTINUED USE OF CASH COLLATERAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **June 6, 2023,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **June 7, 2023, ,** , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

(VIA MESSENGER DELIVERY ON 6/7/23)
Honorable Martin Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 6, 2023 | MAYRA DURAN | /s/ Mayra Duran |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

Keith Patrick Banner on behalf of Interested Party Courtesy NEF
kbanner@greenbergglusker.com, vafanasieva@greenbergglusker.com;calendar@greenbergglusker.com

Sara Chenetz on behalf of Interested Party Courtesy NEF
schenetz@perkinscoie.com, docketLA@perkinscoie.com;cmallahi@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com

Russell Clementson on behalf of U.S. Trustee United States Trustee (SV)
russell.clementson@usdoj.gov

Tracy Green on behalf of Creditor Arancia Studio
tgreen@fennemorelaw.com, ecfbankruptcy@fennemorelaw.com

Robbin L. Itkin on behalf of Creditor Committee Official Committees of Unsecured Creditors for Rive Gauche Television and AfterShock Comics, LLC
ritkin@sklarkirsh.com, mduran@sklarkirsh.com;KFRAZIER@SKLARKIRSH.COM

Michael S Kogan on behalf of Creditor Dog Whisper Productions, LLC
mkogan@koganlawfirm.com

Michael S Kogan on behalf of Creditor Michael Kogan Law Firm, APC
mkogan@koganlawfirm.com

Michael S Kogan on behalf of Interested Party Courtesy NEF
mkogan@koganlawfirm.com

Jeffrey S Kwong on behalf of Debtor AfterShock Comics, LLC
jsk@lnbyg.com, jsk@ecf.inforuptcy.com

Jeffrey S Kwong on behalf of Debtor Rive Gauche Television
jsk@lnbyg.com, jsk@ecf.inforuptcy.com

Timothy McMahon, Jr on behalf of Creditor Committee Official Committees of Unsecured Creditors for Rive Gauche Television and AfterShock Comics, LLC
tmcmahon@sklarkirsh.com, mduran@sklarkirsh.com

Timothy McMahon, Jr on behalf of Interested Party Courtesy NEF
tmcmahon@sklarkirsh.com, mduran@sklarkirsh.com

David L. Neale on behalf of Debtor AfterShock Comics, LLC
dln@lnbyg.com

David L. Neale on behalf of Debtor Rive Gauche Television
dln@lnbyg.com

Howard Steinberg on behalf of Creditor Access Road Capital, LLC
steinbergh@gtlaw.com, pearsallt@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_

**F 9013-3.1.PROOF.SERVICE**

3. **SERVED BY EMAIL (Served Via Email 6/6/23)**

| Committee Members | |
|---|---|
| Martin Katz<br>Lower Canada Productions Inc.<br>Email: martin.katz@prosperopictures.com | Committee Chair<br>Rive Gauche Committee |
| David Frank<br>Indigo Films Entertainment Group<br>Email:  dfrank@indigofilms.com | Committee Member<br>Rive Gauche Committee |
| Brendan Pollitz<br>OTTERA, INC.<br>Email: brendan@ottera.tv | Committee Member<br>Rive Gauche Committee |
| Beverly Rice<br>Jupiter Entertainment<br>Email: beverly@jupiterent.com | Committee Member<br>Rive Gauche Committee |
| Simon Fawcett<br>AS COMICS LTD.<br>Email: Simon@atlanticscreengroup.com | Committee Member<br>AfterShock Committee |
| Jean-Pierre Rose<br>IMPRIMERIE L'EMPREINTE INC.<br>Email:  jprose@empreinte.qc.ca | Committee Member<br>AfterShock Committee |
| Thomas Cho<br>TRI VISION INTERNATIONAL<br>Email : thomascho.trivision@gmail.com | Committee Member<br>AfterShock Committee |
| Jonny Gordon<br>CBS AMC NETWORKS UK CHANNELS<br>PARTNERSHIP<br>Email :  jonny.gordon@amcnetworks.com | Committee Member<br>Rive Gauche Committee |

| Dundon Advisers, LLC | |
|---|---|
| Peter Hurwitz<br>Email: ph@dundon.com<br><br>Michael Whalen<br>Email: mw@dundon.com<br><br>Lee Rooney<br>Email: lr@dundon.com | Proposed Financial Advisors for the Official<br>Committees of Unsecured Creditors for Rive<br>Gauche Television and AfterShock Comics, LLC |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE

# EXHIBIT "3"

**SKLAR KIRSH, LLP**
Robbin L. Itkin (SBN 117105)
*ritkin@sklarkirsh.com*
Kelly Frazier (SBN 212527)
*kfrazier@sklarkirsh.com*
Timothy K. McMahon (SBN 342843)
*tmcmahon@sklarkirsh.com*
1880 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 845-6416
Facsimile: (310) 929-4469

Attorneys for Official Committees of Unsecured
Creditors for Rive Gauche Television and
AfterShock Comics, LLC

FILED & ENTERED

JUN 12 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>AFTERSHOCK COMICS, LLC, a California limited liability company,<br><br>        Debtor and Debtor in Possession. | Case No. 1:22-bk-11456-MB<br><br>Jointly administered with:<br>1:22-bk-11457-MB<br>(Rive Gauche Television)<br><br>Chapter 11 |
| In re<br><br>RIVE GAUCHE TELEVISION, a California corporation,<br><br>        Debtor and Debtor in Possession. | **ORDER GRANTING STIPULATION AMONG DEBTORS, OFFICIAL COMMITTEES OF UNSECURED CREDITORS AND ACCESS ROAD CAPITAL, LLC REGARDING SETTLEMENT WITH ACCESS ROAD AND DEBTORS' CONTINUED USE OF CASH COLLATERAL** |
| ☒  Affects both Debtors<br>☐  Affects Aftershock Comics, LLC only<br>☐  Affects Rive Gauche Television only | Date:        June 7, 2023<br>Time:        10:00 am<br>Crtrm.:      303<br>                 21041 Burbank Blvd.<br>                 Woodland Hills, CA 91367 |

The Court having reviewed and considered the "*Stipulation Among Debtors, Official Committees Of Unsecured Creditors And Access Road Capital, LLC Regarding Settlement With Access Road And Debtors' Continued Use Of Cash Collateral*" ("Stipulation") between AfterShock Comics, LLC and Rive Gauche Television, the Official Committees of Unsecured Creditors and

SKLAR KIRSH, LLP
ATTORNEYS AT LAW

4857-7195-7096.2

1    Access Road Capital, LLC filed on June 6, 2023 [Docket No. 230], and the record in these bankruptcy

2    cases, and good cause appearing therefor,

3        **IT IS HEREBY ORDERED:**

4        1)        The Stipulation is approved in its entirety.

5        2)        The hearing for the *Debtors' Emergency Motion for Entry of Interim Order: (I)*

6    *Authorizing Debtor[s] to Use Cash Collateral on an Interim Basis Pending a Final Hearing; (II)*

7    *Granting Adequate Protection Replacement Liens; (III) Scheduling a Final Hearing; and  (IV)*

8    *Granting Related Relief* (the "Cash Collateral Motion") [Dkt. No. 12] is continued to June 21, 2023,

9    at 9:00 a.m. PST.

10        3)        The log in information for the continued hearing on the Cash Collateral Motion can

11    be found below:

12                Video/audio web address: https://cacb.zoomgov.com/j/1611488543

13                ZoomGov meeting number: 161 148 8543

14                Password: 037066

15                Telephone conference lines: 1 (669) 254 5252 or 1 (646) 828 7666

16

17                                                ###

18

19

20

21

22

23    Date: June 12, 2023

24                                    Martin R Barash
                                      United States Bankruptcy Judge

25

26

27

28

# EXHIBIT "4"

## Re: Aftershock - Cash Collateral Agreed Order and Budget

### Jeff Kropp <jkropp@forestroadco.com>

Tue 11/14/2023 4:55 PM

To:David L. Neale <DLN@lnbyg.com>
Cc:Robbin Itkin <ritkin@sklarkirsh.com>;Jeffrey S. Kwong <JSK@lnbyg.com>;Kelly K. Frazier <kfrazier@sklarkirsh.com>;Howard
J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>

Thanks, David. Confirmed that we received the $25k payment. I appreciate the responses, but then want to confirm that the debtors will be holding off making payroll tomorrow until we are able to get these done as agreed?

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037

forestroadco.com

# EXHIBIT "5"

## Re: Payroll Schedule/Request for Authority to Pay

Jeff Kropp <jkropp@forestroadco.com>

Mon 12/11/2023 3:52 PM

To:David L. Neale <DLN@lnbyg.com>;Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>;Howard J. Steinberg
(steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
Cc:Jeffrey S. Kwong <JSK@lnbyg.com>

Before I share this with Zach, am I reading this correctly that Jon expects us to pay him $25k?

