1  DAVID L. NEALE (SBN 141225)
   JEFFREY S. KWONG (SBN 288239)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234; Facsimile: (310) 229-1244
   Email: dln@lnbyg.com; jsk@lnbyg.com
5
6  Attorneys for Chapter 11 Debtors and Debtors in Possession

7              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
8               SAN FERNANDO VALLEY DIVISION

9  In re:                                    )  Lead Case No.: 1:22-bk-11456-MB
                                             )
10 AFTERSHOCK COMICS, LLC, a California       )  Jointly administered with:
   limited liability company,                )  1:22-bk-11457-MB
11                                            )  (Rive Gauche Television).
          Debtor and Debtor in Possession.   )
12 _____   )  Chapter 11 Cases
   In re:                                    )
13                                            )
   RIVE GAUCHE TELEVISION, a California        )  **NOTICE OF SUBMISSION OF**
14 corporation,                               )  **REDLINES SHOWING CHANGES TO**
                                             )  **DISCLOSURE STATEMENT AND PLAN**
15        Debtor and Debtor in Possession.   )  **OF REORGANIZATION**
   _____   )
16                                            )
   ☒ Affects both Debtors                     )
17 ☐ Affects AfterShock Comics, LLC only      )
   ☐ Affects Rive Gauche Television only       )
18                                            )
19                                            )
                                             )
20                                            )
                                             )
21                                            )
                                             )
22                                            )  Hearing on Shortened Notice
                                             )  DATE:    April 8, 2025
23                                            )  TIME:    1:30 p.m.
                                             )  PLACE:   United States Bankruptcy Court
24                                            )           21041 Burbank Blvd, Ctrm 303
                                             )           Woodland Hills, CA 91367
25                                            )
                                             )
26                                            )

27

28

                              1

1    AfterShock Comics, LLC ("Aftershock") and Rive Gauche Television ("RGTV," and

2   together with Aftershock, the "Debtors"), the debtors and debtors-in-possession in the above-

3   captioned chapter 11 bankruptcy cases (the "Cases"), hereby submit redlines showing changes

4   made to the "Plan Proponents' Joint Combined Disclosure Statement And Chapter 11 Plan Of

5   Reorganization dated March 14, 2025" [Doc. No. 552] (the "March 14 DS/P").   Based on

6   discussions with the Office of the United States Trustee (the "UST"), the Debtors believe that

7   these changes resolve the objections raised by the United States Trustee to the March 14 DS/P.

8   Attached hereto as **Exhibit "A"** is a redline comparing the March 14 DS/P (without exhibits),

9   with the "Plan Proponents' Joint Combined Disclosure Statement And Chapter 11 Plan Of

10  Reorganization dated April 7, 2025" [Docket No. 566] (the "DS/P") (without exhibits).

11     Attached hereto as **Exhibit "B"** is a copy of revised Exhibit "3" to the DS/P (RGTV

12  Claims Chart).

13     Attached hereto as **Exhibit "C"** is a page of Exhibit "8" (Assumed Contract/Lease

14  Schedule) that was revised to reflect that the "Date Contract Expires" for the Kaiju Score

15  "Option & Rights Acquisition [Agreement]" is July 7, 2025.

16

17  Dated: April 7, 2025                    AFTERSHOCK COMICS, LLC &
                                            RIVE GAUCHE TELEVISION
18                                          */s/   Jeffrey S. Kwong*
                                                   David L. Neale
19                                                 Jeffrey S. Kwong
                                                   LEVENE, NEALE, BENDER, YOO
20                                                 & GOLUBCHIK L.L.P.
                                            Counsel for Debtors and Debtors in Possession
21

22

23

24

25

26

27

28

# EXHIBIT "A"

1  DAVID L. NEALE (SBN 141225)
   JEFFREY S. KWONG (SBN 288239)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
   2818 La Cienega Avenue, Los Angeles, California 90034
3  Telephone: (310) 229-1234
   Email: dln@lnbyg.com; jsk@lnbyg.com
4  *Attorneys for Chapter 11 Debtors and Debtors in Possession*
5
   Robbin L. Itkin (SBN 117105)
6  SKLAR KIRSH, LLP
   1880 Century Park East, Suite 300, Los Angeles, California 90067
7  Telephone: (310) 845-6416
   Email: ritkin@sklarkirsh.com
8  *Attorneys for the Official Committees*
9  *of Unsecured Creditors*
10
   Andrew Behlmann (*Pro Hac Vice Pending*)
11 LOWENSTEIN SANDLER LLP
   One Lowenstein Drive
12 Roseland, New Jersey 07068
   Telephone: (973) 597-2332
13 Email: abehlmann@lowenstein.com
   *Attorneys for Access Road Capital, LLC*
14

15 **UNITED STATES BANKRUPTCY COURT**
   **CENTRAL DISTRICT OF CALIFORNIA**
16 **SAN FERNANDO VALLEY DIVISION**

17 In re:                                    )   Lead Case No.: 1:22-bk-11456-MB
   AFTERSHOCK COMICS, LLC, a                 )   Jointly administered with:
18 California limited liability company,     )   1:22-bk-11457-MB
                                             )   (Rive Gauche Television).
19                                           )
            Debtor and Debtor in Possession. )
20 _____  )   Chapter 11 Cases
                                             )
21 In re:                                    )
   RIVE GAUCHE TELEVISION, a                 )   **PLAN PROPONENTS' AMENDED**
22 California corporation,                   )   **JOINT COMBINED DISCLOSURE**
                                             )   **STATEMENT AND CHAPTER 11**
23                                           )   **PLAN OF REORGANIZATION DATED**
            Debtor and Debtor in Possession. )   **MARCH 14APRIL 7, 2025**
24 _____  )
   ☒ Affects both Debtors                    )   Hearing
25                                           )   Date:    [TO BE SET]April 8, 2025
                                             )   Time:    [TO BE SET]1:30 p.m.
26                                           )   Place:   Courtroom 303
                                             )            21041 Burbank Boulevard
27 _____  )            Woodland Hills, CA 91367
28

                                    1

**Introduction**

This Disclosure Statement and Plan (the "DS/P") comprises both (i) a plan of reorganization (the "Plan") for AfterShock Comics, LLC, a California limited liability company ("Aftershock"), and Rive Gauche Television, a California corporation ("RGTV," and together with Aftershock, the "Debtors"), the above-captioned debtors in possession, and (ii) the disclosure statement for the Plan (the "Disclosure Statement").

***The Plan contemplates, among other things set forth in more detail below, that all allowed claims of creditors against the Debtors shall be paid in full from the ongoing operations of the Debtors***.  If the Plan is not confirmed, the Debtors' only alternative would be a liquidation, which likely would allow for only the secured lender to be paid from liquidation of the Debtors' assets. Even then, liquidation would not pay the secured lender in full, and would leave nothing for any other class of claims.[1]  The only way for creditors to be paid *at all*, much less in full, is to pay allowed claims from the cash flow generated by the continued operation of the Debtors' businesses over time as provided for herein.  The Plan Proponents have spent months negotiating the terms and conditions of the Plan, and believe that confirmation of the Plan presents the highest – indeed, the only – likelihood of a full recovery by the Debtors' creditors.  This case has been pending for over two years. The Debtors have pursued numerous paths to refinance or restructure their financial affairs, and believe that the Plan, which pays creditors in full over time, is the best alternative.

In simple terms, the Plan, if confirmed, would allow for the following recoveries by creditors:

- The Debtors' secured lender would be paid in full from the payments of Available Cash, *see* (Plan § 3.1), within approximately 30 months following the Effective Date of the Plan;

- Unpaid wage claimants with administrative claims would be paid 40% of their claims on the Effective Date of the Plan from the Effective Date Shared Admin Claims Payments, *see* (Plan § 3.2A), with the remainder paid in full from the

---

[1] *See* (Plan, Art. VIII.11) (liquidation analysis).

1  payment of Available Cash, *see* (Plan § 3.1) within approximately 9 months

2  thereafter;

3  • The allowed priority claims of professionals and others entitled to such treatment

4  would be paid approximately 7.1% on the Effective Date of the Plan from the

5  Effective Date Shared Admin Claims Payments, *see* (Plan § 3.2A), with the

6  remainder paid in full from the payments of Available Cash, *see* (Plan § 3.1), within

7  approximately 39 months thereafter;[2]

8  • General Unsecured Claims against the Debtors will be paid in full, with interest,

9  within approximately 42 months following the Effective Date; and

10 • Insiders are not paid in full by the end of the Plan's cash flow projections, and the

11 projected payoff will occur after all other creditors are paid in full.

12 Other than the payments made to pay off priority tax claims and Class 3 Allowed Priority

13 Non-Tax Claims on the Effective Date, there are two types of payments that will be made pursuant

14 to this Plan consisting of the ***Effective Date Shared Admin Payments*** (defined below) that will be

15 made on the Effective Date of the Plan, and the ***Available Cash Payments*** (defined below) that will

16 be made thereafter and through the life of the Plan.  The Effective Date Shared Admin Claims

17 Payments total five hundred thousand dollars ($500,000), and that payment will be distributed on

18 the Effective Date as follows: (1) Allowed Unpaid Wage Claims would be paid 40% of their claims

19 (*i.e.*, 40% x $516,842 [total Wage Claims] = $206,736.80); (2) Allowed Content Creator Claims and

20 Post-Petition Royalty Claims will share *pro rata* in $40,000; and (3) Allowed Professional Fee

21 Claims (and any other Allowed Administrative Claims to the extent there are any) will share *pro*

22 *rata* in the remaining amount of the Effective Date Shared Admin Claims Payment (*i.e.*, $253,263.20

23

24 [2] Even though they would be entitled to be treated with the same priority as the unpaid administrative
25 Wage Claims of the Debtors' employees, the professionals employed at the expense of the Debtors'
   bankruptcy estates have agreed to forego receiving payment on account of their claims so that these
26 employees can be paid 40% of their claims upon the Debtors' exit from bankruptcy.  If all of the
   claims of the same priority were treated equally under the Plan, the wage claimants' recovery would
27 only be about 12% of their claims.  The compromise reached with the Debtors' other administrative
   expense priority creditors will, as noted, allow the unpaid employees to be paid 40% of their claims
28 immediately.

3

or 7.1% of their claims) pursuant to Section 3.2A herein.  All other Plan Payments will be made from the Debtors' Available Cash pursuant to Section 3.1 herein, and it is anticipated that all non-insider classes of creditors will be paid in full from these payments by November, 2028.

The Plan is complicated.  The Plan Proponents urge creditors and parties in interest to read the Disclosure Statement and the Plan very carefully.  The Plan includes settlements with the Debtors' secured lender, the Official Committees of Unsecured Creditors, and various other parties in interest.  To enable the Debtors to confirm the Plan and begin repaying creditors, certain groups of creditors will be asked to consent to treatment of their claims that is different from what the law otherwise requires.  For example, holders of administrative claims (such as holders of post-petition Professional Fee Claims and Wage Claims) would generally  be paid in full on the Effective Date of the Plan.  However, the Debtors will not be able to pay such administrative claimants in full on the Effective Date of the Plan, and thus need the cooperation of those claimants to accept a partial initial payment followed by repayment of the remainder over time under the Plan.  Absent that cooperation, it is unlikely that the Plan can be confirmed and implemented.

Importantly, in addition to agreeing to only receiving 7.1% of their estimated claims so that the holders of Allowed Wage Claims can be paid 40% of their claims, professionals who have rendered services to the Debtors' estates are being asked to defer payment of their fees and costs. Their agreement to the treatment will enable wage claimants to be paid in full ***before*** repayment of the balance of the estate professionals' fees and costs despite their equal payment priorities. Likewise, payments to the general unsecured creditors of the Debtors will begin even before the Debtors' secured lender has been paid in full.  This represents a variance from the requirements of the Bankruptcy Code.

The Plan reflects an amendment and reduction of the Debtors' prepetition secured financing and a reorganization of the Debtors' business into a new ownership structure, with independent oversight of the management of the Reorganized Debtors by a Chief Restructuring Officer (the "CRO") until the payments contemplated by the Plan have concluded.  The Debtors have obtained approval by the Bankruptcy Court of the employment of Michael Ozawa of Restructuring Solutions, LLC, who will serve as the initial CRO after the Effective Date of the Plan.  The powers and duties

of the CRO are described in Article 5.7 of the Plan and summarized on **Exhibit "5"** and provides the CRO with significant input on financial and operating decisions of the Reorganized Debtors. Management will also be subject to oversight by a board of directors comprised of representatives of each key constituency and an independent director chosen pursuant to a highly objective standard set forth on **Exhibit "7"**.  Current management of the Debtors, including Jon Kramer, will continue to run the Debtors on a day-to-day basis.  Both Jon and Lee Kramer will be receiving employment agreements which will also provide for the acquisition of an ownership interest in the reorganized Debtors over a period of time after the Effective Date.  The terms and conditions of those agreements are summarized later in this document.

The goal of the Plan is to reorganize the Debtors into a business that is stable, healthy, and able to satisfy its obligations under the Plan as well as ongoing obligations that become due in the ordinary course of business after the Plan becomes effective.  The Debtors will continue to operate their businesses after the Effective Date of the Plan, and will continue to pursue refinancing or equity transactions, which may allow all creditors to get paid on account of their claims sooner.  This is not certain to occur, but the Debtors will keep considering these types of alternatives after the Effective Date of the Plan.

The following Exhibits are attached to this DS/P (each as described more fully below):

| Exhibit | Description |
|---------|-------------|
| 1 | Cash Flow Projections |
| 2 | Aftershock Claims Chart |
| 3 | RGTV Claims Chart[3] |
| 4 | Salter Declaration |
| 5 | CRO Roles and Responsibilities |
| 6 | Example "Available Cash" Calculation |
| 7 | Independent Director Standards |
| 8 | Assumed Contract/Lease Schedule[4] |

[3] The Debtors are continuing to work with certain creditors to reconcile their claim amounts, and will file amended claims chart(s) if necessary to reflect any reconciled claim amounts as part of the Plan Supplement or another pleading prior to the Confirmation Hearing.

[4] The initial Assumed Contract/Lease Schedule attached as **Exhibit "8"** consists of the lists of executory and other contracts that were attached as exhibits to the Debtors' Bankruptcy Schedules. *See* (Aftershock, Doc. No. 93); (RGTV, Doc. No. 7).  The inclusion of contracts in these lists shall not constitute an admission by the Debtors that such contracts are executory or unexpired.  The Debtors are continuing to analyze the nature of, and what they intend to do with, these contracts, and

| 9 | Rejected Contract/Lease Schedule[45] |
|---|---|

The following documents, in addition to any amendments to the above Exhibits and any other supplemental exhibits the Plan Proponents determine are appropriate in aid of the confirmation process, will be filed as part of the Plan Supplement (defined below):

| Plan Art. | Plan Supplement Document |
|---|---|
| 9.1C | Employment Agreements (Kramers) |
| 5.7 | Initial Board of Directors |
| 1.48 3.3A | Kramer Guarantee |
| 1.49 3.3A | Kramer Security Documents |
| 1.50 3.3A | New ARC Note |

## Background[56]

On December 19, 2022 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

• **PROPONENTS**: The parties who have jointly proposed the DS/P (the "Plan Proponents") are the Debtors, the Official Committees of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "Committees"), and the Debtors' prepetition secured lender, Access Road Capital ("ARC").

• **PLAN**: The terms of the Plan, located at Section IX below, comply with the requirements of Section 1123 of the Bankruptcy Code, including the proposed treatment of claims of the Debtors' creditors and the interests of shareholders or members. **The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone as of the date hereof**; however, if the Plan is confirmed and becomes effective by its terms, the terms of the Plan will bind the Debtors

---

reserve the right to file a revised Assumed Contract/Lease Schedule as part of the Plan Supplement or another pleading prior to the Confirmation Hearing.

[45] The Debtors are not aware of any unexpired leases or executory contracts that they intend to reject at this time. However, the Debtors reserve the right to file a revised Rejected Contract/Lease Schedule as part of the Plan Supplement or another pleading prior to the Confirmation Hearing.

[56]      Capitalized terms used in this section but not yet defined have the meanings given below.

and all holders of claims and interests against the Debtors, irrespective of whether and how such holders voted on the Plan.

• **DISCLOSURE STATEMENT**: Sections I-VIII below constitute the Disclosure Statement and describe the assumptions that underlie the Plan and how the Plan will be executed. The Plan Proponents believe the Disclosure Statement meets the standard for adequate information set forth in Section 1125(a) of the Bankruptcy Code. **The information disclosed is for explanatory purposes only and is as accurate as possible, based upon the Debtors' knowledge and belief as of the date hereof.** The Bankruptcy Court has approved the Disclosure Statement, and will consider confirmation of the Plan at the Confirmation Hearing.

Any interested party desiring further information should contact the attorneys for the Plan Proponents identified in the top left corner of the first page of the DS/P, using the contact information provided. Any capitalized term used in the DS/P that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, the feminine gender shall include the masculine, and "any" or "all" means "any and all" unless otherwise expressly stated.

**TABLE OF CONTENTS**

| DISCLOSURE STATEMENT | Section | Page |
|---|---|---|
| | I.        General Disclaimer | ~~6~~8 |
| | II.       Purpose of Disclosure Statement | ~~7~~9 |
| | III.      Deadlines For Voting And Objecting; Date Of Plan Confirmation Hearing | ~~8~~10 |
| | IV.      Identity Of Persons To Contact For More Information Regarding The Plan | ~~9~~11 |
| | V.        Background | ~~9~~12 |
| | VI.      Tax Consequences Of The Plan | ~~17~~20 |
| | VII.     Substantive Consolidation | ~~20~~23 |
| | VIII.   Confirmation Requirements And Procedures | ~~22~~26 |

| **PLAN OF REORGANIZATION** | | |
|---|---|---|
| | IX. Joint Chapter 11 Plan | ~~30~~34 |
| | Article I: Terminology and Definitions | ~~30~~34 |
| | Article II: Classification of Claims and Interests | ~~41~~46 |
| | Article III: Treatment of Claims and Interests | ~~42~~46 |
| | Article IV: Acceptance or Rejection of the Plan | ~~53~~59 |
| | Article V: Means for Implementation of the Plan | ~~54~~60 |
| | Article VI: Treatment of Executory Contracts | ~~60~~67 |
| | Article VII: Provisions Governing Distributions | ~~65~~72 |
| | Article VIII: Procedures for Resolving Disputed, Contingent, and Unliquidated Claims And Distributions with Respect Thereto | ~~67~~75 |
| | Article IX: Conditions to Confirmation and Consummation of the Plan | ~~69~~77 |
| | Article X: Retention of Jurisdiction | ~~70~~78 |
| | Article XI: Miscellaneous Provisions | ~~73~~81 |

## I.  GENERAL DISCLAIMER

THE INFORMATION CONTAINED IN THIS DS/P IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND DESCRIBING THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN AND TO DESCRIBE TREATMENT UNDER AND TERMS OF THE PLAN.  NO ENTITY MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DS/P REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, AND ANY SUCH REPRESENTATIONS TO THE CONTRARY SHALL HAVE NO FORCE OR EFFECT AND SHALL NOT BE RELIED UPON.

THE INFORMATION AND STATEMENTS CONTAINED IN THIS DS/P, INCLUDING, WITHOUT LIMITATION, INFORMATION ABOUT THE DEBTORS, THEIR OPERATIONS, AND THEIR BANKRUPTCY ESTATES AND ASSETS, HAVE BEEN PROVIDED SOLELY BY THE DEBTORS, AND SUCH INFORMATION HAS NOT BEEN INDEPENDENTLY VERIFIED BY ANY OTHER PARTY.

ALL CREDITORS AND PARTIES IN INTEREST ARE ADVISED AND ENCOURAGED TO READ THIS DS/P IN ITS ENTIRETY, INCLUDING ALL EXHIBITS AND SUPPLEMENTS HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE STATEMENTS CONTAINED IN THIS DS/P ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. ANY ESTIMATES OF CLAIMS AND INTERESTS SET FORTH IN THIS DS/P ARE MADE BY THE DEBTORS IN GOOD FAITH BUT MAY VARY FROM THE AMOUNTS OF CLAIMS AND INTERESTS ULTIMATELY ALLOWED BY THE COURT.