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

---

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Monday, December 11, 2023 3:34 PM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>;
Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** Payroll Schedule/Request for Authority to Pay

All – attached please find an updated payroll schedule for the second half of November and the first half of
December. The December budget is based on a reduced staff as indicated. Also attached to the budget is an
explanation of the services performed by each of the retained employees. As we have been saying, it is
imperative to keep the business operating in order to preserve value and leave open the opportunity to pursue a
transaction that recognizes the going concern value of the enterprise, not just the liquidation sale value (which
everyone agrees would be substantially less). Please let us know if ARC will consent to allow the Debtors to use
cash to pay the payroll for the work already done in November and for the work being done through the end of
this first payroll period in December. We have been cooperating with ARC and will continue to cooperate with
ARC, but the ability to produce information and prepare reports is limited by the staffing situation the Debtors are
dealing with.

Regards,
David

**DAVID L. NEALE,** Esq.

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
2818 La Cienega Avenue | Los Angeles, CA 90034
Phone 310 229 1234 | Direct 310 229 3320 | Mobile 310 849 9448
dln@lnbyg.com | www.lnbyg.com

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

🖐 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY PRIVILEGE OR CONTAINING ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE DELETE THIS MESSAGE AND NOTIFY THE SENDER. PLEASE NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE USING "REPLY ALL."

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

## Re: Job Descriptions

**Jeff Kropp <jkropp@forestroadco.com>**
Wed 12/13/2023 10:48 AM

To:David L. Neale <DLN@lnbyg.com>;Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>;Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
Cc:Jeffrey S. Kwong <JSK@lnbyg.com>

Yes, I do have reason to believe that those people didn't actually do the work because every time we ask for information the response is "well we can't really get people to do anything because they aren't being paid." If they aren't helping prepare financial statements then I assume they aren't doing anything else. So that means that you are asking us to pay them for work that they didn't do and that they should just get paid for the passage of time because they were technically on payroll. We are open to paying for the people that will be critical to preserve value going forward, but it definitely isn't the entire list so Jon needs to be doing the work he should have been doing all along to make the difficult decisions regarding who needs to stay on.

We also all conceptually agreed on where we'd turn our focus if Jon didn't deliver the LC as expected when we gave our last consent in early November and we are no closer to coming to a resolution on any of it. We've been very clear on what we think needs to happen but the debtors and the UCCs seem to prefer to hope something manifests than to focus on the structures we've proposed. If anyone has any feedback to our last proposal from our conversation then we are happy to make that the focus. But continuing to ask us to pay non-essential people (including Jon!), is not productive.

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

---

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Wednesday, December 13, 2023 10:37 AM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>; Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** RE: Job Descriptions
Obviously, the skeleton crew is a subset of the people who worked in November, so the problem remains. Do you have any reason to believe that the people who were on the payroll and actually worked in November didn't do the work that they were expected to do? It's asking a lot of people to keep working when they haven't been paid for the work they already did.
**DAVID L. NEALE,** Esq.
**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
2818 La Cienega Avenue | Los Angeles, CA 90034
Phone 310 229 1234 | Direct 310 229 3320 | Mobile 310 849 9448
dln@lnbyg.com | www.lnbyg.com
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY PRIVILEGE OR CONTAINING
ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE DELETE THIS MESSAGE AND NOTIFY THE SENDER. PLEASE
NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE USING "REPLY ALL."

**From:** Jeff Kropp <jkropp@forestroadco.com>
**Sent:** Wednesday, December 13, 2023 10:23 AM
**To:** David L. Neale <DLN@lnbyg.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>; Howard J.
Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** Re: Job Descriptions

I don't think that is workable. Robbin asked for a list of the skeleton crew back in early November so that
should be our focus since those are the people we really care about.

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

---

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Wednesday, December 13, 2023 10:20 AM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>;
Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** RE: Job Descriptions

Jeff – I haven't talked to Jon about this, but what if we divide this into 2 steps: (1) we pay the payroll related to the
work that was already done in November – there's nothing we can do to reduce that number, and the employees
all worked with the expectation of payment, and (2) we provide further information to justify and/or are able to
pare down the next payroll even further, and we try to do that today so if we can come to an agreement, we can
make the next payroll payment in the ordinary course? It doesn't do anyone any good to lose critical people,
regardless of the direction things go.

If you think something like this is workable, I'll see if this would potentially convince people to stay at their jobs.

**DAVID L. NEALE**, Esq.
**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
2818 La Cienega Avenue | Los Angeles, CA 90034
Phone 310 229 1234 | Direct 310 229 3320 | Mobile 310 849 9448
dln@lnbyg.com | www.lnbyg.com
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

🕐 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY PRIVILEGE OR CONTAINING
ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE DELETE THIS MESSAGE AND NOTIFY THE SENDER. PLEASE
NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE USING "REPLY ALL."

**From:** Jeff Kropp <jkropp@forestroadco.com>
**Sent:** Wednesday, December 13, 2023 9:37 AM
**To:** David L. Neale <DLN@lnbyg.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>; Howard J.
Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** Re: Job Descriptions

We are not comfortable consenting to the requested payroll, particularly anything going to Jon since this
is his fault more than anyone's that this has dragged on so long. While these job descriptions are helpful,
what we really need is for Jon to cut this down to the "skeleton crew" that are essential to a sale (even
though we still aren't convinced that is the correct route to go) with an explanation of why each person is

Re: Job Descriptions

essential and propose that payroll number for us to consider. For example, I can't imagine the company
needs both a full-time publishing assistant and a part-time publishing assistant that have the same job
description.

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

---

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Wednesday, December 13, 2023 9:25 AM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>;
Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** RE: Job Descriptions

Now that you've gotten access and the information on each employee's role at the Debtors, can you
please advise as to ARC's position on use of cash collateral to pay the requested payroll? The Debtors
are on the cusp of losing some key employees if payroll isn't made.

Thanks.

**DAVID L. NEALE**, Esq.

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**

2818 La Cienega Avenue | Los Angeles, CA 90034

Phone 310 229 1234 | Direct 310 229 3320 | Mobile 310 849 9448

dln@lnbyg.com | **www.lnbyg.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY PRIVILEGE OR
CONTAINING ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE DELETE THIS MESSAGE AND
NOTIFY THE SENDER. PLEASE NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE USING "REPLY ALL."

---

**From:** Jeff Kropp <jkropp@forestroadco.com>
**Sent:** Tuesday, December 12, 2023 1:30 PM
**To:** David L. Neale <DLN@lnbyg.com>; Robbin L. Itkin (ritkin@sklarkirsh.com)
<ritkin@sklarkirsh.com>; Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** Re: Job Descriptions

Thanks - we still need the info to get in.

Jeff Kropp

General Counsel

The Forest Road Company

(e): jkropp@forestroadco.com

(c): (386) 216-2037

forestroadco.com

---

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Tuesday, December 12, 2023 1:29 PM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com)
<ritkin@sklarkirsh.com>; Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** RE: Job Descriptions

I will get you that access – we thought you already had access, but if not I'll give you the info needed
to get in.

**DAVID L. NEALE,** Esq.

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**

2818 La Cienega Avenue | Los Angeles, CA 90034

Phone 310 229 1234 | Direct 310 229 3320 | Mobile 310 849 9448

dln@lnbyg.com | www.lnbyg.com

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY PRIVILEGE OR
CONTAINING ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE DELETE THIS MESSAGE AND
NOTIFY THE SENDER. PLEASE NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE USING "REPLY ALL."

---

**From:** Jeff Kropp <jkropp@forestroadco.com>
**Sent:** Tuesday, December 12, 2023 1:25 PM
**To:** David L. Neale <DLN@lnbyg.com>; Robbin L. Itkin (ritkin@sklarkirsh.com)
<ritkin@sklarkirsh.com>; Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** Re: Job Descriptions

Thanks, David. We will review but we are not comfortable consenting to the requested payroll,
particularly when we still don't have access to the dataroom or the financials we requested.

Jeff Kropp

6/26/24, 2:18 PM    Re: Job Descriptions

General Counsel

The Forest Road Company

(e): jkropp@forestroadco.com

(c): (386) 216-2037

forestroadco.com

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Tuesday, December 12, 2023 1:23 PM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Subject:** Job Descriptions

Attached is further information regarding the scope of work performed by each of the employees. Please advise as to ARC's position with respect to the payment of payroll.

**DAVID L. NEALE**, Esq.

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**

2818 La Cienega Avenue | Los Angeles, CA 90034

Phone 310 229 1234 | Direct 310 229 3320 | Mobile 310 849 9448

dln@lnbyg.com | **www.lnbyg.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY PRIVILEGE OR CONTAINING ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE DELETE THIS MESSAGE AND NOTIFY THE SENDER. PLEASE NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE USING "REPLY ALL."