THE FINANCIAL DATA RELIED UPON IN FORMULATING THE PLAN IS BASED ON THE DEBTORS' BOOKS AND RECORDS, WHICH, UNLESS OTHERWISE INDICATED, ARE UNAUDITED. THE INFORMATION CONTAINED HEREIN IS, UNLESS OTHERWISE INDICATED, PROVIDED SOLELY BY THE DEBTORS. THE COURT HAS NOT YET DETERMINED WHETHER OR NOT THE PLAN IS CONFIRMABLE, AND THE COURT HAS NO RECOMMENDATION AS TO WHETHER OR NOT YOU SHOULD SUPPORT OR OPPOSE, OR ACCEPT OR REJECT, THE PLAN.

## II.    PURPOSE OF DISCLOSURE STATEMENT

The Disclosure Statement summarizes what is in the Plan, and provides certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)    WHO CAN VOTE OR OBJECT**;

**(2)    HOW YOUR CLAIM IS CLASSIFIED, WHAT THE TREATMENT OF YOUR CLAIM IS (I.E., WHAT YOUR CLAIM WILL RECEIVE IF THE PLAN IS CONFIRMED), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS;**

**(3)    THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR BANKRUPTCY CASES;**

**(4)    SUBJECTS THE COURT WILL CONSIDER IN DECIDING WHETHER OR NOT TO CONFIRM THE PLAN;**

**(5)    THE EFFECT OF PLAN CONFIRMATION; AND**

**(6)    WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consult your own lawyer to obtain advice on how the Plan will affect you and your best course of action. Be sure to read the entirety of this DS/P, together with all exhibits and supplements hereto.

The Plan Proponents have sought and obtained approval of the Disclosure Statement from the Bankruptcy Court as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under Section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you the Disclosure Statement and if you are eligible to vote, solicit your acceptance of the Plan. The Court will consider approval of the Disclosure Statement on a final basis, and confirmation of the Plan at the _____, 2025 Confirmation Hearing.

**III.    DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DS/P. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THE DEBTORS' BANKRUPTCY CASES, IRRESPECTIVE OF WHETHER OR HOW SUCH HOLDERS VOTED WITH RESPECT TO THE PLAN.

1.   **Time and Place of Confirmation Hearing**

The Confirmation Hearing (defined herein) where the Court will determine, among other things, whether to confirm the Plan will take place on _____, 2025, at _____ __.m., before the Honorable Martin R. Barash, United States Bankruptcy Judge for the Central District of California in Courtroom 303 of the United States Bankruptcy Courthouse located at 21041 Burbank Boulevard, California 91367.

2.   **Deadline for Voting on the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to:

> **David L. Neale and Jeffrey S. Kwong**
> **Levene, Neale, Bender, Yoo & Golubchik L.L.P.**
> **2818 La Cienega Avenue**
> **Los Angeles, California 90034**

You can also email your completed ballot to:
> **DLN@LNBYG.COM**
> *and*
> **JSK@LNBYG.COM**

**In either instance, your ballot must be received by 5:00 p.m., PST, on** ~~March~~ April _____ **, 2025 or it will not be counted.**

3.   **Deadlines for Objecting to Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served by same day service upon (a) counsel to the Debtors – David L. Neale and Jeffrey S. Kwong, Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034, email: DLN@LNBYG.COM and JSK@LNBYG.COM; (b) counsel to the Committees – Robbin Itkin, Sklar Kirsh, LLP, 1880 Century Park East, Suite 300, Los Angeles, California 90067, email: ritkin@sklarkirsh.com; and (c) counsel to Access Road Capital, LLC – Andrew Behlmann, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, email: abehlmann@lowenstein.com, by not later than ~~March~~April _____, 2025.

IV.    **IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION REGARDING THE PLAN**

Any interested party desiring further information about the Plan may contact counsel to the

Debtors – David L. Neale and Jeffrey S. Kwong, Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034, email: DLN@LNBYG.COM and JSK@LNBYG.COM; (b) counsel to the Committees – Robbin Itkin, Sklar Kirsh, LLP, 1880 Century Park East, Suite 300, Los Angeles, California 90067, email: ritkin@sklarkirsh.com; and (c) counsel to Access Road Capital, LLC – Andrew Behlmann, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, email: abehlmann@lowenstein.com.

## V.    BACKGROUND[6][7]

### 1.    Description and History of the Debtors

Together, the Debtors comprise (and work together as) the "Aftershock Media" enterprise ("ASM") – which unites a rapidly growing comic creation and publishing business (Aftershock) with a proven film/television production and distribution platform (RGTV) for a global audience.  ASM has three principal lines of business:

- ▪    (1) "**Traditional TV Licensing and Advertising Video on Demand (AVOD) Distribution**" related to RGTV's distribution of rights to the RGTV Library (defined below, and which consists primarily of unscripted television programming);

- ▪    (2) "**Retail Comics**" related to Aftershock's sale of comic books and related products through retail channels; and

- ▪    (3) "**Comic Book IP Development and Exploitation**" related to Aftershock's creation, worldwide licensing, and/or sale of comic IP (defined herein) for use in scripted television or film programming.

Aftershock is engaged in the business of developing, creating, and publishing comic books and graphic novels, which it sells through retail channels (*e.g.*, bookstores).  Aftershock also creates

---

[6][7] This information is prepared by the Debtors.  Neither the Committees nor ARC should be deemed to have conceded any disputed facts or legal issues.  However, rather than identify every issue on which there is, or has been, disagreement among the parties, this information is provided by the Debtors to explain their businesses, summarize significant events during their bankruptcy cases and provide the background necessary to explain why the settlements contained in the Plan are justified and necessary for a successful resolution of these cases.  While the Committees and ARC are joint proponents of the Plan, they may, and in certain circumstances, do, have very different perspectives on many of the matters described herein.

and owns original IP content related to its comic books, which it controls for exploitation in all forms of media.  Exploitation of the IP includes not only Aftershock's ability to sell the IP, but also to license such IP to other companies for conversion to other forms of media such as scripted television and film.  Aftershock currently has interests in more than 150 IP properties (which it expects to increase by approximately up to 20 IP properties per year).

Aftershock's affiliate, RGTV, is a leading co-producer and distributor of television programing around the world.  Since its founding in 1994, RGTV has acquired distribution rights ("Distribution Rights") to a library of over 166 titles, representing over 2,200 episodes and 1,700 hours of non-scripted television and documentary programming (the "RGTV Library").  Well known series in the RGTV Library include *My Strange Addiction*, *Homicide Hunters*, and *Trace of Evil*, and the genres in the RGTV Library include true crime, reality, animal/wildlife, and documentary.

RGTV generates revenue by sublicensing or selling its Distribution Rights to broadcast networks and other licensees in territories around the world.  When RGTV sublicenses or sells distribution rights in a territory, it earns a sales fee and recoups any advances paid to the producers/licensors of the series, as well as any marketing costs advanced.

**2.      The Debtors' Secured Lenders and Financial Difficulties**

The Debtors' senior secured lender is ARC.  The Debtors originally borrowed money from ARC in March 2020 in the principal amount of $11,090,000 (the "Loan") pursuant to the "*Second Amended and Restated Credit and Security Agreement*" (the "Loan Agreement," and collectively with amendments thereto, and the other loan documents, the "Loan Documents").  The Debtors are jointly and severally liable to repay the Loan.  ARC asserts that the Loan is secured by perfected, first-priority security interests in all, or substantially all, of the Debtors' assets.

Although the Debtors' businesses were highly successful prior to the COVID-19 pandemic (the "Pandemic"), the circumstances surrounding the Pandemic detrimentally impacted the Debtors' operations and financial condition.  For example, after the Pandemic started: (1) RGTV's revenues and sales suffered because channel buyers were taking longer to decide on transactions with RGTV regarding Distribution Rights licenses and sales; and (2) Aftershock's revenues and sales suffered

1  because many of the retail outlets for comic books and related material were closed during the

2  Pandemic, and Aftershock's management was forced to hold back new comic IP releases.

3       In addition, the Debtors' financial problems were exacerbated by liquidity problems

4  associated with insufficient junior capital to fund the high cash requirements of their new business

5  ventures that have long investment lead times.  For example:

6       •    (1) **"Traditional TV Licensing and Advertising Video on Demand (AVOD)**

7  **Distribution" line of business**: RGTV experienced delayed decisions with clients and broadcasters

8  during the Pandemic that led to revenue shortfalls, high upfront AVOD costs, and a longer delivery

9  process for content, and longer payment terms.

10      •    (2) **"Retail Comics" line of business**: Aftershock faced higher printing costs as a

11  result of supply chain issues.  Moreover, Aftershock's liquidity problems can be attributed to

12  substantial investments that are associated with the creation of new comic IP.

13      •    (3) "**Development and Exploitation of Comic IP" line of business**: Aftershock

14  experienced longer than expected negotiations for comic IP "option" deals, and a longer than

15  expected development process to convert IP "options" to film and television production.  However,

16  with respect to the IP "options," many of these deals are on the cusp of reaching a steady-state to

17  generate revenue for Aftershock.

18      **3.    The State Court Action**

19      As a result of these liquidity and other financial issues, the Debtors were unable to make

20  certain Loan payments to ARC and several of their other creditors and vendors.  ARC asserted that

21  defaults occurred under the Loan and (1) provided the Debtors with a written Notice of Default; and

22  (2) on October 10, 2022, initiated an action in the California Superior Court titled "*Access Road*

23  *Capital, LLC v. Rive Gauche Television, et al.*," LASC Case No.22STCV33196 (the "State Court

24  Action") against the Debtors and other parties, including Kramer as personal guarantor of the Loan.

25  Although the Debtors and ARC attempted pre-petition to negotiate in good faith to reach an

26  agreement, those negotiations reached an impasse.

27      Concurrently with the filing of this DS/P, ARC intends to file a motion to delay trial in the

28  State Court Action for several months to permit the Plan process to proceed.  If the Plan is confirmed

and becomes effective, then pursuant to the Kramer Security Documents, ARC will receive a security interest in certain real estate owned by Kramer as set forth in the Kramer Guarantee.  Upon delivery of the Kramer Guarantee and Kramer Security Documents, the State Court Action will be voluntarily dismissed as moot.  If the Plan is not confirmed, or is confirmed but fails to become effective, the State Court Action will resume.

### 4.    The Chapter 11 Cases

To continue operations and preserve the Debtors' going concern values for their creditors, among other reasons, the Debtors filed for bankruptcy protection on the Petition Date.  In their respective Chapter 11 Cases, the Debtors have sought to restructure their financial affairs, obtain possible refinancing of the Loan, seek investors, and/or propose a joint plan that will pay their creditors.  The Plan is the culmination of those efforts and the Debtors believe the Plan is the best available means of restructuring their businesses and exiting bankruptcy for the benefit of all Estate constituents.  The Plan Proponents support Confirmation of the Plan and the Debtors' efforts to emerge from bankruptcy.

### 5.    Significant Events During the Bankruptcy Cases.

#### a.    Administrative Matters

The Debtors have addressed various administrative matters with respect to the commencement of, and administration of, their Cases.  These matters include the filing of the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, and the preparation of the materials required by the Office of the United States Trustee (the "OUST"), including, without limitation, monthly operating reports.  A representative of the Debtors also attended the initial interview with the OUST and the meeting of creditors required under 11 U.S.C. § 341(a), which has concluded.  The Debtors also submitted chapter 11 status reports and attended chapter 11 status conferences.

The Court set **May 31, 2023** as the general claims bar date in the Cases.  The Administrative Claims Bar Date in the Cases was **October 25, 2024**, which shall apply to administrative priority claims that have: (1) accrued prior to October 25, 2024; or (2) with respect to producers that have

15

entered into acquisition agreements with RGTV, been described in sales reports that were issued prior to October 25, 2024.  The Debtors timely filed and served notices of both of these deadlines.

**b.  Estate Professionals**

On December 28, 2022, the Debtors filed an application to employ Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG") [Doc. No. 33] as the Debtors' general bankruptcy counsel, which was approved by Court order entered on January 24, 2023 [Doc. No. 95].

On February 15, 2023, Aftershock filed an application to employ Sacker Entertainment Law P.C. ("Sacker") [Doc. No. 107] as its special entertainment counsel to, among other things, negotiate and draft new option and purchase agreements entered into by Aftershock and certain counterparties post-petition.  The court entered an order approving Sacker's employment application, as amended by the supplement thereto, on March 15, 2023 [Doc. No. 139].

On February 22, 2023, the Debtors filed an application to employ Exceptional Leaders International ("ELI") [Doc. No. 111] as their financial advisor and consultant to, among other things, advise the Debtors regarding refinancing and investment transaction options available to the Debtors. The court entered an order approving ELI's employment application, as amended by the supplement thereto, on April 12, 2023 [Doc. No. 176].

On February 22, 2023, the Debtors filed an application to employ Michael V. Bales, Esq. ("Bales") [Doc. No. 113] as their special business counsel to provide "outside general counsel" services to the Debtors, which were anticipated to include, among other things: (1) negotiating and drafting contracts with parties that transact with RGTV (such as creators, and producers); (2) assisting the Debtors with potential financing and investment transactions; and (3) advising the Debtors regarding continuing operations.  The court entered an order approving Bales' employment on April 12, 2023 [Doc. No. 175].

In addition to the Debtors' professionals, the Committees sought and obtained Court approval to employ Sklar Kirsh, LLP as general bankruptcy counsel and Dundon Advisors, LLC as financial advisor.  *See* (Doc. Nos. 130, 153, 169, 180).  The orders approving the Committees' employment of Sklar Kirsh, LLP and Dundon Advisors, LLC were entered on April 10, 2023 and April 13, 2023, respectively.

### c.  Use of Cash Collateral and Financial Performance

ARC asserts a lien on all or substantially all of the Debtors' assets, including cash. Shortly after the Petition Date, the Debtors filed several "first day" motions, including a motion for a Court order authorizing the Debtors to use ARC's cash collateral, as that term is defined in § 363(a) of the Bankruptcy Code (the "Cash Collateral").  The Court previously held an initial hearing (the "Initial Hearing"), and an evidentiary hearing (the "Evidentiary Hearing") on the Debtors' proposed interim use of Cash Collateral.  At the conclusion of the Evidentiary Hearing, on January 24, 2023, the Court entered the "*Interim Order Re: Debtors' Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To Use Cash Collateral On An Interim Basis Pending A Final Hearing; (II) Granting Adequate Protection Replacement Liens; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief*" [Doc. No. 94] which, among other things, authorized the Debtors to use Cash Collateral on an interim basis through February 17, 2023, and scheduled a final hearing on the Motion (the "Final Hearing") that was to commence on February 15, 2023 at 10:00 a.m. (Pacific Time).

Prior to the February 15, 2023 Final Hearing, the Parties entered into the "*Stipulation Between Debtors And Access Road Capital, LLC Re Use Of Cash Collateral*" [Doc. No. 61] (the "Cash Collateral Stipulation"), which was approved by Court order entered on January 31, 2023 [Doc. No. 102].  Pursuant to and subject to the terms of the Cash Collateral Stipulation and the Court's orders on cash collateral, the Debtors were authorized to use Cash Collateral from the Petition Date through March 17, 2023.

On February 22, 2023, the Debtors filed their "*Notice Of Submission Of Supplemental Budget*" [Doc. No. 115], which attached a copy of budget for the Debtors' proposed use of Cash Collateral after March 17, 2023 for the period from the week ending March 24, 2023 through the week ending May 31, 2023.  After a two-day evidentiary hearing that took place on April 5, 2023 and April 6, 2023 (the "Second Evidentiary Hearing"), the Court issued its oral ruling authorizing the Debtors to use cash collateral through May 31, 2023 pursuant to the Debtors' proposed supplemental budget [Doc. No. 129].  The Court's order approving the Debtors' cash collateral usage through May 31, 2023 was entered on April 12, 2023 [Doc. No. 174].

1    After the Second Evidentiary Hearing, the Debtors have operated their businesses and have

2    obtained ARC's consent and/or Court authority to use Cash Collateral pursuant to numerous

3    stipulations or agreed orders that authorized the use of Cash Collateral for short periods of time.

4    Before the Plan Proponents eventually reached an agreement on the non-binding term sheet that

5    created the framework for the Plan, the Debtors and ARC had various disputes over the continued

6    use of Cash Collateral.   The Debtors filed several emergency motions requesting that the Court

7    authorize the Debtors to use Cash Collateral to continue operating their businesses, and/or to comply

8    with the parties' previous agreements.  Although these emergency motions were initially opposed by

9    ARC (and sometimes the Committees), each time the parties were able to resolve their disputes and

10    have agreed upon budgets for continued use of Cash Collateral during the Cases.

11                    **d.  Joint Administration of Debtors**

12    On December 19, 2022, the Debtors filed their motions for joint administration of their

13    Cases.  Among other reasons, the Debtors believed that joint administration of their cases would be

14    in the best interests of creditors because (1) the Debtors are "affiliates" of one another and (2) the

15    Debtors share a common secured creditor (ARC) that has security interests in substantially all of both

16    Debtors' assets.  The Court entered its order approving the joint administration of the Debtors' Cases

17    on December 20, 2022.[78]

18                    **e.  Cash Flow, Projections, and Operations**

19    The Debtors continues to operate their businesses.  The Cash Flow Projections showing the

20    Debtors' projected income and expenses during the life of the Plan are attached as **Exhibit "1"** hereto,

21    *provided* that the Debtors may file updated Cash Flow Projections as part of the Plan Supplement.

22                    **f.  Unexpired Leases and Executory Contracts**

23    As set forth on the Debtors' bankruptcy schedules, the Debtors have a variety of what may

24    be executory contracts, such as the acquisition or distribution agreements that RGTV entered into

25    with its producers and customers, as well as Aftershock's option/purchase contracts.   The Plan

26

27    [78] The Court's order approving the joint administration of the Debtors' Cases designated
28    Aftershock's bankruptcy case as the lead case.  As a result, unless stated otherwise, all docket
references herein are with respect to the documents filed in the Aftershock bankruptcy case.

Proponents will continue to analyze these contracts, and the initial Assumed Contract/Lease Schedule and Rejected Contract/Lease Schedule, which are subject to amendment, are attached as **Exhibits "8" and "9"** hereto.

### g. Disclosure Statement and Plan

As discussed above, the Debtors and ARC (and sometimes the Committees) have been engaged in extensive litigation throughout these Cases. It was only recently, and after extensive negotiations among ARC, the Committees, and the Debtors that the parties reached an agreement on a term sheet (the "Term Sheet") that would serve as a template for a consensual Chapter 11 plan. After the Term Sheet was executed by ARC, the Committees, and the Debtors, the parties worked together to draft, finalize, and jointly propose the Plan.

On February 10, 2025: (1) the Plan Proponents filed the "*Plan Proponents Joint Combined Disclosure Statement and Chapter 11 Plan Of Reorganization Dated February 10, 2025*" (the "Initial Disclosure Statement "); and (2) the Debtors filed an *ex parte* motion for the Court to conditionally approve the Initial Disclosure Statement, and to have the Bankruptcy Court consider final approval of the Initial Disclosure Statement at the confirmation hearing (the "First DS Motion"). The First DS Motion was denied without prejudice at the February 18, 2025 hearing thereon.

On March 14, 2025, the Plan Proponents filed ~~this~~the "*Plan Proponents Joint Combined Disclosure Statement and Chapter 11 Plan Of Reorganization Dated March 14, 2025*," (the "March DS/P,") and a motion for Court approval of the ~~Disclosure Statement~~disclosure statement (the "DS Motion"). ~~The DS~~On April 1, 2025, DWP filed an opposition [Doc. No. 562] (the "Opposition") to the Disclosure Statement, which contains its objections to the Disclosure Statement and Plan. A copy of the Opposition may be obtained by accessing the docket in these cases available on PACER, or by contacting counsel for DWP. The Plan Proponents dispute the allegations and arguments made by DWP, and, if necessary, objections to confirmation of the Plan raised by DWP will be addressed at the time of the hearing on confirmation of the Plan.

On April 7, 2025, the Plan Proponents filed this DS/P, which amends and replaces the March DS/P.

The DS Motion was approved by Court order entered on ~~March~~April __, 2025, which enabled the Debtors to send out the Disclosure Statement and solicit acceptances for the Plan.