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn

more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

**EXHIBIT "6"**

## Jeffrey S. Kwong

| | |
|---|---|
| **From:** | Zachary Tarica <zachary@forestroadco.com> |
| **Sent:** | Friday, October 27, 2023 12:31 PM |
| **To:** | Jon Kramer; Jeff Kropp |
| **Cc:** | Idan Shani; David L. Neale; Jeffrey S. Kwong; Stuart Rekant; Ethan Rosenbaum |
| **Subject:** | Re: ASM P & L + RGTV Revenue Contribution/Comic IP Option Purchase Prices- Confidential |

Simple questions:

1. Did you provide everything, yes or no... telling us you think you did doesn't help
2. What is the status update of the deal w/ PIF & Sandton and what day are you suggesting we get repaid? In some you say 11/3 and others you say 11/10

Missing payroll is your problem, not ours. Been 100% clear on this from the day we asked for the information.

Let me know how I can be clearer on the position for you

Best,
Zach


--
Zachary Tarica
zachary@forestroadco.com
C: 213.544.6099

**From:** Jon Kramer <Jon@rgitv.com>
**Sent:** Friday, October 27, 2023 12:07 PM
**To:** Zachary Tarica <zachary@forestroadco.com>; Jeff Kropp <jkropp@forestroadco.com>
**Cc:** Idan Shani <idan@forestroadco.com>; David L. Neale (dln@lnbyg.com) <DLN@lnbyg.com>; Jeffrey S. Kwong <JSK@lnbyg.com>; Stuart Rekant <srekant@hti-inc.net>; Ethan Rosenbaum <erosenbaum@forestroadco.com>
**Subject:** Re: ASM P & L + RGTV Revenue Contribution/Comic IP Option Purchase Prices- Confidential
See below in red
Believe we have now delivered responses to all of the Forest Road original questions and responded to Jeff's email regarding clarifications on some of the responses previously sent.
I'll reiterate without approval now we will miss payroll again.

**From:** Zachary Tarica <zachary@forestroadco.com>
**Date:** Friday, October 27, 2023 at 11:53 AM
**To:** Jon Kramer <Jon@rgitv.com>, Jeff Kropp <jkropp@forestroadco.com>
**Cc:** Idan Shani <idan@forestroadco.com>, David L. Neale (dln@lnbyg.com) <DLN@lnbyg.com>, Jeffrey S. Kwong <JSK@lnbyg.com>, Stuart Rekant <srekant@hti-inc.net>, Ethan Rosenbaum <erosenbaum@forestroadco.com>
**Subject:** Re: ASM P & L + RGTV Revenue Contribution/Comic IP Option Purchase Prices- Confidential

Jon, let us know when we have received 100% of the information we requested. At that time, we will review it and determine if a) we have it all b) is sufficient to proceed with allowing you to run payroll. To further reiterate, you do NOT have our permission to do us until we confirm the material is here & sufficient.

Separately, can you give an update on where the deal is now. In some of the notes it says Nov 3 and in others you reference Nov 10. Not suggesting either is ok, but curious which one is the right answer.

--
Zachary Tarica
zachary@forestroadco.com
C: 213.544.6099

**From:** Jon Kramer <Jon@rgitv.com>
**Sent:** Friday, October 27, 2023 11:12 AM
**To:** Zachary Tarica <zachary@forestroadco.com>; Jeff Kropp <jkropp@forestroadco.com>
**Cc:** Idan Shani <idan@forestroadco.com>; David L. Neale (dln@lnbyg.com) <DLN@lnbyg.com>; Jeffrey S. Kwong <JSK@lnbyg.com>; Stuart Rekant <srekant@hti-inc.net>; Ethan Rosenbaum <erosenbaum@forestroadco.com>
**Subject:** FW: ASM P & L + RGTV Revenue Contribution/Comic IP Option Purchase Prices- Confidential

Zach

Please find the latest projected P & L for'23. The information contained will answer Questions 2,3,7 and 10. Note there are 2 tabs below on this document . I tab is for the '23 P &L and other for a chart for '23 with the contribution of revenue by title.

We have put the '24 budget on hold as there are factors at work outside of our control that we need further information on to evaluate any reasonable budget projections. They are as follows.

1.The effect of the writers' strike on the timing of projected option payments and production starts.

2.The date of the end of the SAG strike also impacts timing of option and production start payments

3. New and updated information as to the timing and cost of AVOD launches received at MIPCOM last week that we are just starting to evaluate and require further discussions with our platform partners.

4. The timing of a cash infusion that would trigger future anticipated revenue generating activity

Also attached is the ASC RGTV Employee list which will answer Forest Read question #4.

Lastly the option/purchase deals for the Comic IP's are attached. This is in response to #8 promised and shows the options sums received to date or expected to be received shortly and

contractual purchase price when a show is picked up for production.

Believe we have now delivered responses to all of the Forest Road original questions and responded to Jeff's email regarding clarifications on some of the responses previously sent. .

Per your email below please send us your approval of the cash colleterial budget for employee payroll. I don't want to be late a second straight time. I have been told under California law penalties exist for not paying employees on time. This will not help either of us going forward.

This material is all "confidential" and should be treated that way under our confidentiality agreement signed on 10/18/23.

**Note: This e-mail and any attachments are intended solely for the individual or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure under federal and/or state law. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, is prohibited. If you have received this e-mail in error, please contact the sender by return e-mail and delete and/or otherwise destroy the original message and all copies.**

We will continue to endeavor in good faith to responding to any needs of the company (including cash collateral motion for salaries) once we receive 100% of the information we told you we needed on October 15th

Glad we are on the same page, let us know when we can expect the rest of the list from Jeff's email & including the things you said we received which were insufficient.

--
Zachary Tarica

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

Forest Road is a trade name for The Forest Road Company, LLC, and its subsidiaries and affiliates. Investment banking services and securities are offered through Forest Road Securities, LLC (member FINRA, SIPC). To learn more about Forest Road Securities, LLC and its representatives please follow the link to BrokerCheck. Investment advisory services are provided through Forest Road Asset Management LLC. This message and any attachments contain confidential information which is intended only for the individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such message to regulators, law enforcement, or in litigation and as required by law.

# EXHIBIT "7"

**Jeffrey S. Kwong**

| | |
|---|---|
| **From:** | Jeff Kropp <jkropp@forestroadco.com> |
| **Sent:** | Friday, February 9, 2024 11:15 AM |
| **To:** | Jeffrey S. Kwong; David L. Neale; Robbin L. Itkin (ritkin@sklarkirsh.com) |
| **Cc:** | Jon Kramer; Stuart Rekant; Howard J. Steinberg (steinbergh@gtlaw.com) |
| **Subject:** | Re: Request for Call |

Hi Jeffrey,

We are willing to approve these payments subject to a couple conditions. Please let us know if one or both of these work for your client.

1. We are willing to consent to the $36,057 to Robert Half and Lisa Moody if Jon provides us with:
   a. The final 2022 financial statements for Rive Gauche and Aftershock (we have the 2023 estimated financials that you recently sent but would like 2022 as well); and
   b. All documents/correspondence related to discussions with Oak Hill and Sam Adams along with confirmation that we've been provided with everything.

2. We are willing to consent to the remainder of the requested amounts if Jon agrees to turn over his house to us so that we can end the separate litigation against him and both sides can stop incurring those costs. We are willing to take it subject to the existing liens and the homestead exemption.

Thanks,

Jeff

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

**EXHIBIT "8"**

# Jeffrey S. Kwong

| | |
|---|---|
| **From:** | Jeff Kropp <jkropp@forestroadco.com> |
| **Sent:** | Wednesday, June 5, 2024 5:39 PM |
| **To:** | Jeffrey S. Kwong |
| **Cc:** | steinbergh@gtlaw.com; David L. Neale; Kelly K. Frazier; Robbin Itkin |
| **Subject:** | Re: Aftershock - Cash Collateral Request |

Jeffrey -

1. I would characterize our view on the sales process as something we are "open to" but stating that we are prepared to support it when nothing has really been done is a bit too strong.

2. When is the Debtors' meeting with Hilco to provide context for them for the preliminary information they have?  The group meeting with them was 5 days ago so I'm not sure why this hasn't happened already and the lack of urgency on the Debtors part is concerning.  It seems like they are intentionally delaying just to try to extend the use of cash collateral so let me be clear - we will not be consenting to the use of cash collateral until this meeting has occurred and Hilco has come back to the group with their preliminary thoughts and we can discuss next steps regarding their retention and fees, such as potentially paying a smaller retainer to get through their basic due diligence period to confirm there is in fact a go to market plan that we are supportive of.  Hopefully the Debtors are meeting with them tomorrow and then we can schedule a meeting with them for Friday to come up with a plan on those things.

3. Hilco stated on the call that they only needed 2 weeks to do its diligence and come up with a go to market strategy, so asking for 5 weeks to use cash collateral is a bit of an overreach.  Of course, if Hilco is actually engaged to run the full sales process, we are open to consenting to cash collateral to see that process through, but at this stage I don't see why we'd consent to more than 2 weeks.  Also, if we do agree to engage Hilco to do 2 weeks of diligence, any consent to cash collateral beyond that would be subject to Hilco confirming that the Debtors have been responsive and cooperative participants in the process so that we know they are not just trying to drag things out as they've done in the past.