## VI.    TAX CONSEQUENCES OF THE PLAN

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtors.  The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

The implementation of the Plan may have federal, state, and local tax consequences to the Debtors, and the Debtors' creditors and equity holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  *This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or a tax advice to any person, and the summary contained herein is provided for informational purposes only.*

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL AND STATE INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL AND STATE TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST.  ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN. THE BELOW SUMMARY OF TAX CONSEQUENCES IS NOT INTENDED TO BE AND IS NOT TAX ADVICE.

THE DEBTORS DO NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN. CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTORS, HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS.

The following discussion is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS") currently in effect. These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below. In light of continuous amendments to the IRC and Regulations, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

**1. Federal Income Tax Consequences to Certain Creditors**

Generally, a holder of a claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its claim and such holder's adjusted tax basis in the claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's claim. The tax basis of a holder in a claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the claim, and the extent to which the holder previously claimed a deduction for

the worthlessness of all or a portion of the claim.  Generally, if the claim is a capital asset in the holder's hands, any gain or loss realized will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such claim for more than one year.

A creditor who received cash in satisfaction of its claim may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A creditor who did not previously include in income accrued but unpaid interest attributable to its claim, and who receives a distribution on account of its claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its claim.  A creditor who previously included in its income accrued but unpaid interest attributable to its claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its claim.

THE TAX CONSEQUENCES TO CREDITORS OR INTEREST HOLDERS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH CREDITOR AND HOLDER.  CREDITORS MAY RECOGNIZE INCOME OR LOSS AS A RESULT OF THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.  THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH CREDITOR IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF

**THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH CREDITOR OR INTEREST HOLDER. ACCORDINGLY, EACH CREDITOR IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.**

        **2.      Federal Income Tax Consequences to the Debtors**

In general, based upon the information available to it, the Debtors do not expect to incur any substantial tax liability as a result of implementation of the Plan, because, (1) at least with respect to AfterShock, as a limited liability company, tax attributes flow through to its members, and (2) Creditors are projected to be paid in full and, therefore, the Debtors do not expect to incur any cancellation of indebtedness income as a result of the Plan.

        **3.      Information Reporting and Backup Withholding**

Distributions made pursuant to the Plan will be subject to any applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

        **VII.      SUBSTANTIVE CONSOLIDATION**

Upon the Effective Date, the Debtors' Estates shall be substantively consolidated with each other for purposes of the allowance of Claims and payment of Distributions under the Plan. All of

the Debtors' funds, and any other assets currently held by the Debtors and/or their Estates, or later acquired by the Debtors and/or their Estates, shall be deemed to form one pool from which all Allowed Claims shall be paid in accordance with the terms of the Plan, and each of the Reorganized Debtors shall be jointly and severally liable for the obligations of the Reorganized Debtors under the Plan.    The Plan Proponents believe that substantive consolidation of the Debtors' Estates is appropriate under the facts and circumstances of the Cases and the applicable legal authorities.

Substantive consolidation of bankruptcy estates combines the assets and liabilities of separate – but related – debtors into a single pool and treats them as though they belong to a single entity (but does not merge multiple debtors absent further transaction steps effectuating such merger). Substantive consolidation enables a bankruptcy court to disregard separate business entities in order to reach assets for the satisfaction of debts of a related entity.  In place of two or more debtors, each with its own estate and body of creditors, substantive consolidation substitutes a common fund of assets with a combined body of creditors.  The consolidated assets create a single fund from which all claims against the consolidated debtors are satisfied; duplicate and inter-company claims are extinguished; and the creditors of the consolidated entities are combined for purposes of voting on and receiving distributions under a chapter 11 plan.

The primary purpose of substantive consolidation has been described as the "equitable treatment of all creditors."  Generally, substantive consolidation requires either that (1) creditors dealt with the entities as a single unit and did not rely on their separate identity in extending credit; or (2) the affairs of the debtors are so entangled that consolidation will benefit all creditors because untangling such affairs is either impossible or so costly as to consume the assets.

Here, substantive consolidation is warranted and appropriate.  The Debtors operated out of the same office space pre-petition; worked together as part of the "Aftershock Media" enterprise (comprised of Aftershock's comic creation and publishing business, and RGTV's film/television production and distribution platform); and are managed by Kramer (who is the Chief Executive Officer and President of both Aftershock and RGTV).  Further, the Debtors are jointly and severally liable to repay the Loan, and ARC holds the largest secured claim against the Debtors (with liens on all or substantially all of both Debtors' assets).

Moreover, the financial affairs of the Debtors are sufficiently intertwined that untangling such affairs is either impossible or so costly as to consume the assets. Prior to the Petition Date and in the ordinary course of their businesses, the Debtors managed their cash on a consolidated basis. For example, because the Debtors worked together as the "Aftershock Media" enterprise and Aftershock was a newer and developing company without consistent positive or sufficient cash flow, RGTV funds would routinely be used to support Aftershock's operations and to pay for necessary expenses (the "Intercompany Transfers") on both a pre- and post-petition basis. In fact, as shown on the monthly operating reports and as authorized by the Court's cash management order, RGTV made Intercompany Transfers to Aftershock monthly so that these funds could be used to support Aftershock's post-petition operations. As the Chief Executive Officer and President of both Aftershock and RGTV, Kramer was also in charge of speaking/negotiating with, and entering into contracts and transactions with creditors and other parties on behalf of the Debtors. The Debtors also filed, and operated pursuant to, consolidated cash collateral budgets during the pendency of their Cases.

As a result of the manner in which the Debtors' businesses were operated, the task of unwinding the corporate affairs and intercompany transactions, including the Intercompany Transfers, between and among the Debtors would be extremely time-consuming and costly to accomplish. It is not clear from the Debtors' books and records that all of the intercompany transactions (whether booked as gifts, loans, or other transfers) were fully documented and recorded in the financial records of the Debtors. Substantive consolidation is also appropriate because it would be impossible or impracticable to allocate between the Debtors the professional fees incurred by the professionals employed by the Debtors' Estates, who, themselves (like other creditors under the Plan), looked to both of the Estates for satisfaction of their claims.

As a result, the Plan Proponents have concluded that the time, expense, and delay of such an investigation related to the untangling of the Debtors' affairs are far outweighed by the benefits of substantive consolidation. In conjunction with confirmation of the Plan, the Plan Proponents will request approval of a settlement which includes the resolution of all Intercompany Claims and orders

the substantive consolidation of the Debtors for purposes of all distributions and other actions required under the Plan.

## VIII.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A CHAPTER 11 PLAN IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtors (and other Plan Proponents) CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the plan is feasible. These requirements are not the only requirements for confirmation.

### 1.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

### 2.    Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### 3.    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtors' schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

Detailed Claims Charts for Aftershock and RGTV are attached respectively hereto as **Exhibits "2" and "3"**. The Claims Charts identify all claims which were scheduled by the Debtors, including the amounts and priorities of the claims and whether the Debtors contend that the claims are disputed, contingent or unliquidated. The Claims Charts also identify all proofs of claim which were filed by creditors asserting claims against the Debtors, including the amounts and priorities of the claims asserted. The Debtors reserve the right to update and modify the Claims Charts at any time and to file objections to claims even if the Claims Charts do not identify any dispute relating to a particular claim.

### 4.    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

**The Debtors believe that members of Classes 1, 4, and 5 are impaired and entitled to vote to accept or reject the Plan.** Parties who dispute the Debtors' characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtors have incorrectly characterized the class.

### 5.    Who Is <u>Not</u> Entitled to Vote

The following four types of claims are <u>not</u> entitled to vote: (a) claims that have been disallowed; (b) claims in unimpaired classes (*i.e.*, Class 2 and 3); (c) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (d) claims in classes that are impaired but do not receive or retain any value under the Plan (*i.e.*, Classes 6 and 7). Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.

Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF A TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 6.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 7.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any Insiders within that class, or (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.[9]

### 8.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims in such class that actually voted on the plan, voted in favor of the plan.  A class of interests is considered to have "accepted" a plan when at least two-thirds (2/3) in amount of the interest-holders in such class that actually voted on the plan, voted to accept the plan.

### 9.    Treatment of Non-Accepting Classes

As noted above, even if an impaired class does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by

---

[9] The Debtors are soliciting approval of holders of Administrative Claims and Wage Claims to seek such holders' consent to the Plan's treatment of their claims.  These claimants are required to be paid in cash in full on the Effective Date unless they agree to accept a different treatment.  As a result, holders of these claims are being asked to accept a different treatment than what is required under the Bankruptcy Code.

the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

The Debtors will ask the Court to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan, and the Plan constitutes a request for confirmation by cramdown to the extent necessary.

**11.    Liquidation Analysis**

Another confirmation requirement is the "Best Interests Test."  Under the Best Interests Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee.  Pursuant to 11 U.S.C. § 326(a), the chapter 7 trustee receives compensation calculated as 25% of distributions up to $5,000; 10% of distributions between $5,001 and $50,000; 5% of distributions between $50,001 and $1,000,000; and 3% for distributions over $1,000,000.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under

the Plan as such holders would receive under a chapter 7 liquidation of the Debtors. The Debtors maintain that this requirement is met here.

The impaired classes under the Plan consist of classes 1, 4, and 5. The Debtors must therefore satisfy the Best Interests Test with respect to members of classes 1, 4, and 5 that do not vote to accept the Plan.

Here, the claimants in Classes 1, 4, and 5 (*i.e.*, the impaired classes entitled to vote) will either be: (1) paid the full amount of their Allowed Claims under the Plan on the Effective Date; (2) paid the full amount of their allowed claims under the Plan over time with interest or, alternatively; or (3) have agreed to less favorable treatment than the full payment of their claims. Since all such claim holders would be paid the full amount of their Allowed Claims, or agreed to less favorable treatment, all applicable holders of such Allowed Claims will therefore receive *not less* under the Plan than they would receive in a chapter 7 liquidation of the Debtors.

Conversion to Chapter 7 would not provide a better result for creditors of the Debtors for several reasons.

*First*, in a Chapter 7 case, distributions to creditors are delayed until the very end of the case, after the trustee completes all administrative matters and obtains approval from the court to make distributions. In a typical Chapter 7 case, the final accounting and approval for distributions to creditors takes several years from conversion. During that time, there are rarely any interim distributions to creditors. In contrast, the Plan proposes to make payments to certain creditors on the Plan Effective Date, and/or over time from Available Cash and/or Avoidance Action Proceeds. Thus, conversion to Chapter 7 will delay payments to creditors.

*Second*, if a Chapter 7 trustee were to attempt to administer the Debtors' assets, these assets would be sold or administered, and the net proceeds from the administration of property of the Estates available for distribution to creditors would be reduced by any commission payable to the Chapter 7 trustee and the trustees' attorneys' and accounting fees, as well as administrative costs of the Chapter 11 estate (such as the compensation for Chapter 11 professionals). Many of these fees and costs can be avoided if the Debtors remain in control, and allowed to effectuate the terms of the Plan which is projected to result in the full payment of Allowed creditor claims.

1    ***Third***,  as shown below and the Declaration of Roy A. Salter [Doc. No. 124-3] (the "Salter

2    Declaration") attached as **Exhibit "4"** hereto and other exhibits attached hereto, all creditors and

3    interest holders will receive at least as much under the Plan as such creditor or interest holder would

4    receive under a Chapter 7 liquidation of the Plan Proponents because, among other reasons and as set

5    forth below, ARC asserts that it is currently owed more than the $12,000,000 that it is agreeing to be

6    repaid pursuant to the New ARC Note and a "fire sale" liquidation of the Debtors would mean that

7    creditors other than ARC would recover nothing.

8    Specifically, given the nature of the Debtors' businesses, the primary assets of the Debtors'

9    estates are its IP rights (the "IP Rights") in the form of (1) the Distribution Rights to programs in the

10    RGTV Library; and (2) comic IP Rights that can be "optioned" out to, and potentially purchased by,

11    studios and streaming services for use in film and television.  Although the IP Rights have substantial

12    "going concern" value if there are employees to develop and maintain the income streams derived

13    therefrom (*e.g.*, to generate new sales and service existing agreements with regard to the Distribution

14    Rights, and to enter into and perform under the various option/purchase agreements with regards to

15    the Comic IP Rights), the Plan Proponents believe that the "liquidation" value of these assets is very

16    little, especially relative to their "going concern" value.  During the Cases, ARC submitted evidence

17    that placed a liquidation value on the Debtors' assets of $1,250,000, which would mean that general

18    unsecured creditors would receive nothing upon a Chapter 7 liquidation.[10]  In contrast, as set forth

19    in the Cash Flow Projections, general unsecured creditors are projected to receive 100% of their

20    Allowed Claims with interest over time under the Plan.  Further, under the Plan, should the Debtors

21    breach the Plan or be unable to make all required Plan payments, and should ARC take over the assets

22

23

---

24    [10] Attached as Exhibit "4" hereto is the Declaration of Roy Salter [Doc. No. 124-3] (the "Salter

25    Declaration") filed by ARC that placed a liquidation value on the Debtors' assets of $1,250,000.
Mr. Salter was retained as ARC's valuation expert, and the inclusion of the Salter Declaration as an

26    exhibit DS/P does not mean that the Debtors or Committees agree with the contents or conclusions
of the Salter Declaration.  In fact, the Debtors have filed pleadings disagreeing with, and the

27    Committees disagree with the contents and conclusions of the Salter Declaration.  However, the Plan
Proponents (including the Debtors and Committees) agree that all classes of creditors would fare

28    worse in a Chapter 7 liquidation compared to the treatment provided to these classes under the Plan.

or business, subject to any terms and conditions described herein, the creditors will still receive the payments due under the Plan, all as set forth in Section 11.20 herein.  *See* (Plan § 11.20).

As a result, the Plan provides vastly superior treatment to creditors compared to Chapter 7 liquidation and, therefore, satisfies the "best interests of creditors" test pursuant to Section 1129(a)(7) of the Bankruptcy Code.

### 12.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtors will have enough cash on hand on the Plan Effective Date to pay all the claims and expenses which are entitled to be paid on such date.  As shown in the Cash Flow Projections attached hereto, the Debtors will have sufficient cash on hand on the Plan Effective Date to enable the Reorganized Debtors to pay all the claims and expenses that will be paid pursuant to the Plan[10][11] on such date, enabling the Debtors to satisfy the first aspect of the feasibility analysis.  Based on the Plan, the following payments will be required to be made on or about the Effective Date:

| Class/Type | Claimant | Effective Date Payment |
|---|---|---|
| Admin | UST | $0 |
| Admin | Clerk of Court | $0 |
| Admin | All Other Allowed Administrative Claims | $460,000 (to be shared among Allowed Administrative Claims, *see* Section 3.2(A), below) |
| Admin | Allowed Priority Tax Claims (Est.) | $2,122.35 |
| Class 1 | ARC | $0 |

---

[10][11]    The Plan contemplates that holders of Allowed Administrative Claims, comprised primarily of unpaid fees and expenses of estate professionals, will agree to (1) share in the  $500,000 payment on the Effective Date pursuant to Section 3.2 of the Plan; and (2) defer payment of the remaining amount of their respective Allowed Administrative Claims to be paid in full over time pursuant to Section 3.1 of the Plan.  In order to proceed with confirmation of the Plan, the holders of **all** Allowed Administrative Claims, **including, without limitation, the holders of Allowed Wage Claims** must accept this deferred payment of such claims.  *See* discussion of Risk Factors at paragraph 13, below.

| | | |
|---|---|---|
| Class 2 | Other Secured Claims | $0 |
| Class 3 | Allowed Priority Non-Tax Claims | $0 |
| Class 4 | Gen. Unsec. Creditors | $40,000 (to be shared among Allowed Post-Petition Royalty Claims and Content Creator Claims, *see* Section 3.2(A), below) |
| Class 5 | Unsec. Claims of Insiders | $0 |
| Class 6 | Intercompany Claims | $0 |
| Class 7 | Equity | $0 |
| TOTAL | | $502,122.35 |

The second aspect considers whether the Reorganized Debtors will have enough cash over the life of the Plan to make the required Plan payments. Attached as **Exhibit 1** hereto are the Cash Flow Projections prepared on a monthly basis from the projected Effective Date through December 31, 2028, which demonstrate the ability of the Reorganized Debtors to make all of the Plan payments that are required to be made over time. The Debtors' projections are based upon detailed historical data of the Debtors.

## 13.    Risk Factors Regarding the Plan

One risk to the success of the Plan is that the Debtors' operations are not successful, and there is insufficient income to make the required Plan payments when they come due. Specifically, under the Plan, the only payments that are required to be made after the Effective Date are the interest-only payments made quarterly in arrears to ARC ("ARC Interest Payments"). Further, because all payments (except for the ARC Interest Payments) made to creditors under the Plan after the Effective Date will be from Available Cash and/or Avoidance Action Proceeds, if any, if the Debtors' operations are not successful, the Plan term or anticipated timeframe for these Allowed Claims to be Paid in Full may be extended.

Nonetheless, the Debtors' Cash Flow Projections are conservative. The Debtors are confident in the projected cash flow generated by the business operations of the Reorganized Debtors such that the Reorganized Debtors will have sufficient funds available to make all of the required or anticipated Plan payments when they come due. Projections, generally, are subject to uncertainty

and are based on assumptions that affect the information and projections presented herein. The Plan Proponents are unable to, and do not, provide any guarantees, representations, or assurances regarding the Reorganized Debtors' performance under the Plan.

Another risk factor to be considered with respect to confirmation of the Plan involves the payment of Allowed Administrative Claims. The Plan requires holders of Allowed Administrative Claims to agree to defer payment of their respective Allowed Claims and receive payments on account of such Allowed Claims over time, rather than to be paid in full on the Effective Date.[11][12] Certain employees who provided services to the Debtors during their bankruptcy cases have Allowed Administrative Claims are to receive an initial payment of 40% of the Allowed amounts thereof, with the remainder to be paid over a period of approximately 9 months. Professionals who have been employed at the expense of the Debtors' bankruptcy estates are also entitled to be paid in full on account of their Allowed Administrative Claims once their fees and costs have been allowed by the Bankruptcy Court. The Plan contemplates deferral of the payment of those Allowed Administrative Claims and payment over a period of approximately 39 months. **Importantly, the professionals who have rendered services to the Debtors' estates have agreed to permit holders of Allowed Wage Claims to receive superior treatment to them by agreeing: (1) to allow Wage Claims to be paid off sooner than Allowed Professional Fee Claims; and (2) to receive only 7.1% of their estimated claims on the Effective Date, so that the holders of Allowed Wage Claims can be paid 40% of their claims on the Effective Date.**

## IX.

## JOINT CHAPTER 11 PLAN

## ARTICLE I

## TERMINOLOGY AND DEFINITIONS

For purposes of the DS/P, (a) any reference in the DS/P to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means

---

[11][12] Under Section 1129(a)(9)(A), holders of Allowed Administrative Claims are entitled to receive payment in cash in full on account of their respective Allowed Claims unless they agree to a different treatment under a plan.

that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the DS/P to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (c) unless otherwise specified, all references in the DS/P to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the DS/P, (d) the words "herein," "hereof," and "hereto" refer to the DS/P in its entirety rather than to a particular portion of the DS/P, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the DS/P, and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.1** "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses, or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, and (c) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code.

**1.2** "**Administrative Claim Bar Date**" means the October 25, 2024 deadline by which claimants, other than the Estates' professionals, were required to file and serve requests for the payment of administrative expense priority claims described in Section 503(b) of the Bankruptcy Code and entitled to priority under 11 U.S.C. § 507(a)(2). The Administrative Claim Bar Date applies to administrative priority claims that have: (1) accrued prior to October 25, 2024; or (2) with respect to producers that have entered into acquisition agreements with RGTV, been described in sales reports that were issued prior to October 25, 2024.

**1.3** "**Administrative Claim Payments**" means the payments to holders of Allowed Administrative Claims as described in Section 3.2.A herein and subject to the other terms of the Plan.

**1.4** "**Allowed**" means, (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim that has been allowed, or adjudicated in favor of the holder by

estimation or liquidation, by a Final Order, that was incurred by one or both of the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become allowed by failure to object; (b) when used with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) as to which (x) no Proof of Claim has been filed with the Bankruptcy Court and (y) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (iii) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order, or other applicable bankruptcy law, and as to which either (x) at the time of the applicable distribution date, the Debtors have not identified such Claim as being objectionable in whole or part and no objection to the allowance thereof has been filed by the applicable Claims Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan; or (c) when used with respect to an Interest, an Interest held in the name, kind, and amount set forth on the records retained by the Debtors.