4. We are also open to paying the employees other than Jon/Lee their back pay from November and December, but can you please confirm for us what that total amount is to make all the non-insiders whole?  We understand the judge's frustration, but we also feel that we are being unfairly accused by the Debtors of shouldering the blame for this as Howard pointed out in court.  All those employees made a choice to continue working without pay at the time and they were free to leave the company instead, plus it was the Debtors choice to try to strong arm us into providing consent as they've continued to do every step of the way.

Thanks,

Jeff

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

# EXHIBIT "9"

**Hilco**
Corporate Finance

401 N. Michigan, Suite 1630 | Chicago, IL 60611

June [], 2024

John Kramer
Chief Executive Officer
AfterShock Media
15030 Ventura Blvd
Sherman Oaks, CA 91403

Re: Agreement to Provide Investment Banking Services

Mr. Kramer:

This engagement agreement (the "Agreement") describes the agreement between Aftershock Comics LLC, and Rive Gauche Television (collectively "you", the "Company", or "Debtor"), and Hilco Corporate Finance, LLC ("HCF") regarding certain investment banking services that HCF will provide to the Company as described below.  Specifically, we have agreed as follows:

1. **Scope of Services**

On December 19, 2022, the Company commenced a case under Chapter 11 of the Bankruptcy Code that is currently pending before the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), Case No. 22-11457 (the "Chapter 11 Case"). The Company is retaining HCF, subject to Bankruptcy Court approval, as its exclusive investment banker for the possible sale, merger, acquisition, reorganization, financial restructuring, or recapitalization of the Company, its business or assets, or any portion thereof in a single or multiple transactions including, without limitation, a sale of assets under Section 363 of the Bankruptcy Code (collectively or individually referred to herein as a "Transaction"), on the terms and subject to the conditions set forth herein.  We anticipate that our services (the "Services") pursuant to this Agreement will include the following:

Transaction Services. We expect that our services with respect to a Transaction will include:

a. Familiarizing ourselves to the extent that we deem appropriate with the commercial, financial, operational, and legal circumstances of the Company.

b. Identifying and recommending to the Company potential buyers and capital sources in connection with a Transaction.

c. With the Company's assistance, creating written materials (e.g., a "teaser," and form of  Non-Disclosure

After Shock Media
June [], 2024
Page 2

      Agreement) to be used in presenting the Transaction opportunity to prospective buyers and capital sources.  Prior to distribution of these materials, the Company shall review, comment on, and provide written approval for their use in connection with a Transaction.

    d.   Soliciting and review proposals and making recommendations and advising the Company in negotiating proposals concerning a Transaction.

    e.   Assisting the Company in responding to the due diligence review of potential buyers, including by managing a Virtual Data Room (VDR), and assisting the Company in organizing, populating, and maintaining the VDR.

    f.   Assisting the Company and its other professional advisors in recommending and negotiating bidding procedures, a sale timeline, and auction guidelines.

    g.   Assisting the Company in soliciting and evaluating acquisition proposals, including during an auction held pursuant to the bidding procedures.

    h.   Assisting the Company and its other professional advisors in negotiating definitive documentation concerning a Transaction and otherwise assisting in the process of closing a Transaction.

    i.   As necessary, providing testimony and other litigation support services to assist the Company in obtaining court approval of the bidding procedures, motion to approve a sale, and other matters related to the sale process and Transaction.

As used herein, the term "Transaction" shall mean and include any transaction or series of related transactions that constitute the sale or disposition to one or more third-parties (including without limitation any person, group of persons, partnerships, corporation, limited liability corporation, or other entities, and also including, among others, any of the existing owners, shareholders, members, employees, or creditors of any entity comprising the Company and/or the affiliates of each) of: (a) all or a material portion of the equity securities or membership interests of any entity comprising the Company or any interest held by any entity comprising the Company; and/or (b) any significant portion of the assets (including the assignment of any material contracts) or operations of any entity comprising the Company or any joint venture or partnerships or other entity formed by the Company, in either case including without limitation through: (a) a sale or exchange of capital stock, options, or assets with or without a purchase option; (b) a merger, consolidation, or other business combination; (c) an exchange or tender offer; (d) a recapitalization;  (e) the formation of a joint venture, partnership, or similar entity; and/or (f) any similar transaction. For avoidance of doubt, a "Transaction" shall include, without limitation: (a) any sale pursuant to section 363 of the Bankruptcy Code, whether effectuated through a credit bid, a cash payment, or the assumption of liabilities, or any combination thereof; and (b) a Plan that either incorporates a sale of the Company's assets or equity interests in the Company or that is a "new money" Plan.

    2.  **Fees and Expenses**

As compensation for our Services, the Company shall pay HCF the following:

    a)   The Company shall pay a Retainer Fee (the "Retainer Fee") of $125,000 for the services provided in connection with this engagement, with the fee structure as follows:  (i) $62,500 shall be paid on the date two business days after court approval of the retention of HCF and (ii) the remaining $62,500 shall be paid on the earlier to occur of (i) a closing of a Transaction or (ii) thirty days after court approval of the retention of HCF

After Shock Media
June [], 2024
Page 3

> HCF shall extend a 100% credit towards the aggregate Retainer Fee, applied to any Transaction Fee as described in paragraph 2.b.

b) The Company shall pay HCF a fee (the "Transaction Fee") upon the closing date with respect to, and as a condition to the closing of, the Transaction, which Transaction Fee shall be paid directly out of the gross proceeds (or in the case of a credit bid without a cash component or with a cash component less than the amount of the Transaction Fee (as defined below), HCF will be entitled to an allowed administrative claim against the Debtor's estate) of the Transaction Fee, in an amount equal to 3.0% of the Transaction Value (as defined below).

c) Additionally, the Company shall reimburse HCF for all our reasonable expenses incurred in connection with this Agreement, including those related to travel, meals, lodging, and attorneys' fees as well as ancillary costs such as research, printing, duplicating, postage and shipping, database access charges, and other miscellaneous expenses incurred prior to termination or expiration of this Agreement. HCF shall bill the Company for its reimbursable expenses each month. Invoices are due and payable on the date of issue and the Company hereby agrees to pay any such invoices within thirty (30) days of the invoice date.

For the purpose of calculating a Transaction Fee, "Transaction Value" shall include without limitation and without duplication: (i) all cash (including escrowed amounts, and other withheld amounts) paid or payable to the Company or its securityholders, including holders of the Company's or any of its subsidiaries' common stock, preferred stock, options and warrants (collectively, the "Sellers"), by the investor or purchaser in the Transaction (the "Buyer"); (ii) the fair market value of all notes, securities, and other property issued or delivered or to be issued or delivered to the Sellers by Buyer; (iii) all Seller liabilities, including all debt and guarantees, directly or indirectly assumed, refinanced, cancelled, extinguished, credit bid, or consolidated by the Buyer (other than contract and lease liabilities assumed for ordinary course post closing expenses) ; (iv) the amount of all installment payments to be made by the Buyer to the Sellers; (v) the net present value of any contingent payments (whether or not related to future earnings or operations) to be paid by the Buyer to the Sellers; and (vi) the amount of any extraordinary dividends or distributions paid by the Buyer to the Sellers in connection with or contemplated by the Transaction. For purposes of computing "Transaction Value" hereunder, non-cash consideration shall be valued as follows: (a) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal or other reputable source reasonably designated by HCF if The Wall Street Journal does not publish such closing prices) for the five trading days prior to the closing of the Transaction, (b) options shall be valued using the treasury stock method without giving effect to tax implications, and (c) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by HCF and the Company.

3. **Term of Agreement**

This Agreement shall commence as of June [], 2024 (the "Effective Date") and shall continue until the earlier to occur (the "Term") of (a) 12 months from the date hereof, unless extended by mutual agreement of the parties or (b) the date on which either party provides written notice to the other of

After Shock Media
June [], 2024
Page 4

a termination of the Agreement. Upon any expiration or termination of this Agreement, (i) the provisions of this Paragraph 2 and Paragraph 3 shall survive to the extent such provisions relate to the payment of fees and expenses due or accrued on or before the effective date of any expiration or termination and (ii) the provisions of Annex 1 (General Business Terms) and Annex 2 (Indemnification) shall also survive the expiration or termination of this Agreement and shall remain in effect.

4.    **General Business Terms**

At and as a condition to the effectiveness of this Agreement, the Company shall agree to the General Business Terms set forth in Annex 1 hereto, which are an integral part hereof and are hereby incorporated by reference.

5.    **Indemnification**

At and as a condition to the effectiveness of this Agreement, the Company shall agree to the indemnification provisions set forth in Annex 2 hereto, which are an integral part hereof and are hereby incorporated by reference.