**1.5** "**ARC**" means Access Road Capital LLC.

**1.6** "**ARC Affiliate**" means an entity affiliated with ARC, that is designated by ARC in connection with the Plan.

**1.7** "**ARC Secured Claim**" means the Allowed Secured Claim, if any, of ARC.

**1.8** "**Assumed Contract/Lease Schedule**" means the schedule which identifies the executory contracts and unexpired leases to be assumed under the Plan and sets forth any Cure obligation associated with the assumption of such contracts and leases. The Assumed Contract/Lease Schedule will be filed as part of the Plan Supplement.

**1.9** "**Available Cash**" means the gross revenues and other income generated and received by the Reorganized Debtors in the ordinary course from current operations, minus all monthly operating expenses of the Debtors, including post-petition royalty and minimum guarantee payments and advances, minus all monthly selling, general and administrative expenses of the

Debtors including the purchase of fixed assets, minus all debt service payments payable by the Debtors under the Plan, minus a tax payment reserve (in an amount necessary to cover the estimated income tax distributions payable by the Debtors during the applicable tax year and excluding financing proceeds such as production loans, equity investments or co-production financing proceeds such as production loans, equity investments, or co-production financings, plus the payments of the Priority Tax Claims and Priority Non-Tax Claims provided under the Plan, if any), and minus a monthly operating reserve of $750,000.  A sample schedule for the quarterly calculation of Available Cash is annexed hereto as **Exhibit "6"**.

      **1.10**     "**Avoidance Actions**" means the Estates' causes of action under Chapter 5 of the Bankruptcy Code.

      **1.11**     "**Avoidance Action Proceeds**" means the Cash proceeds of any recovery and/or settlement from the Estates' causes of action under Chapter 5 of the Bankruptcy Code.

      **1.12**     "**Ballot**" means the form of ballot approved by the Bankruptcy Court for use by holders of Claims and Interests for purposes of voting to accept or reject the Plan.

      **1.13**     "**Bankruptcy Code**" means Section 101 et seq., of Title 11 of the United States Code, as now in effect or hereafter amended and applicable to the Chapter 11 Cases.

      **1.14**     "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Central District of California or such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof.

      **1.15**     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

      **1.16**     "**Bar Date**" means May 31, 2023, the date designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim against the Debtors other than Administrative Claims or Professional Claims.

      **1.17**     "**Board**" means the board of directors of Newco, as described more fully in Article 5.7 of the Plan.  The Reorganized Debtors shall be managed by Newco as sole member (as to Aftershock) and sole shareholder (as to RGTV).

      **1.18**     "**Business Day**" means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Rule 9006(a) of the Bankruptcy Rules), on which commercial banks are open for

business in Los Angeles, California.

**1.19** "**Cash**" means legal tender of the United States or equivalents thereof.

**1.20** "**Cash Flow Projections**" means the cash flow projections attached hereto as **Exhibit "1"** and made a part hereof.

**1.21** "**Chapter 11 Cases**" or "**Cases**" means the Chapter 11 bankruptcy case of AfterShock, which bears the case number 1:22-bk-11456-MB and the Chapter 11 bankruptcy case of RGTV, which bears the case number 1:22-bk-11457-MB.

**1.22** "**Claim**" has the meaning given in Section 101(5) of the Bankruptcy Code.

**1.23** "**Claims Objection Deadline**" means the later of (a) one hundred and twenty (120) days after the Effective Date, or (b) ninety (90) days after the applicable tardy Proof of Claim is filed and (c) for any Administrative Claim, the last day for filing objections to such Administrative Claim shall be ninety (90) days after the applicable Request for Payment of an Administrative Claim is filed.

**1.24** "**Class**" means a category of holders of Claims or Interests, as described in Articles II and III of the Plan.

**1.25** "**Committees**" means the Official Committees of Unsecured Creditors appointed pursuant to Section 1102(a) of the Bankruptcy Code in each of the Debtors' Chapter 11 Cases.

**1.26** "**Confirmation**" means approval of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

**1.27** "**Confirmation Date**" means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

**1.28** "**Confirmation Hearing**" means the hearing to consider Confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.29** "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan and approving associated findings of fact and conclusions of law.

**1.30** "**Content Creator Claim**" means the General Unsecured Claim of any party to whom the Debtors, or either of them, owe payments for the creation or development of new Intellectual Property for exploitation by AfterShock, whether arising prior to or after the Petition Date, and the operating expenses advanced or related to the Debtors' exploitation of such Intellectual

Property.

**1.31** "**Creditor**" means any Entity that holds a Claim against a Debtor.

**1.32** "**Cure**" means (a) with respect to the assumption of an executory contract or unexpired lease pursuant to Section 365(b) of the Bankruptcy Code, (i) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law, or (ii) the taking of such other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court.

**1.33** "**Cure Claim**" means the General Unsecured Claim of any counterparty to an executory contract or unexpired lease of the Debtors which must be paid or provided for in conjunction with the Reorganized Debtors' assumption of any such executory contract or unexpired lease on the Effective Date.

**1.34** "**Debtors**" means AfterShock and RGTV, each in its capacity as a debtor and debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**1.35** "**Disbursing Agent**" means any Entity designated by the Plan Proponents to serve as disbursing agent under the Plan and may be the CRO or designee thereof. If no third party is designated as Disbursing Agent, the Reorganized Debtors shall constitute the Disbursing Agent.

**1.36** "**Disclosure Statement**" means the written disclosure statement that relates to the Plan, as amended, supplemented, or modified from time to time, and distributed, in accordance with Section 1125 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules or any summary thereof approved by the Bankruptcy Court for distribution to certain Classes or categories of Claims and Interests.

**1.37** "**Disputed**" means (a) with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order, a Claim (i) as to which no Request for Payment or Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (ii) as to which a

Request for Payment or Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, but as to which an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court has been filed by the applicable Claims Objection Deadline, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) as to which a Request for Payment or Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Request for Payment or Proof of Claim was not timely or properly filed; (iv) for damages based upon the rejection by one or both of the Debtors of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed as of the applicable initial distribution date; (v) that is disputed in accordance with the provisions of the Plan; or (vi) if not otherwise Allowed, identified by one or both of the Debtors, as applicable, at the time of the applicable initial distribution date as being objectionable in whole or part and as to which an objection to the allowance thereof has been filed by the applicable Claims Objection Deadline; and (b) with respect to any Interest, an Interest held in a name, kind, or amount different from the name, kind, and amount set forth on the records retained by the Debtors.

**1.38** "**Effective Date**" means the first Business Day upon which all conditions to the consummation of the Plan as set forth in Section 9.2 of the Plan have been satisfied or waived as provided in Section 9.3 of the Plan, and is the date on which the Plan becomes effective.  When the Plan refers to a payment to be made on the Effective Date, the payment shall be made on the Effective Date or as soon as practicable thereafter.  Within five (5) days of the occurrence of the Effective Date, the Debtor will file a notice of Effective Date with the Court.

**1.39** "**Entity**" has the meaning given in Section 101(15) of the Bankruptcy Code.

**1.40** "**Estates**" means the bankruptcy estates of the Debtors in the Chapter 11 Cases created pursuant to Section 541 of the Bankruptcy Code.

**1.41** "**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as entered on the dockets in the Chapter 11 Cases or the dockets of any such court, the operation or effect of which has not been stayed, reversed, or amended and as to

which order or judgment the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the parties, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was validly appealed, or certiorari, reargument, or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired.

**1.42** "**General Unsecured Claims**" means a Claim against one or both of the Debtors that is <u>not</u> an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, ARC Claim, or Other Secured Claim.

**1.43** "**General Unsecured Other Claims**" means General Unsecured Claims other than unsecured Post Petition Royalty Claims and Content Creator Claims.

**1.44** "**Impaired**" means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.45** "**Insider**" has the meaning given in Section 101(31) of the Bankruptcy Code.

**1.46** "**Insider Claims**" means the Allowed Unsecured Claims of any Insider, including, without limitation, the Claims of Kramer and Lee Kramer.

**1.47** "**Intellectual Property**" **or "IP"** has the meaning ascribed to it in Section 101(35A) of the Bankruptcy Code, but, for the avoidance of doubt, expressly includes copyrights and works for hire.

**1.48** "**Interests**" means the legal, equitable, contractual, or other rights of any Entity (a) with respect to Old Debtors Interests and (b) to acquire or receive any of the foregoing.

**1.49** "**Kramer**" means Jonathan Kramer.

**1.50** "**Kramer Guarantee**" means a personal guarantee by Kramer of the Reorganized Debtors' payment and performance of their obligations under the New ARC Note, in form and substance acceptable to ARC.  The Kramer Guarantee will be secured by only the security interests

41

1  granted in the Kramer Security Documents and will be delivered by Kramer to ARC or the ARC

2  Affiliate on or before the Effective Date.  If there are any discrepancies between the description

3  provided herein and the terms of the Kramer Guarantee, the terms of the Kramer Guarantee shall

4  govern.

5      **1.51**    "**Kramer Security Documents**" means a mortgage or deed of trust (or other

6  security instrument acceptable to ARC) in form and substance acceptable to ARC, granting to ARC

7  or the ARC Affiliate a security interest in that certain single-family residence owned by Kramer and

8  located in Santa Monica, California as set forth in the Kramer Guarantee.  Until the New ARC Note

9  is Paid in Full, Kramer shall not transfer any interest (including granting any other mortgage or

10  security interest) in the real property pledged pursuant to the Kramer Security Documents without

11  the express written consent of ARC in its sole discretion.  If there are any discrepancies between the

12  description provided herein and the terms of the Kramer Security Documents, the terms of the Kramer

13  Security Documents shall govern.

14      **1.52**    "**New ARC Note**" means the senior secured note to be issued to ARC or ARC

15  Affiliate (as a Class 1 claimant) on the Effective Date under the Plan, as described in Section 3.3A

16  herein, *provided* that if so directed by ARC, the New ARC Note may consist of an amended version

17  of the existing promissory note made by the Debtors to ARC.  The form of the New ARC Note will

18  be filed with the Plan Supplement.

19      **1.53**    "**New Debtors Interests**" means collectively, the new Interests in the Reorganized

20  Debtors to be issued to Newco on the Effective Date.

21      **1.54**    "**Newco**" means an entity formed by ARC on or before the Effective Date, to which

22  the New Debtors Interests shall be issued.  Unless otherwise determined by ARC in its sole discretion,

23  Newco shall be a Delaware Limited Liability Company treated as a partnership for tax purposes.

24  Newco shall have a single class of membership interests (the Newco Units, as defined below).  On

25  the Effective Date, Newco shall issue 1,000 total Newco Units as set forth in Article 5.2 below.

26      **1.55**    "**Newco Units**" means the membership interests in Newco.

27      **1.56**    "**Old Debtors Interests**" means, collectively, the Old AfterShock Interests and the

28  Old RGTV Interests issued and outstanding prior to the Effective Date, including any options or rights

to purchase or acquire such Interests, or other conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any such Interests that were outstanding as of the Petition Date.

1.57 "**Old AfterShock Interests**" means the Interests in AfterShock as of the Petition Date.

1.58 "**Old RGTV Interests**" means the Interests in RGTV as of the Petition Date.

1.59 "**Other Secured Claim**" means a Secured Claim arising prior to the Petition Date against one or both of the Debtors, other than the ARC Claim.

1.60 "**Paid in Full**" means, with respect to any Allowed Claim, that the Holder of such Claim has received all amounts to which such Holder is entitled to receive under the Plan on account of such Claim.

1.61 "**Person**" has the meaning given in Section 101(41) of the Bankruptcy Code.

1.62 "**Petition Date**" means December 19, 2022 the date on which the Debtors filed their voluntary petitions for relief commencing the Chapter 11 Cases.

1.63 "**Plan**" means the plan of reorganization under Chapter 11 of the Bankruptcy Code and all exhibits annexed hereto or referenced herein, as the same may be amended, modified, or supplemented from time to time.

1.64 "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, replaced, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), which shall be filed at least ten (10) days prior to the deadline to object to Confirmation of the Plan or such later date as may be approved by the Bankruptcy Court.

1.65 "**Post Petition Royalty Claims**" means the General Unsecured Claim of licensors of Intellectual Property which relate to royalties accrued following the Petition Date but prior to the Effective Date other than Content Creator Claims (and only to the extent that the licensor of any Intellectual Property agrees that the Reorganized Debtors can retain the Debtors' pre-Petition Date rights and continue to exploit the applicable Intellectual Property after the Effective Date), and the operating expenses advanced or related to the Debtors' exploitation of such Intellectual Property.

1.66    "**Priority Non-Tax Claim**" means a Claim against one or both of the Debtors entitled to priority pursuant to Sections 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.67    "**Priority Tax Claim**" means a Claim of a governmental unit that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

1.68    "**Priority Wage Claim**" means an unsecured claim for unpaid wages, salaries, commissions, severance pay, and employee benefit contributions pursuant to Section 507(a)(4) of the Bankruptcy Code.

1.69    "**Professional**" means any professional employed in the Chapter 11 Cases by order of the Bankruptcy Court and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b) of the Bankruptcy Code.

1.70    "**Professional Fee Claim**" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Confirmation Date.

1.71    "**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court in connection with one or both of the Chapter 11 Cases.

1.72    "**Rejected Contract/Lease Schedule**" means the schedule which identifies the executory contracts and unexpired leases to be rejected under the Plan.  The Rejected Contract/Lease Schedule will be filed with the Plan Supplement.

1.73    "**Released Causes of Action**" means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are released, waived, and discharged pursuant to Sections 11.8-11.13 of the Plan or pursuant to any agreement, contract, instrument, release, or document entered into in connection with the Plan.

1.74    "**Releasing Party**" has the meaning set forth in Section 11.9 of the Plan.

1.75    "**Reorganized Debtors**" means Aftershock and RGTV, as reorganized pursuant to the Plan, on and after the Effective Date.

1.76    "**Request for Payment**" means a request for payment of an Administrative Claim filed with the Bankruptcy Court in connection with one or both of the Chapter 11 Cases.

1.77    "**Retained Litigation Rights**" means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are property of the Estates, whether arising under the Bankruptcy Code or non-bankruptcy law that are not Released Causes of Action.

1.78    "**Schedules**" means the statements of financial affairs and the schedules of assets, liabilities, and contracts filed in the Bankruptcy Court by the Debtors, as amended or supplemented from time to time in accordance with Rule 1009 of the Bankruptcy Rules or orders of the Bankruptcy Court.

1.79    "**Secured Claim**" means a Claim that is secured by a lien that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which the Estates have an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code; to the extent of the value of the Claim holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

1.80    "**Step 1 Sharing Date**" means the date when ARC or ARC Affiliate has received $12,000,000 in aggregate principal reduction payments on account of the New ARC Note pursuant to Section 3.1 herein.

1.81    "**Step 2 Sharing Date**" means the date when (a) the Step 1 Sharing Date has occurred and (b) Holders of Allowed Content Creator Claims and Post-Petition Royalty Claims, Allowed Class 4 General Unsecured Claims, and Allowed Professional Fee Claims have received distributions totaling $1,500,000 in the aggregate on account of such Allowed Claims pursuant to Section 3.1 herein.

1.82    "**Unimpaired**" means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.83    "**Voting Deadline**" means the deadline established by the Bankruptcy Court by which the holders of Claims and Interests in Classes that are entitled to vote on the Plan must submit

the Ballot indicating such holder's vote on the Plan, in accordance with the procedures set forth in the Disclosure Statement and the instructions provided with the Ballot.

**1.84** **"Wage Claim"** means the post-Petition Date Claim by any employee (present or former) of the Debtors that was earned but remains unpaid as of the Effective Date, along with any associated payroll taxes (including, without limitation, the Debtors' portion of any such taxes).

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 2.1    Introduction

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Section 3.2 of the Plan.

**2.2** **A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. A Claim or Interest may be bifurcated and classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. Classes of Claims and Interests**

| CLASS | TREATMENT |
|---|---|
| Class 1, Allowed ARC Secured Claim | Impaired, entitled to vote on the Plan |
| Class 2, Allowed Other Secured Claims | Unimpaired, not entitled to vote on the Plan |
| Class 3, Allowed Priority Non-Tax Claims | Unimpaired, not entitled to vote on the Plan |
| Class 4, Allowed General Unsecured Claims | Impaired, entitled to vote on the Plan |
| Class 5, Allowed Insider General Unsecured Claims | Impaired, entitled to vote on the Plan |
| Class 6A & 6B, Intercompany Claims | Impaired, deemed to reject the Plan |
| Class 7A & 7B, Allowed Old Debtors Interests | Impaired, deemed to reject the Plan |

## ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

### 3.1    Available Cash Payments

After payment(s) that are required to be made under the Plan on the Effective Date have been made, subsequent payments from Available Cash, if any, to holders of Allowed Administrative

Expense Claims and other claims shall be allocated as follows:

(1)    **Until the occurrence of the Step 1 Sharing Date**, all Available Cash shall be allocated and paid quarterly as follows: (1) 80% to the holders of non-Insider Allowed Wage Claims until Paid in Full; (2) 20% to ARC as principal reduction on the New ARC Note until non-Insider Allowed Wage Claims are Paid in Full, then 100% until the Step 1 Sharing Date.  The Debtors project that the Step 1 Sharing Date shall occur within approximately 30 months following the Effective Date.

(2)    **Upon the occurrence of the Step 1 Sharing Date and until the occurrence of the Step 2 Sharing Date**, all Available Cash shall be allocated and paid quarterly as follows: (1) 25% to the holders of Allowed Content Creator Claims and Post-Petition Royalty Claims[~~12~~13]; (2) 25% to Allowed Class 4 General Unsecured Other Claims; and (3) 50% to Allowed Professional Fee Claims.  The Debtors project that the time between the Step 1 Sharing Date and the Step 2 Sharing Date will be approximately 3 months.

(3)    **Upon the occurrence of the Step 2 Sharing Date and thereafter**, all Available Cash shall be allocated and paid quarterly as follows: (1) one third (1/3) to the holders of Allowed Content Creator Claims and Post-Petition Royalty Claims until Paid in Full; (2) one third (1/3) to Allowed Class 4 General Unsecured Other Claims until Paid in Full; and (3) one third (1/3) to Allowed Professional Fee Claims until Paid in Full.  The Debtors project that, excluding Class 5 insider claims, final payment of all amounts due to holders of Allowed Claims shall occur within approximately 42 months following the Effective Date.

(4)    For the avoidance of doubt, the amounts allocated to each Class of Claims under this Article 3.1 shall be further allocated pro rata among the Allowed Claims in such Class, subject to an appropriate reserve in respect of any Disputed Claims in each Class.

---

[~~12~~13] Content Creator Claims and Post-Petition Royalty Claims to be paid only if contracts/licenses are assumed and retained post-effective date.  Royalty payments coming due after the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors.

**3.2      Unclassified Claims**

A.      Administrative Claims:

On the Effective Date of the Plan, the Reorganized Debtors shall pay to or reserve for the holders of Allowed Administrative Claims (including, but not limited to, Allowed Wage Claims, professional fees and other claims for goods/services incurred during the bankruptcy cases) and Allowed Content Creator Claims and Post-Petition Royalty Claims the sum of $500,000 (the "Effective Date Shared Admin Claims Payments"), payment of which will be distributed on or around the Effective Date as follows: (1) Allowed Unpaid Wage Claims would be paid 40% of their claims; (2) Allowed Content Creator Claims and Post-Petition Royalty Claims will share *pro rata* in $40,000; and (3) Allowed Professional Fee Claims (and any other Allowed Administrative Claims to the extent there are any) will share *pro rata* in the remaining amount of the Effective Date Shared Admin Claims Payment.  The Effective Date Shared Admin Claims Payments yield a recovery by the holders of Allowed Administrative Claims of approximately **11%** on the Effective Date.  Thereafter, the remaining balance of Allowed Administrative Claims shall be paid quarterly from any Available Cash in the manner set forth in Section 3.1 herein.