6.    **Bankruptcy Matters**

HCF understands that certain of the Services and consummation of a Transaction may occur in the Company's Chapter 11 Case.  The Company agrees to seek prompt approval of the Bankruptcy Court to retain HCF, effective as of the filing of the employment application on the terms set forth in this Agreement.  Under such circumstances, the terms of HCF's engagement shall remain subject to entry of an order of the Bankruptcy Court, in form and substance acceptable to HCF in its sole discretion, approving such engagement.

If the foregoing correctly sets forth our understanding, please sign and return an executed copy of this Agreement to us, whereupon this Agreement shall constitute a binding agreement as of the date first above written.  Electronic signatures that comply with applicable law shall be deemed original signatures.

After Shock Media
June [], 2024
Page 5

Sincerely,

**HILCO CORPORATE FINANCE, LLC**

By: _____
    Richard Klein
    Senior Managing Director
    Date:_____

AGREED TO AND ACCEPTED BY:

**[Company Name]**

By: _____

    _____

    _____

    Date: _____

Attachments:
Annex 1
Annex 2

After Shock Media
June [], 2024
Page 6

## ANNEX I: GENERAL BUSINESS TERMS

1. **Conditions to Our Services**. HCF makes no representations or warranties concerning the Company's ability to complete a transaction, including a Transaction. Our services will be provided solely on a reasonable efforts basis, with no guarantee as to the results. Moreover, the Company retains the exclusive right to decide whether and on what terms to complete a transaction. Except as specifically contemplated herein, HCF shall not have any obligation or responsibility to provide accounting, audit, tax, or business consulting services for the Company and shall have no responsibility to provide any valuation opinion, solvency opinions, or fairness opinions. The Company confirms that it will rely on its own counsel, accountants, and similar expert advisors for legal, accounting, tax, and other similar advice.

2. **Cooperation**. The Company acknowledges and confirms that, in rendering the Services, HCF will be using and relying on, and assuming the accuracy of, without any independent verification, data, material, and other information (collectively, the "Information") furnished to HCF by or on behalf of the Company or other third parties (including their agents, counsel, employees, and representatives). The Company represents and warrants that it shall not provide any Information to HCF in violation of any confidentiality obligations it may have. The Company understands that HCF will not be responsible for independently verifying the accuracy of the Information and shall not be liable for inaccuracies in any such Information. The Company will cooperate with HCF in all phases of HCF's performance of the Services. Unless required by law (including pursuant to a subpoena or other legal process after providing the Company with reasonable notice and an opportunity to engage on such legal process, to the extent legally permissible), HCF will not disclose to any third party (other than HCF's counsel) any confidential and proprietary Information provided by the Company, except (i) with the Company's consent or (ii) in furtherance of HCF's performance of the Services hereunder.

7. **Entire Agreement. Counterparts. Validity and Enforceability.** This Agreement constitutes the entire Agreement between the parties and supersedes and cancels all prior or contemporaneous arrangements, understandings, and agreements, written or oral, between them relating to the subject matter hereof. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts. Each of such counterparts shall be deemed to be an original, and all such counterparts, taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally effective as delivery of a manually executed counterpart. This Agreement may not be amended or modified, nor may any provision be waived, except in writing signed by both parties. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

8. **Affiliation.** The Company acknowledges that HCF has been retained only for the limited purposes specified herein and that the Company's engagement of HCF is not deemed to be on behalf of and is not intended to and does not confer rights upon any party other than the Company. No one other than the Company is authorized to rely upon the engagement of HCF hereunder or any statements, advice, opinions, or conduct of HCF. The Company further understands and acknowledges the following: (a) HCF is the investment banking affiliate of Hilco Trading, LLC (together with its other affiliates and subsidiaries, including HCF, "Hilco"); (c) From time to time, Hilco (and/or its officers, directors, and equity holders/members) may represent, partner with, perform services for, provide capital to, or otherwise pursue opportunities or transactions with businesses that are business competitors with the Company or participants in the industries in which the Company does business.  To the fullest extent permitted by law, the Company hereby waives any conflict of interest that now exists or may hereafter arise as

After Shock Media
June [], 2024
Page 7

a result of such persons' or entities' other business activities; provided, however, that HCF shall not represent a party that is adverse to the interests of the Company in matters related to this engagement without the Company's prior consent, nor shall HCF use or disclose the Company's confidential information except as provided for herein; and (c) Nothing in this Agreement is intended to prohibit or limit any of Hilco's (and/or its officers, directors, and equity holders/members) business activities now or in the future.

9. **Advertisements.** Upon the consummation of a transaction, HCF may describe its Services to third parties, including in written marketing materials, consistent with any confidentiality obligations concerning such Services.

10. **Governing Law and Arbitration.** This Agreement will be governed by, and construed in accordance with, the laws of the State of Utah applicable to agreements made and to be performed entirely in such State, without giving effect to the choice of law provisions thereof. Any claim or dispute arising out of or related to this Agreement shall be heard by the United States Bankruptcy Court for the District of Utah. In the event of any dispute arising out of or in connection with this Agreement, the prevailing party shall be entitled to an award of actual attorneys' fees and costs incurred in connection therewith.
THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATING TO OR ARISING OUT OF THE ENGAGEMENT OF HCF PURSUANT TO, OR THE PERFORMANCE BY HCF OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.

11. **Power and Authority.** The Company has all requisite corporate power and authority to enter into this Agreement. This Agreement has been duly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid, and binding agreement of the Company, enforceable in accordance with its terms.

12. **No Third-Party Claims.** No (a) direct or indirect holder of any equity interests or securities of HCF whether such holder is a limited or general partner, member, stockholder, or otherwise, (b) affiliate of HCF, or (c) director, officer, employee, representative, or agent of HCF, or of an affiliate of HCF or of any such direct or indirect holder of any equity interests or securities of HCF (collectively, the "HCF Party Affiliates") shall have any liability or obligation of any nature whatsoever to any party, including the Company, in connection with or under this Agreement or the transactions or Services contemplated hereby, and the Company waives and releases all claims against such HCF Party Affiliates related to any such liability or obligation.

13. **Successors and Assigns.** The benefits of this Agreement, including without limitation Annex 2 hereto, shall inure to the respective successors and permitted assigns of the parties hereto and any Indemnified Person, and their respective successors, permitted assigns, and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns. This Agreement, including Annex 2 hereto, may not be assigned without the prior written consent of the non-assigning party (or parties).

14. **Force Majeure.** HCF shall not be liable for delays in the performance of the Services due to causes beyond the reasonable control of HCF or its personnel or subcontractors including, but not limited to, fire, flood, earthquake, tempest, labor dispute, war, pandemic, act of God, embargo, civil commotion, governmental regulation, or terrorist attack; provided that HCF will use commercially reasonable efforts to work around any such cause and to resume performance of the Services as quickly as reasonably possible in the circumstances.

15. **Non-Solicitation**. During the term of this Agreement and for a period of one (1) year after the expiration or termination of this Agreement for any reason whatsoever, neither party shall, directly or indirectly: (a) solicit, hire or otherwise engage or retain as an employee or independent contractor, any individual who was an employee of or an independent contractor to the other party at any time during the term of this Agreement; or (b) induce any individual who is an employee of or an independent contractor to the other party to terminate his/her employment or independent contractor relationship with that party.

After Shock Media
June [], 2024
Page 8

16. **Notices.** All notices required or permitted to be delivered under this Agreement shall be sent, as follows: (a) to HCF, c/o Hilco Trading, LLC, 5 Revere Drive, Suite 206, Northbrook, Illinois 60062, Email: sbaker@hilcoglobal.com, Attn: Sarah K. Baker, and (b) to the Company, to the address set forth above to your attention, or to such other name or address as may be given in writing to the other party.  All notices under this Agreement shall be deemed sufficient if delivered by electronic mail or overnight mail to the notice parties mentioned above. Any notice shall be deemed to be given only upon actual receipt.

17. **Construction.** The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The word "including" shall mean including without limitation.

After Shock Media
June [], 2024
Page 9

**ANNEX 2 INDEMNIFICATION**

This Annex 2 is a part of and is incorporated into that certain letter agreement (the "Agreement"), dated June [], 2024, by and between the Company and HCF. Capitalized terms not defined herein shall have the same meaning given to them in the Agreement.