The following chart lists all of the Debtors' known[13][14] Administrative Claims, in the amounts the Debtors estimate will be unpaid on the Effective Date, and their treatment under the Plan:

| Name | Amount Owed (Presumed Allowed) | Treatment | Amount and % of Claim to be Paid From $500,000 Effective Date Payment |
|------|-------------------------------|-----------|----------------------------------------------------------------------|
|      |                               |           |                                                                      |

---

[13][14] The Administrative Claims Bar Date was October 25, 2024, and applies to administrative priority claims that have accrued (or, with respect to producers, where sales reports were issued prior to) October 25, 2024.  Any person or entity (other than professionals employed at the expense of the Debtors' estate) that failed to timely file an administrative expense priority claim before October 25, 2024 shall be precluded and barred from asserting a right to payment of that claim anytime thereafter.

| | | | |
|---|---|---|---|
| Levene, Neale, Bender, Yoo & Golubchik L.L.P., bankruptcy counsel to the Debtors | $2,200,000<br><br>(estimated) | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 39 months following the Effective Date. | $156,298.69<br><br>7.1% recovery |
| Sklar Kirsh, LLP, counsel for the Committees | $700,000 (estimated balance after payment and application of $50,000 reserved for payment of Committees' professionals' fees upon entry of fee order)[14][15] | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 39 months following the Effective Date. | $49,731.40<br><br>7.1% recovery |
| Michael V. Bales, Esq., special business counsel to the Debtors | $19,835 | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 39 months following the Effective Date. | $1,409.17<br><br>7.1% recovery |

---

[14][15] The Debtors have previously reserved, and placed into a segregated bank account $75,000 to pay towards the fees and expenses of the Committees' professionals pursuant to Court order. The $75,000 will be allocated as follows: (1) $50,000 to Sklar Kirsh, LLP, and (2) $25,000 to Dundon Advisers, LLC, and is to be paid only if the Court approves the fee applications of these professionals and authorizing the release of the $75,000. In addition, the Allowed Professional Fee Claims set forth in this chart are an estimate of such claims; the actual amount of such claims will only be fixed after the Bankruptcy Court has ruled on the fee applications of such claimants.

| | | | |
|---|---|---|---|
| Sacker Law P.C., special entertainment counsel to the Debtors | $45,000 | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 39 months following the Effective Date. | $3,197.02<br><br>7.1% recovery |
| Exceptional Leaders International, financial advisor and consultant to the Debtors | $250,000 (estimated) | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 39 months following the Effective Date. | $17,761.21<br><br>7.1% recovery |
| Dundon Advisers, LLC, financial advisors to the Committees | $350,000 (estimated balance after payment and application of $25,000 reserved for payment of Committees' professionals' fees upon entry of fee order) | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 39 months following the Effective Date. | $24,865.70<br><br>7.1% recovery |

| Present and Former Employees holding Allowed Wage Claims[15][16] | $516,842 | Participate in Effective Date Shared Admin Claims Payment under section 3.2 herein and Administrative Claim Payments under Section 3.1 herein. Projected to be paid in full within 9 months following the Effective Date. | $206,736.80<br><br>40% recovery |
|---|---|---|---|
| Clerk's Office Fees | $0 (estimated) | Paid in full by the Reorganized Debtors on the Effective Date | $0 |
| Office of the U.S. Trustee Fees | $0 (estimated) | Paid in full by the Reorganized Debtors on the Effective Date | $0 |
| **Total:** | **$4,081,677** | | $460,000 |

The Court must rule on all Professional Fee Claims listed in the chart above before the fees will be owed, except for fees owing to the Clerk's Office, U.S. Trustee, present and former employees, or content creators, or fees to be paid from non-Debtors sources. The Professional in question must file and serve a properly noticed fee application, and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under the Plan.

     B.    <u>Priority Tax Claims</u>:

Priority Tax Claims include certain income, employment and other taxes described by 11 U.S.C. § 507(a)(8) not secured by a lien in the Debtors' assets. The Bankruptcy Code requires that each holder of such a Section 507(a)(8) Priority Tax Claim receive the present value of such claim in regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to

---

[15][16] As noted above, the Bankruptcy Court fixed October 25, 2024 as the deadline by which certain holders of Administrative Claims were required to file a request for payment of their respective claims. Not all of the employees holding Allowed Wage Claims filed timely Administrative Claims. Notwithstanding the foregoing, the Plan contemplates paying the Allowed Wage Claims of all known present and former employees as if timely requests for payment had been filed.

the allowed amount of such claim; (ii) over a period ending not later than five (5) years after the

Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured

claim provided for under the Plan.

The following table lists all of the Debtors' Section 507(a)(8) Priority Tax Claims and their

treatment under this Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| California Franchise Tax Board (against AfterShock) | $612.36 *priority claim based on the proof of claim filed by Franchise Tax Board | Allowed Claim to be paid in full by the Reorganized Debtors on the Effective Date. |
| California Franchise Tax Board (against RGTV) | $800.00 *Scheduled | Allowed Claim to be paid in full by the Reorganized Debtors on the Effective Date. |
| Internal Revenue Service (against AfterShock) | $509.99 *priority claim based on the proof of claim filed by Internal Revenue Service | Allowed claim to be paid in full by the Reorganized Debtors on the Effective Date. |
| Internal Revenue Service (against RGTV) | $200 *priority claim based on the proof of claim filed by Internal Revenue Service | Allowed claim to be paid in full by the Reorganized Debtors on the Effective Date. |
| TOTAL | $2,122.35 ~~16~~17 | |

### 3.3    Classified Claims and Interests

A.    <u>Allowed Secured Claims</u>:

Secured Claims are claims secured by liens on property of the Estates.  The following table

lists all of the Debtors' known Secured Claims and their treatment under this Plan:

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| 1 | Claim: Allowed ARC | N | Y | On the Effective Date, ARC shall receive the New ARC |

---

~~16~~17 This amount will be paid in addition to the $500,000 made available to pay a portion of Allowed
Administrative Expense Claims.

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | Secured Claim<br><br>Total Amount of ARC Secured Claim: $12,000,000<br><br>Collateral: All or substantially all of the Debtors' assets<br><br>Projected Payoff: approximately 30 months following the Effective Date | | | Note, subject to the following terms:<br><br>Principal balance: $12,000,000<br><br>Term: 4 years following the Effective Date. All principal and unpaid interest on the New ARC Note will be due upon maturity.<br><br>Interest Rate: 10% per annum<br><br>Payment Terms: Interest payments shall be paid quarterly in arrears, payable thirty (30) days following the end of the preceding quarter. Further, following the Effective Date, ARC shall be paid quarterly from any Available Cash to pay down the principal of the New ARC Note in the manner described in Section 3.1 herein.<br><br>Collateral: First lien on all assets of Newco (including but not limited to Newco's membership interests in the Reorganized Debtors) and of the Reorganized Debtors. Kramer shall execute and deliver the Kramer Guarantee and the Kramer Security Documents to ARC on or before the Effective Date.<br><br>Equity in Newco: ARC Affiliate will own 750 Newco Units (100% of the outstanding Newco Units) on the Effective Date; after the Allowed ARC Secured Claim has been Paid in Full, ARC |

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | shall surrender 650 Newco Units (65% of the total Newco Units) to Newco as treasury interests and thereafter will own 10% of the then-issued and outstanding Newco Units; and the ARC Affiliate will participate in any liquidity event based upon its equity ownership.~~17~~18 |
| 2 | Claim: Allowed Other Secured Claims  Total Amount of Allowed Other Secured Claims: $0 (estimated) | N | N | The Debtors are not aware of any Allowed Other Secured Claim(s). Should such Allowed Other Secured Claims exist, such claims shall be paid in Cash on the Effective Date or reinstated. |

B.    Allowed Priority Non-Tax Claims:

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  The Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of Priority Non-Tax Claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| 3 | Claim: Allowed Priority Non-Tax Claims  Total Amount of Allowed Priority | N | Y | Other than any Allowed pre-petition Priority Wage Claims, the Debtors are not aware of any Allowed Priority Non-Tax Claims. |

---

~~17~~18 The Debtors collectively have millions of dollars of unused NOLs, *see* (Aftershock Doc. No. 93); (RGTV Doc. No. 16).  The occurrence of the Effective Date may impact the NOLs and the Reorganized Debtors' ability to use them.  *See* Section VI.2., above.

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | Non-Tax Claims: $0 | | | All Allowed Priority Non-Tax Claims (including pre-petition Priority Wage Claims) will be paid in full on the Effective Date. |

C.    Allowed General Unsecured Claims:

General Unsecured Claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  The following chart identifies the Plan's treatment of the class containing all of the Debtors' Allowed General Unsecured Claims:

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| 4 | Claim: Allowed General Unsecured Claims against both Debtors<br><br>Total Amount of Allowed General Unsecured Claims: Approximately $9,979,000[18][19]<br><br>Projected Payoff: approximately 42 months following the Effective Date (39 months for Allowed Content Creator and Post-Petition Royalty Claims) | N | Y | Holders of Allowed General Unsecured Claims shall receive their *pro rata* share of the funds available to pay such Allowed General Unsecured Claims in the amounts and in the manner set forth in Sections 3.1 and/or Section 3.2 herein and the Cash Flow Projections. Payments pursuant to the Plan shall continue as shown in the Cash Flow Projections until such time as all Allowed General Unsecured Claims have been paid in full. The Debtors estimate that such full payment shall occur by not later than the fourth anniversary of the Effective |

---

[18][19] This figure is derived from the Debtors' records, Schedules of Assets and Liabilities, and from a review of the proofs of claim that have been filed through the date of the Plan.  As provided below, all holders of Class 4 Claims shall be afforded sixty (60) days following the Effective Date of the Plan within which to amend their respective proofs of claim based on additional information which they may receive from the Debtors.  If the amount of Class 4 Claims materially increases, the timing of the payoff of that Class may be delayed.

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | Date.[1920] |
| | | | | General Unsecured Claims shall receive interest on account of the unpaid portion of their respective claims at the rate of 5% per annum to be paid as set forth on the Cash Flow Projections. |
| | | | | In addition to the payments described above, holders of Allowed General Unsecured Claims will also receive their *pro rata* share of any Avoidance Action Proceeds (net of any applicable legal fees and expenses). |
| | | | | In no event shall holders of Allowed General Unsecured Claims be entitled to distributions which, in the aggregate, exceed the Allowed amounts of their respective Claims plus 5% interest. |
| | | | | In addition, holders of Class 4 Claims shall continue to receive the treatment set forth herein (payable solely by the Reorganized Debtors and any successor thereof, and not by ARC or the ARC Affiliate) should there be a default under the Plan and ARC exercises its remedies as set |

---

[1920] As set forth in Section 3.1 herein, Class 4 General Unsecured Creditors consists of the following categories of unsecured claims: Content Creator Claims, Post-Petition Royalty Claims, and General Unsecured Other Claims. Any monetary Cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied: (a) on a deferred basis in accordance with the Plan's treatment provided to General Unsecured Claims, (b) as due in the ordinary course of business; or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

| CLASS | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | forth in Section 11.20 herein. |
| 5 | Claim: Allowed General Unsecured Claims of Insiders<br><br>Total Amount of Allowed General Unsecured Claims of Insiders: $4,150,402.20 (Est.)<br><br>Projected Payoff to occur after all other creditors are paid in full. | Y | Y | Holders of Allowed General Unsecured Claims of Insiders shall not receive any distribution on account of such Allowed Claims until such time as Class 1 Claims have been Paid in Full and holders of Class 4 Claims have received distributions totaling at least 75% of the amount of such Allowed Class 4 Claims plus interest thereon (the "Class 5 Commencement Date"). Thereafter, Class 5 Allowed Claims shall be paid in full in installments pursuant to the Cash Flow Projections.[20][21]<br><br>Allowed General Unsecured Claims of Insiders shall accrue simple interest on account of the unpaid portion thereof at the rate of 5% per annum until Paid in Full.<br><br>In no event shall holders of Allowed General Unsecured Claims of Insiders be entitled to distributions which, in the aggregate, exceed the Allowed amounts of their respective Claims plus accrued interest. |

---

[20][21] By way of clarification, upon the occurrence of the Class 5 Commencement Date and in accordance with the Cash Flow Projections, Allowed Class 5 Claims and the remaining 25% of Allowed Class 4 Claims will be paid at the same time in accordance with the terms of the Plan (*i.e.*, Class 5 Claims would not be paid in full ahead of Class 4 Claims).

### D.    **Intercompany Claims**

This Plan constitutes a request that the Court make findings and conclusions that, on or before the date the Debtors filed their chapter 11 petitions, (a) the activities of the Debtors were substantially intertwined; (b) the Debtors' financial records have generally been consolidated; and (c) since the Plan contemplates substantive consolidation of the Debtors, all Intercompany Claims should be extinguished.    Consistent with the foregoing request, the following chart describes the Plan's treatment of the classes containing all of the Intercompany Claims:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 6A | Aftershock Intercompany Claims, if any<br><br>Estimated Claim Amount: Unknown | Y<br><br>Impaired; holders of Claims in this class are <u>not</u> entitled to vote on the Plan because they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. | On the Effective Date, all Aftershock Intercompany Claims shall be extinguished and Aftershock shall receive nothing on account of such Claims. |
| 6B | RGTV Intercompany Claims, if any<br><br>Estimated Claim Amount: Unknown | Y<br><br>Impaired; holders of Claims in this class are <u>not</u> entitled to vote on the Plan because they are deemed to have rejected the Plan pursuant to Section | On the Effective Date, all RGTV Intercompany Claims shall be extinguished and RGTV shall receive nothing on account of such Claims. |

|  |  | 1126(g) of the Bankruptcy Code. |  |
|---|---|---|---|

E.      Interests:

Interest holders are the parties who hold an ownership interest (*i.e.*, equity interest) in the Debtors.  The following chart identifies the Plan's treatment of the classes of interest holders:

| CLASS | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 7-A | All Interests in AfterShock | Y (Interest Holders in this Class are deemed to reject the Plan) | On the Effective Date, all of the Old AfterShock Interests shall be canceled and the holder(s) of the Old AfterShock Interests shall neither receive nor retain any property on account of such Interests. |
| 7-B | All Interests in RGTV | Y (Interest Holders in this Class are deemed to reject the Plan) | On the Effective Date, all of the Old RGTV Interests shall be canceled and the holder(s) of the Old RGTV Interests shall neither receive nor retain any property on account of such Interests. |

## ARTICLE IV

### ACCEPTANCE OR REJECTION OF THE PLAN

**4.1      Impaired Classes of Claims Entitled to Vote**

Holders of Claims in each Impaired Class of Claims and Interests are entitled to vote as a Class to accept or reject the Plan, other than Classes that are deemed to reject the Plan.  The votes of holders of Claims in Classes 1, 4 and 5 shall be solicited with respect to the Plan.

**4.2      Presumed Acceptances by Unimpaired Classes**

With respect to Classes of Claims against the Debtors, Classes 2 and 3 are Unimpaired under the Plan.  Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of holders of such Unimpaired Claims

shall not be solicited.

**4.3     Presumed Rejection by Classes 6 and 7**

With respect to Classes 6 and 7 under the Plan, since holders of Classes 6 and 7 Claims/Interests neither receive nor retain anything on account of such Claims/Interests, holders of Classes 6 and 7 Claims/Interests are deemed not to have accepted the Plan, and the votes of holders of such Claims/Interests shall not be solicited.

**4.4     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  The Plan Proponents reserve the right to alter, amend, or modify the Plan to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

<u>**ARTICLE V**</u>

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**5.1     Funding for the Plan**

The Plan will be funded by the Debtors' Cash on hand as of the Effective Date,[21][22] and from the Available Cash resulting from the business operations of the Reorganized Debtors.  The Cash Flow Projections set forth the projected amount and timing of payments to be made by the Reorganized Debtors under the Plan.

**5.2     Newco Units and New Debtors Interests**

On or before the Effective Date, Newco shall be created to hold all of the New Debtors Interests.  On the Effective Date, 100% of the New Debtors Interests shall be deemed issued to Newco and Newco will become the 100% parent of each of the Reorganized Debtors.  On the Effective Date, Newco shall be deemed to have issued 75% of the total Newco Units to the ARC Affiliate and 25% of the total Newco Units to be held by Newco as treasury Newco Units.  As such, on the Effective

---

[21][22] According to the Debtors' most recent January 2025 monthly operating reports, the Debtors collectively had cash on hand in the amount of approximately $1.29 million.  *See* (Aftershock, Doc. No. 532); (RGTV, Doc. No. 47).

Date, the only holder of outstanding Newco Units shall be ARC Affiliate.

Notwithstanding anything herein to the contrary, to the extent the structure of Newco may be modified so as to preserve any favorable tax attributes of the Debtors under applicable law, the Debtors reserve the right to so modify the ownership structure of Newco and/or the Reorganized Debtors at any time until the Effective Date with the consent of ARC, *provided* that any ownership structure will be predicated upon ARC directly or indirectly owning 100% of the Reorganized Debtors as of the Effective Date, subject to dilution on the terms set forth herein.  After the New ARC Note has been Paid in Full, ARC's direct and indirect ownership of the Reorganized Debtors shall be reduced to 10%.  The Plan contemplates that, in conjunction with their respective employment agreements, Kramer and Lee Kramer (collectively, the "Kramers") shall receive distributions of the shares reserved by the Reorganized Debtors over time.[23]  This participation in the equity ownership of the Reorganized Debtors is a material condition to the Kramers' willingness to continue to provide their respective services to the Reorganized Debtors.

**5.3    Corporate Existence**

Reorganized Aftershock and Reorganized RGTV shall separately exist after the Effective Date as a limited liability company and corporation, respectively, in accordance with the applicable laws in the jurisdiction in which they are organized, without prejudice to the rights of Newco as sole member of Aftershock and sole shareholder of RGTV to restructure each of the Reorganized Debtors in such manner as the Board may deem appropriate in its business judgment.

---

[23] For example, if Newco were to issue membership interests on the Effective Date of the Plan, 75% would be distributed to the ARC Affiliate on the Effective Date, and 25% would be held in reserve.  As such, the ARC Affiliate will own 100% of the outstanding equity in Newco immediately following confirmation of the plan.  If employees are entitled to receive 5% after year 1 of the plan, the ARC Affiliate would still own 75%, but would have its ownership interest diluted by 6.25% (5% of total issued equity), and therefore own 93.75% of Newco.  After 5 years, assuming all conditions to distribution have been satisfied under applicable employment agreements, the ARC Affiliate would own 75%, and designated employees would own up to 25%, resulting in an ultimate 75% ownership of Newco for the ARC Affiliate.  After the New ARC Note has been paid in full, the ARC Affiliate will surrender 65% of the equity interests in Newco back to Newco for redistribution at the discretion of management, but will retain 10% in Newco and participate pro rata in any Liquidity Event (as defined below).

**5.4**      **Revesting of Assets; Releases of Liens**

Other than as set forth herein, the property of the Debtors' Estates, including all Cash on deposit in debtor in possession accounts, and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities held or asserted by the Debtors shall revest in the Reorganized Debtors on the Effective Date, free and clear of all liens, Claims, encumbrances and interests, except as expressly provided in the Plan, *provided*, for the avoidance of doubt, that all liens and security interests existing in favor of ARC shall remain unaffected by confirmation of the Plan or the occurrence of the Effective Date. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of the foregoing property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court, except for the restrictions set forth in this Plan.

**5.5**      **Cancellation of Pre-Effective Date Claims and Interests**

On the Effective Date, except as otherwise specifically provided for in the Plan, all Claims against and Interests in the Debtors shall be canceled and discharged.

**5.6**      **Authorization and Issuance of New Securities**

The Reorganized Debtors shall issue the New Debtors Interests on the Effective Date to Newco.

**5.7**      **Officers and Directors of Newco; Management of Reorganized Debtors**

Newco shall be governed by a Board comprised of seven (7) members, selected as follows:

- **Until the New ARC Note has been Paid in Full**, the Board shall consist of three (3) members selected by the ARC Affiliate in its sole discretion, two (2) members selected by the Committees (one representative for each Committee), one (1) member selected by Kramer, and one (1) independent director selected by the ARC Affiliate with the approval of the Committees and Kramer, not to be unreasonably withheld. The minimum standards for determining the independence of the independent director are set forth on **Exhibit "7"** annexed hereto. The Committees and/or Kramer (or the Reorganized Debtors) are not precluded from suggesting individuals to serve as the independent director, and any candidate proposed by the Committees and Debtors will

1    receive the same consideration as a candidate proposed by ARC.

2    • **Once the New ARC Note has been Paid in Full**, the members of the Board selected

3    by the ARC Affiliate shall resign and a fifth board member shall be designated by

4    Kramer, subject to the Committees having no objection to the designation.

5    • **When all other Allowed Claims (other than Insider General Unsecured Claims)**

6    **have been Paid in Full under the Plan**, all directors appointed by the Committees

7    shall resign from the Board and their replacements shall be designated by Kramer.