A.  <u>Indemnification</u>.  To the fullest extent lawful, the Company will promptly, upon demand, indemnify and hold harmless HCF its affiliates, and each of their directors, officers, employees, agents, members and controlling persons (any or all of the foregoing hereinafter referred to as an "Indemnified Person"), from and against all losses, claims, damages, expenses (including reasonable fees and disbursements of counsel and accountants), costs (including, without limitation, expenses, fees and disbursement and time charges related to giving testimony or furnishing documents in response to a subpoena or otherwise) and liabilities (joint or several), (collectively, "Losses"), resulting directly or indirectly from any threatened or pending investigation, action, claim, proceeding or dispute, including securityholder actions (whether or not HCF, its affiliates, or any other Indemnified Person is a potential or actual named party or witness) (collectively, a "Claim"), which (1) are related to or arise out of any willful or grossly negligent acts or omissions of the Company; (2) are related to or arise out of the breach by the Company of any provision of this Agreement; (3) are related to or arise out of any untrue statement or alleged untrue statement of a material fact contained in any oral or written information provided to HCF, its affiliates, or any other person by the Company or used by the Company in connection with the transaction contemplated by this Agreement or any omission or alleged omission by the Company to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (4) are otherwise related to or arise out of HCF's engagement, role, activities or the performance or non-performance of the Services on the Company's behalf. The Company will not be responsible, however, for any Losses pursuant to clause (2) of the preceding sentence which are judicially determined to have resulted from the willful misconduct or gross negligence of any Indemnified Person seeking indemnification hereunder. The Company also agrees that neither HCF, its affiliates, nor any Indemnified Person shall have any liability to the Company, its owners, parents, creditors or securityholders for or in connection with its engagement, except such liability for Losses incurred by the Company which are judicially determined to have resulted from HCF's willful misconduct or gross negligence. For purposes of the foregoing, "judicially determined" shall mean determined by a court of competent jurisdiction in a final non-appealable judgment on the merits.

B.  <u>Proceedings</u>. HCF will notify the Company if it learns that any investigation, lawsuit, administrative proceeding, or self-regulatory organization proceeding has been instituted based, directly or indirectly, on the transactions which were the subject of HCF's engagement under the Agreement, although failure to do so will not relieve the Company from any obligation or liability it has hereunder or otherwise, except to the extent such failure causes the Company to forfeit substantial rights and defenses. Should any lawsuit, administrative proceeding or self-regulatory organization proceeding (collectively, a "Proceeding") be formally instituted against HCF or any Indemnified Person based, directly or indirectly, on HCF's engagement under the Agreement, the Company will be entitled to

After Shock Media
June [], 2024
Page 10

participate therein and, to the extent that it may wish, to assume the defense of the Proceeding, with counsel reasonably satisfactory to HCF, so long as the Company continues to pay all costs and expenses of the defense and preparation for such Proceeding. Even if the Company assumes the defense of a Proceeding, each Indemnified Person will have the right to participate in such Proceeding and to retain its own counsel at such Indemnified Person's own expense. Furthermore, each Indemnified Person shall have the right to employ its own counsel in any Proceeding and to require the Company to pay all reasonable fees and expenses of such counsel as they are incurred if (1) such Indemnified Person has been advised by such counsel that there may be legal defenses available to it which are different from or additional to defenses available to the Company (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of such Indemnified Person), (2) the Company shall not have assumed the defense of the Proceeding and employed counsel reasonably satisfactory to such Indemnified Person in a timely manner or (3) the Company shall have authorized the employment of such counsel in connection with the defense of the Proceeding.

C.    <u>Contribution</u>. If any indemnification sought by an Indemnified Person pursuant to the terms hereof is held by a court of competent jurisdiction to be unavailable for any reason (other than as a result of the gross negligence or willful misconduct of any such Indemnified Person) or insufficient to hold such Indemnified Person harmless, then the Company and HCF will contribute to the Losses for which such indemnification is held unavailable or insufficient (1) in such proportion as is appropriate to reflect the relative benefits received (or anticipated) from the proposed transaction by the Company on the one hand and the Indemnified Person on the other, in connection with HCF's engagement referred to above (whether or not the transaction contemplated by the engagement is consummated) or (2) if (but only if) the allocation provided in clause (1) is for any reason unenforceable, in such proportion as is appropriate to reflect not only the relative benefits received (or anticipated) from the proposed transaction by the Company on the one hand and the Indemnified Person on the other, but also the relative fault of the Company and the Indemnified Person, as well as any other relevant equitable considerations, in each case subject to the limitation that the contribution by HCF will not exceed the amount of fees actually received by HCF pursuant to HCF's engagement.  IN NO EVENT SHALL HCF OR ANY OTHER INDEMNIFIED PERSON BE OBLIGATED OR LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES. No person found liable for fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation.

D.    <u>Settlement of Claims</u>. The Company will not, without the prior written consent of HCF, which consent will not be unreasonably withheld, settle or compromise or consent to the entry of any judgment in any pending or threatened Claim or Proceeding in respect of which indemnification could be sought hereunder (whether or not HCF or any Indemnified Person is an actual party to such Claim or Proceeding) unless such settlement, compromise or consent includes provisions holding harmless and unconditionally releasing HCF and each other Indemnified Person hereunder from all liability related to or arising out of such Claim or Proceeding, including claims for contribution. The Company shall not be liable for any settlement of any Claim effected by HCF without its written consent (which consent shall not be unreasonably withheld).

After Shock Media
June [], 2024
Page 11

    E.    <u>Miscellaneous</u>. The obligations of each of HCF and the Company are solely corporate obligations. No director, officer, employee, agent, shareholder or controlling person of HCF or the Company shall be subjected to any liability to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement. The Company's indemnity, reimbursement and contribution obligations provided for herein are solely corporate obligations and shall: (1) be in addition to any liability that the Company otherwise may have to HCF and any rights that HCF or any Indemnified Person may have at common law or otherwise; (2) survive the completion or termination of professional services rendered by HCF under the Agreement; (3) apply to any activities prior to this date and any amendment, modification or future addition to HCF's engagement; and (4) inure to the benefit of the heirs, personal representatives, successors, and assigns of HCF and each other Indemnified Person.

Further, if an Indemnified Person (as defined in this Annex 2) is requested or required to appear as a witness in any Action (as defined in this Annex 2) that is brought by or on behalf of or against the Company, or that otherwise relates to this Agreement or the Services, the Company shall reimburse HCF and the Indemnified Person for all reasonable out-of-pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the reasonable fees and disbursements of outside legal counsel. All the indemnification obligations set forth herein and in Annex 2 shall survive, without limitations, a termination or expiration of this Agreement.

If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

The Company hereby consents to personal jurisdiction and service and venue in the United States Bankruptcy Court for the District of Utah THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR PROCEEDING RELATED TO OR ARISING OUT OF HCF'S ENGAGEMENT, ANY TRANSACTION OR CONDUCT IN CONNECTION THEREWITH OR THIS AGREEMENT

# EXHIBIT "10"

## Re: Agenda for Meeting with Hilco

**Jeff Kropp <jkropp@forestroadco.com>**

Wed 6/19/2024 10:26 AM

To:Robbin Itkin <ritkin@sklarkirsh.com>;David L. Neale <DLN@lnbyg.com>;Kelly K. Frazier <kfrazier@sklarkirsh.com>;Peter Hurwitz <Ph@dundon.com>;Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
Cc:Jeffrey S. Kwong <JSK@lnbyg.com>;Jon Kramer <Jon@rgitv.com>;Stuart Rekant <srekant@hti-inc.net>

Thanks Robbin. You are correct about what would happen if the minimum is not achieved but we don't agree as to what happens above that minimum. We would still plan to waive our ability to credit bid above a certain price (which may be the minimum for purposes of Hilco's success fee but may also be a greater amount) for certain buyers but this would be done on an ad hoc basis as we evaluate the seriousness of various buyers and their plans. For example, we may say that for Hilco they earn a success fee for anything over $6m and therefore would just have to pay that fee if we want to credit bid $6.5m. But if a bidder had concerns about the credit bid we could work with Hilco to understand where the buyer is in terms of valuation and give them comfort that we won't credit bid over $8m.

I should qualify all of this by saying that it is also subject to agreement on what the minimum is and how proceeds will be split up. The more favorable the allocation is to us, the more we are willing to be flexible and get closer to a construct like the one you propose. But given that we haven't really seen eye to eye on that previously I'm trying to figure out a way to let the process move forward. We could just say that our reserve price is $14m and then it would all work the way you describe, but I assume in that situation Hilco won't take the engagement so that's the reason I'm trying to get creative.

Jeff Kropp

General Counsel

The Forest Road Company

(e): jkropp@forestroadco.com

(c): (386) 216-2037

forestroadco.com

---

**From:** Robbin Itkin <ritkin@sklarkirsh.com>
**Sent:** Wednesday, June 19, 2024 7:13:05 AM
**To:** Jeff Kropp <jkropp@forestroadco.com>; David L. Neale <DLN@lnbyg.com>; Kelly K. Frazier <kfrazier@sklarkirsh.com>; Peter Hurwitz <Ph@dundon.com>; Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>; Jon Kramer <Jon@rgitv.com>; Stuart Rekant <srekant@hti-inc.net>
**Subject:** Re: Agenda for Meeting with Hilco

Jeff, based on the call yesterday there seems to be confusion regarding credit bidding. What I had been discussing with Howard as a way to protect ARC's concerns is that if the minimum agreed payout amount is not achieved by the sale, then ARC can credit bid, or is deemed to credit bid, and take the assets (with the equity allocation among ARC and estate agreement in place). It makes no sense and could completely chill bidding (and thereby affect ARC's ability to have sale proceeds maximized) for ARC to be able to credit bid at just any point in an auction.