8    The Board shall meet no less frequently than quarterly, and members of the Board shall be

9    entitled to reimbursement for their actual out-of-pocket costs incurred in attending a meeting of the

10   Board in person.  The Board shall have no day-to-day management control over the Reorganized

11   Debtors.  The fiduciary duties of the Board shall be as determined by Delaware law.  The members

12   of the initial Board shall be identified in the Plan Supplement.

13   On or before the Effective Date, the Reorganized Debtors shall hire an independent financial

14   advisor to be designated as the "Chief Restructuring Officer" ("CRO") of the Reorganized Debtors.

15   The CRO shall be selected by the ARC Affiliate, with the Committees' and Kramer's approval, not

16   to be unreasonably withheld.  The Committees and Kramer are not precluded from suggesting

17   individuals to serve as the CRO.  The CRO shall perform the functions of a chief financial officer

18   until such time as the Reorganized Debtors selects a chief financial officer, controller, or other

19   financial professional acceptable to the members of the Board, in their respective reasonable

20   discretion.

21   The CRO shall be consulted by the Reorganized Debtors' management with respect to all

22   operating budgets and management decisions, and report directly and solely to the board of directors.

23   The CRO shall oversee the operations of the Reorganized Debtors but not conduct day-to-day

24   business.  Compensation of the CRO will be $10,000 per month or less, with the scope and time

25   commitments to be negotiated with the CRO and the express job duties shall be set forth in writing.

26   The CRO shall provide monthly and quarterly reports to the board of directors, including, without

27   limitation, a budget to actual reconciliation.  The CRO shall also supervise the disbursements made

28   by the Reorganized Debtors as the Disbursing Agent (who will provide such services at no charge)

to be made to holders of Allowed Claims under the Plan.  The initial roles and responsibilities of the CRO are set forth on **Exhibit "5"**.

The post-confirmation management of the Reorganized Debtors shall be determined by the Board; *provided, however*, that the Kramers shall be retained by the Reorganized Debtors to perform certain executive services as set forth in employment agreements detailing the terms and conditions of the Kramers' continued employment by, and management of the Reorganized Debtors from the Effective Date through the expiration or earlier termination of such agreements (the "Employment Agreements").  The proposed Employment Agreements shall be filed with the Plan Supplement, containing the following principal terms with respect to the Kramers' continued employment are:

- The Kramers shall devote substantially all of their full business time to faithfully perform their services to the Reorganized Debtors for a term of three (3) years from the Plan's Effective Date, and such employment may be terminated for Cause, as defined in the Employment Agreements.

- The Kramers will report to the Board comprised of seven (7) members, five (5) of whom represent creditors and whose fiduciary duties shall be as determined by applicable law.

- With respect to Jon Kramer: Jon Kramer shall be the Chief Executive Officer of Aftershock and President of RGTV, and entitled to a salary of $400,000 per annum, plus contingent annual bonuses if certain annual "Target(s)" as set forth in the Employment Agreement is/are reached.  Kramer could receive up to a 12.5% equity interest in the Reorganized Debtors, vesting in three (3) annual installments, as set forth more fully in the Employment Agreement.  After the ARC Note has been paid in full, Kramer could receive some or all of the equity interests that will be surrendered by Newco.

- With respect to Lee Kramer: Lee Kramer shall be the President of Aftershock, and entitled to a salary of $300,000 per annum, plus contingency annual bonuses if certain annual "Target(s)" as set forth in the Employment Agreement is/are reached.  Mr. Kramer could receive up to a 12.5% equity interest in Aftershock vesting in three (3) annual installments, as set forth more fully in the Employment Agreement.

### 5.8      Liquidity Event

Following the Effective Date, management of the Reorganized Debtors may solicit one or more transactions pursuant to which assets or equity of the Reorganized Debtors are sold, refinanced or otherwise disposed of which may result in funds to pay allowed creditor claims (a "Liquidity Event").  The board of directors of Newco shall be deemed to have approved any such Liquidity Event that yields sufficient proceeds to pay all remaining Allowed Claims in full pursuant to the Plan without the need for a vote; provided, however, that, to qualify for this pre-approval, the proposed transaction must have been approved by the CRO, whose approval may not be unreasonably withheld. After payment of all Allowed Claims in full from a Liquidity Event, ARC shall still be entitled to receive 10% of any remaining cash proceeds on account of its retained ownership interest in Newco. The remaining 90% of any cash proceeds from a Liquidity Event shall be distributed to the Kramers, or pursuant to their direction.

### 5.9      Retained Litigation Rights

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Reorganized Debtors shall retain all of the Debtors' retained Litigation Rights that the Debtors may hold against any Entity.  The Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Retained Litigation Rights.

The Retained Litigation Rights include, among other things, potential claims arising from or relating to the Avoidance Actions.  At this time, the payments have not been reviewed to determine whether any potential defenses exist with regard to the payments.  As such, the value of such claims cannot yet be estimated.

The Reorganized Debtors shall be permitted to hire and pay agents, professionals or advisors in connection with the investigation, pursuit, prosecution and settlement of the Retained Litigation Rights, including the Avoidance Actions, without further notice or order of the Bankruptcy Court.

### 5.10      Effectuating Documents; Further Transactions

Any appropriate officer of the Debtors or the Reorganized Debtors, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Any officer of the Debtors or the Reorganized Debtors, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

**5.11      Exemption From Certain Transfer Taxes**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or any other Entity in the United States pursuant to the Plan shall not be taxed under any law imposing a stamp tax or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan and to the vesting of the property of the Debtors' Estates in the Reorganized Debtors.

**5.12      Corporate Action**

On the Effective Date, all actions contemplated or necessary to implement the transactions described in the Plan shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the officers or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, the appropriate officers or directors of the Reorganized Debtors are authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations or consents except for express consents required under the Plan.

**5.13      Approval of Compromises and Settlements Embodied in Plan**

The terms of the Plan may represent compromises and settlements of certain issues.  To the extent necessary, the Plan is deemed to be a motion for approval of the compromises and settlements and the Confirmation Order shall contain findings supporting and conclusions approving the compromises and settlements as fair and equitable and within the bounds of reasonableness.

**5.14    Substantive Consolidation**

Upon the Plan Effective Date, the Estates shall be consolidated with each other.  For purposes of distributions under this Plan, all of the assets of the Estates shall be combined to form one pool from which all allowed claims shall be paid in accordance with the terms of this Plan.  As discussed above, the Plan Proponents believe that substantive consolidation of the Debtors' Estates is appropriate under the facts and circumstances of the Cases and the applicable legal authorities.  *See* Section VII, *supra*.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS**

**AND UNEXPIRED LEASES**

**6.1    Assumption of Contracts and Leases; Continuing Obligations**

A.    On the Effective Date, in addition to any executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Debtors listed on the Assumed Contract/Lease Schedule[23][24] are hereby deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, and as set forth herein.  The Debtors reserve the right to amend the Assumed Contract/Lease Schedule at any time prior to the Effective Date.  The Debtors shall provide notice of any amendments to the Amended Contract/Lease Schedules to the parties to the executory contracts and unexpired leases affected thereby.  It is currently the Debtors' intention to assume all of its executory contracts and unexpired leases on the Effective Date.

B.    To the extent applicable, all executory contracts or unexpired leases of the Debtors assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant

---

[23][24] The inclusion of any agreement on this Schedule does not constitute an admission that such agreement is, in fact, an "executory contract" subject to assumption or rejection, and, if necessary, the Plan Proponents reserve the right to seek a determination by the Bankruptcy Court of any disputes regarding the proper characterization of any particular contract or lease. Notwithstanding anything to the contrary herein, the Debtors will not assume any contracts that have expired or terminated by their terms since these contracts do not constitute executory contracts or unexpired leases.

executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

C.      Each executory contract and unexpired lease assumed pursuant to the Plan (or pursuant to a Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

D.      Unless expressly rejected, in the event that any license granted to the Debtors by a: (i) governmental unit or (ii) a producer or other licensor of content, intellectual property, or program, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtors, such license shall be deemed to be assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

E.      Continuing obligations of third parties to the Debtors under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing licenses to exploit Intellectual Property, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on, and enforceable by the Reorganized Debtors against, such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtors or by order of Bankruptcy Court.  The deemed rejection provided by Section 6.3 of the Plan shall not apply to any such continuing obligations.

**6.2      Cure Rights for Executory Contracts or Unexpired Leases Assumed under Plan**

**Any monetary Cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied: (a) on a deferred basis in**

accordance with the Plan's treatment provided to General Unsecured Claims in Class 4[24][25], (b) as due in the ordinary course of business; or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.** In the event of a dispute regarding: (i) the amount or timing and method of payment of any Cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (iii) any other matter pertaining to assumption, any monetary Cure payments shall be made following the entry of a Final Order resolving the dispute and approving the assumption. **The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the Cure amount listed by the Debtors for such party's contract or lease by the deadline established by the Court at the time of the Confirmation Hearing shall be deemed consent to such Cure amount**; <u>provided</u>, however, that prior to entry of a Final Order approving the assumption of an executory contract or unexpired lease, the Debtors shall be authorized to reject any executory contract or unexpired lease to the extent the Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by the Bankruptcy Court renders assumption of such executory contract or unexpired lease unfavorable to the Estates.

Section 365(b)(1)(A) requires, as a condition to assumption of an executory contract or unexpired lease, that the Debtors cure, or provide adequate assurance that they will promptly cure, any monetary defaults with respect to such agreements. The confirmation of the Plan requires counterparties to executory contracts and unexpired leases which the Debtors are proposing to assume, to accept the deferred payment of any cure amounts.[25][26] In the event the counterparties to executory contracts and/or unexpired leases do not consent to the manner in which defaults are to be

---

[24][25] See (Plan § 3.3(c)).

[25][26] The Bankruptcy Code further requires that the Debtors provide adequate assurance of their future performance under any assumed executory contract or unexpired lease. The Debtors shall take those steps that may be necessary to provide such adequate assurance of future performance to counterparties; however, if the Debtors are unable to obtain the consent of any counterparty to an executory contract or unexpired lease to the assumption of such agreement(s), the Debtors reserve the right to seek a determination by the Bankruptcy Court as to the adequacy of the assurances of future performance provided by the Debtors, or, alternatively, to reject any agreement that may be subject to disputes concerning cure and/or adequate assurance of future performance.

cured under the Plan, the Debtors reserve the right to reject such agreement(s).

### 6.3    Rejection of Contracts and Leases

Except as otherwise provided in the Plan (including Section 6.1(D) herein), or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected each of the executory contracts and unexpired leases listed on the Rejected Contract/Lease Schedule (that will be filed as part of the Plan Supplement) and any other prepetition executory contract and unexpired lease to which one or both of the Debtors is a party unless such contract or lease (i) is listed on the Assumed Contract/Lease Schedules as an agreement to be assumed by the Debtors as of the Effective Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or (iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by one or both of the Debtors on or before the Confirmation Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date.

### 6.4    Rejection Damage Claim Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be classified as a Class 4 General Unsecured Claim but shall be forever barred and shall not be enforceable against the Debtors unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after entry of the Confirmation Order.  The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim filed by the Bar Date, or shall be otherwise Allowed, and if not shall be barred and unenforceable unless otherwise ordered by the Bankruptcy Court.

### 6.5    Limited Extension of Time to Assume or Reject

A.    Notwithstanding anything set forth in Article VI of the Plan, and except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed

by the lessor), in the event of a dispute as to whether a contract is executory or a lease is unexpired, the Debtors' right to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of one or both of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

B.    Except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor) and provided that the counterparty to the executory contract or unexpired lease is served with the Plan, in the event the Debtors after the Confirmation Date identify the existence of an executory contract or unexpired lease that was not identified, the right of the Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such contract or lease. The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease unless a motion to assume or reject is not filed within such (30) day period.

### 6.6    Postpetition Contracts and Leases

The Debtors shall not be required to assume or reject any contract or lease entered into by the Debtors after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless the Debtors have obtained a Final Order of the Bankruptcy Court approving rejection of such contract and lease.  All royalty obligations coming due to licensors of Intellectual Property <u>from and after the Effective Date</u> shall be paid in the ordinary course of the Reorganized Debtors' business.[26][27]

---

[26][27] During the Case, certain licensors of Intellectual Property have contended that the amounts payable to them under the licenses that become payable after the Petition Date are entitled to be treated as Administrative Claims.  In at least one instance, the Bankruptcy Court denied a motion seeking to compel the Debtors to pay amounts due under certain license agreements as administrative expenses. *See Order Denying "Motion for Order Compelling Debtor to Assume or Reject Contract and Pay Administrative Expense Under 11 U.S.C. § 365* [Doc. No. 298].  Should any other licensor

**6.7       Claims Arising from Assumption or Rejection**

As noted above, all Allowed Claims relating to cure obligations arising from the assumption of any executory contract or unexpired lease (*e.g.*, the Allowed Claim of a producer for unpaid royalties under an executory acquisition agreement being assumed) shall be treated as Class 4 General Unsecured Claims pursuant to the Plan and paid in full with interest over time (instead of being paid in full on the Effective Date of the Plan) pursuant to Section 3.3c, above; all Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as Class 4 General Unsecured Claims pursuant to the Plan; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.  Whether a claim arises by virtue of either assumption or rejection of any executory contract or unexpired lease, under the Plan, any such claim would be paid in full with interest over time.

<u>**ARTICLE VII**</u>

**PROVISIONS GOVERNING DISTRIBUTIONS**

**7.1       Distributions to be Made Pursuant to the Plan**

Distributions to be made by the Reorganized Debtors on the Effective Date on account of any Claim shall be made on the Effective Date or as promptly thereafter as practicable.  Distributions to be made by the Disbursing Agent under the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole election of the Disbursing Agent.

Except as otherwise agreed to by the Disbursing Agent in writing, distributions to be made to holders of Allowed Claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtors' Schedules, as they may from time to time be amended in accordance with Rule 1009 of the Federal Rules of Bankruptcy Procedure, or, if a different address is stated in a Proof of Claim duly filed with the Court, to such address.  Nothing contained in the Plan shall require the Debtors, the Reorganized Debtors, or the Disbursing Agent to attempt to locate any

---

assert similar rights under an existing license agreement, the Debtors would oppose any such request for payment as an Administrative Claim.  In any event, all such Allowed claims are to be paid in full over time, plus interest as Class 4 General Unsecured Claims, under the Plan.

holder of an Allowed Claim.

Checks issued by the Reorganized Debtors or the Disbursing Agent to pay Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtors by the holder of the Allowed Claim to whom such check originally was issued, prior to the expiration of 120 days from the date of issuance of such check.  After such date, the Claim shall be deemed disallowed and the monies otherwise payable on account of such Claim shall revest in the Reorganized Debtors free and clear of all claims and interests.

The Disbursing Agent may request Forms W-9 or W-8BEN, as applicable, from Creditors as a prerequisite to making Distributions on account of Allowed Claims.  Any Creditor that fails to respond to a request by the Disbursing Agent for a Form W-9 or W-8BEN within thirty days shall be entitled to one follow-up notice by the Disbursing Agent.  If such Creditor fails to respond to the follow-up notice within thirty days, the Reorganized Debtors may deem such Creditor to have forfeited any right to a Distribution under this Plan and such Creditor's Claims shall be deemed disallowed and expunged from the claims register.

In connection with the Plan and any instruments issued in connection therewith, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

**7.2     Disbursing Agent**

The Reorganized Debtors may, but are not obligated to, retain and designate a third party as the Disbursing Agent to serve with or without bond for purposes of collecting all payments from the Reorganized Debtors and making all distributions provided for under the Plan to holders of Allowed Claims, with the fees and costs incurred by such Disbursing Agent to be deducted from the distributions payable to such holders of Allowed Claims.  If no third party is designated as Disbursing Agent, the Reorganized Debtors shall constitute the Disbursing Agent.

**7.3     Interest Pending Allowance of Claims**

Except as specifically provided for in the Plan, the Confirmation Order, or in some other order

of the Bankruptcy Court, interest shall not accrue on Claims and no holder of a Claim shall be entitled

to interest accruing on or after the Petition Date on any Claim.

To the extent the Debtors or any other party in interest object to the allowance of any Claim,

nothing in the Plan or herein shall be deemed to imply or create for the holders of any Disputed

Claims any entitlement to receive interest upon the Allowed amount of any such Disputed Claims as

a result, *inter alia*, of the delay in payment of such Claims, except as expressly stated in the treatment

pursuant to the Plan.

### 7.4     No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive

in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed

amount of such Claim.

### 7.5     Claims Register

The Debtors, the Reorganized Debtors, the CRO, the Disbursing Agent, and each of their

respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims

occurring after the Effective Date and shall be entitled instead to recognize and deal for all purposes

hereunder with only those record holders stated on the claims registers as of the close of business on

the Effective Date irrespective of the number of distributions to be made under the Plan to such

Entities or the date of such distributions.

### 7.6     Claim Amendments

Because the amount of royalty Claims placed in Class 4 are, in most instances, based upon

information received by Creditors in that Class from the Debtors, and since some of that information

is only provided following the end of certain quarters, it is possible that the amounts payable to

holders of Claims based on such royalties may change with time.  In the event that any Creditor who

timely filed a Proof of Claim against the Debtors, or either of them, has received information from

the Debtors that has changed the amount of the royalties payable to any such Creditor, such Creditors

shall have sixty (60) days following the Effective Date within which to file an amended Proof of

Claim to include (or deduct) any amount payable from the Debtors of which such Creditor was

unaware at the time of general bar date for filing Proofs of Claim.  Notwithstanding anything to the

1    contrary herein, if a creditor: (1) is able to reconcile its claim with the Debtors (and with the oversight

2    of the CRO); and (2) has received written confirmation from the Debtors of the agreed and reconciled

3    allowed claim amount, that creditor is not required to file an amended proof of claim on the Court's

4    claims registers for the Debtors' cases.

6    **ARTICLE VIII**

7    **PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED**

8    **CLAIMS AND**

9    **DISTRIBUTIONS WITH RESPECT THERETO**

10   **8.1        Objections to Claims**

11           A.          All objections to Claims must be filed and served on the holders of such Claims by

12   the Claims Objection Deadline.  If an objection has not been filed to a Proof of Claim or Request for

13   Payment by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled

14   Claim, or Request for Payment, relates shall be treated as an Allowed Claim if such Claim has not

15   been Allowed earlier.   The Debtors or Reorganized Debtors may, at any time, request that the

16   Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the

17   Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or

18   whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain

19   jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim,

20   including during the pendency of any appeal relating to any such objection.   In the event the

21   Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall

22   constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as

23   determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on

24   such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate

25   payment on such Claim.  All of the aforementioned Claims objection, estimation, and resolution

26   procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated

27   and thereafter resolved by any permitted mechanisms.

28           B.          After the Effective Date, the Reorganized Debtors or any other party in interest shall

have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims. The Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

C.     Nothing herein shall limit the contractual rights and obligations of any party with respect to any Claim, under (i) an assumed agreement or (ii) any non-executory agreement as to which such party has continuing obligations pursuant to Section 6.1(e) of the Plan or applicable law.

**8.2     Treatment of Disputed Claims Pending Allowance**

Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

Any distributions otherwise payable to a holder of a Disputed Class 4 General Unsecured Claim, based upon the amount that would hypothetically be payable to the holder of such Disputed Class 4 General Unsecured Claim if such Disputed Class 4 General Unsecured Claim were Allowed in full, shall be placed into a reserve account held by the Reorganized Debtors (the "Disputed Class 4 Claims Reserve"), pending entry of a Final Order by the Bankruptcy Court determining the Allowed amount, if any, of such Disputed Class 4 General Unsecured Claim.  Once the Allowed amount, if any, of a Disputed Class 4 General Unsecured Claim is determined by a Final Order of the Bankruptcy Court, any amounts set aside for that claim pursuant to the terms of the Plan shall be released from the Disputed Class 4 Claims Reserve and paid to the holder of such Allowed Claim on the same terms and conditions as are otherwise applicable to the treatment of Class 4 Claims under the Plan.  Any additional amount held in the Disputed Class 4 Claims Reserve on account of such Disputed Claim that is remaining in the Disputed Class 4 Claims Reserve after final resolution of such Disputed Class 4 General Unsecured Claim shall be removed from the Disputed Class 4 Claims Reserve and released to the Reorganized Debtors.[27][28]

---

[27][28] The Plan Proponents, or any of them, reserve the right to object to unclassified claims and claims in other classes under the Plan, and, pending the resolution of such objection(s), the holder of any claim subject to dispute shall only receive the distribution otherwise payable under the Plan to other similarly situated creditors when such disputed claim(s) is/are Allowed by Final Order.  Any payments that would otherwise by made to any of these creditors would be placed in a segregated account established in addition to the Disputed Class 4 Claims Reserve.