**ROBBIN L. ITKIN**
**PARTNER**

RITKIN@SKLARKIRSH.COM

-

*We are currently working outside the office.  Please email documents to me instead of mailing them to my office.
Thank you.*

-

image

1880 CENTURY PARK EAST, SUITE 300

LOS ANGELES, CA  90067

310.845.6416 **MAIN** | 310.929.4469  **FAX**

310.929.4466 **DIRECT**

WWW.SKLARKIRSH.COM

**CONFIDENTIALITY NOTICE:** This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain
confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended
recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this
transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy
the original transmission and its attachments without reading or saving in any manner. Thank you, Sklar Kirsh, LLP.

---

**From:** Jeff Kropp <jkropp@forestroadco.com>
**Sent:** Tuesday, June 18, 2024 2:17:58 PM
**To:** David L. Neale <DLN@lnbyg.com>; Robbin Itkin <ritkin@sklarkirsh.com>; Kelly K. Frazier
<kfrazier@sklarkirsh.com>; Peter Hurwitz <Ph@dundon.com>; Howard J. Steinberg (steinbergh@gtlaw.com)
<steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>; Jon Kramer <Jon@rgitv.com>; Stuart Rekant <srekant@hti-inc.net>
**Subject:** Re: Agenda for Meeting with Hilco

Before we get into all this we need to hear an update from Hilco as to the value they think they may
be able to get based on what they've learned to date. We are not yet supportive of moving forward
with the process vs chapter 7 or an equitization transaction. Zach will be on the line and he will be the
one Hilco needs to convince. Assuming they are able to do that, then the agenda you've laid out
makes sense to me.

Jeff Kropp

General Counsel

The Forest Road Company

(e): jkropp@forestroadco.com

(c): (386) 216-2037

forestroadco.com

---

**From:** David L. Neale <DLN@lnbyg.com>
**Sent:** Tuesday, June 18, 2024 11:11:00 AM
**To:** Jeff Kropp <jkropp@forestroadco.com>; Robbin L. Itkin (ritkin@sklarkirsh.com) <ritkin@sklarkirsh.com>; Kelly
K. Frazier - Sklar Kirsh LLP (kfrazier@sklarkirsh.com) <kfrazier@sklarkirsh.com>; Peter Hurwitz
<Ph@dundon.com>; Howard J. Steinberg (steinbergh@gtlaw.com) <steinbergh@gtlaw.com>
**Cc:** Jeffrey S. Kwong <JSK@lnbyg.com>; Jon Kramer <Jon@rgitv.com>; Stuart Rekant <srekant@hti-inc.net>
**Subject:** Agenda for Meeting with Hilco

6/26/24, 2:30 PM                                    Re: Agenda for Meeting with Hilco

All – we have put together an agenda for our meeting with Hilco so that we can use our time efficiently.  We have shared the agenda with Hilco and they are prepared to address the topics listed.  If anyone has anything else to add to the agenda, please let us know prior to the meeting.

1.    Engagement Considerations

    Term - initial term and milestones to proceed thereafter

    Fee adjustments for credit bid or pre-existing targets

    Fixed fee payments - Court approval timing

    Engagement letter textual comments/timing

2.    Company's Role

    Data room support

    On going financial updates

    Written material preparation

    management participation in the process

    on going sales management activities

3.    Senior Lender Items

    Agreed target payment

    Credit Bid amount

4.    Timing  Considerations

    initial outreach

    indication of interest

    third party due diligence

    term sheet step

    long form documentation

**DAVID L. NEALE,** Esq.

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK  L.L.P.**
2818 La Cienega Avenue  |  Los Angeles, CA  90034
Phone  310 229 1234  |  Direct  310 229 3320  |  Mobile  310 849 9448
dln@lnbyg.com  |  www.lnbyg.com

6/26/24, 2:30 PM                              Re: Agenda for Meeting with Hilco

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

 Please consider the environment before printing this email.

THIS MESSAGE MAY BE A CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION SUBJECT TO EVIDENTIARY
PRIVILEGE OR CONTAINING ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
DELETE THIS MESSAGE AND NOTIFY THE SENDER.  PLEASE NOTE ALL OF THE RECIPIENTS OF THIS EMAIL BEFORE
USING "REPLY ALL."

Forest Road is a trade name for The Forest Road Company, LLC and its subsidiaries and affiliates. Investment advisory services are provided through Forest
Road Asset Management LLC. Forest Road Securities is the trade name of Forest Road's investment banking division, with such services and securities
offered through About Corporate Finance Corporation (member FINRA, SIPC). To learn more about About Corporate Finance Corporation and its
representatives please follow the link to BrokerCheck. This message and any attachments contain confidential information which is intended only for the
individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to
applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such
message to regulators, law enforcement, or in litigation and as required by law.

**CAUTION:** This email originated from outside of Sklar Kirsh. Do not click links, reply, or open
attachments unless you recognize the sender and know the content is safe.

Forest Road is a trade name for The Forest Road Company, LLC and its subsidiaries and affiliates. Investment advisory services are provided through Forest
Road Asset Management LLC. Forest Road Securities is the trade name of Forest Road's investment banking division, with such services and securities
offered through About Corporate Finance Corporation (member FINRA, SIPC). To learn more about About Corporate Finance Corporation and its
representatives please follow the link to BrokerCheck. This message and any attachments contain confidential information which is intended only for the
individual named. If you are not the named addressee you are strictly prohibited from disseminating, distributing or copying this email. Subject to
applicable law, Forest Road may intercept, monitor, review and retain communications traveling through its networks/systems and may produce any such
message to regulators, law enforcement, or in litigation and as required by law.

**EXHIBIT "11"**

**AfterShock Media Back Payroll Post-Petition**

| | Reset pr | Oct pr | Nov pr | Dec pr | Jan's pr | Feb pr | Mar pr | Apr pr | Totals |
|---|---|---|---|---|---|---|---|---|---|
| **AfterShock Comics** | | | | | | | | | |
| Business Meetings/Meals Reimbursements | | | 288 | 17 | - | | | | 305 |
| Insurance | | | | | | | | | - |
| Health | | | 3,369 | 2,969 | 1,825 | - | - | - | 8,162 |
| Tax and accounting | | - | 5,767 | 4,796 | 3,981 | | | | 14,544 |
| **Rive Gauche** | 4,483 | 9,377 | | | | | | | |
| UnitedHealthCare/ Health Insurance | 762 | 762 | 962 | 962 | 762 | - | - | 1,924 |
| Payroll Costs (Taxes and Workers Comp) | - | - | 2,847 | 2,514 | - | - | - | 5,361 |
| **AfterShock Media Combined Salaries** | 39,183 | 25,000 | 176,133 | 161,901 | 119,245 | 10,875 | 10,875 | 10,875 | 489,905 |
| Ambassador Network - 100 Visits/month | | | 10,500 | 9,820 | | | | | 20,320 |
| Sarah Pruett | | | 3,080 | 3,240 | 1,600 | | | | 7,920 |
| Gigi Williams | | | 473 | 536 | 240 | | | | 1,249 |
| Anne Randulic (Sedgwick) | | | 4,833 | 4,834 | 4,834 | | | | 14,501 |
| Kelly Diodati termed 3.15.24 | | | 5,000 | 5,000 | 5,000 | | | | 15,000 |
| Teddy Leo - Associate/Assistant Editor termed 12.31.23 | | | 5,167 | 5,167 | - | | | | 10,333 |
| Lisa Moody | | | - | | | | | | - |
| Dan Shires, VP UK (wire) | | | 9,816 | 9,777 | 9,771 | | | | 29,364 |
| Madelyn Starr - Coordinator, Global Film & TV termed 12.6.23 | | | 5,377 | 1,343 | - | | | | 6,721 |
| David Sigurani (ach) | | | 6,500 | 6,500 | 6,500 | | | | 19,500 |
| Max Zupanovic - Director, Film/TV | | | 6,000 | 6,000 | 6,000 | | | | 18,000 |
| Justina Hembrik | | | 12,400 | 12,400 | 12,400 | | | | 37,200 |
| Jeff Ford | | | | | | | | | |
| **Existing Headcount** | 39,183 | 25,000 | 106,988 | 97,284 | 72,900 | 10,875 | 10,875 | 10,875 | |
| Joe Pruett - termed 2.4.24 | 8,333 | | 8,733 | 8,733 | 8,733 | | | | 34,533 |
| Katherine Jamison | | | 4,167 | 4,167 | 4,167 | | | | 12,500 |
| Lee Kramer, Amnesia Inc | 5,850 | | 11,250 | 11,250 | 11,250 | 3,375 | 3,375 | 3,375 | 49,725 |
| Marc Hammond termed 3.11.24 | | | 4,167 | 4,167 | 4,167 | | | | 12,500 |
| Brian Cunningham termed 3.8.24 | | | 8,333 | 8,333 | 8,333 | | | | 25,000 |
| Ryan Carroll | | | 6,250 | | - | | - | - | 6,250 |
| Steve Rotterdam, Bonfire Agency LLC | | | 11,250 | 11,250 | 11,250 | | | | 33,750 |
| Jon Kramer Dist - ASC | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 3,750 | 3,750 | 3,750 | 73,750 |
| Jon Kramer Dist - RGTV | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 3,750 | 3,750 | 3,750 | 73,750 |
| Antonia Lianos termed 12.31.23 | | | 8,096 | 14,513 | - | - | - | - | 22,609 |
| Laurie A Carreira termed 12.14.23 | | | 6,200 | 3,100 | - | - | - | - | 9,300 |
| Marine Ksadzhikyan termed 12.15.23 | | | 13,542 | 6,771 | - | - | - | - | 20,312 |
| **Hourly Employees** | | | | | | | | | |
| **Total Salaries** | 39,183 | 25,000 | 176,133 | 161,901 | 119,245 | 10,875 | 10,875 | 10,875 | |
| **Total FICA Employer Share** | 0 | - | 8,461 | 7,422 | 5,328 | 287 | 287 | 287 | |
| | | | 194,180 | Total | Total | Total | Total | | 594,618 |