**8.3**        **Distributions on Account of Disputed Claims Once Allowed**

The Reorganized Debtors or the Disbursing Agent, as the case may be, shall, on the applicable distribution dates, make distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions shall be made pursuant to the provisions of the Plan governing the applicable Class. Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

<u>**ARTICLE IX**</u>

**CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**9.1**        **Conditions to Confirmation**

The following are conditions precedent to Confirmation, each of which must be satisfied or waived in accordance with Section 9.3 of the Plan:

A.        The Bankruptcy Court shall have entered the Confirmation Order confirming the Plan and approving the Disclosure Statement on a final basis; and

B.        The Confirmation Order shall have become a Final Order and not have been modified, amended or reversed.

C.        The Kramers shall have entered into Employment Agreements (to be filed with the Plan Supplement) conditioned upon the Effective Date occurring.

**9.2**        **Conditions to Effective Date**

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 9.3 of the Plan:

A.        All conditions to confirmation of the Plan shall remain satisfied or waived.

B.        Each order of the Bankruptcy Court referred to in Section 9.1 of the Plan shall have become a Final Order and not have been modified, amended or reversed.

C.        The New ARC Note, Kramer Guarantee, and Kramer Security Documents, each in form and substance acceptable to ARC in its sole discretion, shall have been executed and delivered to ARC.

D.        All of the initial members of the Board shall have been designated pursuant to

Article 5.7 above.

E.        All other documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan (not otherwise specified herein) shall be in form and substance reasonably acceptable to each of the Plan Proponents.

F.        The Debtors shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order.

G.        All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been executed and delivered, including, without limitation, the Employment Agreements, and all conditions precedent thereto (other than the occurrence of the Effective Date) shall have been satisfied or waived.

H.        All corporate and other proceedings to be taken by the Debtors in connection with the Plan and the consummation of the transactions contemplated thereby and by the Plan, and all documents incident thereto shall have been completed.

**9.3        Waiver of Conditions**

Notwithstanding anything contained herein to the contrary, the Plan Proponents shall have the exclusive right, in their sole discretion, to deem satisfied or waived any of the conditions set forth above in Section 9.2, other than the condition set forth in Section 9.2(C), which is nonwaivable.

**<u>ARTICLE X</u>**

**RETENTION OF JURISDICTION**

**10.1        Scope of Retention of Jurisdiction**

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.        allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan, including

the resolution of any Request for Payment of any Administrative Claim and the resolution of any

objections to the allowance or priority of Claims or Interests;

B.    hear and determine all applications for compensation and reimbursement of

expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and

1129(a)(4) of the Bankruptcy Code; *provided*, *however,* that from and after the Effective Date, the

payment of the fees and expenses of the retained Professionals of the Reorganized Debtors shall be

made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy

Court, but the Court shall retain jurisdiction to address any issues arising regarding the payment of

Professional fees;

C.    hear and determine all matters with respect to the assumption or rejection of any

executory contract or unexpired lease to which one or both of the Debtors is a party or with respect

to which the Debtors may be liable, including, if necessary, the nature or amount of any required Cure

or the liquidation or allowance of any Claims arising therefrom;

D.    effectuate performance of and payments under the provisions of the Plan;

E.    hear and determine any and all adversary proceedings, motions, applications, and

contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

F.    enter such orders as may be necessary or appropriate to execute, implement, or

consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements

or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation

Order;

G.    hear and determine any matters arising in connection with or relating to the Plan, the

Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other

agreement or document created in connection with the Plan, the Disclosure Statement, or the

Confirmation Order;

H.    hear and determine disputes arising in connection with the interpretation,

implementation, consummation, or enforcement of the Plan, including disputes arising under

agreements, documents, or instruments executed in connection with the Plan or distributions

thereunder;

1      I.      hear and determine whether an asserted, uncured nonmonetary default in connection

2    with the New ARC Note is material or has occurred before giving rise to ARC's remedies set forth

3    in Section 11.20 herein, *provided* that to the extent the Court declines to exercise jurisdiction over

4    any such determination or the parties involved, this reservation of jurisdiction shall not be exclusive

5    and the parties shall be deemed to have consented to the jurisdiction of the state and federal courts

6    located in California;

7      J.      enforce the terms of the New ARC Note, the Kramer Guarantee, and the Kramer

8    Security Documents and any related provisions of the Plan, *provided* that this reservation of

9    jurisdiction is not exclusive and ARC and the ARC Affiliate shall have the option to bring any such

10    dispute before the Court or in the state and federal courts located in California;

11      K.      issue injunctions, enter and implement other orders, or take such other actions as

12    may be necessary or appropriate to restrain interference by any entity with the implementation,

13    consummation, or enforcement of the Plan or the Confirmation Order;

14      L.      enter and implement such orders as may be necessary or appropriate if the

15    Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

16      M.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications,

17    and rulings entered in connection with the Chapter 11 Cases;

18      N.      except as otherwise limited herein, recover all assets of the Debtors and property of

19    the Estates, wherever located;

20      O.      hear and determine matters concerning state, local, and federal taxes in accordance

21    with Sections 346, 505, and 1146 of the Bankruptcy Code;

22      P.      hear and determine all disputes involving the existence, nature, or scope of the

23    discharge of the Debtors;

24      Q.      hear and determine such other matters as may be provided in the Confirmation Order

25    or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code, including,

26    without limitation, any disputes regarding the selection of an independent board member and/or CRO;

27    and

28      R.      enter one or more final decrees closing the Chapter 11 Cases.

**10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.1 of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1    Professional Fee Claims; Expense Reimbursements**

All final applications seeking allowance and payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and any Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such application(s) must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than fourteen (14) days (or such longer period as may be allowed by order of the Bankruptcy Court) prior to the hearing set by the Bankruptcy Court for consideration of such application(s). Debtors' bankruptcy counsel shall provide notice of deadlines for the filing of Professional Fee Claims, and of the hearing thereon.

**11.2    Administrative Claims Bar Date**

The Court previously set the Administrative Claims Bar Date in the Cases to be October 25, 2024, and notice of the Administrative Claims Bar Date was provided to all known creditors and parties in interest.  Any Entity (other than professionals employed at the expense of the Debtors' estate) that failed to timely file an administrative expense priority claim before October 25, 2024 may be precluded and barred from asserting a right to payment of that claim anytime thereafter. Notwithstanding anything to the contrary herein, the Administrative Claim Bar Date applies only to administrative priority claims that have: (1) accrued prior to October 25, 2024; or (2) with respect to producers that have entered into acquisition agreements with RGTV, been described in sales reports

that were issued prior to October 25, 2024.

### 11.3    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Reorganized Debtors when due. The obligation of the Reorganized Debtors to pay such fees shall continue only until the Chapter 11 Cases are closed, dismissed, or converted.

### 11.4    Modifications and Amendments

The Plan Proponents may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors or Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however,* that prior notice of such proceedings shall be served to the extent required by the Bankruptcy Rules or order of the Bankruptcy Court, *provided further* that with respect to technical amendments to exhibits to the Plan or Plan Supplement that do not have a material adverse impact on any Entity that has not consented thereto, no further proceedings shall be required but such amended exhibits shall be filed in the Chapter 11 Cases.

### 11.5    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted

in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.6    Successors and Assigns and Binding Effect**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such entity, including, but not limited to, the Reorganized Debtors and all other parties in interest in the Chapter 11 Cases and any subsequent bankruptcy involving the Debtors.

**11.7    Compromises and Settlements**

From and after the Effective Date, the Reorganized Debtors may compromise and settle various Claims against them and/or Retained Litigation Rights and other claims that it may have against other Entities without any further approval by the Bankruptcy Court.

**11.8    Releases and Satisfaction of Subordination Rights**

All Claims against the Debtors and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any alleged subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in the Plan. Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any alleged subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**11.9    Releases and Related Matters**

A.    <u>Releases</u>.

**AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH HOLDER OF ANY CLAIM THAT ~~VOTES~~ELECTS TO ~~ACCEPT~~OPT-IN TO THE ~~PLAN~~RELEASES ON THE BALLOT (EACH A "RELEASING PARTY") SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER, AGAINST THE**

DEBTORS ARISING FROM OR RELATED TO THE DEBTORS' PRE- AND/OR POST-PETITION ACTIONS, OMISSIONS OR LIABILITIES, EXCEPT FOR THOSE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES SET FORTH IN THIS PLAN.

FURTHER, AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION (INCLUDING BUT NOT LIMITED TO THE AGREEMENT BY ARC TO THE MODIFICATIONS TO ITS SECURED CLAIM CONTEMPLATED BY THIS PLAN AND ITS CONSENT TO THE DEBTORS' CONTINUED USE OF CASH COLLATERAL DURING THESE CHAPTER 11 CASES), THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE DEBTORS, THE COMMITTEES, AND EACH ~~HOLDER OF ANY CLAIM THAT VOTES TO ACCEPT THE PLAN AND, ON ITS BALLOT INDICATES ITS INTENT TO AGREE TO THE PROPOSED RELEASE DESCRIBED HEREIN,~~RELEASING PARTY SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER, AGAINST ARC ARISING FROM OR RELATED TO ARC'S PRE- AND/OR POST-PETITION ACTIONS, OMISSIONS OR LIABILITIES. ~~THE FAILURE OF ANY HOLDER OF A CLAIM TO CHOOSE WHETHER OR NOT TO AGREE TO THE RELEASE DESCRIBED HEREIN ON HIS, HER OR ITS BALLOT SHALL BE DEEMED TO HAVE AGREED TO THE RELEASE.~~ NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE PLAN AND THIS PROVISION DOES NOT RELEASE OR HAVE ANY IMPACT ON ANY POST-CONFIRMATION ACTIONS, OMISSIONS, OR LIABILITIES OF ARC BASED UPON FACTS AND CIRCUMSTANCES OCCURRING AFTER CONFIRMATION OF THE PLAN.

B.    Waiver of Statutory Limitations on Releases.

THE LAWS OF SOME STATES (FOR EXAMPLE, CALIFORNIA CIVIL CODE §1542) PROVIDE, IN WORDS OR SUBSTANCE, THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR

**SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER DECISION TO RELEASE.  THE RELEASING PARTIES IN EACH OF SECTIONS 11.9(aA) AND (bB) OF THE PLAN ARE DEEMED TO HAVE WAIVED ANY RIGHTS THEY MAY HAVE UNDER SUCH STATE LAWS AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.**

**11.10    Discharge of the Debtors**

A.    Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims; and upon the distribution of all payments required to be made under the Plan, except as otherwise provided herein or in the Confirmation Order, (i) the Debtors shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan, and (ii) all Old Debtors Interests shall be cancelled.  For the avoidance of doubt, the foregoing discharge shall not impact the Reorganized Debtors' obligations under this Plan, or the rights of any holder of a Claim under this Plan.

B.    As of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further Claims, debts, rights, causes of action, liabilities, or Interests relating to the Debtors based upon any act, omission, transaction, or other activity of any nature that occurred prior to the Confirmation Date related to the Debtors and/or their assets and properties.  For the avoidance of

doubt, nothing in this paragraph shall impact the Reorganized Debtors' obligations under this Plan, or the rights of any holder of a Claim under this Plan.

   C.   The discharge of the Debtors pursuant to the Plan is not intended to limit in any way the Debtors' insurance coverage or to deprive any third party of any rights to such coverage that may otherwise exist.

   **11.11**   **Injunction**

   A.   **EXCEPT AS PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD, MAY HOLD, OR ALLEGE THAT THEY HOLD, A CLAIM OR OTHER DEBT OR LIABILITY THAT IS DISCHARGED OR AN INTEREST OR OTHER RIGHT OF AN EQUITY SECURITY HOLDER THAT IS TERMINATED PURSUANT TO THE TERMS OF THE PLAN ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR RESPECTIVE PROPERTY ON ACCOUNT OF ANY SUCH DISCHARGED CLAIMS, DEBTS, OR LIABILITIES OR TERMINATED INTERESTS OR RIGHTS: (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER OR IN ANY PLACE ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE IN ANY MANNER OR IN ANY PLACE; OR (IV) COMMENCING OR CONTINUING ANY ACTION, IN EACH SUCH CASE IN ANY MANNER OR IN ANY PLACE OR AGAINST ANY ENTITY THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.**

   ~~B. AS OF THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD, OR MAY HOLD, A CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, OR LIABILITY THAT IS RELEASED PURSUANT TO SECTION 11.9 OF THE PLAN OR IS SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.12 OF THE PLAN ARE PERMANENTLY~~

ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF SUCH RELEASED CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES OR TERMINATED INTERESTS OR RIGHTS: (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER OR IN ANY PLACE ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE IN ANY MANNER OR IN ANY PLACE; OR (IV) COMMENCING OR CONTINUING ANY ACTION, IN EACH SUCH CASE IN ANY MANNER OR IN ANY PLACE OR AGAINST ANY ENTITY THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.

C. WITHOUT LIMITING THE EFFECT OF THE FOREGOING UPON ANY ENTITY, BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING DISTRIBUTIONS PURSUANT TO THE PLAN SHALL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN THIS SECTION 11.11.

**11.12    Exculpation and Limitation of Liability**

A.    EXCEPT AS PROVIDED HEREIN OR IN THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, NONE OF (I) THE DEBTORS, (II) THE REORGANIZED DEBTORSCOMMITTEES, (III) THE COMMITTEES, (IV) ARC AND (VIV) ANY OF THE RESPECTIVE CURRENT OR FORMER OWNERS, PARTNERS, MEMBERS,THEIR OFFICERS AND DIRECTORS, OFFICERS, ATTORNEYSOR RETAINED PROFESSIONALS OR STOCKHOLDERS OF ANY OF THE FOREGOING, SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR AN INTEREST, OR ANY OF THEIR RESPECTIVE MEMBERS, DIRECTORS, OFFICERS, ADVISORS, ATTORNEYS, PARTNERS, OR STOCKHOLDERS, OR ANY OF THEIR RESPECTIVE SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH,

RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, NEGOTIATION OR IMPLEMENTATION OF THE PLAN, THE SOLICITATION OF ACCEPTANCES OF THE PLAN, THE PURSUIT OF CONFIRMATION OF THE PLAN, OR THE CONFIRMATION OF THE PLAN, EXCEPT FOR ACTS OR OMISSIONS WHICH ARE THE RESULT OF FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, OR WILLFUL VIOLATION OF FEDERAL OR STATE SECURITIES LAWS OR THE INTERNAL REVENUE CODE (IN EACH CASE AS DETERMINED BY A FINAL ORDER), AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN *FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE*.  NOTWITHSTANDING THE ABOVE, NOTHING CONTAINED IN THE PLAN SHALL RELEASE ANYONE FROM ANY LIABILITY RELATING TO THE OBLIGATIONS CREATED BY THE PLAN OR AS TO ANY PROPERTY INCORRECTLY DISTRIBUTED UNDER THE PLAN. *NOTWITHSTANDING THE FOREGOING THE EXCULPATION SECTION OF THIS PLAN SHALL NOT: (I) APPLY TO ANY FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE OF ANY RELEASED PERSON; AND (II) PREVENT OR LIMIT THE ABILITY OF PARTIES TO PURSUE THEIR OWN PROFESSIONALS FOR PROFESSIONAL LIABILITY OR MALPRACTICE.  NOTHING SET FORTH HEREIN SHALL BE DEEMED TO BE A THIRD PARTY RELEASE OR A REQUEST TO APPROVE ANY THIRD PARTY RELEASE, INCLUDING, WITHOUT LIMITATION, ANY GUARANTIES ASSOCIATED WITH THE CLAIMS ASSERTED HEREIN.*

B.    NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN, ~~NO HOLDER OF A CLAIM OR AN INTEREST, NO OTHER PARTY IN INTEREST, NONE OF THEIR RESPECTIVE PARTNERS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, ATTORNEYS, PROFESSIONALS, AGENTS, STOCKHOLDERS, OR AFFILIATES, AND NONE OF THEIR RESPECTIVE SUCCESSORS OR ASSIGNS, SHALL HAVE ANY RIGHT OF ACTION AGAINST (I) THE DEBTORS, (II) THE REORGANIZED DEBTORS,~~

(III) THE COMMITTEES, (IV) ARC, OR (V) ANY OF THE RESPECTIVE CURRENT OR FORMER PARTNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, ATTORNEYS, PROFESSIONALS, AGENTS, STOCKHOLDERS, OR AFFILIATES OF THE FOREGOING (BUT SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH), FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, NEGOTIATION, OR IMPLEMENTATION OF THE PLAN, SOLICITATION OF ACCEPTANCES OF THE PLAN, THE PURSUIT OF CONFIRMATION OF THE PLAN, OR THE CONFIRMATION OF THE PLAN, EXCEPT FOR ACTS OR OMISSIONS WHICH ARE THE RESULT OF FRAUD, OR WILLFUL MISCONDUCT OR WILLFUL VIOLATION OF FEDERAL OR STATE SECURITIES LAWS OR THE INTERNAL REVENUE CODE (IN EACH CASE AS DETERMINED BY A FINAL ORDER).  NOTWITHSTANDING THE ABOVE, NOTHING CONTAINED IN THE PLAN SHALL RELEASE ANYONE FROM ANY LIABILITY RELATING TO THE OBLIGATIONS CREATED BY THE PLAN OR AS TO ANY PROPERTY INCORRECTLY DISTRIBUTED UNDER THE PLAN.THE RELEASES, INJUNCTIONS, AND EXCULPATION PROVISIONS OF THE PLAN DO NOT APPLY TO, OR HAVE ANY IMPACT ON THE LIABILITIES OR OBLIGATIONS OF NON-DEBTOR THIRD PARTIES IN CONNECTION WITH CONTRACTS AMONG SUCH NON-DEBTORS AND THE DEBTORS OR OTHER PARTIES OR WHICH IMPACT RIGHTS OF CREDITORS AND CONTRACTING PARTIES WITH THE DEBTORS.

**11.13    Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**11.14    Revocation, Withdrawal, or Non-Consummation**

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Plan Proponents revoke or

withdraw the Plan in its entirety, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**11.15    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

**11.16    Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of California shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each of the Debtors shall govern corporate governance matters with respect to such Debtors; in each case without giving effect to the principles of conflicts of law thereof.

**11.17    Agreement Regarding Bankruptcy Filing(s)**

No bankruptcy filing by the Reorganized Debtors shall be authorized unless approved by holders of not less than sixty-five percent (65%) of the membership or ownership interests, and the Confirmation Order shall include a provision directing this requirement.  No member or owner of the Reorganized Debtors shall be allowed to take steps, directly or indirectly, to file an involuntary bankruptcy petition against the Reorganized Debtors.  In the event of a bankruptcy filing by one or both of the Reorganized Debtors, whether voluntary or involuntary, the Reorganized Debtors

1  stipulate to a waiver of the automatic stay, which shall not apply to any creditor other than ARC.

2  **11.18    Post-Confirmation Status Report**

3  Within 120 days of the entry of the order confirming the Plan, the Debtors shall file a status

4  report with the Court explaining what progress has been made toward consummation of the confirmed

5  Plan. The status reports shall be served on the Office of the United States Trustee, the former

6  Committee members of both Debtors, any secured creditors and priority unsecured creditors entitled

7  to receive distributions under the Plan, and those parties who have requested special notice after the

8  Effective Date. Further status reports shall be filed every 120 days and served on the same entities.

9  **11.19    Post-Confirmation Conversion/Dismissal**

10  A creditor or party in interest may bring a motion to convert or dismiss the Chapter 11 Cases

11  under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan. If the Court

12  orders one or both of the Chapter 11 Cases converted to Chapter 7 after the Plan is confirmed, then

13  all property that had been property of Estates, and that has not been disbursed pursuant to the Plan,

14  will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property,

15  but only to the extent that the Court did not previously authorize relief from stay during the Chapter

16  11 Cases.