# EXHIBIT "12"

6/26/24, 2:32 PM
Re: Aftershock - Cash Collateral Request

# Re: Aftershock - Cash Collateral Request

**Jeff Kropp <jkropp@forestroadco.com>**
Wed 6/5/2024 5:38 PM

To:Jeffrey S. Kwong <JSK@lnbyg.com>
Cc:steinbergh@gtlaw.com <steinbergh@gtlaw.com>;David L. Neale <DLN@lnbyg.com>;Kelly K. Frazier
<kfrazier@sklarkirsh.com>;Robbin Itkin <ritkin@sklarkirsh.com>

Jeffrey -

1. I would characterize our view on the sales process as something we are "open to" but stating that we are prepared to support it when nothing has really been done is a bit too strong.

2. When is the Debtors' meeting with Hilco to provide context for them for the preliminary information they have?  The group meeting with them was 5 days ago so I'm not sure why this hasn't happened already and the lack of urgency on the Debtors part is concerning.  It seems like they are intentionally delaying just to try to extend the use of cash collateral so let me be clear - we will not be consenting to the use of cash collateral until this meeting has occurred and Hilco has come back to the group with their preliminary thoughts and we can discuss next steps regarding their retention and fees, such as potentially paying a smaller retainer to get through their basic due diligence period to confirm there is in fact a go to market plan that we are supportive of.  Hopefully the Debtors are meeting with them tomorrow and then we can schedule a meeting with them for Friday to come up with a plan on those things.

3. Hilco stated on the call that they only needed 2 weeks to do its diligence and come up with a go to market strategy, so asking for 5 weeks to use cash collateral is a bit of an overreach.  Of course, if Hilco is actually engaged to run the full sales process, we are open to consenting to cash collateral to see that process through, but at this stage I don't see why we'd consent to more than 2 weeks.  Also, if we do agree to engage Hilco to do 2 weeks of diligence, any consent to cash collateral beyond that would be subject to Hilco confirming that the Debtors have been responsive and cooperative participants in the process so that we know they are not just trying to drag things out as they've done in the past.

4. We are also open to paying the employees other than Jon/Lee their back pay from November and December, but can you please confirm for us what that total amount is to make all the non-insiders whole?  We understand the judge's frustration, but we also feel that we are being unfairly accused by the Debtors of shouldering the blame for this as Howard pointed out in court.  All those employees made a choice to continue working without pay at the time and they were free to leave the company instead, plus it was the Debtors choice to try to strong arm us into providing consent as they've continued to do every step of the way.

Thanks,

Jeff

Jeff Kropp
General Counsel
The Forest Road Company
(e): jkropp@forestroadco.com
(c): (386) 216-2037
forestroadco.com

---

**From:** Jeffrey S. Kwong <JSK@lnbyg.com>
**Sent:** Wednesday, June 5, 2024 3:56 PM
**To:** Jeff Kropp <jkropp@forestroadco.com>
**Cc:** steinbergh@gtlaw.com <steinbergh@gtlaw.com>; David L. Neale <DLN@lnbyg.com>; Kelly K. Frazier

6/26/24, 2:32 PM                                    Re: Aftershock - Cash Collateral Request

<kfrazier@sklarkirsh.com>; Robbin Itkin <ritkin@sklarkirsh.com>
**Subject:** Aftershock - Cash Collateral Request

Jeff –

The Debtors' authority to use cash collateral expires this week, and we are requesting consent to cash collateral usage pursuant to the attached budget for the next 5 weeks to pay the "bare bones" expenses to keep the lights on so that, among other reasons, the value of their assets and/or businesses can be preserved while all parties explore the retention of a sales agent and the sales process.

Howard stated at yesterday's hearing that ARC was prepared to support a sales process if, after some further due diligence by Hilco (or some other sales agent), it is determined that there is a "market" for these assets and sufficient value above and beyond the fee of the sales agent. The Debtors have a meeting with Hilco to provide it with more information, and this request for cash collateral is designed to give Hilco more time to analyze the assets, and provide us with its assessment. The expenses in the attached budget are similar to the last budget approved by ARC, and include some of the expenses "rolled over" from the last budget (they are in green font or highlighted). ***Can you please let me know by tomorrow if we have ARC's consent without necessitating Court intervention?***

Please note that the budget includes partial payments for "backpay" – amounts owed to former or current employees for services rendered from November/December 2023 (those amounts are in RED font in the bottom chart). The Court has time and again stated that the Debtors have to pay their former and current employees for services rendered. We have also previously provided an extended budget with a plan to repay these wages over several months (i.e., on the weeks that regular payroll is not due). We need to have these "backpay" amounts paid.

Also, the budget includes the current, monthly salaries of all of the Debtors' employees (100% to both insider and non-insider employees), but the agreed order can provide that cash collateral usage is subject to all of the terms of the prior order.

Thanks.

**JEFFREY S. KWONG, Esq.**
**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
**2818 La Cienega Avenue   |   Los Angeles, CA 90034**
**Phone  310 229 1234   |   Direct  310 229 3337   |   Fax  310 229 1244**
**jsk@lnbyg.com   |   www.lnbyg.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s
email policies which can be found at http://www.lnbyg.com/disclaimers.htm.
🖢 Please consider the environment before printing this email

**From:** Jeffrey S. Kwong
**Sent:** Monday, May 27, 2024 7:41 AM
**To:** Robbin Itkin <ritkin@sklarkirsh.com>
**Cc:** steinbergh@gtlaw.com; jkropp@forestroadco.com; David L. Neale <DLN@lnbyg.com>; Kelly K. Frazier <kfrazier@sklarkirsh.com>
**Subject:** Re: Emergency Motion

I called chambers on Friday to ask for the court's availability on 5/31 and have not heard back yet.

This agreement should resolve the motion. I'll call chambers to let the court know today (but expect to leave a voicemail given the holiday) but let's also work on filing a stip/agreed order before the hearing.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing documents entitled **DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER ENFORCING THE "ORDER GRANTING STIPULATION AMONG DEBTORS, OFFICIAL COMMITTEES OF UNSECURED CREDITORS AND ACCESS ROAD CAPITAL, LLC REGARDING SETTLEMENT WITH ACCESS ROAD AND DEBTORS' CONTINUED USE OF CASH COLLATERAL," AND AUTHORIZING CASH COLLATERAL USAGE THROUGH THE WEEK OF AUGUST 30, 2024; DECLARATION OF JONATHAN KRAMER IN SUPPORT THEREOF** will be served or were served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 26, 2024** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Jessica L Bagdanov     jbagdanov@bg.law, ecf@bg.law**
- **Keith Patrick Banner     kbanner@greenbergglusker.com, calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com**
- **Sara Chenetz     schenetz@perkinscoie.com, docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com**
- **Russell Clementson     russell.clementson@usdoj.gov**
- **Alan W Forsley     alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com**
- **Evelina Gentry     evelina.gentry@akerman.com, rob.diwa@akerman.com**
- **Tracy Green     tgreen@fennemorelaw.com, ecfbankruptcy@fennemorelaw.com**
- **Robbin L. Itkin     ritkin@sklarkirsh.com, mduran@sklarkirsh.com;KFRAZIER@SKLARKIRSH.COM**
- **Michael S Kogan     mkogan@koganlawfirm.com**
- **Jeffrey S Kwong     jsk@lnbyg.com, jsk@ecf.inforuptcy.com**
- **Timothy McMahon     tmcmahon@sklarkirsh.com, mduran@sklarkirsh.com**
- **David L. Neale     dln@lnbyg.com**
- **Howard Steinberg     steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com**
- **United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**:
On **June 26, 2024,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 26, 2024** I will serve the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 26, 2024 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**