17  The order confirming the Plan may also be revoked under very limited circumstances. The

18  Court may revoke the order if the order of confirmation was procured by fraud and if the party in

19  interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the

20  Confirmation Order.

21  **11.20    ARC Remedies Upon Default Under The New ARC Note**

22  In the event that the Reorganized Debtors are in monetary default under the New ARC Note,

23  ARC shall provide written notice of the alleged default, and the Reorganized Debtors shall have ten

24  (10) business days from the date of the notice within which to cure any default. In the event the

25  Reorganized Debtors default in two (2) consecutive payment periods required under the New ARC

26  Note, and fail to cure both of the prior defaults within the cure period, ARC shall be entitled to

27  accelerate the New ARC Note and foreclose upon its collateral (as defined in the New ARC Note).

28  Alternatively, following the second uncured breach, ARC may elect to have all collateral on which it

has a first priority security interest, along with all cash held directly or indirectly by the Reorganized Debtors, transferred to ARC or its designee in consideration for a reduction of $7.5 million of the outstanding balance of the New ARC Note.

Following an uncured event of Default (as defined in the New ARC Note), to the extent ARC is entitled to, and does, exercise its remedies and either (1) continues the business of the Reorganized Debtors as a going concern, or (2) obtains a recovery on a disposition of the Reorganized Debtors' assets that exceeds the outstanding balance of the New ARC Note, ARC or its designee will either (a) in the event the business is operated, assume the obligations to creditors under and pursuant to the terms of the Plan, or (b) in the event the assets are monetized, pay any funds received in excess of the amount necessary to pay the outstanding balance of the New ARC Note and such additional costs and expenses incurred in connection with the continuation and/or change of control of the business, including all costs of sale, to the Reorganized Debtors solely for distribution to creditors holding Allowed Claims in accordance with the structure set forth in Section 3.1 herein (with respect to the distribution of Available Cash).  Any uncured non-monetary default under the New ARC Note must be material before giving rise to any remedies under this Plan in favor of ARC.[28][29]

---

[28][29] As set forth in Section 10.1 herein, the Court will retain jurisdiction to determine if any asserted default under the New ARC Note is material; *provided, however*, that if the Court declines to exercise jurisdiction over any dispute regarding an asserted default under the New ARC Note, the Debtors, the Reorganized Debtors, and ARC consent to the jurisdiction of the state and federal courts in California to hear and determine such dispute.

1

2    **11.21    Final Decree**

3    Once the Estates have been fully administered as referred to in Rule 3022 of the Federal Rules

4    of Bankruptcy Procedure, the Reorganized Debtors shall file motions with the Court to obtain a final

5    decree to close their Chapter 11 Cases.

   Dated:   ~~March 14~~April 7, 2025

6                                                      LEVENE, NEALE, BENDER, YOO

7                                                      & GOLUBCHIK L.L.P.

8                                        By:/s/ David L. Neale

9                                              DAVID L. NEALE
                                               JEFFREY S. KWONG

10                                             Attorneys for Chapter 11 Debtors and Debtors in
                                               Possession, Aftershock Comics, LLC and Rive

11                                             Gauche Television

12                                        SKLAR KIRSH, LLP

13                                        By:/s/ Robbin Itkin

14                                             ROBIN ITKIN
                                               Attorneys for the Official Committees of Unsecured

15                                             Creditors

16                                        LOWENSTEIN SANDLER LLP

17                                        By:/s/ Andrew Behlmann

18                                             ANDREW BEHLMANN
                                               Attorneys for Access Road Capital, LLC

19

20

21

22

23

24

25

26

27

28

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 4/7/2025 2:03:35 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2nd Amended Combined DS and Plan 3.14.25 v3 (clean).docx | |
| **Modified filename:** 2nd Amended Combined DS and Plan dated 4.7.25 (Clean) (NEW).docx | |
| **Changes:** | |
| Add | 105 |
| Delete | 102 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 207 |

# EXHIBIT "B"

| Creditor | Claim No. | Date Claim Filed | Secured | Priority | General Unsecured | Administrative | Schedule "E" Secured | Schedule "F" Priority | Schedule "F" Unsecured | Secured Amount | Priority Amount | Unsecured (Non-Insider) Amount | Unsecured (Insider) Amount | Admin | NOTES* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FILED CLAIM | | | FILED ADMIN | | SCHEDULED | | NON-OBJECTION FILED CLAIM REPLACING SCHEDULED CLAIM AMOUNT (See Notes) | | | | | |
| Access Road Capital LLC | 9 | 5/23/23 | $15,651,159.02 | | | | | | $16,736,928.00 | $12,000,000.00 | | | | | Agreed Plan Treatment |
| AMC Networks International Broadcasting | 5 | 5/15/23 | | | $353,489.00 | | | | $375,989.00 | | | $353,489.00 | | | Objection/Reclassification. Claim is for "wages, salaries, or commissions" for the post-petition period (and not for the period that is 180 days prior to the petition date in order to be entitled to priority under 11 U.S.C. § 507(a)(4)). Amount is included in $561,842 of post-petition administrative wage claims described in the Plan; amount asserted is less than what is reflected on Debtor's records ($50,237). Appears to include amounts asserted in Claim #20. |
| | 16 | 12/27/2023 | $15,150.00 | | $18,373.86 | | | | $0.00 | | | $0.00 | | | |
| Antonia M Llanos | 20 | 12/27/2023 | | | | $38,415.88 | | | | | | | | $38,415.88 | Objection/Reclassification. Claim is for "wages, salaries, or commissions" for the post-petition period (and not for the period that is 180 days prior to the petition date in order to be entitled to priority under 11 U.S.C. § 507(a)(4)). Amount is included in $561,842 of post-petition administrative wage claims described in the Plan; amount asserted is less than what is reflected on Debtor's records ($50,237). Appears to include amounts asserted in Claim #19. |
| Antonia M Llanos (Nov 2023-Dec 2023) | | 10/2/2024 | | | | | | | | | | | | | |
| California Employment Dev. Dept. | | | | | | $0.00 | | | | | $0.00 | | | | |
| Creative Differences | | | | | | | | | $441.00 | | | $441.00 | | | |
| Dinter, Inc. | | | | | | | | | $57,000.00 | | | $57,000.00 | | | |
| Discovery Networks Intl LLC | | | | | | | | | $67,500.00 | | | $67,500.00 | | | |
| | 7 | 6/5/23 | | | $608,936.50 | | | | | | | $608,936.50 | | | Object. (1) DWP filed an amended proof of claim asserting an unsecured claim in the amount of $608,936; (2) the Debtors' books and records show that DWP is owed less than half of the amended claim amount; and (3) the Debtors intend to file an objection to DWP's amended proof of claim unless the parties can agree on an appropriate allowed claim in favor of DWP. |
| Dog Whisperer Production | | | | | | | | | | | | | | | |
| Fairpoint Films, Inc. | | | | | | | | | $121,875.00 | | | $121,875.00 | | | |
| Franchise Tax Board | | | | | | | | $800.00 | | | $800.00 | | | | |
| Franchise Tax Board (Dec 2023-Dec 2024) | 23 | 10/21/2024 | | | $1,775.32 | | | | | | | | | $1,775.32 | |
| Indigo Films Entertainment Group | 8 | 5/23/23 | | | $0.00 | | | | $23,185.25 | | | $45,836.00 | | | Indigo's asserted amount. |
| Internal Revenue Service | 1 | 4/6/23 | | $200.00 | | | | | $1,365.00 | | $200.00 | $1,365.00 | | | |
| Invite, LLC | | | | | | | | | $100,728.36 | | | $100,728.36 | | | |
| Jon and/or Martha Kramer | | | | | | | | | | | | | | | |
| Jonathan Kramer | 25 | | | | | $105,072.00 | | | | | | | $100,728.36 | $105,072.00 | |
| Jupiter Entertainment, Inc. | 3 | 4/17/23 | | | Unknown | | | | $1,774,010.00 | | | $2,664,542.19 | | | Jupiter's asserted amount. |
| Laurie A. Carreira (11/1/23-12/14/23) | 21 | 10/4/2024 | | | | $32,479.86 | | | | | | | | $32,479.86 | Objection/Reclassification. Claim is for "wages, salaries, or commissions" for the post-petition period (and not for the period that is 180 days prior to the petition date in order to be entitled to priority under 11 U.S.C. § 507(a)(4)). Amount is included in $561,842 of post-petition administrative wage claims described in the Plan; amount asserted is different from what is reflected on Debtor's records ($30,697). Appears to include amounts asserted in Claim #15. |
| | 15 | 12/26/2024 | $15,150.00 | | $16,709.86 | | | | | | | $0.00 | | | Objection/Reclassification. Claim is for "wages, salaries, or commissions" for the post-petition period (and not for the period that is 180 days prior to the petition date in order to be entitled to priority under 11 U.S.C. § 507(a)(4)). Amount is included in $561,842 of post-petition administrative wage claims described in the Plan; amount asserted is different from what is reflected on Debtor's records ($30,697). Appears to include amounts asserted in Claim #21. |
| Laurie Carreira | | | | | | | | | | | | | | | |
| Lower Canada Productions Inc | 11 | 5/26/23 | | | $60,000.00 | | | | $60,000.00 | | | $60,000.00 | | | |
| | 4 | 5/2/23 | | | $277,309.16 | | | | $227,831.00 | | | $277,309.16 | | | M2's counsel confirmed that the administrative claim would be withdrawn. |
| M2 Pictures | | | | | | | | | | | | | | | |
| M2 Pictures, LLC | 24 | 10/21/2024 | | | $19,657.29 | | | | | | | | | $19,657.29 | Objection/Reclassification. Asserted priority claim under 11 U.S.C. § 507(a)(4) |
| | 19 | 10/1/2024 | $5,045.45 | | $9,346.66 | | | | | | | $14,392.11 | | | Claim included in $561,842 of post-petition administrative wage claims set forth in the Plan; amount asserted is more than what is reflected on Debtor's records ($74,643). Appears largely duplicative of Claim #22. |
| Madelyn Starr | | | | | | | | | | | | | | | |
| | 17 | 10/1/2024 | | | $79,169.66 | | | | | | | $0.00 | | | Claim included in $561,842 of post-petition administrative wage claims set forth in the Plan; amount asserted is more than what is reflected on Debtor's records ($74,643). Appears largely duplicative of Claim #17. |
| Marine Kaadzhikyan | 22 | 12/27/2023 | | | | | | | | | | | | | |
| | 22 | | | | | $74,642.19 | | | | | | | | $74,642.19 | |
| Marine Kaadzhikyan (Nov 2023-Dec 2023) | | 10/16/2024 | | | | | | | | | | | | | |
| Michael V. Bales, Esq. | | | | | | | | | $24,847.50 | | | $24,847.50 | | | |
| Moment For Justice Products Inc. | 12 | 5/26/23 | | | $37,037.04 | | | | $36,403.00 | | | $37,037.04 | | | |
| OTTera Inc. | | | | | | | | | $24,006.00 | | | $24,006.00 | | | |
| Prudential Insurance | | | | | | | | | $826.44 | | | $826.44 | | | |
| Robert Half Agency | 2 | 3/15/23 | | | $9,914.50 | | | | $9,282.50 | | | $9,914.50 | | | |
| Rose Snyder & Jacobs | | | | | | | | | $25,601.00 | | | $25,601.00 | | | |
| Santa Monica Video | 10 | 5/25/23 | $58,029.99 | | | | | | $46,042.46 | $58,029.99 | | | | | |
| Sauer & Wagner LLP | | | | | | | | | $71,255.82 | | | $71,255.82 | | | |
| Synoptek, LLC | | | | | | | | | $2,402.83 | | | $2,402.83 | | | |
| Synoptek, LLC | 18 | 5/22/2024 | | | $2,402.83 | | | | | | | $2,402.83 | | | |
| Tangram | 6 | 5/16/23 | | $6,551.00 | $35,171.00 | | | | $25,442.00 | | $6,551.00 | $35,171.00 | | | |
| TBS-CNN | 1314 (Unknown) | 5/30/23&5/30/23 | | | $ 756,442.00 | | | | $756,443.53 | | | | $ 756,442.00 | | |
| World Screen | | | | | | | | | $2,500.00 | | | $2,500.00 | | | |
| **Total** | | | | | | | | | | 12,064,580.99 | 1,000.00 | 5,265,092.92 | 100,728.36 | 272,042.54 | |
| | | | | | | | | | | Secured | Priority | General (Non-Insider) Unsecured | General (Insider) Unsecured | Admin (Asserted in Administrative Proofs of Claim)*** | |

**The Debtors are continuing to analyze claims scheduled and filed against their Estates, and may object to claims that do not have a notation in this column.

***The Debtors are in the process of reconciling certain Administrative Wage Claims, but all or a portion of these claims are included in the $516,842 amount set forth in the Plan.

RGTV Claims Chart

**EXHIBIT "C"**

| Foreign | Licensing Book Publishing | Planeta | Insexts | AV. Diagonal, 662-664 | | Barcelona | Spain | 08034 | see notes | License under Editorial Planeta, S.A. 5 years from publishing of the Book with option to renew |
|---------|---------------------------|---------|---------|-----------------------|---|-----------|-------|-------|-----------|----------------------------------------------------------------------------------------------|
| Foreign | Licensing Book Publishing | Planeta | Unholy Grail | AV. Diagonal, 662-664 | | Barcelona | Spain | 08034 | see notes | License under Editorial Planeta, S.A. 5 years from publishing of the Book with option to renew |
| Foreign | Licensing Book Publishing | Planeta | Pestilence | AV. Diagonal, 662-664 | | Barcelona | Spain | 08034 | see notes | License under Editorial Planeta, S.A. 5 years from publishing of the Book with option to renew |
| Foreign | Licensing Book Publishing | Planeta | Blood Blister | AV. Diagonal, 662-664 | | Barcelona | Spain | 08034 | see notes | License under Editorial Planeta, S.A. 5 years from publishing of the Book with option to renew |
| Foreign | Licensing Book Publishing | Planeta | Babyteeth | AV. Diagonal, 662-664 | | Barcelona | Spain | 08034 | see notes | License under Editorial Planeta, S.A. 5 years from publishing of the Book with option to renew |
| Foreign | Licensing Book Publishing | Planeta | Shock | AV. Diagonal, 662-664 | | Barcelona | Spain | 08034 | see notes | License under Editorial Planeta, S.A. 5 years from publishing of the Book with option to renew |
| Foreign | Licensing Book Publishing | Univers Poche | Walk Through Hell Vol 1 | 92 ave de France | | Paris | France | 75013 | see notes | License under Univers Poche. 5 years from publishing Translation with option to renew |
| Foreign | Licensing Book Publishing | Univers Poche | Walk Through Hell Vol 2 | 92 ave de France | | Paris | France | 75013 | see notes | License under Univers Poche. 5 years from publishing Translation with option to renew |
| Foreign | Licensing Book Publishing | Univers Poche | Undone by Blood | 92 ave de France | | Paris | France | 75013 | see notes | License under Univers Poche. 5 years from publishing Translation with option to renew |
| Foreign | Licensing Book Publishing | Univers Poche | Out of Body | 92 ave de France | | Paris | France | 75013 | see notes | License under Univers Poche. 5 years from publishing Translation with option to renew |
| Foreign | Licensing Book Publishing | Univers Poche | Seven Swords | 92 ave de France | | Paris | France | 75013 | see notes | License under Univers Poche. 5 years from publishing Translation with option to renew |
| Foreign | Licensing Book Publishing | Waverider | Babyteeth | 107, DSC Tower Dubai Studio City | | Dubai | United Arab Emirates | | see notes | License under Waverider Entertainment Limited. 5 years from initial publishing of the Book with option to renew |
| Foreign | Licensing Book Publishing | Waverider | Maniac of New York | 107, DSC Tower Dubai Studio City | | Dubai | United Arab Emirates | | see notes | License under Waverider Entertainment Limited. 5 years from initial publishing of the Book with option to renew |

| COMIC BOOK TITLE | TYPE OF CONTRACT | COUNTER-PARTY NAME | ADDRESS2 | | CITY | STATE | Country | ZIP | DATE CONTRACT EXPIRES | TYPE OF SERVICE/COMMENTS |
|------------------|------------------|--------------------|----------|---|------|-------|---------|-----|-----------------------|--------------------------|
| A Calculated Man | Option/Purchase | Hulu | Business Affairs | | Santa Monica | CA | US | 90404 | 3/20/2024 | |
| Chicken Devil | Short Form Package | Village Roadshow Entertainment | Business Affairs | Suite 200 | Los Angeles | CA | US | 90067 | 4/10/2024 | |
| Dark Red | Option/Purchase | Blumhouse TV | Business Affairs | | Los Angeles | CA | US | 90057 | 4/18/2023 | Exercised renewal Option. |
| Dead Day | Option & Rights Acquisition (as amended) | Universal Television | Business Affairs | 1440 / 16th Floor | Universal City | CA | US | 91608 | 12/22/2023 | Exercised renewal Option. |
| Jimmy's Bastards | Deal Memo | AMC TV Studios | Business Affairs | Ste 5050W | Santa Monica | CA | US | 90404 | 10/20/2023 | |
| Kaiju Score | Option & Rights Acquisition (as amended) | Columbia Pictures | Business Affairs | | Culver City | CA | US | 90232 | 7/7/2025 | |
| Man Who F'd Up Time | Option/Purchase | Netflix | Business Affairs | | Los Angeles | CA | US | 90028 | 7/11/2023 | |
| Mary Shelley Monster Hunter | Option Agreement | BBC Studios | Business Affairs | 101 Wood Lane | London | | UK | W12 7FA | 1/2/2023 | |
| Midnight Vista | Option/Purchase | ABC Signature, LLC | Business Affairs | | Burbank | CA | US | 91521 | 2024 | |
| Normals | Option Deal Memo | Werner Film Projects | Business Affairs | 145 Smith Street | Fitzroy | VIC | AUS | 3065 | 5/28/2024 | |
| Party & Prey | Short Form Option | Legendary Pictures | Business Affairs | Suite 1500 | Burbank | CA | US | 91505 | 4/7/2024 | |
| Replacer | Option/Purchase | ANMS Media Inc | Business Affairs | | Toronto | ON | CAN | M6G3J9 | 12/31/2021 | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled **NOTICE OF SUBMISSION OF REDLINES SHOWING CHANGES TO DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 7, 2025** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Jessica L Bagdanov     jbagdanov@bg.law, ecf@bg.law**
- **Keith Patrick Banner     kbanner@greenbergglusker.com, calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com**
- **Sara Chenetz     schenetz@perkinscoie.com, docketLA@perkinscoie.com;cmallahi@perkinscoie.com;jkulow@perkinscoie.com;chenetz-sara-perkins-coie-8670@ecf.pacerpro.com;rleibowitz@perkinscoie.com**
- **Russell Clementson     russell.clementson@usdoj.gov**
- **Alan W Forsley     alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com,andrea@flpllp.com**
- **Evelina Gentry     evelina.gentry@akerman.com, rob.diwa@akerman.com;reyko.delpino@akerman.com**
- **Tracy Green     tgreen@fennemorelaw.com, ecfbankruptcy@fennemorelaw.com**
- **Robbin L. Itkin     ritkin@sklarkirsh.com, mduran@sklarkirsh.com;KFRAZIER@SKLARKIRSH.COM**
- **Michael S Kogan     mkogan@koganlawfirm.com**
- **Jeffrey S Kwong     jsk@lnbyg.com, jsk@ecf.inforuptcy.com**
- **Aaron J Malo     amalo@sheppardmullin.com, abilly@sheppardmullin.com;mlinker@sheppardmullin.com**
- **Timothy McMahon     tmcmahon@sklarkirsh.com, mduran@sklarkirsh.com**
- **David L. Neale     dln@lnbyg.com**
- **Howard Steinberg     steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com**
- **United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**:
On **April 7, 2025,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Russell Clementson
Office of the United States Trustee
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 9001

U.S. Securities and Exchange Commission
444 S. Flower Street, Suite 90
Los Angeles, CA 90071

☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 7, 2025** I will serve the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
Honorable Martin Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342, Courtroom 303
Woodland Hills, CA 91367

**Served by Email:**
Access Road Capital, LLC
Andrew D. Behlmann ABehlmann@lowenstein.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 7, 2025 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**